BRIAN TRAINOR

April 30, 2021

Page 3

```
1              UNITED STATES DISTRICT COURT
2              EASTERN DISTRICT OF LOUISIANA
3
4    JERRY ROGERS, JR.            CIVIL ACTION NO. 20-517
5    Versus
6    RANDY SMITH, ETC., ET AL          Section (D)(3)
7
8
9
10
11            Deposition of BRIAN TRAINOR, taken on
12   Friday, April 30, 2021, 9:30 in the office of Milling
13   Benson Woodward, 68031 Capital Trace Row, Mandeville,
14   Louisiana 70471.
15
16
17
18
19
20
21
22
23
24
25
```

```
1              I N D E X
2                              PAGE
3    Title                      1
4    Appearances                2
5    Stipulation                4
6    Examination by Mr. Collings     5
7    Reporter's certificate     63
8
9              EXHIBIT INDEX
10   Exhibit 1   Notice of Deposition           9
11   Exhibit 2   August 26, 2019 letter         9
12   Exhibit 3   Privilege logs                15
13   Exhibit 4   Emails                        21
14   Exhibit 5   Affidavit for Arrest Warrant  44
15   Exhibit 6   Affidavit of Steven Gaudet    47
16   Exhibit 7   Plaintiff's Witness & Exhibit List  52
17   Exhibit 8   Plaintiff's Supplemental Responses  60
18
19
20
21
22
23
24
25
```

Page 2

```
1    APPEARANCES:
2    MILLING BENSON WOODWARD, LLP
     68031 Capital Trace Row
3    Mandeville, Louisiana 70471
     Phone: (985) 871-3924
4    Fax: (985) 871-6957
     Email: ccollings@millinglaw.com
5         BY:  CHADWICK COLLINGS, ESQUIRE
              Attorney for:  Defendants
6
7    MOST & ASSOCIATES
     201 Saint Charles Avenue, Suite 114 # 101
8    New Orleans, Louisiana 70170
     Phone: (504) 509-5023
9    Email: williammost@gmail.com
          BY:  WILLIAM MOST, ESQUIRE
10             Attorney for:  Plaintiff
11
12   Also present:
13   Keith Canizaro
     Jared Lunsford
14
15
16   REPORTED BY:
17   Belinda D. Vigueira
     Certified Court Reporter
18
19
20
21
22
23
24
25
```

Page 4

```
1              S T I P U L A T I O N
2
3         It is stipulated and agreed by and between
4    counsel that the deposition of Brian Trainor is
5    hereby being taken pursuant to Federal Rules of Civil
6    Procedure for all purposes in accordance with law;
7         That the formalities of filing, read and
8    sign, and certification are hereby waived;
9         That all objections, except those as to the
10   form of the question and/or responsiveness of the
11   answer, are hereby reserved until such time as this
12   deposition or any part thereof may be used in
13   evidence.
14         *  *  *  *  *  *  *  *  *
15         BELINDA D. VIGUEIRA, Certified Court
16   Reporter, in and for the State of Louisiana,
17   officiated in administering the oath to the witness.
18
19
20
21
22
23
24
25
```



**TORRES REPORTING & ASSOCIATES, INC.**

COURT REPORTING & LITIGATION SERVICES
www.torresreporting.com
1.866.982.6878 Toll Free

Baton Rouge, LA
225.751.0732
225.752.7308 FAX

New Orleans, LA
504.392.4791
504.392.4852 FAX

Page 5

1          BRIAN TRAINOR, AFTER FIRST BEING DULY SWORN
2    IN THE ABOVE-ENTITLED MATTER, DID TESTIFY ON HIS OATH
3    AS FOLLOWS:
4                    *     *     *
5                 EXAMINATION
6    BY MR. COLLINGS:
7        Q    All right.  Good morning, Brian.  Chadwick
8    Collings on behalf of the defendants in this matter,
9    Sheriff Randy Smith, Keith Canizaro, Danny Culpeper.
10            Could you please state your full name and
11   address for the record?
12       A    Yes.  Brian Frederick Trainor, 211 Evangeline
13   Drive, Mandeville, Louisiana 70471.
14       Q    All right.  I have asked to take your
15   deposition, Brian, because you were at one point and
16   maybe still, I guess you can tell me, counsel of record
17   for Jerry Rogers.  Are you familiar with Jerry?
18       A    I am, yes.  I represented him in St. Tammany
19   Parish.  Um, I don't believe -- I believe the case is
20   closed.  I guess I'm still on the record.  I didn't
21   withdraw, but I don't believe there's any open or
22   active case at this point.
23       Q    And you represented him only in the criminal
24   matter?
25       A    Correct.

Page 6

1        Q    All right.  Let's back up and go a little bit
2    into your relationship with Jerry.  Now, you worked for
3    the St. Tammany Parish Sheriff's Office what year to
4    what year?
5        A    I started in 2010.  I want to say
6    September 2010 until June 30 of '16.
7        Q    Were you at the Sheriff's Office while Jerry
8    was also there?  I know he was an employee at one
9    point.
10       A    I don't believe so.  I think he had -- I don't
11   believe so.  I think he left before I got there.
12       Q    How did you know Jerry Rogers?
13       A    I knew Jerry from my time as a prosecutor in
14   Saint Tammany from 2002 to 2010.  At that time I know
15   he had worked for the Sheriff's Office so I met him
16   during that period.
17       Q    Okay.  Were you friends with Jerry?
18       A    No, just acquaintances; professional
19   acquaintance.
20       Q    And how is it you came to represent him?
21       MR. MOST:
22            Objection.  Let me make an objection
23       here.  I'll note that the Fifth Circuit Court
24       of Appeal has said that depositions of
25       opposing counsel are disfavored generally and

Page 7

1    should be permitted in only limited
2    circumstances.  So we're going to object to
3    the question about how he came to represent
4    Jerry Rogers on the grounds of
5    attorney-client privilege.
6    BY MR. COLLINGS:
7        Q    Does this individual represent you?
8        A    My understanding he represents Mr. Rogers.
9        Q    All right.  So, you -- and you're not Jerry
10   Rogers, correct?
11       A    I'm not Jerry Rogers.
12       MR. MOST:
13            I note for the record that ownership of
14       the privilege, the attorney-client privilege
15       is generally recognized as privilege belongs
16       to the client.  The client has sole power to
17       waive it.  See In Re Seagate Tech.  That's
18       497 F3rd 1360.  And an attorney may assert
19       privilege on client's behalf.  That's Haines
20       v. Ligget Group.  So if you have a problem
21       with me invoking attorney-client privilege on
22       behalf of Jerry Rogers at this deposition,
23       let me know.
24       MR. COLLINGS:
25            Well, I would have appreciated some

Page 8

1    motion practice if you wanted to somehow
2    limit this witness's deposition.  There was
3    none.  You've been on notice of this
4    deposition for quite sometime and there's
5    been no notice from you or Mr. Trainor that
6    there was going to be any objection.
7    MR. MOST:
8            That's not correct.  The issue of
9       attorney-client privilege being invoked at
10      this deposition was raised to you.
11   MR. COLLINGS:
12            And I haven't asked him anything about
13      communication between he and his client,
14      former client.
15   MR. MOST:
16            You asked how he came to represent the
17      client which implicates communications
18      between client and attorney.
19   MR. COLLINGS:
20            I didn't ask him what his client said
21      to him or what he said to his former client.
22      I said how did you come to represent him.
23   BY MR. COLLINGS:
24       Q    Can you answer that question without disclosing
25   a communication between you and Jerry?



**TORRES  REPORTING & ASSOCIATES**, inc.

COURT REPORTING & LITIGATION SERVICES
www.torresreporting.com
1.866.982.6878 Toll Free

**Baton Rouge, LA**
225.751.0732
225.752.7308 FAX

**New Orleans, LA**
504.392.4791
504.392.4852 FAX

BRIAN TRAINOR

Page 9

1    A    No.
2    Q    All right.  When did you become Jerry's
3  attorney?
4    A    Um, August -- I'd say August of 2019.
5    Q    And was that subsequent to his arrest or before
6  his arrest?
7    A    Prior.
8    Q    Okay.  And what was your understanding of your
9  representation?
10        MR. COLLINGS:
11            I'm going to object on the basis of
12        attorney-client privilege and instruct the
13        witness not to answer that.
14  BY MR. COLLINGS:
15    Q    I'm going to hand you a copy of a letter that I
16  have that is dated August 26, 2019.  Can you tell me if
17  that is in fact your letter?
18    A    It is.
19        MR. COLLINGS:
20            All right.  We'll mark and attach as
21        Exhibit 1 the Notice of Deposition which you
22        have, correct?
23            So that will be Exhibit 1.
24  BY MR. COLLINGS:
25    Q    Take a quick second, if you would familiarize

Page 10

1  yourself again with that letter.
2    A    Okay.
3    Q    All right.  Do you remember this letter?
4    A    I do.
5    Q    This is your -- obviously, this is your letter
6  to Lieutenant Alvin Hotard, correct?
7    A    Correct.
8    Q    And you wrote it and you signed it, correct?
9    A    I did.  Yes.
10    Q    And you wrote it with your client's consent?
11        MR. MOST:
12            I object on the basis that it calls for
13        privileged attorney-client communications.
14  BY MR. COLLINGS:
15    Q    It says you wrote it on his behalf, is that
16  true, or did you just decide to write this on your own?
17        MR. MOST:
18            Do you want to ask him what it says
19        because if you're asking him about his
20        communications between him and his client I'm
21        going to continue to object on the basis of
22        attorney-client communication.
23  BY MR. COLLINGS:
24    Q    "Please allow this correspondence on behalf of
25  my client, Jerry Rogers, to serve as the response to

Page 11

1  the recent inquiry into information that the St.
2  Tammany Parish Sheriff's Office believes was released
3  by a member of the agency."  Period, close quote.  You
4  remember that statement?
5    A    I can read it.  Yes, I remember it.
6    Q    Okay.  Now, is that statement accurate?
7    A    It's -- I mean the statement is what it is.
8    Q    "On behalf of my client, Jerry Rogers."  You're
9  writing letter on behalf of Jerry Rogers, correct?
10    A    In my capacity as his attorney this is a
11  letter I wrote on behalf of my client.
12    Q    Okay.  So that was accurate?
13    A    Yes.
14    Q    All right.  Next paragraph.  "Mr. Rogers is a
15  staunch supporter of law enforcement and is himself a
16  fellow law enforcement officer with a stellar record.
17  Like all law enforcement professionals he wants nothing
18  more than to see the guilty party or parties held
19  responsible for the homicide of Ms. Nanette Krentel
20  provided the evidence establishes that this matter was
21  indeed a homicide as indicated by Dr. Charles Preston,
22  coroner for St. Tammany Parish."  Is that an accurate
23  representation of a statement on behalf of Jerry
24  Rogers?
25    A    It is a accurate reading of what the letter

Page 12

1  says and I believe it's accurate.
2    Q    All right.  Well, is these your -- are these
3  your beliefs or are these Jerry Rogers' beliefs that
4  you're conveying?
5        MR. MOST:
6            Object.  You're asking for his
7        communications about Jerry Rogers' belief to
8        his attorney, and we're going to object on
9        the basis of attorney-client privilege.
10        MR. COLLINGS:
11            I can read this entire letter into the
12        record and ask you line by line, word for
13        word.  Can you read this letter and tell me
14        where in this letter are there your thoughts,
15        not Mr. Rogers' thoughts?
16        MR. MOST:
17            Objection.  Calls for --
18        MR. COLLINGS:
19            No, no.
20        MR. MOST:
21            Asking him to distinguish --
22        MR. COLLINGS:
23            I'm asking about his thoughts.  Where
24        are his thoughts?
25  BY MR. COLLINGS:


**TORRES REPORTING & ASSOCIATES, INC.**
COURT REPORTING & LITIGATION SERVICES
www.torresreporting.com
1.866.982.6878 Toll Free

Baton Rouge, LA
225.751.0732
225.752.7308 FAX

New Orleans, LA
504.392.4791
504.392.4852 FAX

BRIAN TRAINOR

Page 13

1   Q   Something that is unique to you, has nothing to
2   do with Jerry Rogers.  Because the letter says it's on
3   behalf of Jerry.  I want to know where in this it
4   deviates from Jerry and it's your words.
5           MR. MOST:
6               Objection.  Calls for attorney-client
7           privileged communication and instruct the
8           deponent not to answer.
9           MR. COLLINGS:
10              All right.  We're going to reserve our
11          right to bring you back I'm afraid because I
12          think that this is really nonsensical.
13          BY MR. COLLINGS:
14   Q   I'm asking you what is in this letter that is
15   your thoughts alone.  Something that you did, not on
16   behalf of Jerry, but on your behalf.
17          MR. MOST:
18              And that's not a question.
19          BY MR. COLLINGS:
20   Q   Can you answer that?  Can you tell me, is there
21   one word, one sentence, anything in here that's yours?
22          MR. MOST:
23              Objection.  Calls for attorney-client
24          privileged communications and instruct the
25          deponent not to answer.

Page 14

1               What's the point of this, Chad?
2           MR. COLLINGS:
3               Unfortunately, counsel, I don't answer
4           your questions.
5           BY MR. COLLINGS:
6    Q   All right.  We're going to reserve our right to
7    bring you back and ask you about this letter because,
8    apparently, Mr. Rogers and his attorney won't allow you
9    to answer those questions.  We'll get some guidance
10   from the Court.  Moving on.
11              I'm going to show you a copy of what was
12   provided to me as a privilege log by the plaintiff
13   through his counsel who is sitting to your left.  I
14   want to direct your attention to the fourth item on
15   here.
16          MR. MOST:
17              Do you have a copy for us as well?
18          MR. COLLINGS:
19              It's your own document, so no.  I
20          assume you have copies of your own privilege
21          logs.
22          BY MR. COLLINGS:
23   Q   Have you ever seen that document before?
24   A   This document?
25   Q   Yes.

Page 15

1    A   No.
2           MR. COLLINGS:
3               All right.  For the record we're going
4           to attach this as Exhibit 3.
5           BY MR. COLLINGS:
6    Q   All right.  Take a look at the fourth
7    recording.  So you've got four recordings, the fourth
8    one down.  It's dated -- it says, recording William
9    Most, Law Offices of William Most.  Date 10/13/2020.
10   Call with Steve Gaudet.  Attorney interview with Steve
11   Gaudet.  I'm sorry I'm reading that -- I'm at the wrong
12   one.  It's the second recording.
13          MR. MOST:
14              Number 2.
15          BY MR. COLLINGS:
16   Q   Yes.  My apologies.  Recording Jerry Rogers,
17   Jr.  Law office of William Most.  Dated 1/24/2019.
18   Title of document, Steve Gaudet Recording.  Attorney
19   Brian Trainor's discussion of legal strategy with
20   client, Jerry Rogers, prior to Steve Gaudet signing
21   affidavit, attorney-client.
22              All right.  First question.  You've never seen
23   this document before, correct?
24   A   Have not.  Correct.
25   Q   Were you aware that there was a recording of

Page 16

1    this conversation that apparently happened between you,
2    Steve Gaudet and Jerry Rogers?
3    A   On this January 24th date?
4    Q   Right.
5    A   No.
6    Q   So, that wasn't a recording that you knew about
7    or had any role in creating, correct?
8    A   Correct.
9    Q   All right.  And have you ever heard that
10   recording?
11   A   I have not.
12   Q   Were you part of making any other recordings in
13   relation to Jerry Rogers in your representation of him?
14   A   No.  I did not record anything.
15   Q   Have you heard any other recordings?  There are
16   several listed here.  Have any of these been shared
17   with you?
18   A   I have not heard any of these.
19   Q   When did you first learn that there was a
20   recording made of your conversation between you, Steve
21   and Jerry?
22   A   I don't remember if it was in our telephone
23   conversation or -- I think that was it.  I think when
24   we talked about the deposition was the first time I
25   was made aware there maybe a recording of me, Jerry



TORRES REPORTING & ASSOCIATES, INC.

COURT REPORTING & LITIGATION SERVICES
www.torresreporting.com
1.866.982.6878 Toll Free

Baton Rouge, LA
225.751.0732
225.752.7308 FAX

New Orleans, LA
504.392.4791
504.392.4852 FAX

BRIAN TRAINOR

Page 17

1  and Steve Gaudet.

2      Q   All right.  And just for the record, that was a

3  conversation you and I had, approximately, three or

4  four weeks ago when we scheduled this deposition?

5      A   That's correct.  Yeah.  Maybe a month ago.

6  Right.  About a month ago.

7      Q   Were you surprised to learn that your client

8  was recording you without your knowledge?

9      A   Uh, yeah.

10     Q   Is that unusual?

11     A   I can't say that I've never been recorded I

12  guess, but, um, I would say it's unusual.  I don't

13  think everybody does it, but I guess they have the

14  right to.

15     Q   And Jerry never shared that with you?

16         MR. MOST:

17             Objection.  Calls for privileged

18         attorney-client communications.

19  BY MR. COLLINGS:

20     Q   Did Jerry ever provide you with a copy of this

21  recording?

22         MR. MOST:

23             Objection.  Calls for attorney-client

24         communications.  Instruct the client -- the

25         deponent not to answer.

Page 18

1  BY MR. COLLINGS:

2      Q   Did you ever listen to the recording of this

3  conversation?

4      A   I have not.

5      Q   Was that recording ever provided to you?

6      A   Um, I think this --

7          Well, I don't know if it was the same one.  I

8  think it was sent, um, but subject to the objection I

9  don't know if I need to answer that or not.

10         MR. MOST:

11             If it has anything to do with your

12         client, I'll suggest that you not answer the

13         question.

14         THE WITNESS:

15             All right.

16  BY MR. COLLINGS:

17     Q   Were you ever provided with any recordings in

18  this matter, audio recordings or video recordings if

19  they exist?

20     A   No video, but again, subject to the same

21  objection.

22         MR. MOST:

23             Do you want to ask the question in a

24         way that doesn't implicate an attorney-client

25         communication.

Page 19

1  BY MR. COLLINGS:

2      Q   I don't think it is.  I'm not asking him who

3  told him what, what he and his client talked about.

4  I'm asking if he's ever been provided any audio

5  recording, period.  That's a yes or no.  That is not an

6  attorney-client communication.

7          MR. MOST:

8              To the extent that it calls for

9          attorney-client communications we're going to

10         instruct him not to answer.  You can ask has

11         it been provided by anyone other than his

12         client, might be a way of avoiding that

13         problem.

14  BY MR. COLLINGS:

15     Q   Were you provided with any audio recordings;

16  yes or no?

17         MR. MOST:

18             Objection.  Calls for attorney-client

19         communications and instruct the deponent not

20         to answer.

21  BY MR. COLLINGS:

22     Q   Have you listened to any audio recordings in

23  this matter?

24     A   I have not.

25     Q   All right.  So, you haven't listened to any and

Page 20

1  you're not going to answer whether or not any were

2  provided to you?

3      A   I'm not.

4      Q   Okay.  But you're certain you've not listened

5  to any recordings made by anyone in this matter,

6  correct?

7      A   Correct.

8      Q   All right.  Has anyone other than Jerry Rogers

9  provided you with any audio recordings?

10     A   No.

11     Q   Are you aware of any other recordings other

12  than what's identified on this sheet in front of you?

13     A   No.  I'm not aware of any other recordings.

14  I'm not even aware that all these exist, quite

15  frankly, but no.

16     Q   Okay.  What was the charge that you represented

17  Jerry for?

18     A   Um, criminal defamation.

19     Q   What is your understanding of criminal

20  defamation?

21         MR. MOST:

22             Objection.  Calls for a legal

23         conclusion.

24  BY MR. COLLINGS:

25     Q   You can answer.



**TORRES  REPORTING & ASSOCIATES, INC.**

COURT REPORTING & LITIGATION SERVICES
www.torresreporting.com
1.866.982.6878 Toll Free

**Baton Rouge, LA**
225.751.0732
225.752.7308 FAX

**New Orleans, LA**
504.392.4791
504.392.4852 FAX

BRIAN TRAINOR

Page 21

1    A    Um, it's -- whatever the statute -- I don't
2  recall the verbatim reading of the statute, but, um --
3  I'd have to read the statute.  I don't recall going
4  back to 2019.  I knew it at the time but I don't
5  recall it verbatim now.
6    Q    Were you ever provided with the copy of the
7  emails from Jerry Rogers to the family of Nanette
8  Krentel?
9    A    Yes.
10   Q    You've seen those?
11   A    I have, yes.
12   Q    So, for the record I've just handed the witness
13 a number of emails.
14       MR. COLLINGS:
15           I'd like you to attach those, Madam
16       Court Reporter, in globo as Exhibit 4.
17 BY MR. COLLINGS:
18   Q    You've seen these before?
19   A    I have.
20   Q    Do you know if any of these emails were sent
21 from a U.S. Government IP address?
22   A    I do not.
23   Q    Do you know who the email address
24 justicenanette@yahoo.com.  Do you know whose email
25 address that is?

Page 22

1    A    Yes.
2    Q    Whose email address is that?
3    A    Well, according to the discovery it was
4  Mr. Rogers.
5    Q    Okay.  Do you know why there is no
6  identification of Jerry Rogers in any of these emails?
7       MR. MOST:
8           Objection.  Calls for privileged
9       attorney-client communications, and instruct
10      the deponent not to answer.
11 BY MR. COLLINGS:
12   Q    Look through 'em and tell me if you see any
13 email where it says, "I am Jerry Rogers."  See if --
14 tell me if you see that anywhere in any of these
15 emails?
16   A    No, I don't recall seeing that anywhere.
17   Q    All right.  And do you know who
18 watsonk07@hotmail.com.  Do you know whose email address
19 that is?
20   A    I believe it's Kim Watson.
21   Q    And who is Kim Watson to your knowledge?
22   A    She's Nanette Krentel's sister.
23   Q    All right.  So, justice for Nanette -- or
24 justicenanette@yahoo.com was sending emails which we
25 now know is Jerry Rogers to the victim's sister,

Page 23

1  correct?
2       MR. MOST:
3           Objection.  Assumes facts not in
4       evidence.
5  BY MR. COLLINGS:
6    Q    You can answer.
7    A    That's what this purports to show.
8    Q    Do you have any idea why that occurred?
9       MR. MOST:
10          Objection.  Calls for attorney-client
11      privileged communications and going to
12      instruct the witness not to answer.
13 BY MR. COLLINGS:
14   Q    I'm not asking you the substance of the
15 communication, I'm just asking if you know why it
16 happened?  Yes or no?
17   A    No.
18   Q    When you read the first email, which starts on
19 page 5 of the documents in front of you.  See that?
20   A    I do.
21   Q    All right.  That looks to be the first of this
22 string of emails.  Would you agree with that?
23   A    Um, I don't -- I would assume, but if you tell
24 me it is, it is.  I don't have any reason to doubt
25 you, but I didn't look through the chronological order

Page 24

1  of these emails.
2    Q    If you look at the bottom of page 4, it's dated
3  Friday December 29, 2017, 8:37 A.M.?
4    A    Okay.
5    Q    Justicenanette wrote?
6    A    Got ya.
7    Q    And then it goes from there.  And it doesn't
8  appear any other emails below that one.
9    A    Okay.
10   Q    And then it looks like Mr. Rogers sent a
11 followup email on January 10 saying, "Just wanted to
12 ensure that you got the below information."  Period.
13 You see that?  That's page 4.
14   A    Oh, January 12th here?
15   Q    January 10th.  So --
16   A    Oh, that's fine.  Yeah.
17   Q    So December 29 he sends --
18   A    Yeah.  Going up.
19   Q    Sends her an email and then on the 10th, so
20 that's 12 days later I suppose.  He wants to make sure
21 she got it.  You see that?
22   A    Yes.
23   Q    And so he's sending it to this lady who,
24 apparently, works at the District Attorney's Office up
25 in Nebraska.  See that?



**TORRES  REPORTING & ASSOCIATES, INC.**

COURT REPORTING & LITIGATION SERVICES
www.torresreporting.com
1.866.982.6878 Toll Free

**Baton Rouge, LA**
225.751.0732
225.752.7308 FAX

**New Orleans, LA**
504.392.4791
504.392.4852 FAX

BRIAN TRAINOR

Page 25

1      A   Yes.
2      Q   All right.  Do you know -- when we start
3  reading through this email -- let's go to the bottom of
4  that page 5.  Second to last paragraph.  "As I
5  understand the fire investigators were out of town
6  (school) when the fire occurred," open paren, "(how
7  convenient!)"  Exclamation point, close paren.  "Fire
8  inspectors were sent to the scene.  One may ask why was
9  ATF not notified and sent to the scene?"  Question
10  mark.  "Fire district should have policy in place about
11  investigating, quote, "their own", close quote."
12  Period."  Do you see that?
13     A   I do.
14     Q   All right.  Do you have any idea if any of
15  these statements are accurate?
16     A   No, no idea.
17     Q   Next paragraph.  "ATF should have been notified
18  immediately!"  Exclamation point.  "As I understand the
19  fire inspector resigned when told to investigate.  He
20  knew it was way above his training and expertise.
21  Period."  Do you know if that's accurate?
22         MR. MOST:
23             Hold on.  We're going to object on the
24         basis it calls for attorney-client
25         communication because you're asking about --

Page 26

1         client's lawyer about whether his client --
2         the lawyer's client's statements are true or
3         false.  It necessarily implicates privileged
4         communications between the attorney and the
5         client.
6         MR. COLLINGS:
7             I'm asking him if he personally knows
8         whether these statements are true or not.
9         MR. MOST:
10             Well, you're asking about his client's
11         statements which Mr. Trainor's knowledge of
12         whether they are true or false may be
13         informed by his client telling him whether
14         they're true or false.  So you're asking a
15         lawyer about his client's statements.  The
16         truth or falsity of them necessarily
17         implicates attorney-client privileged
18         communications.  Instruct the deponent not to
19         answer on that basis.
20         MR. COLLINGS:
21             Okay.  We'll reserve our right to bring
22         you back and explore this again.
23  BY MR. COLLINGS:
24     Q   All right, next page.  Page 6.  First full
25  paragraph.  Dave Morel.  Let's just start with Dave

Page 27

1  Morel.  Do you know Dave Morel?
2      A   I do or did.
3      Q   Dave Morel's deceased, correct?
4      A   Correct.
5      Q   You knew him in what capacity?
6      A   Um, both professionally and socially.
7      Q   All right.  And are you familiar with any of
8  the complaints that are noted here in this paragraph
9  about him?
10     A   No.  I know -- I knew he had an ownership
11  interest in The Alibi Bar in New Orleans just from
12  knowing him, but.
13     Q   Have you ever been to The Alibi Bar.
14     A   I have.
15     Q   Did you ever see Dave in The Alibi Bar?
16     A   Uh, I probably -- maybe once.  Maybe twice.
17     Q   Did you ever see the sheriff and his wife in
18  The Alibi Bar when you were there?
19     A   No.  We didn't socialize.
20     Q   Do you know anything about Dave Morel's
21  marriage?
22     A   No.  I mean, I remember there may have been a
23  domestic incident but I don't know that to be
24  100 percent.  I heard that through the grapevine, but
25  I don't even know if that was ever investigated quite

Page 28

1  frankly.
2      Q   All right.  There's an allegation here in
3  paragraph 3, "may have been a covered up."  You see that?
4  Quote, unquote.  "May have been covered up."  Talking
5  about shooting up his home.
6      A   Oh.  Um.  I see the allegation.  I don't know
7  anything about that though.
8      Q   You were at one time the chief deputy at the
9  Sheriff's Office, correct?
10     A   Correct.
11     Q   And before that you were a district attorney
12  with the 22nd JDC District Attorney's Office, correct?
13     A   Correct.
14     Q   Do you know, have any knowledge, about any
15  coverup of anything regarding Dave Morel?
16     A   No, I don't have any knowledge of any incident
17  either.
18     Q   And were you part of any coverup of anything
19  regarding Dave Morel?
20     A   Was not.
21     Q   Do you know Tommy Morris?
22     A   I do through Sheriff's Office, yeah.
23     Q   And what do you know about Tommy Morris?
24     A   I knew -- when I was prosecutor I think we
25  used Tommy a lot to do fingerprint analysis if I


TORRES REPORTING & ASSOCIATES, INC.
COURT REPORTING & LITIGATION SERVICES
www.torresreporting.com
1.866.982.6878 Toll Free

Baton Rouge, LA
225.751.0732
225.752.7308 FAX

New Orleans, LA
504.392.4791
504.392.4852 FAX

Page 29

1  remember right from the crime lab.  If we had a
2  multiple bill and we had to prove that this defendant
3  is the same defendant that was convicted previously,
4  we would call Tommy and he would do a fingerprint
5  analysis to connect the dots.  That's about the extent
6  of my work with him.
7       Q   All right.  Do you know anything about whether
8  or not Tommy was the only certified deputy to work the
9  IBIS machine?
10      A   Uh, I would have no idea.  That was -- I'm
11 assuming this was after 2016.  I have no knowledge of
12 any inner workings of the Sheriff's Office after that.
13      Q   And do you know anything about the FBI/ATF
14 taking away the IBIS machine from the Saint Tammany
15 Parish Sheriff's Office?
16      A   No idea.
17      Q   Do you know anything about two deputies, one or
18 two deputies being sent to school to become certified
19 after Nanette was found to be deceased?
20      A   No idea.
21      Q   What about a polygraph examination?  Are you
22 familiar with any polygraph investigations of anyone
23 connected to the Nanette Krentel murder?
24      A   Personally, I'm not other than watching the
25 interviews of Lance Vitter.  I believe he mentioned

Page 30

1  that he had given a polygraph.  I've never seen them,
2  though.  I don't know if they were done or not.  I
3  don't doubt him.  If he said he did 'em, I'm sure he
4  did 'em.
5       Q   Do you know Lance Vitter?
6       A   I do.
7       Q   How do you know Lance?
8       A   Just from my time at the Sheriff's Office and
9  the D.A.'s Office before that.
10      Q   Do you know Dr. Difatta?
11      A   I do.
12      Q   How do you know Dr. Difatta?
13      A   Again, through my time with the District
14 Attorney's Office here.  He was the forensic
15 pathologist for the coroner's office under Dr. Galvin
16 and then also under current coroner, Dr. -- I just
17 drew a blank on his name.  Um, whoever the current
18 coroner is.  It will come to me.
19      Q   Preston?
20      A   Charles Preston.  Yeah.
21      Q   Do you know if Dr. Difatta and Lance Vitter
22 are, quote, "very close", close quote?
23      A   I have no idea.
24      Q   Do you know of any "big disagreement", quote,
25 unquote, between Dr. Difatta and Preston on Nanette's

Page 31

1  death?
2       A   I have no idea.
3       Q   Do you know who the major crime commander was
4  at the time of Nanette Krentel's death?
5       A   I do not.  No.
6       Q   Do you know who the "stone cold rookie" close
7  quote, as the lead investigator was on that case?
8       A   Are you asking me did I learn who the lead
9  was?
10      Q   Yes.
11      A   I believe it was Danny Buckner.
12      Q   All right.  Are you familiar with Detective
13 Buckner?
14      A   Yes.
15      Q   You know him?
16      A   I know him through Sheriff's Office contacts,
17 yeah, when I worked there.
18      Q   Did you know that he was a certified homicide
19 investigator?
20      A   No.
21      Q   Did you know that he worked a number of other
22 homicides at the St. Tammany Parish Sheriff's Office?
23      A   Um, no.
24      Q   Both as the lead and as an assistant detective.
25      A   No, I don't recall.  I mean, I'm not saying he

Page 32

1  didn't, but I don't have any knowledge of that.
2       Q   Assume what I just told you is true, would it
3  be safe to say then that he was not in fact a stone
4  cold rookie?
5           MR. MOST:
6               Objection.  Calls for opinion.
7       A   Um, depending on the definition of stone cold
8  rookie.  I don't know.  I mean --
9  BY MR. COLLINGS:
10      Q   What is your understanding of the word rookie?
11      A   I would be -- a guess would probably be
12 relatively new or inexperienced.  So, I don't know.  I
13 mean, he is a homicide investigator with the Sheriff's
14 Office.  I'm assuming they placed him there for a
15 reason.
16      Q   All right.  If you look further down it
17 identifies the major crime division commander as Steve
18 Gaudet.  You know Steve Gaudet?
19      A   I do.
20      Q   How do you know Steve Gaudet?
21      A   Again, just from my time at the D.A.'s Office
22 and at the Sheriff's Office.  We never worked -- just
23 like all these people, I did not work hand in hand
24 with any of them.  Just through the rank structure I
25 know who they are.  I would talk to 'em from time to



TORRES REPORTING & ASSOCIATES, INC.

COURT REPORTING & LITIGATION SERVICES
www.torresreporting.com
1.866.982.6878 Toll Free

Baton Rouge, LA
225.751.0732
225.752.7308 FAX

New Orleans, LA
504.392.4791
504.392.4852 FAX

BRIAN TRAINOR

Page 33

1  time. But that's the same way I knew Steve. That's
2  it.
3      Q  All right. Do you know if Steve Gaudet lives
4  or lived in Tangipahoa Parish?
5      A  I recall -- I don't know other than hearing
6  through the Sheriff's Office back when I was there,
7  there was an issue with maybe him taking Sheriff's
8  Office vehicle out of parish to a residence. I don't
9  know what ever happened with that. I don't even know
10  if it was true. I just remember that being brought up
11  at one point.
12     Q  Do you know if Steve Gaudet had a domestic
13  violence issue with his wife?
14     A  No idea.
15     Q  Do you know if the Sheriff talked to Nanette
16  prior to her death. We're on Page 7, first full
17  paragraph.
18     A  No idea.
19     Q  Have you ever seen any phone records that would
20  reveal whether that statement is correct or not?
21     A  No.
22     Q  Have you ever seen crime scene logs?
23     A  Um, I don't recall there being crime scene
24  logs in the discovery. If they were, I don't remember
25  'em.

Page 34

1      Q  Do you know Sarah Ann Modisett?
2      A  I do not.
3      Q  Do you know Joe Picone?
4      A  I do.
5      Q  How do you know Joe Picone?
6      A  Through professional and he's a friend of mine
7  as well. I know him through my time at the D.A.'s
8  Office and at the Sheriff's Office.
9      Q  Is there any reason, to your knowledge, why one
10  would need to be careful to bring anything to his
11  office?
12     A  I have no idea.
13     Q  Do you know Brian Brown?
14     A  I do.
15     Q  How do you know Brian Brown?
16     A  From my time as a prosecutor. At the time, I
17  think Brian was -- I don't remember his rank, but he
18  worked for the Slidell Police Department. Now he's
19  with the Attorney General's Office doing, I think
20  internet crimes against children, if I recall. I
21  think that's what he does. I think he may be a
22  supervisor in that unit.
23     Q  Do you know Steve Chaisson?
24     A  I do.
25     Q  How do you know Steve Chaisson?

Page 35

1      A  From my time as the D.A.'s Office. I think
2  mainly from my time at the Sheriff's Office. I don't
3  know if Steve -- I don't remember when he came over to
4  the Sheriff's Office or what his role was when I was
5  at the D.A.'s Office, but I know him just in a
6  professional capacity.
7      Q  Do you know Jenny May?
8      A  Yes.
9      Q  How do you know Jenny May?
10     A  So, again, my time with the Sheriff's Office I
11  met Jenny May. I was on -- I don't remember the year.
12  Probably 2013, maybe. I was on the FBI task force and
13  Jenny May was our point of contact so I would talk to
14  her from time to time. I think it was around 2000- --
15  I would say '14 to '16.
16     Q  Okay. Do you know who Rick Jones is?
17     A  I do not.
18     Q  Do you know if Jenny May was ever the lead
19  detective or investigator on this investigation?
20     A  I do not know that.
21     Q  Have you had occasion to see the affidavit for
22  arrest for Jerry?
23     A  I have.
24     Q  Hand you a copy of it. Take a moment,
25  refamiliarize yourself with that, please.

Page 36

1      A  Okay. I remember it.
2      Q  All right. You've seen this before?
3      A  I have.
4      Q  To your knowledge, what, if anything, in this
5  affidavit is factually incorrect?
6      MR. MOST:
7          Brian, does that question implicate
8      information you may or may not have learned
9      from your client?
10     THE WITNESS:
11         It would implicate information I
12     learned during my representation of
13     Mr. Rogers.
14     MR. MOST:
15         On that basis, we're going to object to
16     the question. It calls for attorney-client
17     privileged communications.
18  BY MR. COLLINGS:
19     Q  Let's drill down on that a little bit. You
20  chose your words carefully and I appreciate that.
21  That's what we lawyers do. The question on the table
22  is anything in this affidavit factually incorrect to
23  your knowledge? So, let me structure the question a
24  little differently. Is there anything in this
25  affidavit that's factually incorrect that you know of



**TORRES REPORTING & ASSOCIATES, INC.**

COURT REPORTING & LITIGATION SERVICES
www.torresreporting.com
1.866.982.6878 Toll Free

**Baton Rouge, LA**
225.751.0732
225.752.7308 FAX

**New Orleans, LA**
504.392.4791
504.392.4852 FAX

BRIAN TRAINOR

Page 37

1  outside of your communications with your client, former
2  client?
3      A  Um, and I'm not trying -- I'm not trying to be
4  evasive with you at all.  I'm trying to make sure that
5  I answer correctly because outside of my
6  representation of Jerry I wouldn't know any of these
7  statements or facts.  So, in my investigation
8  preparing defense for Jerry it was uncovered that, I
9  believe, there is an inconsistency in some of the
10  information.
11      Q  All right.  Is that information you learned
12  from someone other than Jerry?
13      A  Yes.
14      Q  All right.  Who is that person?
15      A  Well, it would be some of the family members
16  of Miss Krentel.
17      Q  Who are those?
18      A  Dan Watson, Kim Watson, and I can't
19  remember -- Gina, maybe.  I think it was Gina.
20      Q  Dan, Gina and Kim?
21      A  Yes.
22      Q  Okay.  So you spoke with those three
23  individuals?
24      A  I spoke with -- I believe I spoke with all
25  three of them.  Gina, I can't remember if I spoke with

Page 38

1  her or she was in the -- in the communication.  I
2  don't remember if I talked to her directly, though.  I
3  know I spoke to the other two.
4      Q  All right.  Let's talk about -- let's start
5  with Dan.  Let's do him first.
6      A  Okay.
7      Q  How many times did you speak with Dan?
8      A  Um, maybe -- maybe three times.
9      Q  Were those in person or by phone or both?
10      A  No.  It was all by phone.  I think he was out
11  of state.
12      Q  So, he called you or you called him?
13      A  I think he called me the first time and I
14  called him back and spoke to him.
15      Q  All right.  And how many times did you actually
16  speak to each other.
17      A  Maybe three times.
18      Q  All right.  Tell me about the substance of
19  those conversations?
20          MR. MOST:
21              Object on the basis of work product
22          privilege as has already been subject to a
23          ruling in this case.  Communications between
24          an attorney and the witness, the content
25          thereof, are subject to the work product

Page 39

1  privilege.
2      MR. COLLINGS:
3          No.  I'm gonna disagree with you on
4      that.  Work product is -- work product of the
5      attorney in your case was the subject of a
6      motion and a ruling.  There has been no
7      ruling of any kind about the investigation
8      done by Jerry Roger's criminal attorney in a
9      different matter, and if you want to instruct
10      him not to answer that, we're going to
11      reserve our right and bring him back and ask
12      him those same questions again at your
13      expense.
14      MR. MOST:
15          There has already been a ruling in this
16      case.
17      MR. COLLINGS:
18          About your work product; not his.
19      MR. MOST:
20          About --
21      MR. COLLINGS:
22          In this matter.
23      MR. MOST:
24          About the contents of an attorney's
25      communication with the witness that's for the

Page 40

1  preparation of litigation.  It's not limited
2  to civil litigation.  It's subject to the
3  attorney work product privilege.  There's
4  already been a ruling by a judge in this case
5  on that topic.  So we're gonna -- we're gonna
6  instruct the client not to answer, or the
7  witness not to answer.
8      MR. COLLINGS:
9          All right.  Then I'm giving you this
10      opportunity to rethink that position because
11      I am going to ask for my fees and costs on
12      this issue to bring him back and do this
13      again.  He had a conversation with the family
14      members of a victim of a homicide in
15      representation in a criminal matter.  You're
16      going to continue to assert that privilege
17      and instruct him not to answer?
18      MR. MOST:
19          Do you have any case law that
20      distinguishes that factual context from the
21      context in which the ruling has already been
22      issued in this case which is R. Doc. 66.
23      MR. COLLINGS:
24          I'm not doing that with you.  I'm just
25      asking a question.  I'm giving you an



**TORRES REPORTING & ASSOCIATES, INC.**

COURT REPORTING & LITIGATION SERVICES
www.torresreporting.com
1.866.982.6878 Toll Free

Baton Rouge, LA
225.751.0732
225.752.7308 FAX

New Orleans, LA
504.392.4791
504.392.4852 FAX

BRIAN TRAINOR

Page 41

1  opportunity to rethink your position.  If
2  you're still going to instruct him not to
3  answer it, I'll move on.
4      MR. MOST:
5          I'm giving you an opportunity, if you
6  have any case law to suggest that there's any
7  reason to distinguish between the ruling of
8  this court in this case, R. Doc. 66, and the
9  factual situation you're presenting.  If you
10  have any --
11     MR. COLLINGS:
12         I think I've already said what I was
13  going to say.  All right.  I'm not going to
14  do a debate with you on the record.  I'm
15  giving you that opportunity --
16     MR. MOST:
17         Please don't interrupt me when I'm
18  talking, Mr. Collings.
19     MR. COLLINGS:
20         You're repeating yourself.  You're
21  wasting our time.  Do you have anything else
22  you want to tell me?
23     MR. MOST:
24         You have anything else you want to tell
25  me?

Page 42

1          MR. COLLINGS:
2              No.  I've given you the opportunity.
3          Apparently, you're gonna maintain the
4          objection, instruct him not to answer.
5          Correct?
6          MR. MOST:
7              Correct.
8  BY MR. COLLINGS:
9      Q   All right.  We're not going to revisit with you
10  about the substance of your conversations.
11         MR. COLLINGS:
12             Is that going to be with respect to all
13         the people he spoke with in connection with
14         his representation of Jerry, you maintain
15         that objection and instruct him not to answer
16         any of those questions?
17         MR. MOST:
18             If you're asking about an attorney's
19         conversation with witnesses that were
20         conducted for the purpose of defending a
21         client?  Yes.
22  BY MR. COLLINGS:
23      Q   Okay.  Well, let's just identify who you talked
24  to so when we file our motion we can compel that and be
25  specific about the conversations we want to have the

Page 43

1  court order you to respond to at Mr. Rogers' expense.
2  Dan Watson?
3      A   Dan Watson.
4      Q   You spoke to Dan at least three times.
5      A   I spoke to Dan.  Spoke to Kim Watson.
6      Q   Yes.
7      A   Gina.  I believe I spoke to Gina, but I'm not
8  100 percent.  I'm pretty sure I spoke to Gina as well.
9      Q   Okay.  Did you speak with anyone else in
10  connection with your representation of Jerry besides
11  those three people and Jerry himself?
12      A   Any family members or anyone period?
13      Q   Anyone else.  Let's just get anyone else out
14  the way that you might have spoken with.
15      A   Sure.  Pat Magee was the head at the time, the
16  head of the criminal division for the Attorney
17  General's Office.  Uh, I probably talked to Collin
18  Sims to find out if they're keeping this case or if
19  they're recusing themselves.  Um, William LeBeau was
20  the assistant attorney general assigned the case.
21  Bill Stiles is the number two guy with the Attorney
22  General's Office.  Um -- uh, Steve Gaudet.  I'd have
23  to go back and look.  I don't know off the top of my
24  head.  I talked to Canizaro, I think, at the time.  It
25  was during the investigation.  I don't believe I

Page 44

1  talked to Alvin Hotard.  Um, I may have talked to
2  somebody at the jail to coordinate his bond.  I don't
3  remember.  His, being Jerry Rogers bond.  I don't
4  remember off the top of my head who all.  We talked to
5  a bunch of people.  That maybe all of them.  I don't
6  know.  I'd have to go back and figure out, look at
7  notes to see who I may have spoken with.
8      Q   Okay.  Other than Dan, Gina and Kim, anyone
9  else you spoke with gave you information that would be
10  contrary to what's in this affidavit?
11         MR. MOST:
12             You might want to say, "other than his
13         client."
14  BY MR. COLLINGS:
15      Q   Other than Jerry, Kim, Gina and Dan.
16      A   I don't recall.  Um -- I don't remember.
17      Q   Okay.
18         MR. COLLINGS:
19             For the record, we're attaching a copy
20         of the affidavit for arrest warrant dated
21         September 16, 2019 as Exhibit 5.
22      A   Chad, on the last question, anybody else I
23  talked to...
24  BY MR. COLLINGS:
25      Q   Uh-huh.



**TORRES REPORTING & ASSOCIATES**, INC.

COURT REPORTING & LITIGATION SERVICES
www.torresreporting.com
1.866.982.6878 Toll Free

**Baton Rouge, LA**
225.751.0732
225.752.7308 FAX

**New Orleans, LA**
504.392.4791
504.392.4852 FAX

BRIAN TRAINOR

Page 45

1    A   I remember I was contacted by Clint Epperson,
2  Civil Rights Division from the FBI called to talk
3  about this case as well.  So I met with him.
4    Q   You met with him in person?
5    A   In person, um, I think twice.  There was
6  another, as they normally do, there was another agent
7  there but I don't remember -- I don't remember his
8  name.  I don't know if I ever got his name.  Epperson
9  was the only one that reached out.
10   Q   Was a recording made of that conversation to
11 your knowledge?
12   A   Not to my knowledge.  I don't think so.
13   Q   What did you speak to Agent Epperson about?
14   A   It was about they were evidently looking into
15 Mr. Rogers' arrest and whether or not there was any
16 civil rights implications.
17   Q   All right.  What did you tell 'em?
18   A   Um, I didn't really tell 'em anything other
19 than they asked for documents.  We provided documents
20 and that was about it.
21   Q   What documents did you provide.
22   A   Probably the booking photos.  The affidavit.
23 I think they requested the Affidavit of Arrest.  They
24 may have requested the emails, too, that I got from
25 discovery.  I don't remember.  Whatever.  I'm sure

Page 46

1  whatever report they have that says what I provided
2  them, I provided.  I don't recall everything they
3  asked for.
4    Q   The emails in discovery, you're talking about
5  those emails we just went through?
6    Q   Exhibit 4.
7    Q   Exhibit 4.
8    A   Yeah.  Correct.
9    Q   Any other emails to your knowledge other than
10 those?
11   A   No.
12   Q   All right.  Another than asking for documents
13 from you that you just listed, was there anything else
14 provided to the FBI by you?
15   A   No.
16   Q   And there was only that one conversation where
17 they asked for these records you provided them?  Did
18 you ever talk to them again?
19   A   I think we probably -- probably two or three
20 times, if I recall, they called.  They called or came
21 by my office to talk and we met and they asked the
22 questions about the documents and that was it.  They
23 asked questions, did I feel that, you know, that --
24 what were my opinions of Sergeant Canizaro, things
25 like that.

Page 47

1    Q   Did they get into the substance of this case at
2  all?
3    A   They did.
4    Q   Did you assert the attorney-client
5  communication privilege when you had that conversation
6  with them?
7    A   Mr. Rogers was present for all of those
8  meetings.  So, they didn't -- when I say they asked
9  me, they were really asking Jerry.  I was there on his
10 behalf.
11   Q   Did you have anything to say to them?
12   A   I did not other than just compiling documents
13 that they asked for.  Okay.  With the exception of,
14 let me be clear.  They did ask what was my opinion of
15 Keith, so that was --
16   Q   What was your opinion of Keith?
17   A   I told 'em that I thought he was a good guy.
18 I like him.  Our families knew each other.  Our kids
19 played baseball and that I have no issue with Keith at
20 all.
21   Q   Okay.  Show you Exhibit 6.  Copy of an
22 affidavit that was provided to me in this litigation
23 signed by Steve Gaudet and, apparently, notarized by
24 you.  Tell me if you recognize that document.
25   A   Yes.

Page 48

1    Q   All right.  You remember this affidavit?
2    A   I do.
3    Q   All right.  Who typed this affidavit up?
4    A   It would have been -- I would have.
5    Q   So, you created it.
6    A   Um-hum.
7    Q   And how did you come to know about the
8  substance of what's in this affidavit in order to
9  prepare it?
10   A   I would have learned of this during my
11 representation of Jerry in the criminal case.
12   Q   All right.  The words here that, apparently,
13 this is Steve Gaudet's affidavit, not Jerry Rogers'
14 affidavit, right?
15   A   Correct.
16   Q   So you typed it up.  How did you get the
17 information?  From Steve?
18   A   Yes.
19   Q   All right.  So, you meet with Steve.  Was it
20 the day -- was it January 23, 2020 or was that some day
21 before then?
22   A   I definitely met with him on this day.  I
23 don't know if I talked to him before that day or not.
24   Q   So it was either this day or some other day
25 before then or both?



**TORRES REPORTING & ASSOCIATES, INC.**

COURT REPORTING & LITIGATION SERVICES
www.torresreporting.com
1.866.982.6878 Toll Free

**Baton Rouge, LA**
225.751.0732
225.752.7308 FAX

**New Orleans, LA**
504.392.4791
504.392.4852 FAX

BRIAN TRAINOR

Page 49

1      A    Um-hum.
2      Q    You met with him and he provided you what's in
3  this affidavit?
4      A    Correct.  He confirmed it.
5      Q    All right.  So, as to number 6.
6      A    Yes.
7      Q    Quote, "He believes that the ultimate decision
8  to charge Mr. Jerry Rogers was politically motivated
9  and done so after being informed that the statute was
10 unconstitutional as applied to Mr. Rogers actions."
11 Close quote.  You see that?
12     A    I do.
13     Q    Is that normal for a trained investigator to
14 believe that his own subjective beliefs are relevant
15 whether or not someone is charged?
16         MR. MOST:
17             Objection calls for an opinion.  You
18         can answer.
19     A    Can you ask me that one more time?
20 BY MR. COLLINGS:
21     Q    This says he believes.  All right.  You're an
22 attorney, you were a prosecutor, you were the chief
23 deputy at the Sheriff's Office.  You have a pretty fair
24 appreciation of the legal system and how it works
25 criminally, correct?

Page 50

1      A    Correct.
2      Q    And when you were the chief deputy at the
3  Sheriff's Office and when you were just a deputy chief
4  at the Sheriff's Office, did you ever see investigative
5  reports where an investigator gave his subjective
6  belief?
7      A    Yes.
8      Q    Yeah?  When was that?
9      A    I think in almost every one they say:  Based
10 on the evidence I believe this person committed X and
11 they make the crime.  I mean, they take the facts, the
12 evidence, and put it together and then they reach
13 their ultimate conclusion.
14     Q    But there's evidentiary background for that,
15 right?  There's always got to be some facts.
16     A    Sure.
17     Q    All right.  So, where are the facts in this
18 affidavit that says the decision was politically
19 motivated.  That seems to be lacking.
20     A    Well, that's Mr. Gaudet's belief.  I don't
21 know.  You'd have to ask him.
22     Q    All right.  Well, did Mr. Gaudet provide you
23 with those facts that support this subjective belief,
24 and it just got forgotten to be put in the affidavit?
25     A    No.  Whatever he said I put on there and that

Page 51

1  was it.
2      Q    So, he didn't supply you with those facts then,
3  did he?
4      A    Not at that time, no, or not ever.
5      Q    So as you sit here today you still don't know
6  what facts led him to believe this was a politically
7  motivated prosecution?
8      A    Correct, other than what's in the affidavit.
9      Q    All right.  And am I missing something because
10 I don't see anything in here that says this is why it
11 was politically motivated?
12     A    Steve Gaudet would have to answer that.  I
13 don't know.
14     Q    And as you sit here today, you are still
15 unaware of those facts, correct?
16     A    Correct.
17     Q    Who were these witnesses?  Are these people
18 that work for you?
19     A    Yeah, they work in the office.
20     Q    Melanie -- what's her name?
21     A    Hingle.
22     Q    And the second?
23     A    Alex Lloyd.
24     Q    These are your staff members?
25     A    They're actually Craig Hart's staff members,

Page 52

1  but we share office space.  They were there.
2      Q    Okay.  I'm gonna hand you a copy of the
3  Plaintiff's Witness and Exhibit List.  I'm just going
4  to go through it and I'm going to ask you if you know
5  any of these people and what you might -- if you
6  remember ever talking to them and then we're going to
7  go through it from there.
8         MR. COLLINGS:
9             For the record, this will be attached
10         as Exhibit 7.
11 BY MR. COLLINGS:
12     Q    All right.
13     A    Okay.
14     Q    Witness number one, Jerry Rogers.  We already
15 know you know him.
16     A    Yes.
17     Q    Randy Smith, obviously, you know who that is?
18     A    Yep.
19     Q    Right.
20     A    Correct.
21     Q    Danny Culpeper.  Do you know who that is?
22     A    Yes.
23     Q    How do you know Danny Culpeper?
24     A    We worked together at the Sheriff's Office.
25     Q    Do you have any opinion as to whether or not



TORRES REPORTING & ASSOCIATES, INC.

COURT REPORTING & LITIGATION SERVICES
www.torresreporting.com
1.866.982.6878 Toll Free

Baton Rouge, LA
225.751.0732
225.752.7308 FAX

New Orleans, LA
504.392.4791
504.392.4852 FAX

BRIAN TRAINOR

Page 53

1 Danny is a competent investigator?
2        MR. MOST:
3           Objection.  Calls for opinion.  You can
4        answer.
5    A  I have no opinion.
6 BY MR. COLLINGS:
7    Q  Any reason to believe that Danny would do
8 anything that was improper with respect to Jerry
9 Rogers?
10   A  I don't have -- I don't have any evidence that
11 he did anything -- there was any reason to do anything
12 improper in this.
13   Q  You are aware that Danny Culpeper is a named
14 defendant by Jerry Rogers in this lawsuit, correct?
15   A  Yes.
16   Q  You have no evidence of any wrongdoing on
17 Danny's part, correct?
18   A  I have no knowledge of Danny Culpeper's
19 involvement other than Steve Gaudet's affidavit, but,
20 no, I don't have any knowledge of his involvement.
21   Q  All right.  Number 4, Keith Canizaro.  You see
22 that?
23   A  I do.
24   Q  Same question with respect to Keith.  You know
25 Keith?

Page 54

1    A  I do.
2    Q  You know him from your time at the Sheriff's
3 Office, correct.
4    A  Correct.
5    Q  And you know he was an investigator for the
6 Sheriff's Office for a number of years, correct?
7    A  Correct.
8    Q  You have any doubts about his competency as an
9 investigator?
10   A  I do not.
11   Q  You have any reason to believe Keith Canizaro
12 did anything improper with respect to the investigation
13 of Jerry Rogers?
14   A  I don't believe -- I don't believe that the
15 criminal defamation statute as applied to these facts
16 was warranted.  So, in that sense I would say that an
17 arrest should not have been made given these facts
18 based on that statute, 1447.  If you ask me did Keith
19 fabricate evidence?  I don't believe -- I don't
20 believe that.
21   Q  All right.  Let's kind of drill down a little
22 bit on that.  What you just said.  What makes you think
23 these charges were not warranted?
24       MR. MOST:
25          Objection.  Calls for a legal

Page 55

1        conclusion.  Calls for an opinion.
2 BY MR. COLLINGS:
3    Q  You said it.  I want to know why.
4    A  Because I believe the Garrison case, the case
5 law that I researched given these fact patterns where
6 the purported victim was a public official in his
7 public official capacity performing a public function
8 is not a, quote, unquote, victim under the criminal
9 defamation statute given these specific facts of this
10 case.
11   Q  Okay.  Anything else?
12   A  No.
13   Q  Alvin Hotard, number 5.  See his name there?
14   A  I do.
15   Q  You know Alvin?
16   A  I do from my time working at the Sheriff's
17 Office.  I know Alvin.
18   Q  Do you have any knowledge of Alvin Hotard doing
19 anything wrong with respect to the investigation of
20 Jerry Rogers?
21   A  No.
22   Q  Daniel Buckner?
23   A  I know him from my time at the Sheriff's
24 Office.  I don't have any knowledge of him doing
25 anything wrong, subject to my statement before that

Page 56

1 1447.  Just -- and it's the same for all.  I just
2 don't think it applied to my client, Mr. Rogers, given
3 this fact pattern.  But I don't have any knowledge of
4 him doing anything, per se, wrong.
5    Q  Do you know Julius Collin Sims?
6    A  I do.  He works for the -- he's the chief of
7 trials, or maybe first assistant at the District
8 Attorney's Office here in the 22nd Judicial District.
9 I know him from my time at the Sheriff's Office while
10 he was at the District Attorney's Office.
11   Q  Did you ever have any conversations with Julius
12 Collin Sims about the Jerry Rogers investigation?
13   A  If I did, it was -- no substantive about the
14 facts, just more procedural; who's going to handle the
15 case once Jerry was arrested; is it going to stay with
16 the local District Attorney or go to the Attorney
17 General's Office.
18   Q  And what did he say to you when you asked him
19 that question?
20   A  Quite frankly, I don't know if I got a
21 response from him.  I was just notified afterwards
22 that it was -- the recusal was done and it was going
23 to the Attorney General's Office.  I don't remember if
24 he told me that or if I just learned that.
25   Q  Did you know Jerry Rogers' wife worked at the



**TORRES REPORTING & ASSOCIATES, INC.**

COURT REPORTING & LITIGATION SERVICES
www.torresreporting.com
1.866.982.6878 Toll Free

**Baton Rouge, LA**
225.751.0732
225.752.7308 FAX

**New Orleans, LA**
504.392.4791
504.392.4852 FAX

BRIAN TRAINOR

Page 57

1  District Attorney's Office?
2      A   I did and that was why I was wanting to know
3  were they keeping it or if they were gonna pick up the
4  charge or was it going to go to the Attorney General's
5  Office.
6      Q   Kim Watson.  Do you know Kim?
7      A   I don't know her personally.  I spoke to her
8  on the phone.  I know that she's the sister of
9  Nanette.
10     Q   Stefan Montgomery.  Did you ever talk to Stefan
11 Montgomery about Jerry Rogers?
12     A   I don't -- I don't think I ever talked to
13 Stefan.  Um, I know his name came up, but I don't -- I
14 don't recall ever talking to him.
15     Q   All right.  Steve Gaudet we covered.  Brian
16 Trainor is the guy sitting here answering all the
17 questions?
18     A   Extremely honest.
19     Q   Judge Raymond Childress?
20     A   I do.  I do know who Judge Childress is.  I
21 had no communication with him at all about any of this
22 matter.
23     Q   David Maselli?
24     A   I know who David is from my time at the
25 Sheriff's Office, but I never spoke to David about any

Page 58

1  of Mr. Rogers' matter or Marco Lopez for that matter.
2  Also, works for the Sheriff's Office who I know, but
3  did not speak to him at all about Mr. Rogers.
4      Q   What about Matthew Rowley?
5      A   I recognize the name.  I can't say that I know
6  who Matthew Rowley is.  I don't know -- I don't
7  remember him from the Sheriff's Office.
8      Q   Judge Scott Gardner?
9      A   I know Judge Gardner from our time together
10 working at the D.A.'s Office and then, of course, his
11 time on the bench as a judge in the 22nd, but I had no
12 communication with him outside of the filing of a
13 motion in the -- in my capacity as Mr. Rogers'
14 attorney in the criminal matter.
15     Q   That was a Motion for Preliminary Examination?
16     A   Correct.
17     Q   And he was the presiding judge that day?
18     A   He was.  It got allotted, I guess, to Division
19 G, which was his division.
20     Q   All right.  And there was -- you had that one
21 interaction with him?  That hearing?
22     A   That's it.  And it really wasn't even a
23 hearing.  But, yes, that was my only interaction with
24 him on this matter.
25     Q   Okay.  Joseph LeBeau?

Page 59

1      A   Yes.  Joseph was the assistant attorney
2  general assigned the case on behalf of Jeff Landry's
3  office.  I spoke to him several times in my capacity
4  as Mr. Rogers' lawyer in connection with the criminal
5  matter.
6      Q   Did Mr. LeBeau ever convey to you anything
7  about their belief as to this investigation and
8  ultimate prosecution?
9      A   Well, they ultimately declined to prosecute
10 Mr. Rogers on the matter.
11     Q   Did he say why?
12     A   I don't -- I don't recall verbatim.
13 Basically, he just didn't think that the statute
14 applied.  They deemed it unconstitutional.
15     Q   All right.  Patrick Magee?
16     A   Patrick at the time was the head of the
17 criminal division.  I had reached out to Patrick
18 before it was assigned to Mr. LeBeau because I didn't
19 know who the assistant attorney general was going to
20 be, and he just relayed to me it would be forwarded to
21 one of the assistants and that was Mr. LeBeau.  So I
22 don't recall talking to Patrick about any -- I don't
23 think he ever made a decision on the case.  I think it
24 was -- he may have ultimately made the decision, but
25 he didn't relay it to me.  It would have come through

Page 60

1  Mr. LeBeau.
2      Q   Steve Chaisson?
3      A   I know Steve from the Sheriff's Office, like I
4  said earlier.  I don't recall ever talking to Steve
5  about this matter.
6      Q   Okay.  Butch Wilson?
7      A   I know who Butch is from his time at the
8  attorney general's office and then he worked at the
9  D.A.'s Office, local D.A.'s, 22nd, but I didn't speak
10 to him at all about this matter.
11     Q   Genevieve May?
12     A   I think that's Jenny May.  I never spoke with
13 her at all about this matter, but I know who she is
14 from my previous testimony.
15     Q   And Clint Epperson, I think you talked about?
16     A   Correct.  Spoke to Mr. Epperson about this
17 matter in connection with my representation of
18 some. Rogers.
19     Q   All right.  I'm going to hand you, probably
20 going to be our last exhibit, Exhibit 8, which are the
21 Plaintiff's Supplemental Responses to Defendants First
22 Set of Discovery Requests and particularly I want to
23 direct your attention to the last page, Supplemental
24 Response to Request for Production Number 7.  Take a
25 moment.



**TORRES REPORTING & ASSOCIATES, INC.**

COURT REPORTING & LITIGATION SERVICES
www.torresreporting.com
1.866.982.6878 Toll Free

**Baton Rouge, LA**
225.751.0732
225.752.7308 FAX

**New Orleans, LA**
504.392.4791
504.392.4852 FAX

BRIAN TRAINOR

Page 61

1     MR. MOST:
2         Plaintiff's Response to Supplemental
3     Responses?
4     MR. COLLINGS:
5         That is correct.
6   A   Okay.
7   BY MR. COLLINGS:
8   Q   So, we're trying to identify Mr. Rogers
9   damages.  So, presumably that would include his alleged
10  damages.  That would include the fees he incurred in
11  the defense of the criminal charges against him by you.
12  A   Yes.
13  Q   Take a moment, read his response and tell me if
14  it is accurate.
15  A   I would say the rate -- the rate would be
16  accurate.  The estimate of 40 hours.  I don't bill by
17  the hour on criminal matters, so I would say that's a
18  very conservative estimate.  I know I worked way more
19  than 40 hours on this case, but.
20  Q   You did this on a flat fee?
21  A   I did.
22  Q   What was the flat fee?
23  A   Um, I think for Jerry -- I'd have to go back
24  and look but it might have been -- I may have only
25  charged like $1500 just because I know him for so

Page 62

1   long, and I really didn't think it was going to take
2   as much time as it did, quite frankly.  Um --
3   Q   So, other than that a $1500, did you charge him
4   anything else?
5   A   No.
6   Q   And he -- and it was the entire fee was used,
7   correct?  You didn't give him a refund on that?
8   A   Correct.
9   Q   All right.  Let's step outside for a minute.
10  Go off the record.
11      (OFF THE RECORD)
12      MR. COLLINGS:
13          All right.  I tender the witness.
14      MR. MOST:
15          No questions for me.
16      MR. COLLINGS:
17          All right.  That concludes the
18      deposition.  Do you want to read and sign?
19      THE WITNESS:
20          I'll waive read and sign.
21  (WHEREUPON, DEPOSITION WAS CONCLUDED AT 10:45 A.M.)
22
23
24
25

Page 63

1
2         REPORTER'S CERTIFICATE
3         I, BELINDA D. VIGUEIRA, Certified Court
   Reporter in and for the State of Louisiana,
4   Certificate No. 83075, as the officer before whom
   this testimony was taken, do hereby certify that
5   Brian Trainor, to whom the oath was administered,
   after having been duly sworn by me upon authority of
6   R.S. 37:2554, did testify as hereinbefore set forth
   in the foregoing 61 pages;
7
          That this testimony was reported by me in
8   the stenotype reporting method, was prepared and
   transcribed by me or under my personal direction and
9   supervision, and is a true and correct transcript to
   the best of my ability and understanding;
10
          That the transcript has been prepared in
11  compliance with transcript format guidelines required
   by statute or by rules of the board;
12
          That I have acted in compliance with the
13  prohibition on contractual relationships, as defined
   by Louisiana Code of Civil Procedure Article 1434 and
14  in rules and advisory opinions of the board;
15        That I am not related to counsel or to the
   parties herein, nor am I otherwise interested in the
16  outcome of this matter.
17        Dated this 5th day of May 2021.
18
19
                        _____
20                      Belinda D. Vigueira, CCR
                        Certificate No. 83075
21
22
23
24
25



**TORRES REPORTING & ASSOCIATES, INC.**
COURT REPORTING & LITIGATION SERVICES
www.torresreporting.com
1.866.982.6878 Toll Free

Baton Rouge, LA
225.751.0732
225.752.7308 FAX

New Orleans, LA
504.392.4791
504.392.4852 FAX

**Exhibits**

**EXHIBIT 1** 3:10 9:21, 23

**EXHIBIT 2** 3:11

**EXHIBIT 3** 3:12 15:4

**EXHIBIT 4** 3:13 21:16 46:6,7

**EXHIBIT 5** 3:14 44:21

**EXHIBIT 6** 3:15 47:21

**EXHIBIT 7** 3:16 52:10

**EXHIBIT 8** 3:17 60:20

---

**$**

**$1500** 61:25 62:3

---

**1**

**1** 9:21,23

**1/24/2019** 15:17

**10** 24:11

**10/13/2020** 15:9

**100** 27:24 43:8

**10:45** 62:21

**10th** 24:15,19

**12** 24:20

**12th** 24:14

**1360** 7:18

**14** 35:15

**1447** 54:18 56:1

**16** 6:6 35:15 44:21

---

**2**

**2** 15:14

**2000-** 35:14

**2002** 6:14

**2010** 6:5,6,14

**2013** 35:12

**2016** 29:11

**2017** 24:3

**2019** 9:4,16 21:4 44:21

**2020** 48:20

**211** 5:12

**22nd** 28:12 56:8 58:11 60:9

**23** 48:20

**24th** 16:3

**26** 9:16

**29** 24:3,17

---

**3**

**3** 15:4 28:3

**30** 6:6

---

**4**

**4** 21:16 24:2,13 46:6,7 53:21

**40** 61:16,19

**497** 7:18

---

**5**

**5** 23:19 25:4 44:21 55:13

---

**6**

**6** 26:24 47:21 49:5

**66** 40:22 41:8

---

**7**

**7** 33:16 52:10 60:24

**70471** 5:13

---

**8**

**8** 60:20

**8:37** 24:3

---

**A**

**A.M.** 24:3 62:21

**ABOVE-ENTITLED** 5:2

**accurate** 11:6,12,22,25 12:1 25:15,21 61:14,16

**acquaintance** 6:19

**acquaintances** 6:18

**actions** 49:10

**active** 5:22

**address** 5:11 21:21,23, 25 22:2,18

**affidavit** 15:21 35:21 36:5,22,25 44:10,20 45:22,23 47:22 48:1,3, 8,13,14 49:3 50:18,24 51:8 53:19

**afraid** 13:11

**agency** 11:3

**agent** 45:6,13

**agree** 23:22

**Alex** 51:23

**Alibi** 27:11,13,15,18

**allegation** 28:2,6

**alleged** 61:9

**allotted** 58:18

**Alvin** 10:6 44:1 55:13, 15,17,18

**analysis** 28:25 29:5

**Ann** 34:1

**answering** 57:16

**apologies** 15:16

**apparently** 14:8 16:1 24:24 42:3 47:23 48:12

**Appeal** 6:24

**applied** 49:10 54:15 56:2 59:14

**appreciated** 7:25

**appreciation** 49:24

**approximately** 17:3

**arrest** 9:5,6 35:22 44:20 45:15,23 54:17

**arrested** 56:15

**assert** 7:18 40:16 47:4

**assigned** 43:20 59:2, 18

**assistant** 31:24 43:20 56:7 59:1,19

**assistants** 59:21

**assume** 14:20 23:23 32:2

**Assumes** 23:3

**assuming** 29:11 32:14

**ATF** 25:9,17

**attach** 9:20 15:4 21:15

**attached** 52:9

**attaching** 44:19

**attention** 14:14 60:23

**attorney** 7:18 8:18 9:3 11:10 12:8 14:8 15:10, 18 26:4 28:11 34:19 38:24 39:5,8 40:3 43:16,20,21 49:22 56:16,23 57:4 58:14 59:1,19 60:8

**attorney's** 24:24 28:12 30:14 39:24 42:18 56:8, 10 57:1

**attorney-client** 7:5,14, 21 8:9 9:12 10:13,22 12:9 13:6,23 15:21 17:18,23 18:24 19:6,9, 18 22:9 23:10 25:24



**TORRES REPORTING & ASSOCIATES, INC.**

COURT REPORTING & LITIGATION SERVICES
www.torresreporting.com
1.866.982.6878 Toll Free

Baton Rouge, LA
225.751.0732
225.752.7308 FAX

New Orleans, LA
504.392.4791
504.392.4852 FAX

26:17 36:16 47:4

**audio** 18:18 19:4,15,22 20:9

**August** 9:4,16

**avoiding** 19:12

**aware** 15:25 16:25 20:11,13,14 53:13

**B**

**back** 6:1 13:11 14:7 21:4 26:22 33:6 38:14 39:11 40:12 43:23 44:6 61:23

**background** 50:14

**Bar** 27:11,13,15,18

**baseball** 47:19

**based** 50:9 54:18

**Basically** 59:13

**basis** 9:11 10:12,21 12:9 25:24 26:19 36:15 38:21

**behalf** 5:8 7:19,22 10:15,24 11:8,9,11,23 13:3,16 47:10 59:2

**belief** 12:7 50:6,20,23 59:7

**beliefs** 12:3 49:14

**believes** 11:2 49:7,21

**belongs** 7:15

**bench** 58:11

**big** 30:24

**bill** 29:2 43:21 61:16

**bit** 6:1 36:19 54:22

**blank** 30:17

**bond** 44:2,3

**booking** 45:22

**bottom** 24:2 25:3

**Brian** 5:1,7,12,15 15:19 34:13,15,17 36:7 57:15

**bring** 13:11 14:7 26:21 34:10 39:11 40:12

**brought** 33:10

**Brown** 34:13,15

**Buckner** 31:11,13 55:22

**bunch** 44:5

**Butch** 60:6,7

**C**

**call** 15:10 29:4

**called** 38:12,13,14 45:2 46:20

**calls** 10:12 12:17 13:6, 23 17:17,23 19:8,18 20:22 22:8 23:10 25:24 32:6 36:16 49:17 53:3 54:25 55:1

**Canizaro** 5:9 43:24 46:24 53:21 54:11

**capacity** 11:10 27:5 35:6 55:7 58:13 59:3

**careful** 34:10

**carefully** 36:20

**case** 5:19,22 31:7 38:23 39:5,16 40:4,19,22 41:6,8 43:18,20 45:3 47:1 48:11 55:4,10 56:15 59:2,23 61:19

**certified** 29:8,18 31:18

**Chad** 14:1 44:22

**Chadwick** 5:7

**Chaisson** 34:23,25 60:2

**charge** 20:16 49:8 57:4 62:3

**charged** 49:15 61:25

**charges** 54:23 61:11

**Charles** 11:21 30:20

**chief** 28:8 49:22 50:2,3

56:6

**children** 34:20

**Childress** 57:19,20

**chose** 36:20

**chronological** 23:25

**Circuit** 6:23

**circumstances** 7:2

**civil** 40:2 45:2,16

**clear** 47:14

**client** 7:16 8:13,14,17, 18,20,21 10:20,25 11:8, 11 15:20 17:7,24 18:12 19:3,12 26:1,5,13 36:9 37:1,2 40:6 42:21 44:13 56:2

**client's** 7:19 10:10 26:1,2,10,15

**Clint** 45:1 60:15

**close** 11:3 25:7,11 30:22 31:6 49:11

**closed** 5:20

**cold** 31:6 32:4,7

**Collin** 43:17 56:5,12

**Collings** 5:6,8 7:6,24 8:11,19,23 9:14,19,24 10:14,23 12:10,18,22, 25 13:9,13,19 14:2,5, 18,22 15:2,5,15 17:19 18:1,16 19:1,14,21 20:24 21:14,17 22:11 23:5,13 26:6,20,23 32:9 36:18 39:2,17,21 40:8, 23 41:11,18,19 42:1,8, 11,22 44:14,18,24 49:20 52:8,11 53:6 55:2 61:4,7 62:12,16

**commander** 31:3 32:17

**committed** 50:10

**communication** 8:13, 25 10:22 13:7 18:25 19:6 23:15 25:25 38:1 39:25 47:5 57:21 58:12

**communications** 8:17 10:13,20 12:7 13:24 17:18,24 19:9,19 22:9 23:11 26:4,18 36:17 37:1 38:23

**compel** 42:24

**competency** 54:8

**competent** 53:1

**compiling** 47:12

**complaints** 27:8

**CONCLUDED** 62:21

**concludes** 62:17

**conclusion** 20:23 50:13 55:1

**conducted** 42:20

**confirmed** 49:4

**connect** 29:5

**connected** 29:23

**connection** 42:13 43:10 59:4 60:17

**consent** 10:10

**conservative** 61:18

**contact** 35:13

**contacted** 45:1

**contacts** 31:16

**content** 38:24

**contents** 39:24

**context** 40:20,21

**continue** 10:21 40:16

**contrary** 44:10

**convenient** 25:7

**conversation** 16:1,20, 23 17:3 18:3 40:13 42:19 45:10 46:16 47:5

**conversations** 38:19 42:10,25 56:11

**convey** 59:6

**conveying** 12:4



**TORRES REPORTING & ASSOCIATES, INC.**

COURT REPORTING & LITIGATION SERVICES
www.torresreporting.com
1.866.982.6878 Toll Free

Baton Rouge, LA
225.751.0732
225.752.7308 FAX

New Orleans, LA
504.392.4791
504.392.4852 FAX

**convicted** 29:3

**coordinate** 44:2

**copies** 14:20

**copy** 9:15 14:11,17
17:20 21:6 35:24 44:19
47:21 52:2

**coroner** 11:22 30:16,18

**coroner's** 30:15

**correct** 5:25 7:10 8:8
9:22 10:6,7,8 11:9
15:23,24 16:7,8 17:5
20:6,7 23:1 27:3,4 28:9,
10,12,13 33:20 42:5,7
46:8 48:15 49:4,25 50:1
51:8,15,16 52:20 53:14,
17 54:3,4,6,7 58:16
60:16 61:5 62:7,8

**correctly** 37:5

**correspondence**
10:24

**costs** 40:11

**counsel** 5:16 6:25
14:3,13

**court** 6:23 14:10 21:16
41:8 43:1

**covered** 28:3,4 57:15

**coverup** 28:15,18

**Craig** 51:25

**created** 48:5

**creating** 16:7

**crime** 29:1 31:3 32:17
33:22,23 50:11

**crimes** 34:20

**criminal** 5:23 20:18,19
39:8 40:15 43:16 48:11
54:15 55:8 58:14 59:4,
17 61:11,17

**criminally** 49:25

**Culpeper** 5:9 52:21,23
53:13

**Culpeper's** 53:18

**current** 30:16,17

**D**

**D.a.'s** 30:9 32:21 34:7
35:1,5 58:10 60:9

**damages** 61:9,10

**Dan** 37:18,20 38:5,7
43:2,3,4,5 44:8,15

**Daniel** 55:22

**Danny** 5:9 31:11 52:21,
23 53:1,7,13,18

**Danny's** 53:17

**date** 15:9 16:3

**dated** 9:16 15:8,17 24:2
44:20

**Dave** 26:25 27:1,3,15,
20 28:15,19

**David** 57:23,24,25

**day** 48:20,22,23,24
58:17

**days** 24:20

**death** 31:1,4 33:16

**debate** 41:14

**deceased** 27:3 29:19

**December** 24:3,17

**decide** 10:16

**decision** 49:7 50:18
59:23,24

**declined** 59:9

**deemed** 59:14

**defamation** 20:18,20
54:15 55:9

**defendant** 29:2,3
53:14

**defendants** 5:8 60:21

**defending** 42:20

**defense** 37:8 61:11

**definition** 32:7

**Department** 34:18

**depending** 32:7

**deponent** 13:8,25
17:25 19:19 22:10
26:18

**deposition** 5:15 7:22
8:2,4,10 9:21 16:24
17:4 62:18,21

**depositions** 6:24

**deputies** 29:17,18

**deputy** 28:8 29:8 49:23
50:2,3

**detective** 31:12,24
35:19

**deviates** 13:4

**Difatta** 30:10,12,21,25

**differently** 36:24

**direct** 14:14 60:23

**directly** 38:2

**disagree** 39:3

**disagreement** 30:24

**disclosing** 8:24

**discovery** 22:3 33:24
45:25 46:4 60:22

**discussion** 15:19

**disfavored** 6:25

**distinguish** 12:21 41:7

**distinguishes** 40:20

**district** 24:24 25:10
28:11,12 30:13 56:7,8,
10,16 57:1

**division** 32:17 43:16
45:2 58:18,19 59:17

**Doc** 40:22 41:8

**document** 14:19,23,24
15:18,23 47:24

**documents** 23:19
45:19,21 46:12,22
47:12

**domestic** 27:23 33:12

**dots** 29:5

**doubt** 23:24 30:3

**doubts** 54:8

**drew** 30:17

**drill** 36:19 54:21

**Drive** 5:13

**DULY** 5:1

**E**

**earlier** 60:4

**em** 22:12 30:3,4 32:25
33:25 45:17,18 47:17

**email** 21:23,24 22:2,13,
18 23:18 24:11,19 25:3

**emails** 21:7,13,20 22:6,
15,24 23:22 24:1,8
45:24 46:4,5,9

**employee** 6:8

**enforcement** 11:15,
16,17

**ensure** 24:12

**entire** 12:11 62:6

**Epperson** 45:1,8,13
60:15,16

**establishes** 11:20

**estimate** 61:16,18

**Evangeline** 5:12

**evasive** 37:4

**evidence** 11:20 23:4
50:10,12 53:10,16
54:19

**evidentiary** 50:14

**evidently** 45:14

**examination** 5:5 29:21
58:15

**exception** 47:13

**Exclamation** 25:7,18



**TORRES REPORTING & ASSOCIATES, INC.**

COURT REPORTING & LITIGATION SERVICES
www.torresreporting.com
1.866.982.6878 Toll Free

Baton Rouge, LA
225.751.0732
225.752.7308 FAX

New Orleans, LA
504.392.4791
504.392.4852 FAX

BRIAN TRAINOR

**exhibit** 9:21,23 15:4 21:16 44:21 46:6,7 47:21 52:3,10 60:20

**exist** 18:19 20:14

**expense** 39:13 43:1

**expertise** 25:20

**explore** 26:22

**extent** 19:8 29:5

**Extremely** 57:18

---

**F**

**F3rd** 7:18

**fabricate** 54:19

**fact** 9:17 32:3 55:5 56:3

**facts** 23:3 37:7 50:11, 15,17,23 51:2,6,15 54:15,17 55:9 56:14

**factual** 40:20 41:9

**factually** 36:5,22,25

**fair** 49:23

**false** 26:3,12,14

**falsity** 26:16

**familiar** 5:17 27:7 29:22 31:12

**familiarize** 9:25

**families** 47:18

**family** 21:7 37:15 40:13 43:12

**FBI** 35:12 45:2 46:14

**FBI/ATF** 29:13

**fee** 61:20,22 62:6

**feel** 46:23

**fees** 40:11 61:10

**fellow** 11:16

**figure** 44:6

**file** 42:24

**filing** 58:12

**find** 43:18

**fine** 24:16

**fingerprint** 28:25 29:4

**fire** 25:5,6,7,10,19

**flat** 61:20,22

**followup** 24:11

**force** 35:12

**forensic** 30:14

**forgotten** 50:24

**forwarded** 59:20

**found** 29:19

**fourth** 14:14 15:6,7

**frankly** 20:15 28:1 56:20 62:2

**Frederick** 5:12

**Friday** 24:3

**friend** 34:6

**friends** 6:17

**front** 20:12 23:19

**full** 5:10 26:24 33:16

**function** 55:7

---

**G**

**Galvin** 30:15

**Gardner** 58:8,9

**Garrison** 55:4

**Gaudet** 15:10,11,18,20 16:2 17:1 32:18,20 33:3,12 43:22 47:23 50:22 51:12 57:15

**Gaudet's** 48:13 50:20 53:19

**gave** 44:9 50:5

**general** 43:20 59:2,19

**general's** 34:19 43:17, 22 56:17,23 57:4 60:8

**generally** 6:25 7:15

**Genevieve** 60:11

**Gina** 37:19,20,25 43:7,8 44:8,15

**give** 62:7

**giving** 40:9,25 41:5,15

**globo** 21:16

**good** 5:7 47:17

**Government** 21:21

**grapevine** 27:24

**grounds** 7:4

**Group** 7:20

**guess** 5:16,20 17:12,13 32:11 58:18

**guidance** 14:9

**guilty** 11:18

**guy** 43:21 47:17 57:16

---

**H**

**Haines** 7:19

**hand** 9:15 32:23 35:24 52:2 60:19

**handed** 21:12

**handle** 56:14

**happened** 16:1 23:16 33:9

**Hart's** 51:25

**head** 43:15,16,24 44:4 59:16

**heard** 16:9,15,18 27:24

**hearing** 33:5 58:21,23

**held** 11:18

**Hingle** 51:21

**Hold** 25:23

**home** 28:5

**homicide** 11:19,21 31:18 32:13 40:14

**homicides** 31:22

**honest** 57:18

**Hotard** 10:6 44:1 55:13, 18

**hour** 61:17

**hours** 61:16,19

---

**I**

**IBIS** 29:9,14

**idea** 23:8 25:14,16 29:10,16,20 30:23 31:2 33:14,18 34:12

**identification** 22:6

**identified** 20:12

**identifies** 32:17

**identify** 42:23 61:8

**immediately** 25:18

**implicate** 18:24 36:7, 11

**implicates** 8:17 26:3, 17

**implications** 45:16

**improper** 53:8,12 54:12

**incident** 27:23 28:16

**include** 61:9,10

**inconsistency** 37:9

**incorrect** 36:5,22,25

**incurred** 61:10

**individual** 7:7

**individuals** 37:23

**inexperienced** 32:12

**information** 11:1 24:12 36:8,11 37:10,11 44:9 48:17

**informed** 26:13 49:9

**inquiry** 11:1



**Torres Reporting & Associates, inc.**
COURT REPORTING & LITIGATION SERVICES
www.torresreporting.com
1.866.982.6878 Toll Free

Baton Rouge, LA
225.751.0732
225.752.7308 FAX

New Orleans, LA
504.392.4791
504.392.4852 FAX

inspector 25:19

inspectors 25:8

instruct 9:12 13:7,24 17:24 19:10,19 22:9 23:12 26:18 39:9 40:6, 17 41:2 42:4,15

interaction 58:21,23

interest 27:11

internet 34:20

interrupt 41:17

interview 15:10

interviews 29:25

investigate 25:19

investigated 27:25

investigating 25:11

investigation 35:19 37:7 39:7 43:25 54:12 55:19 56:12 59:7

investigations 29:22

investigative 50:4

investigator 31:7,19 32:13 35:19 49:13 50:5 53:1 54:5,9

investigators 25:5

invoked 8:9

invoking 7:21

involvement 53:19,20

IP 21:21

issue 8:8 33:7,13 40:12 47:19

issued 40:22

item 14:14

**J**

jail 44:2

January 16:3 24:11,14, 15 48:20

JDC 28:12

Jeff 59:2

Jenny 35:7,9,11,13,18 60:12

Jerry 5:17 6:2,7,12,13, 17 7:4,9,11,22 8:25 10:25 11:8,9,23 12:3,7 13:2,3,4,16 15:16,20 16:2,13,21,25 17:15,20 20:8,17 21:7 22:6,13,25 35:22 37:6,8,12 39:8 42:14 43:10,11 44:3,15 47:9 48:11,13 49:8 52:14 53:8,14 54:13 55:20 56:12,15,25 57:11 61:23

Jerry's 9:2

Joe 34:3,5

Jones 35:16

Joseph 58:25 59:1

Jr 15:17

judge 40:4 57:19,20 58:8,9,11,17

Judicial 56:8

Julius 56:5,11

June 6:6

justice 22:23

Justicenanette 24:5

justicenanette@ yahoo.com 22:24

justicenanette@ yahoo.com. 21:24

**K**

keeping 43:18 57:3

Keith 5:9 47:15,16,19 53:21,24,25 54:11,18

kids 47:18

Kim 22:20,21 37:18,20 43:5 44:8,15 57:6

kind 39:7 54:21

knew 6:13 16:6 21:4 25:20 27:5,10 28:24 33:1 47:18

knowing 27:12

knowledge 17:8 22:21 26:11 28:14,16 29:11 32:1 34:9 36:4,23 45:11,12 46:9 53:18,20 55:18,24 56:3

Krentel 11:19 21:8 29:23 37:16

Krentel's 22:22 31:4

**L**

lab 29:1

lacking 50:19

lady 24:23

Lance 29:25 30:5,7,21

Landry's 59:2

law 11:15,16,17 15:9,17 40:19 41:6 55:5

lawsuit 53:14

lawyer 26:1,15 59:4

lawyer's 26:2

lawyers 36:21

lead 31:7,8,24 35:18

learn 16:19 17:7 31:8

learned 36:8,12 37:11 48:10 56:24

Lebeau 43:19 58:25 59:6,18,21 60:1

led 51:6

left 6:11 14:13

legal 15:19 20:22 49:24 54:25

letter 9:15,17 10:1,3,5 11:9,11,25 12:11,13,14 13:2,14 14:7

Lieutenant 10:6

Ligget 7:20

limit 8:2

limited 7:1 40:1

List 52:3

listed 16:16 46:13

listen 18:2

listened 19:22,25 20:4

litigation 40:1,2 47:22

lived 33:4

lives 33:3

Lloyd 51:23

local 56:16 60:9

log 14:12

logs 14:21 33:22,24

long 62:1

Lopez 58:1

lot 28:25

Louisiana 5:13

**M**

machine 29:9,14

Madam 21:15

made 16:20,25 20:5 45:10 54:17 59:23,24

Magee 43:15 59:15

maintain 42:3,14

major 31:3 32:17

make 6:22 24:20 37:4 50:11

makes 54:22

making 16:12

Mandeville 5:13

Marco 58:1

mark 9:20 25:10

marriage 27:21



**TORRES REPORTING & ASSOCIATES, INC.**
COURT REPORTING & LITIGATION SERVICES
www.torresreporting.com
1.866.982.6878 Toll Free

Baton Rouge, LA
225.751.0732
225.752.7308 FAX

New Orleans, LA
504.392.4791
504.392.4852 FAX

**Maselli** 57:23

**matter** 5:2,8,24 11:20 18:18 19:23 20:5 39:9, 22 40:15 57:22 58:1,14, 24 59:5,10 60:5,10,13, 17

**matters** 61:17

**Matthew** 58:4,6

**meet** 48:19

**meetings** 47:8

**Melanie** 51:20

**member** 11:3

**members** 37:15 40:14 43:12 51:24,25

**mentioned** 29:25

**met** 6:15 35:11 45:3,4 46:21 48:22 49:2

**mine** 34:6

**minute** 62:9

**missing** 51:9

**Modisett** 34:1

**moment** 35:24 60:25 61:13

**Montgomery** 57:10,11

**month** 17:5,6

**Morel** 26:25 27:1 28:15, 19

**Morel's** 27:3,20

**morning** 5:7

**Morris** 28:21,23

**motion** 8:1 39:6 42:24 58:13,15

**motivated** 49:8 50:19 51:7,11

**move** 41:3

**Moving** 14:10

**multiple** 29:2

**murder** 29:23

## N

**named** 53:13

**Nanette** 11:19 21:7 22:22,23 29:19,23 31:4 33:15 57:9

**Nanette's** 30:25

**Nebraska** 24:25

**necessarily** 26:3,16

**nonsensical** 13:12

**normal** 49:13

**notarized** 47:23

**note** 6:23 7:13

**noted** 27:8

**notes** 44:7

**notice** 8:3,5 9:21

**notified** 25:9,17 56:21

**number** 15:14 21:13 31:21 43:21 49:5 52:14 53:21 54:6 55:13 60:24

## O

**OATH** 5:2

**object** 7:2 9:11 10:12, 21 12:6,8 25:23 36:15 38:21

**objection** 6:22 8:6 12:17 13:6,23 17:17,23 18:8,21 19:18 20:22 22:8 23:3,10 32:6 42:4, 15 49:17 53:3 54:25

**occasion** 35:21

**occurred** 23:8 25:6

**office** 6:3,7,15 11:2 15:17 24:24 28:9,12,22 29:12,15 30:8,9,14,15 31:16,22 32:14,21,22 33:6,8 34:8,11,19 35:1, 2,4,5,10 43:17,22 46:21 49:23 50:3,4 51:19

52:1,24 54:3,6 55:17,24 56:8,9,10,17,23 57:1,5, 25 58:2,7,10 59:3 60:3, 8,9

**officer** 11:16

**Offices** 15:9

**official** 55:6,7

**open** 5:21 25:6

**opinion** 32:6 47:14,16 49:17 52:25 53:3,5 55:1

**opinions** 46:24

**opportunity** 40:10 41:1,5,15 42:2

**opposing** 6:25

**order** 23:25 43:1 48:8

**Orleans** 27:11

**ownership** 7:13 27:10

## P

**paragraph** 11:14 25:4, 17 26:25 27:8 28:3 33:17

**paren** 25:6,7

**parish** 5:19 6:3 11:2,22 29:15 31:22 33:4,8

**part** 16:12 28:18 53:17

**parties** 11:18

**party** 11:18

**Pat** 43:15

**pathologist** 30:15

**Patrick** 59:15,16,17,22

**pattern** 56:3

**patterns** 55:5

**people** 32:23 42:13 43:11 44:5 51:17 52:5

**percent** 27:24 43:8

**performing** 55:7

**period** 6:16 11:3 19:5

24:12 25:12,21 43:12

**permitted** 7:1

**person** 37:14 38:9 45:4,5 50:10

**personally** 26:7 29:24 57:7

**phone** 33:19 38:9,10 57:8

**photos** 45:22

**pick** 57:3

**Picone** 34:3,5

**place** 25:10

**plaintiff** 14:12

**Plaintiff's** 52:3 60:21 61:2

**played** 47:19

**point** 5:15,22 6:9 14:1 25:7,18 33:11 35:13

**Police** 34:18

**policy** 25:10

**politically** 49:8 50:18 51:6,11

**polygraph** 29:21,22 30:1

**position** 40:10 41:1

**power** 7:16

**practice** 8:1

**Preliminary** 58:15

**preparation** 40:1

**prepare** 48:9

**preparing** 37:8

**present** 47:7

**presenting** 41:9

**presiding** 58:17

**Preston** 11:21 30:19, 20,25

**pretty** 43:8 49:23



**TORRES REPORTING & ASSOCIATES, INC.**

COURT REPORTING & LITIGATION SERVICES
www.torresreporting.com
1.866.982.6878 Toll Free

Baton Rouge, LA
225.751.0732
225.752.7308 FAX

New Orleans, LA
504.392.4791
504.392.4852 FAX

previous 60:14

previously 29:3

prior 9:7 15:20 33:16

privilege 7:5,14,15,19, 21 8:9 9:12 12:9 14:12, 20 38:22 39:1 40:3,16 47:5

privileged 10:13 13:7, 24 17:17 22:8 23:11 26:3,17 36:17

problem 7:20 19:13

procedural 56:14

product 38:21,25 39:4, 18 40:3

Production 60:24

professional 6:18 34:6 35:6

professionally 27:6

professionals 11:17

prosecute 59:9

prosecution 51:7 59:8

prosecutor 6:13 28:24 34:16 49:22

prove 29:2

provide 17:20 45:21 50:22

provided 11:20 14:12 18:5,17 19:4,11,15 20:2,9 21:6 45:19 46:1, 2,14,17 47:22 49:2

public 55:6,7

purported 55:6

purports 23:7

purpose 42:20

put 50:12,24,25

**Q**

question 7:3 8:24 13:18 15:22 18:13,23 25:9 36:7,16,21,23 40:25 44:22 53:24 56:19

questions 14:4,9 39:12 42:16 46:22,23 57:17 62:15

quick 9:25

quote 11:3 25:11 28:4 30:22,24 31:7 49:7,11 55:8

**R**

raised 8:10

Randy 5:9 52:17

rank 32:24 34:17

rate 61:15

Raymond 57:19

reach 50:12

reached 45:9 59:17

read 11:5 12:11,13 21:3 23:18 61:13 62:18,20

reading 11:25 15:11 21:2 25:3

reason 23:24 32:15 34:9 41:7 53:7,11 54:11

recall 21:2,3,5 22:16 31:25 33:5,23 34:20 44:16 46:2,20 57:14 59:12,22 60:4

recent 11:1

recognize 47:24 58:5

recognized 7:15

record 5:11,16,20 7:13 11:16 12:12 15:3 16:14 17:2 21:12 41:14 44:19 52:9 62:10,11

recorded 17:11

recording 15:7,8,12, 16,18,25 16:6,10,20,25 17:8,21 18:2,5 19:5 45:10

recordings 15:7 16:12, 15 18:17,18 19:15,22 20:5,9,11,13

records 33:19 46:17

recusal 56:22

recusing 43:19

refamiliarize 35:25

refund 62:7

relation 16:13

relationship 6:2

relay 59:25

relayed 59:20

released 11:2

relevant 49:14

remember 10:3 11:4,5 16:22 27:22 29:1 33:10, 24 34:17 35:3,11 36:1 37:19,25 38:2 44:3,4,16 45:1,7,25 48:1 52:6 56:23 58:7

repeating 41:20

report 46:1

Reporter 21:16

reports 50:5

represent 6:20 7:3,7 8:16,22

representation 9:9 11:23 16:13 36:12 37:6 40:15 42:14 43:10 48:11 60:17

represented 5:18,23 20:16

represents 7:8

Request 60:24

requested 45:23,24

Requests 60:22

researched 55:5

reserve 13:10 14:6 26:21 39:11

residence 33:8

resigned 25:19

respect 42:12 53:8,24 54:12 55:19

respond 43:1

response 10:25 56:21 60:24 61:2,13

Responses 60:21 61:3

responsible 11:19

rethink 40:10 41:1

reveal 33:20

revisit 42:9

Rick 35:16

rights 45:2,16

Roger's 39:8

Rogers 5:17 6:12 7:4,8, 10,11,22 10:25 11:8,9, 14,24 13:2 14:8 15:16, 20 16:2,13 20:8 21:7 22:4,6,13,25 24:10 36:13 47:7 49:8,10 52:14 53:9,14 54:13 55:20 56:2,12 57:11 58:3 59:10 60:18 61:8

Rogers' 12:3,7,15 43:1 44:3 45:15 48:13 56:25 58:1,13 59:4

role 16:7 35:4

rookie 31:6 32:4,8,10

Rowley 58:4,6

ruling 38:23 39:6,7,15 40:4,21 41:7

**S**

safe 32:3

Saint 6:14 29:14

Sarah 34:1

scene 25:8,9 33:22,23

scheduled 17:4



**TORRES REPORTING & ASSOCIATES, INC.**

COURT REPORTING & LITIGATION SERVICES
www.torresreporting.com
1.866.982.6878 Toll Free

Baton Rouge, LA
225.751.0732
225.752.7308 FAX

New Orleans, LA
504.392.4791
504.392.4852 FAX

school 25:6 29:18

Scott 58:8

Seagate 7:17

sending 22:24 24:23

sends 24:17,19

sense 54:16

sentence 13:21

September 6:6 44:21

Sergeant 46:24

serve 10:25

Set 60:22

share 52:1

shared 16:16 17:15

sheet 20:12

sheriff 5:9 27:17 33:15

Sheriff's 6:3,7,15 11:2
28:9,22 29:12,15 30:8
31:16,22 32:13,22 33:6,
7 34:8 35:2,4,10 49:23
50:3,4 52:24 54:2,6
55:16,23 56:9 57:25
58:2,7 60:3

shooting 28:5

show 14:11 23:7 47:21

sign 62:18,20

signed 10:8 47:23

signing 15:20

Sims 43:18 56:5,12

sister 22:22,25 57:8

sit 51:5,14

sitting 14:13 57:16

situation 41:9

Slidell 34:18

Smith 5:9 52:17

socialize 27:19

socially 27:6

sole 7:16

space 52:1

speak 38:7,16 43:9
45:13 58:3 60:9

specific 42:25 55:9

spoke 37:22,24,25
38:3,14 42:13 43:4,5,7,
8 44:9 57:7,25 59:3
60:12,16

spoken 43:14 44:7

St 5:18 6:3 11:1,22
31:22

staff 51:24,25

start 25:2 26:25 38:4

started 6:5

starts 23:18

state 5:10 38:11

statement 11:4,6,7,23
33:20 55:25

statements 25:15
26:2,8,11,15 37:7

statute 21:1,2,3 49:9
54:15,18 55:9 59:13

staunch 11:15

stay 56:15

Stefan 57:10,13

stellar 11:16

step 62:9

Steve 15:10,18,20 16:2,
20 17:1 32:17,18,20
33:1,3,12 34:23,25 35:3
43:22 47:23 48:13,17,
19 51:12 53:19 57:15
60:2,3,4

Stiles 43:21

stone 31:6 32:3,7

strategy 15:19

string 23:22

structure 32:24 36:23

subject 18:8,20 38:22,
25 39:5 40:2 55:25

subjective 49:14 50:5,
23

subsequent 9:5

substance 23:14 38:18
42:10 47:1 48:8

substantive 56:13

suggest 18:12 41:6

supervisor 34:22

Supplemental 60:21,
23 61:2

supply 51:2

support 50:23

supporter 11:15

suppose 24:20

surprised 17:7

SWORN 5:1

system 49:24

T

table 36:21

taking 29:14 33:7

talk 32:25 35:13 38:4
45:2 46:18,21 57:10

talked 16:24 19:3 33:15
38:2 42:23 43:17,24
44:1,4,23 48:23 57:12
60:15

talking 28:4 41:18 46:4
52:6 57:14 59:22 60:4

Tammany 5:18 6:3,14
11:2,22 29:14 31:22

Tangipahoa 33:4

task 35:12

Tech 7:17

telephone 16:22

telling 26:13

tender 62:13

TESTIFY 5:2

testimony 60:14

thereof 38:25

things 46:24

thought 47:17

thoughts 12:14,15,23,
24 13:15

time 6:13,14 16:24 21:4
28:8 30:8,13 31:4
32:21,25 33:1 34:7,16
35:1,2,10,14 38:13
41:21 43:15,24 49:19
51:4 54:2 55:16,23 56:9
57:24 58:9,11 59:16
60:7 62:2

times 38:7,8,15,17 43:4
46:20 59:3

Title 15:18

today 51:5,14

told 19:3 25:19 32:2
47:17 56:24

Tommy 28:21,23,25
29:4,8

top 43:23 44:4

topic 40:5

town 25:5

trained 49:13

training 25:20

Trainor 5:1,12 8:5
57:16

Trainor's 15:19 26:11

trials 56:7

true 10:16 26:2,8,12,14
32:2 33:10

truth 26:16

typed 48:3,16

U

U.S. 21:21

Uh-huh 44:25



TORRES REPORTING & ASSOCIATES, INC.

COURT REPORTING & LITIGATION SERVICES
www.torresreporting.com
1.866.982.6878 Toll Free

Baton Rouge, LA
225.751.0732
225.752.7308 FAX

New Orleans, LA
504.392.4791
504.392.4852 FAX

BRIAN TRAINOR

ultimate 49:7 50:13 59:8

ultimately 59:9,24

Um-hum 48:6 49:1

unaware 51:15

unconstitutional 49:10 59:14

uncovered 37:8

understand 25:5,18

understanding 7:8 9:8 20:19 32:10

unique 13:1

unit 34:22

unquote 28:4 30:25 55:8

unusual 17:10,12

**V**

vehicle 33:8

verbatim 21:2,5 59:12

victim 40:14 55:6,8

victim's 22:25

video 18:18,20

violence 33:13

Vitter 29:25 30:5,21

**W**

waive 7:17 62:20

wanted 8:1 24:11

wanting 57:2

warrant 44:20

warranted 54:16,23

wasting 41:21

watching 29:24

Watson 22:20,21 37:18 43:2,3,5 57:6

watsonk07@hotmail. com. 22:18

weeks 17:4

wife 27:17 33:13 56:25

William 15:8,9,17 43:19

Wilson 60:6

withdraw 5:21

witness's 8:2

witnesses 42:19 51:17

word 12:12,13 13:21 32:10

words 13:4 36:20 48:12

work 29:6,8 32:23 38:21,25 39:4,18 40:3 51:18,19

worked 6:2,15 31:17, 21 32:22 34:18 52:24 56:25 60:8 61:18

working 55:16 58:10

workings 29:12

works 24:24 49:24 56:6 58:2

write 10:16

writing 11:9

wrong 15:11 55:19,25 56:4

wrongdoing 53:16

wrote 10:8,10,15 11:11 24:5

**Y**

ya 24:6

year 6:3,4 35:11

years 54:6



**TORRES REPORTING & ASSOCIATES, INC.**

COURT REPORTING & LITIGATION SERVICES
www.torresreporting.com
1.866.982.6878 Toll Free

Baton Rouge, LA
225.751.0732
225.752.7308 FAX

New Orleans, LA
504.392.4791
504.392.4852 FAX