FD-1057 (Rev. 5-8-10)

UNCLASSIFIED//FOUO



# FEDERAL BUREAU OF INVESTIGATION
### Electronic Communication

**Title:** (U//FOUO) Case Opening Request      **Date:** 10/08/2019

**From:** NEW ORLEANS
       NO-16
       **Contact:** Clinton D. Epperson, 504-816-3000

**Approved By:** SSA REED RONALD
             A/CDC Kyle E. Hanrahan
             Jeffrey B. Veltri

**Drafted By:** Clinton D. Epperson

**Case ID #:** 282B-NO-3179991      (U//FOUO) SENSITIVE INVESTIGATIVE MATTER
                                 SUBJECTS▬
                                 ▬▬▬▬▬▬▬▬
                                 ▬▬ST. TAMMANY PARISH SHERIFF'S
                                 OFFICE;
                                 VICTIM-JERRY HAMILTON ROGERS/LOCATION-ST
                                 TAMMANY PARISH;
                                 CONSPIRACY AGAINST RIGHTS

**Synopsis:** (U//FOUO) Writer requests a full investigation into the below matter to investigate allegations that reasonably indicate a civil right violation occurred when Jerry Rogers was arrested by the St. Tammany Parish Sheriff's Office (STPSO) for violating Louisiana State Statute 14:47-Defamation; a law previously ruled unconstitutional by the Supreme Court of the United States.

**Details:**

**<u>PREDICATION</u>**

The FBI New Orleans Division received information, to include media articles, the STPSO arrested Jerry Rogers (ROGERS), a United States Department of Housing and Urban Development (HUD) Agent, on September 16, 2019 for criminal defamation, after ROGERS sent emails that criticized a

UNCLASSIFIED//FOUO

**UNCLASSIFIED//FOUO**

Title:  (U//FOUO) Case Opening Request
Re:  282B-NO-3179991, 10/08/2019


STPSO investigation to a victim's family member.  Additionally, STPSO investigators were told the by 22nd Judicial Attorney's (DA) Office's ███████████████████████████████████████████████████████████, the statute was previously ruled unconstitutional prior to ROGERS' arrest.  At least one (1) news outlet reported the information in ROGERS' email(s) was sent to two current candidates opposing ████████████████ ██████████ in the 2019 election for the position of St. Tammany Parish Sheriff.

**INVESTIGATION TO DATE**

On September 23, 2017, FBI Special Agent (SA) Clinton D. Epperson and Task Force Officer (TFO) Russell Varmall interviewed ██████ in reference to the September 16, 2019, arrest of ROGERS.  ROGERS was arrested for violating Louisiana State Statute 14:47-Defamation.

According to ████████ ROGERS, previously employed as a STPSO Deputy, worked for HUD as a federal agent.  ROGERS was a friend of former STPSO ██████ ████████████████████ who was involved in the investigation into the 2017 homicide of Nanette Krentel.  ROGERS was believed to have received information concerning the homicide investigation from ████████████  ROGERS emailed a member(s) of KRENTEL's family to included KRENTEL's sister who was a prosecutor outside of Louisiana.  In the email ROGERS criticized STPSO's investigation of KRENTEL's homicide. According to the affidavit for ROGERS' arrest, STPSO initially investigated the matter as an obstruction of justice matter.

On September 13, 2019, ██████ had a meeting with ███████████████████ █████████████████████████████████████████████████████████████ ███████████ to discuss the investigation into ROGERS' email to KRENTEL's family member(s).  The STPSO deputies communicated they had internally ruled out charging ROGERS with obstruction of justice, but believed 14:47-Defamation was an appropriate charge.  ██████told the STPSO

**UNCLASSIFIED//FOUO**

UNCLASSIFIED//FOUO

Title:  (U//FOUO) Case Opening Request
Re:  282B-NO-3179991, 10/08/2019

personnel, ▇▇▇ would research the viability of charging 14:47-Defamation
and inform STPSO of his opinion at a later time.

On the morning of September 16, 2019, ▇▇▇ met with other ADAs in the
DA's office and found prior court rulings in which 14:47-Defamation was
deemed unconstitutional. The fact patterns of the previous cases were
similar to ROGERS' case. ▇▇▇ informed ▇▇▇▇▇ the DA's office would
not support the use of the statute to charge ROGERS due to previous
courts ruling the statute was unconstitutional. ▇▇▇ also notified
▇▇▇▇▇ that the DA recused themselves from the case due to ROGERS'
wife, ▇▇▇▇▇▇ being employed as a secretary within the DA. ▇▇▇
believed the call with ▇▇▇▇▇ occurred approximately at or before
11:00AM. ▇▇▇ later learned ROGERS was arrested for violating 14:47-
Defamation under the authority of a warrant signed by ▇▇▇▇▇▇
▇▇▇ S (CHMM) with ▇▇▇▇ as the affiant.

At a meeting, unrelated to the ROGERS case, ▇▇▇N▇ told ▇ the timing
of ROGERS arrest was not ▇▇▇▇▇ decision.

▇▇▇▇▇▇ (CAPT) ▇ was interviewed on September 23, 2019.
▇▇▇ explained he had been tasked with locating documentation of
previous rulings on 14:47-Defamation for ▇▇. ▇▇▇ was also present
for ▇ telephonic conversation with an unknown person within STPSO.
▇▇▇ recalled ▇ phone conversation occurred sometime prior to
lunch.


**ANTICIPATED INVESTIGATION**

Based on the above information, the writer respectfully requests a full
investigation be opened to investigate for evidence of a criminal
conspiracy conducted by the above mentioned STPSO members, and/or others,

UNCLASSIFIED//FOUO

**UNCLASSIFIED//FOUO**

Title:  (U//FOUO) Case Opening Request
Re:  282B-NO-3179991, 10/08/2019

to deprive ROGERS of his constitutionally protected civil rights. Due to ████████ position as ████████████ a part of ████████ Executive Staff, as well as ██████ and ███████ ranks, this matter will be captioned as a SENSITIVE INVESTIGATIVE MATTER.

◆◆

FD-302 (Rev. 5-8-10)

- 1 of 4 -



UNCLASSIFIED//FOUO

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry ____10/10/2019____

██████ ██ ██ ████████ date of birth (DOB) ████ ██ ████ ██, cell ███ ██████ telephone ███-███ ████ was interviewed at the 22nd Judicial District Attorney's (DA) Office, 701 N. Columbia Street, Covington, LA 70433.  After being advised of the identities of the interviewing Agents and the nature of the interview, ███ provided the following information:

On September 13, 2019, ████ met with St. Tammany Parish Sheriff's Office (STPSO) ██████ ██ Sgt.Danny Culpepper (CULPEPPER), Lieutenant (██ ████) ██ (HOTARD), and ███████ (Sgt.) Keith Canizaro (CANIZARO) concerning an investigation into Jerry Rogers (ROGERS).

ROGERS, a previous STPSO deputy, was employed at the United Stated Department of Housing and Urban Development (HUD) as a federal law enforcement agent.  ROGERS was investigated by STPSO after emails that criticized STPSO's investigative efforts were sent to the family member(s) of Nanette Krentel (KRENTEL).  KRENTEL's 2017 death was ruled a homicide, but no arrest had been made. The emails, sent from the email address "justicenanette@yahoo.com," were believed to be sent by ROGERS and were critical of STPSO detectives that previously led and/or currently led the investigation. ████████ ██ ███ █ ████ ██, who was friends with ROGERS, was involved in the investigation at one point until he was fired for leaking case specific information to ROGERS.

The deputies that met with ████ indicated, based on their investigation, ROGERS would not be charged with an obstruction of justice charge.  The deputies wished to charge ROGERS with violating Louisiana statute 14:47-Defamation for the statements made in the emails. ████ received a copy of STPSO's investigation. ████ stated he was not willing to provide an answer at the meeting, but would provide an answer at a later time.

On the morning of September 16, 2019, at approximately 9:00AM ████ received

UNCLASSIFIED//FOUO

Investigation on ___09/20/2019___ at _Mandeville, Louisiana, United States (In Person)_

File # _282B-NO-3179991_                                          Date drafted _09/25/2019_

by _Clinton D. Epperson, Russell Antoine Varmall_

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 5-8-10)

**UNCLASSIFIED//FOUO**

282B-NO-3179991

Continuation of FD-302 of  (U//FOUO) Interview of ▮▮▮▮▮▮▮▮  ,On  09/20/2019  ,Page  2 of 4

a phone call from ▮▮▮▮▮▮ ▮▮▮▮▮▮ requested an answer as to whether
the DA's office supported STPSO charging ROGERS. ▮▮▮ believed that ▮▮▮▮▮
▮▮▮▮▮ was telling or pressuring the detectives to move quickly
to arrest ROGERS.

At approximately 10:30AM ▮▮▮ met with ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮▮▮
to discuss the ROGERS case. ▮▮▮▮ researched the constitutionality of
14:47-Defamation. It was determined previous application of 14:47-Defamation
had been ruled unconstitutional on multiple occasions. ▮▮▮▮, speaking about
the use of 14:47-Defamation as a charge, "To think someone can be arrested
for this is crazy."

With ▮▮▮▮▮▮▮▮▮▮ and ▮▮▮▮▮ present, ▮▮▮▮ contacted ▮▮▮▮▮▮▮▮ by phone
between 10:30AM and 11:30AM; ▮▮▮ did not have a record of the exact time of
the call. ▮▮▮ told ▮▮▮▮▮▮ the DA's office did not support the use of
14:47-Defamation, as it had been found unconstitutional on multiple
occasions in previous applications. ▮▮▮ told ▮▮▮▮▮▮ the DA's office was
going to rescues themselves from the case due to ROGERS' wife, ▮▮▮▮▮
▮▮▮▮▮▮▮▮, working as a secretary in the DA's office. ▮▮▮ told
▮▮▮▮▮ the DA's office would also advise the Louisiana Attorney General's
(AG's) Office of the DA's recusal and of the previous court opinions that
14:47-Defamation was unconstitutional. ▮▮▮ later sent letters and emails
to both STPSO and the AG's office making the notification.

▮▮▮ later learned STPSO arrested ROGERS for 14:47-Defamation on September
16, 2019.  The affidavit for the arrest warrant as well as the actual arrest
warrant, signed by ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ appeared to be signed
via an electronic document system called Cloudgavel(ph). ▮▮▮ and ▮▮
▮▮▮▮▮▮▮▮ reviewed the DA office's records and believed they found
only one submission for a 14:47-Defamation charge in the DA office's
history; ▮▮▮▮ had done the research.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮, an STPSO detective was recently fired by
STPSO. ▮▮▮ was surprised by ▮▮▮▮▮ firing, because ▮▮▮▮▮ was
"one of their most competent" detectives and had been on a task force with
the United States Secret Service (USSS). ▮▮▮ learned of ▮▮▮▮▮▮
firing from an email from STPSO ▮▮▮▮▮▮▮▮▮ ▮▮▮ learned

**UNCLASSIFIED//FOUO**

FD-302a (Rev. 5-8-10)

282B-NO-3179991

Continuation of FD-302 of  (U//FOUO) Interview of ██████████ ,On 09/20/2019 ,Page  3 of 4

was fired for sharing privileged information used to defame STPSO and personnel.

It was ████ understanding that the information in the emails ROGERS sent to KRENTEL's sister, who was a prosecutor outside of Louisiana, predated ██████████ involvement in the investigation.

████ stated ██████████████ , a candidate running for St. Tammany Sheriff, made a post on Facebook.  In the post, ██████████ , reported ████ had threatened ████████ after ████████ had made comments, online, critical of ████ and the KRENTEL investigation.

████ told Agents there was an incident during STPSO's investigation into ROGERS' emails involving ROGERS in Monroe, LA.  During the incident ROGERS made incoherent statements and the Monroe SWAT team was dispatched to the hotel ROGERS' was staying at.  ████████ left work to go to the scene in Monroe.  ROGERS made statements to the affect that he [ROGERS] was sexually abused as a child and that ROGERS may have sexually abused his brother and sister.

██████████████████ was currently ROGERS attorney.  ████████ was previously in-house counsel for STPSO.

████ provided the following items:

- St. Tammany Parish Sheriff's Office Booking Receipt for ROGERS dated 9/16/2019.
- Affidavit For Arrest Warrant for the arrest of ROGERS signed by ████████ and ████████ signed on Monday, September 16, 2019.
- Arrest Warrant for ROGERS signed by ████████ on Monday, September 16, 2019.
- Email correspondence from ██████████████ paralegal, to STPSO and the Louisiana Attorney General's Office recusing the DA's Office from the ROGERS case, as well as notification of potential unconstitutionality of the 14:47-Defamation statute.
- STPSO's memorandum confirming receipt of DA Office's recusal.
- A letter from ROGERS' attorney, ████████ that contained "Call For Service Detail Report-CFS 1248" from the Monroe Police Department, and a narrative synopsis written by West Monroe Police Department Crisis Negotiator ████████████.
- Copies of emails sent from "justicenanette@yahoo.com," purportedly by ROGERS, to KRENTEL's sister ████████.

FD-302a (Rev. 5-8-10)

UNCLASSIFIED//FOUO

282B-NO-3179991

Continuation of FD-302 of (U//FOUO) Interview of  , On 09/20/2019 , Page 4 of 4

- 2018 Unconstitutional Statutes Biennial Report To The Legislature In Accordance With R.S. 24:204(A)(10), from the Louisiana State Law Institute Constitutional Law Committee, and printed excerpts from the State v. Snyder (1972).

Additionally, ▉ forwarded a screen shot of ▉ Facebook post.

[The above mentioned items, ▉ Facebook post, as well as SA Epperson and Varmall's original notes were made a part of the investigative file via 1A.]

FD-302 (Rev. 5-8-10)



UNCLASSIFIED//FOUO

## FEDERAL BUREAU OF INVESTIGATION

Date of entry ___10/15/2019___

███████████████████, date of birth (DOB) ████████████ cell phone ████████, work phone ████████████ was interviewed at the 22nd Judicial District Attorney's Office, 701 N. Columbia Street, Covington, LA 70433. After being advised of the identities of the interviewing Agents and the nature of the interview, ███████ provided the following information:

At approximately 9:00AM or 9:30AM on September 16, 2019, █████████ ████████ asked █████ if state statute 14:47-Defamation was unconstitutional. █████ believed the statute had been deemed unconstitutional, but researched the matter.

█████████ found previous rulings that found 14:47 Defamation unconstitutional. ████████ learned the St. Tammany Parish Sheriff's Office (STPSO) wanted to arrest an individual on the charge. ████████ said "this is so obvious" that if STPSO arrested a person on that charge the deputies would not have qualified immunity. ███████ took what he found to ████ and informed him of what had been found. ████████ told ████ ██████████ ████████ and ██████ "I don't think we can refuse the charges fast enough."

█████████ was present when ████ spoke with someone from STPSO on the phone, sometime before lunch. █████ did not recall if ████ was called, or if ████ made the call. ███████ had been in the room with ████████████ and ███ for approximately 10-15 minutes before the phone call occurred.

█████████ was asked to research, within Carpel(ph), a data management system, if the DA's office had ever charged 14:47-Defamation. ███████ contacted ████████████████ in the Washington Parish arm of the office. ████████ stated, per Carpel, one case had been submitted to the DA's office in Washington Parish, but the case was not prosecuted. ████████ found the DA's

UNCLASSIFIED//FOUO

---

Investigation on __09/24/2019__ at Covington, Louisiana, United States (In Person)

File # 282B-NO-3179991                                    Date drafted __10/04/2019__

by   Clinton D. Epperson, Russell Antoine Varmall

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 5-8-10)

282B-NO-3179991

Continuation of FD-302 of  (U//FOUO) Interview of ██████████ , On  09/24/2019 , Page  2 of 2



office in St. Tammany had initially charged 14:47-Defamation, but later changed the charge. ████████ explained the fact pattern in that case was better characterized as a "revenge porn case."

██████ learned of Jerry Rogers' (ROGERS) arrest for violating 14:47-Defamation at approximately 4:20PM via text from a co-worker.

██████ did not know the specifics on the ROGERS case, but understood it was connected to the firing of STPSO ████████████████ ████████ ████████ had worked on a pervious case with ████████ .

FD-1036 (Rev. 10-16-2009)

UNCLASSIFIED//FOUO



# FEDERAL BUREAU OF INVESTIGATION
## Import Form

**Form Type:** Letter Incom - Letter - Incoming          **Date:** 10/15/2019

**Title:** (U//FOUO) Letter From Attorney ████████████, containing texts and
emails sent by Rogers.

**Approved By:** SSA REED RONALD

**Drafted By:** Clinton D. Epperson

**Case ID #:** 282B-NO-3179991      (U//FOUO) SENSITIVE INVESTIGATIVE MATTER
SUBJECTS ████████████████████
████████████-ST. TAMMANY PARISH SHERIFF'S
OFFICE;
VICTIM-JERRY HAMILTON ROGERS/LOCATION-ST
TAMMANY PARISH;
CONSPIRACY AGAINST RIGHTS

**Synopsis:** (U//FOUO) On October 9, 2019, SA Epperson received, via mail,
a letter from the ████████Law Firm. Jerry Rogers' (ROGERS) attorney ████████
████████████ requested Agents not utilize medical release forms to
obtain ROGERS' medical records, until ROGERS spoke with his
employer/supervisors.

Additionally, ████████ provided all emails ROGERS sent from the email
address "justicenanette@yahoo.com."

◆◆

FD-1036 (Rev. 10-16-2009)

UNCLASSIFIED//FOUO



# FEDERAL BUREAU OF INVESTIGATION
## Import Form

**Form Type:** LHM - Letter Head Memorandum          **Date:** 10/15/2019

**Title:** (U) Opening LHM to USAO re: Captioned Investigation

**Approved By:** SSA REED RONALD

**Drafted By:** Clinton D. Epperson

**Case ID #:** 282B-NO-3179991      (U//FOUO) SENSITIVE INVESTIGATIVE MATTER
SUBJECTS-███████████████████████
████████████████████
████████R-ST. TAMMANY PARISH SHERIFF'S
OFFICE;
VICTIM-JERRY HAMILTON ROGERS/LOCATION-ST
TAMMANY PARISH;
CONSPIRACY AGAINST RIGHTS

**Synopsis:** (U//FOUO) On October 10, 2019 SA Clinton D. Epperson sent the
Opening LHM in reference to the captioned matter to the USAO of Eastern
District of Louisiana via email; to be followed with hard copy.

◆ ◆

UNCLASSIFIED//FOUO

FD-302 (Rev. 5-8-10)

-1 of 6-



UNCLASSIFIED//FOUO

FEDERAL BUREAU OF INVESTIGATION

Date of entry          10/17/2019

     Jerry Rogers (ROGERS), date of birth (DOB) November 3, 1972, LA DL#
005531730, cell phone 985-789-7239, home address 82096 Highway 1080, Folsom,
LA 70437, was interviewed at ████████Law Firm, 1974 Highway 190, Covington,
LA 70433.  Also present was ████████████, ROGERS' attorney.  After being
advised of the identities of the interviewing Agents and the nature of the
interview, ROGERS provided the following information:

     ROGERS was currently employed with the United States Department of
Housing and Urban Development (HUD) as a series 1811 Agent.  ROGERS worked
at HUD for 10 years and worked at the St. Tammany Parish Sheriff's Office
(STPSO) as a deputy for 11 years prior to working for HUD.

     ROGERS worked with STPSO ██████████████████████████ during
ROGERS' time employed at STPSO.  After ROGERS was hired at HUD, ROGERS
continued to work HUD cases with ██████████ when HUD needed assistance from
STPSO.

     ROGERS explained STPSO investigated the homicide of Nanette Krentel
(KRENTEL) that occurred approximately two (2) years ago.  KRENTEL's husband
was a Fire Chief.  ROGERS followed the investigation online through media
reports and through social media. KRENTEL's sister, ████Watson████████ was
a prosecutor in the state of Nebraska.  ROGERS obtained WATSON's email
address from ████████████.  ██ a friend of ROGERS,
previously worked as a deputy at STPSO, but currently worked at Fed Ex as a
Security Specialist.

     ROGERS sent the first email to ████████ in December of 2018.  The email
contained information ROGERS learned through public/online sources and
social media.  ROGERS was critical of STPSO's investigation and the
detectives on the investigation.  ROGERS was critical of detective First
Name Unknown(FNU)████████████, because ROGERS was told ██████ was a

UNCLASSIFIED//FOUO

Investigation on  10/03/2019  at  Covington, Louisiana, United States (In Person)

File #  282B-NO-3179991                                    Date drafted  10/04/2019

by  Clinton D. Epperson, Russell Antoine Varmall

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FD-302a (Rev. 5-8-10)

282B-NO-3179991

Continuation of FD-302 of (U//FOUO) Interview of Jerry Rogers _____ , On 10/03/2019 , Page 2 of 6

"rookie."

ROGERS said he never received information specific to the KRENTEL investigation from ███████ . ROGERS understood that ██████████ role in the investigation was to analyze KRENTEL's husband's financial records, as ████████ was not a homicide detective. ROGERS had conversations with ███ prior to ██████████ being assigned to the investigation.

████████ printed copies of the emails from ROGERS to ██████ and provided the printouts to the Agents, along with a time line of the emails, created by ██████ .

In the emails to ██████ ROGERS prefaced the fact that the information he her was not vetted, nor he certain the information was 100% correct. ROGERS also sent potential questions for ██████ to ask investigators. ROGERS did not intend to harm the family, but rather wanted to relay concerns he had about the investigation since ██████ was out of the state.

ROGERS used the email address "justicenanette@yahoo.com" because ROGERS was concerned if STPSO found out ROGERS sent the emails, STPSO would retaliate against ROGERS or his family. ROGERS was specifically concerned because ROGERS' brother, ██████████ worked at STPSO on computers, but not as a deputy. ROGERS' wife worked at the district attorney's office, and ROGERS feared for his wife's job.

ROGERS sent the first email on December 29, 2018, but did not receive a response from ██████ ROGERS resent the email on January 10, 2019 and received a response.

On August 13 or 14, 2019, STPSO ████████ and ██████████ ███████ met with ROGERS at ROGERS' office at HUD, unannounced. ██████ and ████████ visit made ROGERS nervous. ██████ and ██████ said the purpose of their visit was an internal investigation of information being leaked outside of STPSO and they wanted to talk to ROGERS about emails. ROGERS was told he was not the focus of the investigation. ██████ and ██████ said they have ROGERS' phone records and read ROGERS' emails. ██████ said the IP address on one of the emails was sent from the HUD office, but ROGERS did not recall every sending any emails to ██████ from ROGERS' HUD office. ROGERS only used his personal computer or personal phone to send the

FD-302a (Rev. 5-8-10)

282B-NO-3179991

Continuation of FD-302 of  (U//FOUO) Interview of Jerry Rogers _____ , On _10/03/2019_ , Page _3 of 6_



emails.  ROGERS thought he may have sent an email from his work cell phone.
ROGERS told the detectives none of the information in the emails was from
any investigator on the KRENTEL case.  ████ and ████ said they would be
interviewing ████ next.  ROGERS notified his ████ ████
████ after ████ and ████ left.

    When the detectives mentioned they had ROGERS' emails, ROGERS recalled
approximately two (2) years ago he had sent information via his personal
email address to FBI Special Agents (SAs) Richard Voyles and Wayne Horner.
Prior to sending SAs the information, ROGERS and ████ met with the SAs at
████ office in Covington.  The information, sent to the SAs, concerned
possible criminal activity committed by St. Tammany Parish ████
████    ROGERS thought it was possible STPSO had the emails and
would retaliate against ROGERS and/or his family; ROGERS was very concerned.

    ████ asked for a follow up interview with ROGERS on/or about August
22, 2019.  ROGERS declined the interview and retained ████ as his
attorney around that time period.

    ████ stated he called STPSO ████ to let him
know he ████ was representing ROGERS.  During the conversation ████
confirmed the investigation was initially an internal investigation, but it
had turned into a criminal investigation.  ████ indicated STPSO was
looking at possible "obstruction" charges.  ████ had no more
communication with ████ until September 16 after ROGERS arrest.

    On the afternoon of Monday, September 16, 2019, ROGERS was outside of his
home when a car with three (3) STPSO detectives arrived.  ROGERS was at home
during a weekday after he was placed on administrative leave on August 20,
2019, due to a medical issue.  STPSO ████ ████ ████ ████ co████
and ████ told ROGERS they had a warrant for ROGERS' arrest.
ROGERS was arrested, although the detectives did not tell ROGERS why he was
being arrested.  ROGERS was given his Miranda Warning on scene.  ROGERS was
transported to the St. Tammany Jail (STJ).  At STJ, ROGERS signed his
Miranda Warning and was asked questions related to the booking process.
During the booking process ROGERS was specifically asked if he was
suicidal.  ROGERS answered he was not suicidal.

FD-302a (Rev. 5-8-10)

UNCLASSIFIED//FOUO

282B-NO-3179991

Continuation of FD-302 of (U//FOUO) Interview of Jerry Rogers _____ , On 10/03/2019 , Page 4 of 6

ROGERS was taken by four (4) corrections officers to a portion of the jail with which ROGERS was not familiar. ROGERS was made to enter a cell and strip all of his clothing off. ROGERS was given a green padded gown for clothing. Other than the green gown, ROGERS wore no clothing.

ROGERS was removed from the cell and asked a nearby deputy why he was being arrested and booked. The deputy looked up something on his computer and said, "Here is a press release." Based on that statement ROGERS believed the media had been made aware of his arrest. The deputy informed ROGERS he had been arrested for the charge of Defamation. ROGERS asked, "Why am I back here in this suit?" The deputy answered that it was "Something medical would have to talk to you about." ROGERS felt his treatment in the jail was "payback or retaliation for the emails. This is how they are paying me back."

Approximately one hour passed and a person from medical spoke with ROGERS. ROGERS again asked why he was in the back of the jail in the green gown. The person from medical said he would check his file, but never came back to speak to ROGERS.

Approximately one hour passed when ROGERS was given a pair of blue paper scrubs to wear. ROGERS walked to the front in the paper scrubs to complete the booking process and to be fingerprinted. Once the booking paperwork was completed, ROGERS was taken to a room and allowed to change into his original personal clothing.

ROGERS waited for approximately one and a half hours as the bond was set. Once the bond was set, ROGERS was taken to Lakeview Hospital where ROGERS' wife, father, and HUD co-worker, ████████████ were waiting. Once at the hospital, the STPSO deputy left ROGERS with the hospital staff. A doctor asked ROGERS why he[ROGERS] was here. ROGERS believed it was because someone at STPSO said he[ROGERS] was suicidal. ROGERS told the doctor it was "Payback."

ROGERS was at the hospital for approximately one (1) to two (2) hours while a mental evaluation was completed by the doctor. ROGERS answered the doctor's questions and was ultimately released.

ROGERS explained he had contact with ████████ prior to September 16,

UNCLASSIFIED//FOUO

FD-302a (Rev 5-8-10)

**UNCLASSIFIED//FOUO**

282B-NO-3179991

Continuation of FD-302 of (U//FOUO) Interview of Jerry Rogers _____ , On 10/03/2019 , Page 5 of 6

2019.  After exchanging several emails to determine the meeting location, ROGERS met with ████████ at ████████ house on September 15, 2019.

At the meeting ████████ seemed confused as to why he ████████ had been fired by STPSO.  ████ had documents in his hand that ROGERS understood were ████████ termination paperwork, but ROGERS did not read the paperwork.  ████ said STPSO obtained his ████████ emails and phone records and accused ████ of "leaking" information.  ROGERS told ████████ none of the information ROGERS sent to ████ contained information he [ROGERS] received from ████████

Agents asked ROGERS if he [ROGERS] had ever sent any other individuals emails critical of other investigations.  ROGERS sent emails to ████ ████████ (ph), regarding the investigation of former St. Tammany ████████ ; ████████ was ████████ attorney.  ROGERS believed he used email address "jkelly@yahoo.com" to communicate anonymously with ████████  The email from ROGERS to ████████ contained information ROGERS had obtained from social media and other publicly available information.

ROGERS sent ████████ , a candidate running against ████ for St. Tammany Sheriff, a list of general questions.  ROGERS said the questions were general questions he asked of the candidate in order to learn more about ████████  ROGERS denied he sent any information to ████ ROGERS used "justincenanette@yahoo.com" to email the questions to ████

ROGERS denied using alcohol or drugs at the time he sent the emails to ████ or ████████  ROGERS said he was currently on several medications after an incident that happened near Monroe, Louisiana.

Sometime after ROGERS was interviewed by ████ and ████████ , ROGERS went to Monroe, Louisiana for work.  ROGERS went to MONROE with HUD Agent ████████  After completing the necessary work in Monroe, ROGERS and ████████ agreed to leave at approximately 5:00AM the next morning.  ROGERS did not sleep the night before he left Monroe due to anxiety issues.  ROGERS said he was hearing and seeing things throughout the night.  ROGERS was also anxious about STPSO retaliating against him and/or losing his job for sending ████ the emails.  ROGERS had been having trouble sleeping prior to his trip to Monroe.

**UNCLASSIFIED//FOUO**

FD-302a (Rev 5-8-10)

**UNCLASSIFIED//FOUO**

282B-NO-3179991

Continuation of FD-302 of  (U//FOUO) Interview of Jerry Rogers           . On  10/03/2019  . Page  6 of 6

ROGERS didn't recall all the details of the incident in Monroe.  ROGERS ultimately learned he refused to come out of his hotel room and the police were called.  The police surrounded his room with a SWAT team.  ROGERS spoke to several people by phone and eventually came out of his room where he was taken into custody by police and taken to a hospital, where he stayed for at least two days.  He was later taken to a hospital in Kenner and diagnosed with PTSD.  ROGERS was given prescription medication which helped him sleep and reduce his anxiety.  ROGERS was placed on administrative leave and will be re-evaluated before he returns to work.

ROGERS state he would print the text communications and emails he sent to ███████ and provide the printed material to Agents at a later date.

ROGERS signed four (4) Authorization Form For Disclosure Of Protected Health Information forms.

[AGENT's NOTE:  On October 4, 2019, ROGERS notified SA Epperson that he [ROGERS] had sent additional emails from the "justicenanette@yahoo.com" account. ROGERS sent anonymous email(s) to ███████ criticizing government contract issues and to ███████ of Mothers Against Drunk Driving (MADD). ROGERS stated he would print the emails and provide them to SA Epperson at a later date.]

The printouts provided by ███████, as well as the notes of the interviewing agents, were made a part of the investigative file via 1A.

FD-302 (Rev. 5-8-10)                              - 1 of 1 -



UNCLASSIFIED//FOUO

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry _____10/30/2019_____


On October 29, 2019, Federal Bureau of Investigation Special Agent (SA) Clinton D. Epperson met with attorney ███████ at his office, 1974 Highway 190 Suite #3, Covington, LA 70433. ████████ previously contacted and informed SA Epperson there were documents ready for pickup at ███████ office.

███████ provided SA Epperson with an envelope that contained printed emails and text messages from Jerry Rogers (ROGERS). ████████ was provided the printed emails and texts by ROGERS. The printed emails contained communications between ROGERS and former St. Tammany Parish Sheriff's Office ████████████████, as well as emails sent by ROGERS to Mothers Against Drunk Driving.

███████ told SA Epperson St. Tammany Parish ██ made a press release wherein ██████ discussed ROGERS' mental health and arrest.

The documents released by ███████ were made apart of the investigative file via 1A, as was a news article that contained ████████ press release.


UNCLASSIFIED//FOUO

---

Investigation on  _10/29/2019_  at  Covington, Louisiana, United States (In Person)

File #  282B-NO-3179991 _____   Date drafted  _10/29/2019_

by  Clinton D. Epperson

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302 (Rev. 5-8-10)

-1 of 2-



UNCLASSIFIED//FOUO

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry _____11/04/2019_____

███████████████████████████████████ for the Louisiana Attorney
General's Office (LAGO), office phone number ██████████, email address
████████████████████ was interviewed telephonically.  After being
advised of the identity of the interviewing Agent and the nature of the
interview, █████ provided the following information:

███ was aware of the arrest of Jerry Rogers (ROGERS) by St. Tammany
Parish Sheriff's Office (STPSO) detectives for violating Louisiana statute
14:47-Criminal Defamation.  ██████ had not received STPSO's investigative
file and did not have all the facts of the investigation, but the Louisiana
statute 14:47-Criminal Defamation was deemed unconstitutional in previous
applications.  The assistant district attorney, ████████████, told the STPSO
detectives the statute was likely unconstitutional prior to detectives
arresting ROGERS.  ██████ stated STPSO detectives were "idiots" for using the
statute to arrest a person.  ██████ said he would attempt to keep an open
mind, but thought it was unlikely the LAGO would prosecute ROGERS.

On or about Monday, October 28th, 2019, ██████ contacted STPSO and
requested STPSO's investigative file on ROGERS, but was unsuccessful.  STPSO
stated the investigative file was not ready yet.  Normally ██████ received
the investigative file quickly after an arrest was made.  ██████ said he had
received murder case files more quickly.  The fact STPSO had not submitted
the investigative file to LAGO was "completely atypical."

███████ stated the arrest appeared to be politically motivated due to the
upcoming election in St. Tammany Parish for the position of St. Tammany
Sheriff.  ██████ believed STPSO would submit the investigative file after the
election for St. Tammany Sheriff was complete.

██████ later emailed the writer with all the information █████ had
received to date from STPSO, which entailed ROGERS' booking paperwork, the

UNCLASSIFIED//FOUO

| | | |
|---|---|---|
| Investigation on | 11/01/2019 at | New Orleans, Louisiana, United States (Phone) |
| File # | 282B-NO-3179991 | Date drafted 11/04/2019 |
| by | Clinton D. Epperson | |

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FD-302a (Rev. 5-8-10)

**UNCLASSIFIED//FOUO**

282B-NO-3179991

Continuation of FD-302 of  (U//FOUO) ████████████████                                    . On  11/01/2019  . Page  2 of 2

affidavit for ROGERS' arrest warrant, and the arrest warrant for ROGERS.

The email sent by ██████ along with the writer's notes, were made a part of the investigative file via 1A.

FD-302 (Rev. 5-8-10)

-1 of 6-



**UNCLASSIFIED//FOUO**

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry ___11/18/2019___

Jerry Rogers (ROGERS), date of birth (DOB) November 3, 1972, LA DL#
005531730, cell phone 985-789-7239, home address 82096 Highway 1080, Folsom,
LA 70437, was interviewed at 410 N. Jefferson, Covington, LA 70433. Also
present was Department of Justice Civil Rights Division Trial Attorney
████████, and ROGERS' attorneys ████████████████ and ███████.
After being advised of the identities of the interviewing Agents and
the nature of the interview, ROGERS provided the following information:

In 1998 ROGERS was employed as a deputy with the St. Tammany Parish
Sheriff's Office (STPSO). In 2009, ROGERS was hired as an investigator with
the United States Department of Housing and Urban Development (HUD).

Nanette Krentel (KRENTEL) was murdered in July of 2017 in St. Tammany
Parish. ROGERS explained he sent emails to KRENTEL's sister, ████████
████████. The emails were critical of STPSO's investigation of the KRENTEL
murder. ROGERS sent the email in an attempt to help the family by providing
insights to ████████, who was a prosecuting attorney in Nebraska. ROGERS felt
something was "not right" with STPSO's investigation. STPSO made numerous
missteps in the investigation. ████████ communicated to ROGERS that some of
the information he provided was new and/or helpful to ████████. ROGERS never
received any indication from ████████ she wanted him to stop sending emails.

There was no "bad blood" between ROGERS and anyone at STPSO, nor did he
have an "axe to grind" with STPSO. The emails sent to ████████ were only
motivated by his desire to help ████████ gain closure.

ROGERS learned about the KRENTEL investigation via the news media, social
media, and through discussion with his friends and former co-workers to
include, ████████████████, ████████████████, ████████, and ████████
████████. ROGERS did not discuss the emails he sent to ████████ with any
of his friends or associates.

**UNCLASSIFIED//FOUO**

Investigation on __11/04/2019__ at _Covington, Louisiana, United States (In Person)_

File # _282B-NO-3179991_                          Date drafted _11/06/2019_

by _Clinton D. Epperson_

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FD-302a (Rev. 5-8-10)

282B-NO-3179991

Continuation of FD-302 of (U//FOUO) 2nd Interview of Jerry Rogers , On 11/04/2019 , Page 2 of 6

ROGERS believed he sent the first email in December of 2017, and received ▇▇▇▇ first response in January of 2018. ROGERS was asked why the emails contained information about spousal abuse. ROGERS just wanted to send information that was out in the community that could be of use to ▇▇▇▇ such as the fact ▇▇▇▇▇▇▇ who had been involved in the KRENTEL investigation at one point, had been involved in a domestic abuse incident. Additionally, STPSO was not communicating with KRENTEL's family, which ROGERS felt was "wrong."

No one employed inside STPSO leaked information about the KRENTEL investigation to ROGERS. ROGERS obtained his information from the news media and social media along with information he heard from his friends and associates.

While employed at STPSO, ROGERS worked and became friends with ▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇. ▇▇▇▇▇▇ was experienced and successful with financial investigations. ROGERS continued to work with ▇▇▇▇▇ as a HUD investigator when their cases were connected. ▇▇▇▇▇ did not provide case specific information about the KRENTEL investigation to ROGERS, as ▇▇▇▇▇▇ wasn't originally assigned to the KRENTEL investigation. ROGERS sent ▇▇▇▇ the first email prior to ▇▇▇▇▇▇ being assigned to the case.

ROGERS talked with STPSO ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ about the use of the polygraph to question suspects early in the KRENTEL investigation. ROGERS felt a polygraph should only be used at the end of an investigation as a "last resort" after all evidence was analyzed and all leads were exhausted. ▇▇▇▇▇▇ who was friends with ROGERS, said, "I just do what I'm told," and claimed to be "out of the loop" of the details of the KRENTEL investigation. ROGERS didn't recall from whom he learned the polygraph had been employed for the investigation. ROGERS sensed ▇▇▇▇ was frustrated with how the KRENTEL investigation was being conducted. ROGERS never sensed ▇▇▇▇▇ was frustrated with the KRENTEL investigation because ▇▇▇▇▇▇ had not been on the case very long.

▇▇▇▇▇ interjected that ▇▇▇▇ had been "shuffled" around within STPSO after ▇▇▇▇ was recorded, by ▇▇▇▇, making unflattering statements about St. Tammany ▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇ had sued ▇▇▇▇ for a wrongful termination. Prior to depositions in the suit, ▇▇▇▇ was

FD-302a (Rev. 5-8-10)

282B-NO-3179991

Continuation of FD-302 of (U//FOUO) 2nd Interview of Jerry Rogers _____ , On 11/04/2019 , Page 3 of 6

promoted.  ROGERS confirmed ███████ information.

ROGERS explained the emails he sent to ███████ contained statements
critical of █████ due to public statements ██████ made wherein KRENTEL's
husband was cleared of any involvement in KRENTEL's murder; along with the
lack of communication between STPSO and KRENTEL's family.

ROGERS had known █████ for many years.  ROGERS knew █████ when ████ was
a Lieutenant (LT.) at STPSO and later when █████ was the Chief of the
Slidell Police Department (SPD).  After being hired as a HUD agent, ROGERS
attended a SPD officer's funeral.  When █████ saw ROGERS, █████ patted
ROGERS down for a "wire" due to ROGERS' employment with the federal
government.  ROGERS thought █████ behavior was inappropriate.  █████ had
not bothered ROGERS on any of his HUD cases.

When ROGERS was hired at HUD, he left STPSO on good terms with STPSO and
with no "write-ups."  ROGERS worked under █████ when ████████████████████
was Sheriff of St. Tammany Parish.  ROGERS was close with █████ and
considered █████ a mentor.  When █████ became Sheriff, █████ left STPSO and
became the Chief of the Covington Police Department.

After leaving STPSO, ROGERS worked with █████ to create a law enforcement
memorial in Covington.  The idea had been proposed to █████ who passed on
the project.  ROGERS worked with █████ to successfully create the memorial.
ROGERS believed █████ looked bad within the community for passing on the
idea of the memorial.  Based on the work he did on the memorial, ROGERS
believed the community, and those within law enforcement, knew ROGERS was
close to █████.

ROGERS was asked about his criticisms of STPSO ██████████████████████████
██████████.  ROGERS admitted he called █████ "clueless" in an email to
█████.  ROGERS heard █████ own colleagues characterize █████ as
"clueless."  ROGERS first met █████ when █████ interviewed ROGERS about
the emails sent to █████.  ROGERS knew of ████████████████, but never
worked with him.  ROGERS did not know which Chief Deputy supervised the
KRENTEL investigation or the investigation that led to ROGERS' arrest.  Of
the three STPSO detectives that arrested ROGERS, ████████████████████
████████████ and █████ ROGERS only "kind of knew" █████.  When
asked, ROGERS said he never worked for or with █████████████.  ROGERS had

FD-302a (Rev. 5-8-10)

282B-NO-3179991

Continuation of FD-302 of (U//FOUO) 2nd Interview of Jerry Rogers , On 11/04/2019 , Page 4 of 6

very little interaction with STPSO ████████████████████████ , and
had never worked a case with ███████ ROGERS did not know why ███████
would have been the affiant for ROGERS' arrest warrant.

ROGERS was interviewed for approximately one(1) to one and a half (1.5)
hours at his HUD office on August 13, 2019, by STPSO ████████████████ and
███████ The detectives had not pre-arranged the interview with ROGERS.
The detectives rang the doorbell to the HUD office. ROGERS spoke to the
detectives through the lobby glass. The detectives told ROGERS multiple
times they needed to speak to him[ROGERS]. ROGERS asked the detectives
"what is this about" multiple times. The detectives told ROGERS, "you are
merely a witness." ROGERS said he didn't immediately let the detectives in
the office or go into the lobby to speak with the detectives, because ROGERS
was concerned the office conference room may have been occupied. The
detectives waited in the lobby as ROGERS attempted to determine if the
conference room was available and to use the bathroom. ROGERS ultimately
spoke with the detectives in the office lobby.

ROGERS was told ██████ and ████████ investigation was an internal STPSO
investigation into who leaked information to ROGERS concerning the KRENTEL
investigation. ROGERS recalled the detectives read an excerpt of an email.
Detectives told ROGERS STPSO had "all your emails." ROGERS told the
detectives no one at STPSO leaked any information to ROGERS. ███████ and
███████ claimed to have ROGERS' phone records. The detectives also wanted
to know what motivated ROGERS to send the emails to ███████ At one point in
the interview, ███████ asked, "Is this recorded in here?" ROGERS did not
recall what was being discussed specifically when ███████ asked about the
room being recorded. ROGERS was uncomfortable with the fact ███████ was a
part of the interview, because ROGERS knew he had criticized ███████ within
an email to ███████. ███████ asked ROGERS, "why would you say that about
me?" ROGERS believed the excerpt of ROGERS's emails read by the detective
may have contained ROGERS' comment about ███████ being clueless. The
detectives told ROGERS the emails were unprofessional and unethical and made
ROGERS look bad. The detectives mentioned the fact that ROGERS sent the
emails using a HUD IP address. ROGERS stated he never sent any emails to
███████ from a HUD computer, nor did ROGERS know how to connect his personal
devices to the HUD office's Wi-Fi.

FD-302a (Rev. 5-8-10)

UNCLASSIFIED//FOUO

282B-NO-3179991

Continuation of FD-302 of  (U//FOUO) 2nd Interview of Jerry Rogers    , On  11/04/2019  , Page  5 of 6

The meeting was interrupted at one point by a cleaning crew.  ROGERS' co-workers walked past the lobby window several times and could see ROGERS was talking to the detectives and later asked ROGERS what the detectives were doing at the office.  The co-workers could tell ROGERS had an unpleasant time with the detectives.  During the interview ▬▬▬ seemed upset. ▬▬▬ did not yell or raise his voice, but his tone indicated to ROGERS that he ▬▬▬ was upset.  During the interview, the detectives never mentioned their investigation concerned a possible obstruction of justice issue.  Nor, did the detectives ever mention that ROGERS' emails had any affect on the family.  The interview was abruptly ended by ▬▬▬ and ▬▬▬ when detectives stated they were going to speak to ▬▬▬

Sometime after the interview, ROGERS spoke to ▬▬▬, a Mandeville Police Department police officer and former STPSO deputy. ▬▬▬ told ROGERS that he ▬▬▬ heard ROGERS was being investigated by STPSO and the investigation may lead to an obstruction of justice charge.  ROGERS believed ▬▬▬ overheard a conversation and learned about STPSO's investigation into ROGERS.

ROGERS used an anonymous email to communicate with ▬▬▬.  Additionally, ROGERS used a VPN at his house to prevent his emails from being traced.

ROGERS was concerned when the detectives stated they had all of ROGERS' emails, as ROGERS had sent information to the FBI about potential criminal activity conducted by ▬▬▬  ROGERS was concerned that his brother, who worked at STPSO, would be retaliated against if ▬▬▬ knew ROGERS provided information to the FBI.  ROGERS spoke with FBI Special Agents Horner and Voyles about a potential criminal matter concerning a St. Tammany Parish Jail contract dealing with the jail's commissary.  ROGERS believed the contract with the company that oversaw the jail's commissary was from a company that provided political donations to ▬▬▬ election campaign. ROGERS may have heard the information from ▬▬▬ prior to doing his own research with, friend and former STPSO colleague, ▬▬▬  Prior to ▬▬▬ termination from STPSO, ▬▬▬ dealt with the jail's commissary.

ROGERS heard numerous former and current STPSO employees were frustrated with ▬▬▬ running of STPSO.  ROGERS admitted he had an "axe to grind" with ▬▬▬ due to the way ▬▬▬ ran STPSO.  ROGERS wanted change to occur

UNCLASSIFIED//FOUO

FD-302a (Rev. 5-8-10)

**UNCLASSIFIED//FOUO**

282B-NO-3179991

Continuation of FD-302 of (U//FOUO) 2nd Interview of Jerry Rogers ,On 11/04/2019 ,Page 6 of 6

and to call attention to ████ conduct. ROGERS said of ████ "At the end
of the day, I think he is a bad guy." ROGERS was not sure if those within
STPSO knew of ROGERS' opinions of ████ but those within STPSO knew that
ROGERS associated with ████ and others that opposed ████ re-election.

████ later contacted ROGERS via phone and text messages to set up a
second interview. ROGERS initially agreed to meet with ████, but later
declined after retaining ████. ████ sent a letter apprising STPSO
that ████ represented ROGERS and that ROGERS did not wish to make any
further statements to STPSO. ████ was contacted by ████. ████
confirmed ████ suspicions that STPSO's investigation was no longer an
internal investigation. ████ said STPSO was investigating a possible
obstruction of justice.

When asked, ROGERS stated the detectives that arrested him said nothing
unusual or unprofessional. ROGERS thought it was odd three (3) detectives
were sent to arrest him on a misdemeanor charge. ROGERS thought it would
have been more reasonable to issue ROGERS a summons for the misdemeanor
charge of criminal defamation. ROGERS thought ████ appeared embarrassed
to be involved in arresting ROGERS on a misdemeanor violation. ROGERS did
not know, at the time of his arrest, he was being arrested on a misdemeanor
charge. ROGERS thought it was odd that three detectives unrelated to the
case arrested him.

████ met with ROGERS after ████ was fired from STPSO.
████ was unsure why he was fired from STPSO if ROGERS told
investigators ████ never leaked information. ████ said he was
getting closer to "answering the murder question." What ████ knew
contradicted other STPSO detectives theories on the KRENTEL investigation.
████ also sent ROGERS an article concerning Louisiana's criminal
defamation statute.

**UNCLASSIFIED//FOUO**

FD-302 (Rev. 5-8-10)

- 1 of 3 -



UNCLASSIFIED//FOUO

## FEDERAL BUREAU OF INVESTIGATION

Date of entry     11/20/2019

▓▓▓▓▓▓▓▓▓▓▓▓▓, date of birth (DOB) ▓▓▓▓▓▓▓▓▓▓ cell ▓▓▓▓▓▓▓▓ telephone ▓▓▓▓▓▓, was interviewed at the 22nd Judicial District Attorney's (DA) Office, 701 N. Columbia Street, Covington, LA 70433. Also present was Department of Justice Civil Rights Division Trial Attorney ▓▓▓▓▓▓▓▓▓▓. After being advised of the identity of the interviewing Agent and the nature of the interview, ▓▓▓▓ provided the following information:

On Friday, September 13, 2019, ▓▓▓▓ met with St. Tammany Parish Sheriff's Office (STPSO) employees ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ and ▓▓▓▓▓▓▓▓▓ (hereinafter referred to as STPSO dectives) in ▓▓▓▓ office. The sole reason for the meeting, that lasted approximately 20 minutes, was to discuss whether the District Attorney's (DA) office would support the use of Louisiana Statute 14:47-Criminal Defamation for arrest of Jerry Rogers (ROGERS). ROGERS allegedly sent emails to the family of Nanette Krentel (KRENTEL), critical of STPSO's investigation into the homicide of KRENTEL. According to STPSO detectives ROGERS' emails undermined STPSO's ability to communicate with the family. ▓▓▓▓▓▓▓▓ told ▓▓▓▓ "This is very important to the Sheriff. He wants to move on this." ▓▓▓▓ remarked that ROGERS was a "shitty detective."

The STPSO detectives provided ▓▓▓▓ with several documents from their investigation and stated a search warrant was used to obtain ROGERS' emails. ▓▓▓▓ was not provided a copy of the warrant. ▓▓▓▓ was told by the STPSO detectives the case originated from complaints made by KRENTEL's family.

▓▓▓▓ was not familiar with the statute and needed to do more research before he provided an answer to ▓▓▓▓▓▓. ▓▓▓▓ told the STPSO detectives he would answer them on Monday, September 16, 2019.

UNCLASSIFIED//FOUO

Investigation on  11/05/2019  at  Covington, Louisiana, United States (In Person)

File #  282B-NO-3179991                              Date drafted  11/12/2019

by  Clinton D. Epperson

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 5-8-10)

UNCLASSIFIED//FOUO

282B-NO-3179991

Continuation of FD-302 of  (U//FOUO) 2nd Interview of ███████████ , On  11/05/2019 , Page   2 of 3



At approximately 9:00 AM on September 16th, ████████ called ████ and asked for an answer on the ROGERS matter. ████ said he would meet with his team of assistant district attorneys (ADA) and have an answer for ████ later.

████ spoke with several ADAs and determined, based on previous court rulings, criminal defamation was likely unconstitutional. ████ did not recall the exact time he spoke with ████████ on the phone later that morning, but believed he called ████ with his ████████ cell phone. ████ believed the phone call to ████████ occurred between 10:30 AM and 11:30 AM.  During the phone conversation, ████ told ████████ the criminal defamation statute was likely unconstitutional. ████ told ████████ "This in unconstitutional and you can't do this."  It was unknown if anyone was present with ████████ at the time of the conversation. ████ also told ████████ that STPSO detectives had probably not even met the elements of the defamation statute. ████████ disagreed with ████ interpretation of the statute. ████ also told ████████ the DA's office planned to recuse themselves due to ROGERS' wife, ████████████████, being employed at the DA's office.

████ did not recall if he told ████████ the statutes was unconstitutional first, or if he told ████████ the DA's office would recuse themselves first.

████████ made no indication that STPSO detectives still intended to arrest ROGERS.

During a phone conversation later in the afternoon with ████████ ████████ told ████ "If you were going to recuse yourself, I wish you would keep your opinions to yourself."

████ later learned of ROGERS' arrest from employees in the DA's office. ████ on his own, obtained a copy of ROGERS arrest warrant signed by ████████ ████████ ██████████ [CHILDRESS] and the affidavit for the arrest warrants signed by ████████ ████ said ████████ was "notoriously lazy."

████ believed STPSO should have anticipated the DA's office would recuse themselves.  During the investigation, STPSO complained to the DA's office that ████████ would not cooperate with their investigators. STPSO attempted

UNCLASSIFIED//FOUO

FD-302a (Rev. 5-8-10)

282B-NO-3179991

Continuation of FD-302 of (U//FOUO) 2nd Interview of ▮▮▮▮▮▮ , On 11/05/2019 , Page 3 of 3



to interview ▮▮▮▮ sometime prior to ROGERS' arrest. ▮▮▮▮▮ was the
STPSO detective that told ▮▮▮ of ▮▮▮▮▮ refusal to be interviewed by
STPSO.

At an unrelated meeting several days later, ▮▮▮▮ commented on ROGERS
arrest to ▮▮▮▮▮ ▮▮▮▮▮ responded by saying, "It wasn't my decision on
the timing."

According to ▮▮▮▮ after STPSO detective ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
was fired, everyone at STPSO thought ▮▮▮▮▮▮▮▮ firing was a bad
decision.

Per standard operating procedures, ▮▮▮▮ requested STPSO's file on
internal investigation that led to the firing of ▮▮▮▮▮▮ The DA's
office needed the file to determine if ▮▮▮▮▮▮ was able to testify in the
future on cases that had not yet gone to court. Multiple requests were
made, but to date ▮▮▮▮ office had not received the file from STPSO. STPSO
▮▮▮▮▮▮▮▮▮▮▮ who oversaw STPSO Internal Affairs only provided a
summary of ▮▮▮▮▮▮▮ firing in an email, a copy of which was provided to
SA Epperson.

Prior to SA Epperson and Johnson leaving the building after the
interview, ▮▮▮▮ provided SA Epperson with a copy of ▮▮▮▮ work cell bill
which documented incoming and outgoing calls. ▮▮▮ highlighted ▮▮▮▮▮▮▮
phone number

SA Epperson's original interview notes, a copy of the email from ▮▮▮ and
▮▮▮▮ cell phone bill were made a part of the investigative file via 1A.

FD-302 (Rev. 5-8-10)

- 1 of 1 -



UNCLASSIFIED//FOUO

## FEDERAL BUREAU OF INVESTIGATION

Date of entry      11/20/2019

████████ Caplan ███████ date of birth (DOB) ████ ██ 4, 19██ cell phone ████-401-748██ work phone ██85-█ was interviewed at the 22nd Judicial District Attorney's Office, 701 N. Columbia Street, Covington, LA 70433. Also present was Department of Justice Civil Rights Division Trial Attorney ███ ██ Joh██ ████ After being advised of the identity of the interviewing Agent and the nature of the interview, ██████ provided the following information:

████████ provided materially similar information as his first interview. ████████ added that he intended to file a judiciary complaint against ████████ ████████ Childre██ ██ ██ due to the fact ████████ signed the warrant for the arrest of Jerry Rogers for violating Louisiana State Statute 14:47-Criminal Defamation.  The statute was found to be unconstitutional by the United States Supreme Court and the Louisiana Supreme Court in some of the statute's previous applications. ████████ believed ██ ██ ██ as a judge, should have been familiar with the previous courts' rulings.

   SA Epperson's original notes from the interview were made a part of the investigative file via 1A.

UNCLASSIFIED//FOUO

Investigation on   11/05/2019   at   Covington, Louisiana, United States (In Person)

File #   282B-NO-3179991                                     Date drafted   11/12/2019

by   Clinton D. Epperson

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302 (Rev. 5-8-10)

-1 of 11-



**UNCLASSIFIED//FOUO**

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry _____11/20/2019_____

████████████████ ████████████ date of birth (DOB) ████████████
cell phone ████████████████ was interviewed at his residence, ████████████
████████████████████████████. Also present was Department of Justice
Civil Rights Division Trial Attorney ████████████████ After being advised of
the identity of the interviewing Agent and the nature of the interview,
████████████ provided the following information:

████████████ was hired by the St. Tammany Parish Sheriff's Office (STPSO)
in July of 2007 after he worked for the Covington Police Department (CPD)
from 1995 until 2007. ████████████ specialized in cases that concerned bank
fraud and embezzlement and was a member of multiple federal task forces that
included the United States Secret Service (USSS) and Department of Homeland
Security. ████████████ worked with Jerry Rogers (ROGERS) at STPSO until
ROGERS was hired by the United States Department of Housing and Urban
Development (HUD).

When asked about ROGERS' relationship with STPSO, ████████████ said ROGERS
had a contentious relationship with former sheriff ████████████
administration.  ROGERS' relationship was contentious due to a matter ROGERS
was told to investigate by high level supervisors within STPSO.  ROGERS
belived the matter was a civil matter and did not need to be investigated
criminally, which caused tension in ROGERS relationship with ████████████
administration. ████████████ was later told to investigate the same matter
and, like ROGERS, determined the matter was a civil situation.  ROGERS
disliked ████████ and supported ████████████████ when ████████ ran for
sheriff.

████████████ tried to stay out of the politics of the sheriff's elections.
When ████████ was elected Sheriff, ████████████ was promoted to Sergeant (SGT.)
and supervised a six (6) person unit. ████████████ highest rank at STPSO was
SGT.

**UNCLASSIFIED//FOUO**

Investigation on  _11/05/2019_  at  Covington, Louisiana, United States (In Person)

File # 282B-NO-3179991                                    Date drafted  11/07/2019

by  Clinton D. Epperson

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FD-302a (Rev. 5-8-10)

UNCLASSIFIED//FOUO

282B-NO-3179991

Continuation of FD-302 of (U//FOUO) Interview of ███████████ , On 11/05/2019 , Page 2 of 11

STPSO investigated the death of Nanette Krentel (KRENTEL).  The KRENTEL investigation was initially lead by ████████, ██████████ and, ████████████████ ██████ was tasked to run all other investigations within the Major Crimes section while the KRENTEL investigation occurred.  The first STPSO investigators believed KRENTEL committed suicide, while the coroner found KRENTEL's death was a homicide.

████████ was assigned to the KRENTEL investigation approximately a year and a half after KRENTEL's death.  ████████ was brought in to provide a new perspective and to specifically look at the financial records of KRENTEL's husband, who was initially cleared of any involvement in KRENTEL's death by STPSO. ████ and ██████ were taken off the case and reassigned to Internal Affairs; ██████ was promoted to LT. and supervised the investigation; ████████████████ was assigned to the case, and ████████ remained on the case. ████████ was assigned to the investigation but reported directly to ████████████████ . ████████ did not report to his chain of command which, below █████, was comprised of ██████ ████████████████ Former United States Marshall ███████████ also worked on the investigation. ████████ communicated directly with █████ for matters related to the investigation even though ████████ was █████ supervisor. ████████ believed █████ planned to have ███ and ████████ leave STPSO after the 2019 elections.

████████ understood the "whole case has been a disaster" for the first year and a half and █████ was not happy with the investigation's progress. ████████ was assigned to the case during a meeting with █████ and ██████ ████████████████ . ████████ learned investigative information was "leaked out." ████████████████ retired before he was fired, after ████████ communicated directly with KRENTEL's family. ████████ told KRENTEL's family that, ████████ was in over his head."

████████ started on the investigation and identified investigative steps that needed to be done. ████████ asked to see ████████ reports to learn what had been done and what had not been done. ████████ said there was no written report. ████████ did have a notebook with his case notes. ████████ found it unusual that ████████ had not at least started a report

FD-302a (Rev. 5-8-10)

282B-NO-3179991

Continuation of FD-302 of  (U//FOUO) Interview of ██████████ , On  11/05/2019 , Page  3 of 11

for an investigation that was more than a year old, although there was not policy that required ████████ to write a report.

Initially investigators thought it was possible a hitman was paid to kill KRENTEL.  Investigators analyzed records and looked for movement of money in accounts and hidden insurance policies.  The original investigators overlooked a gas station receipt that ████████ thought was suspicious and relevant.  ████████ questioned why the original investigators did not follow up on the receipt.

████████ checked out every piece of evidence to start over and ensure everything was accurate.  ████████ found several obvious steps had not been initially completely.  Three boxes of evidence were "never looked at." ████████ said, "they never searched emails of phones." ████ reviewed the evidence and found some of the evidence had not been processed.  ████████ found a cell phone in evidence that appeared to have a bullet hole through the phone that hadn't been properly processed. ████████ questioned ██████ about the phone and ████████ indicated he forgot about the phone.  ████ and ████████ discussed the phone, but ████████ was not sure if ██████ was aware of the issue.  The Federal Bureau of Investigation (FBI) and the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF)  assisted STPSO by processing some of the evidence.  The fact ████████ started looking at the investigation from its inception caused tension with the original investigators.

Early in the investigation KRENTEL's husband, ████████████████ was interviewed.  ████ told investigators that he believed his brother killed KRENTEL.  ████ based his theory on the fact that a Rolex watch, which ████ and his brother considered a family heirloom, was not found at the crime scene.  ████ believed his brother killed KRENTEL and took the Rolex watch. Investigators agreed that no Rolex watch was found at the scene.  ████████ later found a Rolex watch band in one of the three boxes of evidence that was "never looked at."

There was a meeting in January of 2019, where the new team of investigators met to discuss the case.  The meeting was tense because new investigators openly questioned the work of the original investigators during the meeting.

**UNCLASSIFIED//FOUO**

282B-NO-3179991

Continuation of FD-302 of (U//FOUO) Interview of ██████████ , On 11/05/2019 , Page 4 of 11



On August 14th, 2019, ███████ was told to meet with ████████
███████ asked about the KRENTEL investigation intially and then asked how
██████ knew ROGERS. ██████████ explained ROGERS was a friend, former
co-worker, and they collaborated on cases when necessary. ████████ asked
if ██████ had talked to ROGERS about the KRENTEL investigation. ███████
███████ stated, "probably." ██████████ then "flew off the handle" and
chewed "my ass out." █████████ saw that ██████ was "pissed."
████████ said he had probably talked to ROGERS about the case on a
professional level. ███████████ felt it was his job to network with other
investigators within law enforcement to get ideas and opinions if he thought
their input could be helpful to solving a case. ██████ who had been cut
out of the investigation, stated he was upset that ██ the original
investigators were replaced with new investigators who then leaked
information on the case.

████████ told ██████ that ROGERS had sent emails to KRENTEL's family
and ███████████, who was running for Sheriff against ██████ ████████
mentioned that some of ROGERS' emails were sent from a HUD IP address.
████████ claimed ROGERS told STPSO investigators that ██████ passed
specific case information to ROGERS which ROGERS then sent to a family
member of KRENTEL. ██████████ claimed ROGERS emails were obtained "the right
way," with a search warrant, but it took investigators a while to get the
emails opened. ██████████ asked specifically what information was given to
ROGERS, because ████████ could not recall exactly what he and ROGERS
discussed about the case.

███████ said only five (5) people within STPSO were aware of the
investigation into the leaked information. ████████ said ██████ was aware
of the emails sent by ROGERS. ███████ told ████████ to handle the
situation. During the one (1) hour meeting, ████████ said he believed
████████ account of his interactions with ROGERS. ██████████ said, "We
all need to get in the same room and talk about this." █████████ assumed
that meant all the investigators would get together to discuss the issue.
████████ never mentioned detective ██████ during the meeting, but did say
the·detectives on the Major Crimes squad were "pissed" by the situation.
████████ said, "We're not done with Jerry" and that investigators would
"see what HUD thinks about this." ██████████ was unaware there was a
current "leak investigation" and ████████ never mentioned anyone was under

FD-302a (Rev. 5-8-10)

UNCLASSIFIED//FOUO

282B-NO-3179991

Continuation of FD-302 of  (U//FOUO) Interview of ▮▮▮▮▮▮▮▮ , On  11/05/2019 , Page  5 of 11

investigation for obstruction of justice. ▮▮▮▮▮▮ stated ROGERS wasn't aligned polically with ▮▮▮▮ and his re-election campaign. ▮▮▮▮ asked to see the emails ROGERS sent. ▮▮▮▮▮▮ did not show ▮▮▮▮ the emails, but said the leaks were "nothing too bad." At the end of the meeting ▮▮▮▮▮ was not as upset and gave ▮▮▮▮▮▮ a hug.

▮▮▮▮▮▮ recalled talking with ▮▮▮▮▮▮▮▮ about the KRENTEL investigation once or twice. The conversations were not specifically about evidence in the case, but were centered around the difficulties of "getting things done."

On August 15th, ▮▮▮▮ called ▮▮▮▮▮▮ and asked, "have you talked to Jerry Rogers?" ▮▮▮▮▮ said he had not spoken to ROGERS. ▮▮▮▮ said, "we've had a little development." The conversation ended and ▮▮▮▮ felt ▮▮▮▮▮▮ call was a bad sign.

At approximately 5:00 PM, ▮▮▮▮ told ▮▮▮▮ they needed to meet along with ▮▮▮▮▮▮▮ When ▮▮▮▮ entered the meeting he said he hoped this meeting would go better than yesterday's meeting. ▮▮▮▮ appeared unaware ▮▮▮▮▮ had met with ▮▮▮▮ the day before. ▮▮▮▮ discussed the issues of leaked information to ROGERS and placed ▮▮▮▮▮▮ on administrative leave. ▮▮▮▮▮ was made to turn in his gun, badge, work phone, and car. Those in the meeting with ▮▮▮▮▮ had a solemn demeanor and appeared to be in "disbelief." ▮▮▮▮▮ was asked to turn over his personal phone and for consent to search the phone. ▮▮▮▮▮ asked whether the investigation was criminal or internal. ▮▮▮▮ was told internal investigations often turned into criminal investigations. ▮▮▮▮ last statement to ▮▮▮▮▮ was, "Don't worry about it. Enjoy your vacation. Let the investigation take place." ▮▮▮▮▮▮ had no sense he was in jeopardy of losing his job.

On August 19th, ▮▮▮▮ called ▮▮▮▮▮ and asked for the password for ▮▮▮▮▮▮ personal phone. ▮▮▮▮▮ asked ▮▮▮ about what the parameters of the search would be. ▮▮▮▮▮ felt there was no specific policy limiting STPSO's search of ▮▮▮▮▮ personal phone. ▮▮▮▮▮ thought it would set a bad precedent for the agency if they dumped all of ▮▮▮▮▮ data for an internal investigation. ▮▮▮▮ said he would have ▮▮▮ call ▮▮▮▮ back with an answer.

UNCLASSIFIED//FOUO

FD-302a (Rev. 5-8-10)

UNCLASSIFIED//FOUO

282B-NO-3179991

Continuation of FD-302 of (U//FOUO) Interview of ███████████ , On 11/05/2019 , Page 6 of 11

Later on the same day, ███████ called ███████. ███████ expressed
his concerns pertaining to the scope of the phone search. ███████ said
STPSO decided to get a warrant to search ███████ phone. ███████
asked if the investigation was now a criminal investigation. ███████
confirmed there was a criminal investigation into the obstruction of
justice. ███████ said the "emails caused the family to be less trusting
and forthcoming with information that would help solve the case."
did not say who was being investigated but ███████ assumed ROGERS and
███████ were the targets of the investigation. ███████ said he would
try to resolve the investigation quickly. ███████ gave ███████ the
phone's password. ███████ later called back and asked for ███████
iTunes encryption password. ███████ said he created the password years
ago and could not recall the password. Based on ███████ request for the
iTunes encryption password, ███████ surmised ███████ did not limit the
scope of the phone search, and downloaded all the data on ███████ phone
using Cellebrite.

A day or two later, ███████████ texted ███████.
███████ was a previous STPSO employee ███████ worked with. ███████
ran against ███ for the position of St. Tammany Sheriff. ███████ only
asked if ███ was okay. ███████ explained he could not talk about
the issue.

On the same day, ███████ saw a Facebook post by ███████. In
the post ███ reported a deputy was under investigation. ███████ called
███████ and asked what information had been leaked about ███████ being
put on administrative leave. ███████ had heard ROGERS sent information to
a KRENTEL family member and that ROGERS had "held himself up in a hotel
room." ███████ said a SWAT team had to get ROGERS out of the hotel room.
███████ did not know which hotel or the location.

On August 22nd, with his attorney ███████ present, ███████ was
interviewed by ███████ and ███████ for approximately one (1) to one and a
half (1.5) hours about leaked information. ███████ was read his Miranda
rights. ███████ and ███████ explained their investigation concerned
obstruction of justice. ███████ was asked about his relationship with
ROGERS; what experience he had in homicide investigations; and what
information ███████ gave to ROGERS. ███████ explained he had only

UNCLASSIFIED//FOUO

FD-302a (Rev. 5-8-10)

282B-NO-3179991

Continuation of FD-302 of (U//FOUO) Interview of ███████████ , On 11/05/2019 , Page 7 of 11

communicated with ROGERS on a professional basis concerning the KRENTEL
investigation, as he would on any financial investigation. ████████ did
not recall exactly what he talked with ROGERS about because ████████ had
talked to so many detectives and law enforcement officials about the case.
At one point, ████████ provided a case briefing to approximately 50 law
enforcement and government officials who were stakeholders in the
investigations. ████████ briefing included detailed information about
the case. According to ██████ and ██████ ROGERS admitted that the emails
he [ROGERS] sent contained information received from ████████ Detectives
refused to let ██████ see any of ROGERS' emails; to date ██████ had
not seen ROGERS emails. ██████ and ██████ contended that ROGERS did not
have any investigative knowledge or experience that could have helped
████████ and ████████ wanted to know, specifically, what
information ████████ provided to ROGERS and whether the information
████████ provided had been vetted. ████████ termination was referenced
by ██████ and ██████ to communicate to ██████ the seriousness of
leaked information. ██████ and ████████ said ROGERS believed ████████
provided the information to ROGERS so ROGERS would pass the information to
KRENTEL's family.  The detectives seemed "pissed" ROGERS sent the emails and
that ████████ provided that information to ROGERS.

████████ felt he was being investigated partly because his loyalty to
████ was in question. On August 26th, ████████ sent ████████ a screenshot
of a message ████████ had previously written and sent to a neighbor in
order to show ██████ that ██████ was loyal to ██████ The message was
to ████████ neighbor who had posted critical comments of ██████ and his
handling of the KRENTEL investigation on social media. ████████ message
was a personal response to the neighbor in a private chat wherein he
defended the KRENTEL investigation and ████████ handling of the
investigation.

On August 29th, ████████ was contacted by Internal Affairs for an
interview. When ████████ arrived he was interviewed by ██████ and ██████
████████ felt being interviewed by ██████ and ███, who were a part of the
initial team of investigators on the KRENTEL investigation was a conflict of
interest since ████████ had essentially replaced ███ and ████████.  A high
level meeting would have to have taken place in order to determine who
exactly interviewed ████████. ███ was "an asshole" to ████████

FD-302a (Rev 5-8-10)

UNCLASSIFIED//FOUO

282B-NO-3179991

Continuation of FD-302 of (U//FOUO) Interview of ▮▮▮▮▮▮ , On 11/05/2019 , Page 8 of 11



throughout the interview. ▮▮▮ was "more low key." ▮▮▮ told ▮▮▮ that ROGERS was "stupid" and did not have the expertise to add anything to the KRENTEL investigation. ▮▮▮ again told ▮▮ and ▮▮▮ that he ▮▮▮▮ could not recall exactly what he discussed with ROGERS and was again not allowed to see the emails sent by ROGERS. ▮ and ▮▮▮ said that ROGERS believed ▮▮ provided the information so ROGERS could pass the information to the KRENTEL family. ▮▮▮▮ offered to take a polygraph to support his story, but the offered wasn't acknowledged.

▮▮▮▮▮ told ▮▮ and ▮▮▮ about his communications with ▮▮ ▮▮▮. ▮▮ explained he also had contact with ▮▮▮ concerning a cold case from the 1980s wherein ▮▮▮ was the STPSO deputy that responded to a scene where human remains were found. The interviewers specifically wanted to know about ▮▮▮▮▮ conversation with ROGERS in ▮▮▮▮ office several weeks prior. ▮▮▮ talked with ROGERS about an old STPSO case that was connected with one of ROGERS current cases. ▮▮▮ asked why ROGERS was allowed continued access to STPSO if he was under investigation by STPSO and why ▮▮▮▮ was not told.

On August 30th, ▮▮▮▮ was called into the Internal Affairs office where ▮▮ and Human Resources ▮▮▮▮▮▮ presented ▮▮▮▮ with a termination letter.

On September 2nd, ▮▮▮▮ found a laptop in his house that belonged to the USSS task force and arranged for it to be returned. He checked the laptop to ensure no personal data was on the laptop and found his work products from the KRENTEL investigation which jogged ▮▮▮ memory. He recalled the last time he talked to ROGERS they discussed a theory concerning the condition of KRENTEL's remains, and specifically the condition of KRENTEL's skull. ▮▮▮▮ emailed ▮▮▮▮ and provided his best recollection of the last time he spoke with ROGERS.

▮▮▮▮ was later denied the opportunity to appeal his termination to an independent review board. ▮▮▮▮ was also denied the opportunity to resign from STPSO.

One (1) to two (2) weeks after ▮▮▮▮ termination, ROGERS called ▮▮▮▮▮ declined to take ROGERS' call. ROGERS later emailed ▮▮▮▮ in an attempt to learn what happened to ▮▮▮▮ ROGERS later

FD-302a (Rev. 5-8-10)

UNCLASSIFIED//FOUO

282B-NO-3179991

Continuation of FD-302 of (U//FOUO) Interview of █████████████████ , On 11/05/2019 , Page 9 of 11

emailed ██████████ a letter from ROGERS' attorney ████████████████ . ██████████ letter to STPSO mentioned an internal investigation that was conducted.

████████████ and ROGERS met on September 16th, prior to ROGERS arrest by STPSO. ROGERS met ████████████ at ████████████ house and the two talked for approximately one (1) hour. During the conversation ROGERS said he sent emails to KRENTEL's family and that he was interviewed by STPSO. While being interviewed by STPSO ROGERS was told there was only an internal investigation being conducted and investigators mentioned ████████ and ████████ name. ████████████ was stunned to learn ████████ and ████████████ interviewed ROGERS due to their involvement in the KRENTEL investigation. ████████████ felt ████████ and ████████████ interview of ROGERS was a conflict of interest due ROGERS direct criticisms of ████████ work on the KRENTEL investigation. STPSO does not have a specific policy to determine if an investigator should be recused from a case. ████████████ said there were times when STPSO sent cases to the Louisiana State Police (LSP). For example, an STPSO captain was involved in a domestic abuse incident. The STPSO sent the matter to LSP due to the nature of the incident and the perception of STPSO investigating their own employee.

████████████ theorized the emails sent by ROGERS was initially investigated as an internal matter, but investigators improperly used criminal investigative techniques, such as a search warrant for ROGERS emails, which were prohibited in an internal investigation. Once STPSO realized the problem, ROGERS was arrested to legitimize the search warrants that were improperly obtained.

████████████ explained he had been personally criticized in the past on social media while he worked on other investigations for STPSO. ██████ knew no one could be arrested for criticizing an investigation.

ROGERS' arrest would not have taken place without ████████ consent. ████████████ an outspoken critic of STPSO, was arrested for cyber stalking.

████████████ described ████████ as a "pretty mellow" person. ████████ had "taken a pretty good beating" publicly. ████████████ thought it was possible ROGERS' statements about ████████ may have upset ████████

UNCLASSIFIED//FOUO

FD-302a (Rev. 5-8-10)

UNCLASSIFIED//FOUO

282B-NO-3179991

Continuation of FD-302 of  (U//FOUO) Interview of ███████████  , On 11/05/2019 , Page 10 of 11

Typically, the District Attorney's (DA) office did not discuss cases with investigators until the investigators submitted a case to be charged. If a matter was "high risk" or sensitive, the DA's office would discuss matters with the STPSO prior to a case submittal. █████████ had a good relationship within the DA's office and discussed "hypotheticals" with assistant district attorneys (ADA). Some specific divisions within STPSO did have regular meeting with ADAs. ████████ never saw an instance where STPSO went against the DA office's opinion.

STPSO had two attorneys; an internal attorney FNU ███████████ and an external attorney █████████████████. ███████ was mainly tasked with internal public records requests and was not typically involved in case related matters. ████████ was involved in defending STPSO against civil litigation.

████ was brought into the KRENTEL investigation as part of the second group of investigators. ██████ reached out to ████████ after he was terminated. █████ and ████████ never "jived." ████████ thought ████ might be willing to speak with FBI Agents about her experience at STPSO.

When ████████ worked at STPSO, press releases were usually prepared in advance of the subject's arrest only if the issue was "high profile." Press releases were rare unless the issue was newsworthy. Press releases were more common during election season.

Typically a warrant was submitted to a judge electronically; it was rare to physically take a warrant to a judge. There were times in a sensitive case when the supervisor requested the investigator "hand-walk" a warrant to a judge for the judge's signature. The person who conducted the investigation was the person who signed the affidavits and forms prior to submission to the judge.

██████████ later recalled that he and ROGERS met on or about August 6th at █████████ office. ███████████████ walked through the office during ROGERS' and ████████████ meeting. After ROGERS left, ████ asked why ROGERS was at the office. ████████ stated ROGERS was a political adversary to ████████.

████████ stated his attorney was aware of █████████ interview with

UNCLASSIFIED//FOUO

FD-302a (Rev. 5-8-10)

**UNCLASSIFIED//FOUO**

282B-NO-3179991

Continuation of FD-302 of (U//FOUO) Interview of ███████████ , On  11/05/2019  , Page   11 of 11

the FBI.

███████ described ROGERS as "goofy" and "kind of a clown" as well as a "conspiracy theorist." ████████ questioned why ROGERS involved himself in the KRENTEL investigation. ██████ felt that STPSO made a "laser strike" on ROGERS and █████████ was collateral damage.

███████ provided a written statement he created, along with various documents ████████ thought were relevant to the matter.

SA Epperson's original interviews notes, along with the documents ████████ provided, were made a part of the investigative case file via 1A.


[AGENT'S NOTE: ██████████ provided basic information, which were documented in SA Epperson's notes, concerning the structure and rank of STPSO management.]

**UNCLASSIFIED//FOUO**

FD-302 (Rev. 5-8-10)

- 1 of 1 -



UNCLASSIFIED//FOUO

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry     11/20/2019

    On November 14, 2019, SA Epperson received a phone call from ███████
███ , cell phone ████████ a civil attorney, who represented Jerry
Rogers (ROGERS). ████ wanted to cooperate with the FBI and make ROGERS
available to Special Agents for future interviews.

    ████ was sued by 10 former St. Tammany Parish Sheriff's Office (STPSO)
deputies who were fired by █████ for supporting ██████ political rival,
████████ in the previous sheriffs election. ████ said ████ had a
history of violating individual's first amendment rights. ████ believed the
ongoing civil law suit mentioned above, case number 17-CV-05219, in the
Eastern District of Louisiana, against St. Tammany Parish ████████
████████ was relevant to ROGERS' arrest.

UNCLASSIFIED//FOUO

Investigation on  11/14/2019  at  New Orleans, Louisiana, United States (Phone)

File #  282B-NO-3179991                                         Date drafted  11/15/2019

by  Clinton D. Epperson

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FD-302 (Rev. 5-8-10)

- 1 of 1 -

**FEDERAL BUREAU OF INVESTIGATION**



Date of entry ___11/21/2019___

▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇ , ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
telephonically contacted Federal Bureau of Investigation (FBI) Special Agent
(SA) DeWayne J. Horner and provided the following information:

During the time period when ▇▇▇▇▇▇▇▇ was on administrative leave
from the St. Tammany Parish Sheriff's Office, ▇▇▇▇▇▇▇ reached out to a
mutual friend so that the friend could find out the employment status of
▇▇▇▇▇▇

The mutual friend reached out to ▇▇▇▇▇ and asked if ▇▇▇▇ could
go to St. Tammany Parish ▇▇▇▇▇▇▇▇ and ask ▇▇▇ about the
employment status of ▇▇▇▇ The mutual friend went to ▇▇▇ because
▇▇ and ▇▇▇ have a close relationship.

In a text message, ▇▇▇ told ▇▇▇ that ▇▇▇▇▇ situation with the
St. Tammany Parish Sheriff's Office was political. ▇▇▇ also told ▇▇▇ ,
in a text message, that it was going to be worse for JERRY ROGERS, a Housing
and Urban Development, Office of Inspector General Special Agent.

The text message between ▇▇▇ and ▇▇▇▇ occurred sometime between
August 19, 2019, and the end of August 2019.

---

Investigation on ___11/18/2019___ at New Orleans, Louisiana, United States (Phone)

File # 282B-NO-3179991                                    Date drafted ___11/18/2019___

by DeWayne J. Horner

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency

FD-1057 (Rev. 5-8-10)



UNCLASSIFIED//

# FEDERAL BUREAU OF INVESTIGATION
### Electronic Communication

**Title:** (U) STPSO Organizational Chart          **Date:** 12/04/2019

**CC:** REED RONALD
Clinton D. Epperson

**From:** NEW ORLEANS
NO-20
    **Contact:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**Approved By:** ▮▮▮▮▮▮▮▮▮▮

**Drafted By:** ▮▮▮▮▮▮▮▮▮

**Case ID #:** 282B-NO-3179991     (U//FOUO) SENSITIVE INVESTIGATIVE MATTER
SUBJECTS-▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮ ST. TAMMANY PARISH SHERIFF'S
OFFICE;
VICTIM-JERRY HAMILTON ROGERS/LOCATION-ST
TAMMANY PARISH;
CONSPIRACY AGAINST RIGHTS

**Synopsis:** (U) To document St. Tammany Parish Sheriff's Office (STPSO)
organizational chart based on information provided by ▮▮▮▮▮▮▮▮▮

**Enclosure(s):** Enclosed are the following items:
1. (U) STPSO Organizational Chart

**Details:**

(U//FOUO) ▮▮▮▮▮▮▮▮▮▮ created a St. Tammany Parish Sheriff's
Office (STPSO) organizational chart. The information included in the
chart was provided by ▮▮▮▮▮▮▮▮

(U//FOUO) The organizational chart has been uploaded to the 1A section of
this case file.

UNCLASSIFIED//▮▮▮▮

UNCLASSIFIED//█

Title:  (U) STPSO Organizational Chart
Re:  282B-NO-3179991, 12/04/2019

◆◆

FD-302 (Rev. 5-8-10)

- 1 of 1 -



UNCLASSIFIED//FOUO

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry          12/09/2019

████████████████████ date of birth (DOB) ████████████████, cell ████████ ████████ was interviewed telephonically. ████ sent FBI Special Agent (SA) Clinton D. Epperson two emails on November 22, 2019. SA Epperson contacted ████ to clarify the meaning of the emails. After being advised of the identity of the interviewing Agent and the nature of the interview, ████ provided the following information:

The emails sent by ████ contained a photograph of a printout that represented the search history of ██████████████████████████ ████████████ research of the constitutionality of Lousiana statute 14:47-Criminal Defamation. ████ explained that the time of ████████ search was shortly before a telephone conversation he had with St. Tammany Parish Sheriff's Office (STPSO) ██████████████.

According to ██████████████████████, ████ was arrested by STPSO for telephone harassment. ████ explained ████████ who "hates the sheriff," was an outspoken critic of ████ ██████████████. ████ posted videos of himself speaking critically of ████ on social media. ████ stated STPSO worked very hard to investigate ████. STPSO's investigation ultimately led to ████████ arrest. ████ said that if STPSO worked as hard on all their other investigations as they did to arrest ████████ there would be no crime in St. Tammany Parish.

The emails ████ sent to SA Epperson, along with SA Epperson's notes were attached to the investigative file via 1A.

[AGENT'S NOTE: ████████ emails appeared to be duplicate emails.]

UNCLASSIFIED//FOUO

Investigation on  11/27/2019  at  New Orleans, Louisiana, United States (Phone)

File #  282B-NO-3179991                                          Date drafted  11/27/2019

by  Clinton D. Epperson

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-1057 (Rev 5-8-10)

UNCLASSIFIED//FOUO



# FEDERAL BUREAU OF INVESTIGATION
### Electronic Communication

**Title:** (U) Event Timeline                    **Date:** 12/09/2019

**CC:** REED RONALD
     Clinton D. Epperson

**From:** NEW ORLEANS
        NO-20
        **Contact:** ██████████████████████████

**Approved By:** ███████████████████

**Drafted By:** ████████████████████

**Case ID #:** 282B-NO-3179991        (U//FOUO) SENSITIVE INVESTIGATIVE MATTER
                                      SUBJECTS—███████████████████████████
                                      ███████████ ST. TAMMANY PARISH SHERIFF'S
                                      OFFICE;
                                      VICTIM-JERRY HAMILTON ROGERS/LOCATION-ST
                                      TAMMANY PARISH;
                                      CONSPIRACY AGAINST RIGHTS

**Synopsis:** (U) To document event timeline

**Enclosure(s):** Enclosed are the following items:
1. (U) Event Timeline

**Details:**

(U//FOUO) ███████████████████ created an event timeline, which
includes known events regarding captioned investigation as of 6 December
2019.

(U//FOUO) The event timeline has been uploaded to the lA section of this
case file.

UNCLASSIFIED//FOUO

UNCLASSIFIED//FOUO

Title:  (U) Event Timeline
Re:  282B-NO-3179991, 12/09/2019


(U) This product completes a carry forward objective regarding visual
aids from fiscal year 2019.


◆◆

FD-302 (Rev. 5-8-10)                          - 1 of 4 -



UNCLASSIFIED//FOUO

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry      12/10/2019

████████████████████████████████, date of birth (DOB) ████
████ work phone number ████████████ was interviewed at The St. Tammany
Parish Justice Center, 701 N. Columbia Street #3066, Covington, LA 70433.
Also present was Department of Justice Civil Rights Division Trial Attorney
████████ and ████████████, ████████████████████████
After being advised of the identities of the interviewing Agents and the
nature of the interview, ████████████ provided the following
information:

BACKGROUND

████████████ graduated from Loyola Law School and first worked for an
insurance company as a staff attorney for two (2) to three (3) years before
going into private practice. In 1985 ████████████ worked as an assistant
district attorney (ADA) in the 22nd Judicial District Attorney's Office for
two years where he prosecuted all misdemeanor and DWI cases. In 1998 ████
████████ ran unopposed and won election to the Division A 22nd Judicial
District Court (JDC).

   Judges within the 22nd JDC also presided in Washington Parish on
rotation. When assigned to Washington Parish, judges could spend two (2) to
three (3) weeks out of the month presiding over felony cases and two (2) to
three (3) days presiding over civil cases, depending on the docket.

   Attorneys and judges in Louisiana were required to complete 12.5 hours of
continuing legal education each year, until the age of 65. ████████████
typically completed more than 20 hours each year through seminars he
attended. ████████████ selected courses he believed were relevant for
his position.

DUTY JUDGE RESPONSIBILITIES

UNCLASSIFIED//FOUO

Investigation on  12/02/2019  at  Covington, Louisiana, United States (In Person)

File #  282B-NO-3179991                                    Date drafted  12/03/2019

by  Clinton D. Epperson, DeWayne J. Horner

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 5-8-10)

282B-NO-3179991

Continuation of FD-302 of  (U) Interview of ██████████████████  , On  12/02/2019  , Page  2 of 4

Judges within the 22nd JDC were placed on separate Duty Judge rotations serving one week for St. Tammany Parish and one week for Washington Parish, which totaled approximately ten (10) weeks per year.  At times the week as a Duty Judge for one parish could overlap with the Duty Judge responsibilities of the other parish.  In addition to daily responsibilities in court, the Duty Judge is responsible for signing search warrants and arrests warrants submitted by law enforcement agencies.  For the past five years, the majority of warrants were sent to the Duty Judge electronically.  For the last two years the electronic system used was CloudGavel.  When a warrant was submitted by a law enforcement agency, the Duty Judge received notification on his/her electronic devices and was able to read and sign documents from his phone, office, or home.  CloudGavel also provided templates which allowed for more uniformity in submissions.

The Duty Judge, in ████████████████ experience, received and signed on average 40-50 warrant submissions during a week as the Duty Judge.  The majority of search warrants submitted were drug related, computer related, and more recently phone related.  The warrants were typically straight forward and did not contain complex questions of constitutionality.

When ████████████ was the Duty Judge, he read and signed the warrants himself without need of assistance from his staff attorney████████████ ████████ did not need help with warrants submitted through CloudGavel because the warrants were straight forward and fact specific.  He only needed to determine if probable cause existed within the "four corners" of the document.  ████████████████ did not sign warrants that lacked the necessary information or had significant mistakes.  Those warrants were returned through Cloudgavel unsigned.  The Duty Judge was able to message, through CloudGavel, the person that submitted the warrants; ████████████████ did not typically use that feature.  There were law enforcement agencies within the 22nd Judicial District without access to CloudGavel.  The officers from those agencies, or road deputies who did not have CloudGavel accounts, walked the warrants to the Duty Judge for review and signature, but that did not occur often.  ████████████████ estimated he returned less than 5% of the submitted warrants for revisions or additional information. ████████████████ did not sign warrants submitted to him when he was not the Duty Judge.  Judges in the 22nd JDC did not sign warrants for a specific case.  Long term cases may have search warrants or arrest warrants signed by

FD-302a (Rev. 5-8-10)

282B-NO-3179991

Continuation of FD-302 of  (U) Interview of ▓▓▓▓▓▓▓▓▓▓▓  , On  12/02/2019  , Page  3 of 4

numerous judges.

▓▓▓▓▓▓▓▓▓▓ estimated that a simple three page arrest warrant took
only one minute to read and sign.  If ▓▓▓▓▓▓▓▓▓ received multiple
warrants for the same case, he could skim subsequent submissions because
most of the fact were consistent through the separate documents.

▓▓▓▓▓▓▓▓▓▓ was asked about the use of law clerks in the 22nd JDC.
There were criminal clerks and civil clerks within the 22nd JDC, but those
clerks did not work directly for judges.  If a judge needed research done
for a matter, the staff attorneys would complete that research. The clerks
within the 22nd JDC worked for the elected Clerk of Court.

▓▓▓▓▓▓▓▓▓ knew Washington Parish ▓▓▓▓▓▓▓▓▓▓ well, as they
attended high school together. ▓▓▓▓▓▓ attended some of the same
social events as St. Tammany Parish ▓▓▓▓▓▓▓▓▓▓▓▓ , but did not
have a close relationship with ▓▓▓▓▓

JERRY ROGERS ARREST WARRANT

On September 16, 2019, ▓▓▓▓▓▓▓▓▓ was covering the Duty Judge
position for another judge.  He was in his chambers, during a civil trial,
when he received an affidavit and arrest warrant for the arrest of Jerry
Rogers (ROGERS).  He did not recall which deputy sent the affidavit through
CloudGavel. ▓▓▓▓▓▓▓▓ surmised the affidavit and warrant were
connected to the  investigation of the 2017 murder of Nanette Krentel.
▓▓▓▓▓▓▓▓ was "shocked" when he saw the arrest warrant for ROGERS was
for violating Louisiana Statute 14:47-Criminal Defamation. ▓▓▓▓▓▓▓▓
had never seen anyone charged for Criminal Defamation before.  Initially
▓▓▓▓▓▓▓▓ thought it was possible the statute was previously found
unconstitutional.  He looked in the 2019 version of "West's Louisiana
Statutory Criminal Law and Procedure" and found Criminal Defamation was
present. ▓▓▓▓▓▓▓▓ felt the facts in the affidavit met the elements
of the statute and signed ROGERS' arrest warrant.  ROGERS' arrest warrant
was the first Criminal Defamation warrant ▓▓▓▓▓▓▓▓ signed.  When
asked if he was told of the warrant ahead of time by anyone, ▓▓▓▓▓▓▓▓
answered, "Absolutely not." ▓▓▓▓▓▓▓▓ did not recall how many
warrants he needed to sign that day or whether the number of submissions
were low or high. ▓▓▓▓▓▓▓▓ said, regarding signing ROGERS' arrest

FD-302a (Rev 5-8-10)

UNCLASSIFIED//FOUO

282B-NO-3179991

Continuation of FD-302 of  (U) Interview of ███████████████  , On  12/02/2019  , Page  4 of 4

warrant, "I wasn't trying to be on anyone's team" and "I was being objective." ████████████did not discuss the ROGERS arrest warrant with ████ or seek her input on the matter.

After signing the arrest warrant ████████████has not reviewed the affidavit for ROGERS' arrest.  Prior to the interview ████████████ researched the Criminal Defamation statute and learned it was previously found unconstitutional.

████████████was asked if the Louisiana statute book contained any unconstitutional laws. ████████████ believed there was a law pertaining to sodomy that was found unconstitutional still in the Louisiana statute book.

When asked, ████████████ stated if a law enforcement officer knew Criminal Defamation had been found unconstitutional the law enforcement officer should not submit affidavits or seek a warrant for a person's arrest.  Additionally, if the law enforcement officer had information that a law was possibly unconstitutional, the law enforcement officer should make those questions or concerns known to the judge prior to the review of an affidavit and warrant. ████████████assumed law enforcement officers requested arrest warrants and search warrants in good faith and would bring attention to all known facts, to include if the law enforcement officer suspected a law was possibly unconstitutional.

████████████had heard of the "True Blue Drew Book". ████████████ did not know if the book covered the Criminal Defamation statute.  Criminal Defamation was not covered in ████████████ continued legal education courses.

UNCLASSIFIED//FOUO

FD-302 (Rev. 5-8-10)

- 1 of 7 -



UNCLASSIFIED//FOUO

## FEDERAL BUREAU OF INVESTIGATION

Date of entry    12/10/2019

████████████████  date of birth (DOB) ████████████ cell phone
████████████ was interviewed at the FBI New Orleans office, 2901 Leon C.
Simon Drive, New Orleans, LA 70122. Also present was Department of Justice
Civil Rights Division Trial Attorney ██████████████. After being advised of
the identities of the interviewing Agents and the nature of the interview,
████ provided the following information:

████ retired as a Lieutenant Colonel from the Louisiana State Police (LSP)
after 32 years. In her last role with LSP, ████ supervised LSP's
investigations. She later served from 2010-2018 as the United States
Marshal for the Eastern District of Louisiana. ████ was recently hired by
the United States Department of Health and Human Services for a position in
Washington, DC.

On October 18, 2018, ████ was contacted by the St. Tammany Parish
Sheriff's Office (STPSO) and ████████████████████████. ████ was
asked to work on cold cases, to include the deaths of two STPSO deputies.

On November 20, 2018, ████████ was sworn in as an unpaid Reserve Deputy with
STPSO. ████████ offered ████ a paid position, but ████ declined to be
paid. ████ was previously warned by a friend to avoid working on the murder
investigation that involved a fire chief. ████ was not familiar with the
investigation to which the friend referred or the significance of the
warning. After she was sworn in, ████ met with the investigative team that
investigated the 2017 murder of Nanette Krentel (NANETTE). ████ had not
initially realized NANETTE's husband was █████████████████████████████.
 Present for the meeting were ████████████████████████████████████████
██████████████████████████████████████████████████████████████████████
████ and ████ Last Name Unknown (LNU). ████████ demeanor during the
meeting made ████ feel unwelcome. ████ was told she could not take

UNCLASSIFIED//FOUO

Investigation on  12/03/2019  at  New Orleans, Louisiana, United States (In Person)

File #  282B-NO-3179991                                    Date drafted  12/03/2019

by  Clinton D. Epperson, DeWayne J. Horner

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.



FD-302a (Rev. 5-8-10)

282B-NO-3179991

Continuation of FD-302 of (U//FOUO) Interview of ▮▮▮▮▮▮▮▮ , On 12/03/2019 , Page 2 of 7

investigative steps without ▮▮▮▮▮ being a part of those steps. Comments made in the first meeting indicated to ▮▮▮ she was only on the case because of ▮▮▮▮▮ The specifics of the Krentel investigation were not discussed, but issues surrounding the case were discussed.

▮▮▮▮▮was later transferred to Internal Affairs within a month of ▮▮▮ assignment to the case. ▮▮▮▮▮ was later promoted to Lt. and stayed on the investigative team. ▮▮▮▮▮▮▮ was later added to the investigation. ▮▮▮ learned STPSO ▮▮▮▮▮▮▮ who was not on the investigative team, had been fired after he leaked case information, prior to ▮▮▮ assignment to the investigation.

Throughout ▮▮▮ time on the investigation, the investigative team repeatedly made statements about the investigation. Those statements included that ▮▮▮▮▮▮ did not trust the investigative team, NANETTE's family was "crazy", the investigative team was not allowed to conclude NANETTE's death was a suicide because of a "political game", and the investigative team believed ▮▮▮▮▮▮ was hiding something. ▮▮▮ overheard ▮▮▮▮▮ on multiple occasions talk to potential witnesses in an unprofessional manner, telling the potential witnesses NANETTE's family was "crazy" and that NANETTE committed suicide, but the investigative team had to go through the motions of the investigation.

▮▮▮ found several issues with how the investigation was conducted. ▮▮▮ never saw a report from ▮▮▮▮▮ even though he was the primary detective from the start of the investigation. Evidence in the case was not properly secured and/or stored. The investigative team believed NANETTER committed suicide because NANETTE was turning 50 years of age, she was losing her looks, she had to color her hair every couple of weeks due to her vanity, she was a drug addict, she had a husband that was unfaithful, and she took anti-depressants. The investigative team believed NANETTE killed herself to get back at ▮▮▮▮▮ ▮▮▮▮▮ thought their theory was offensive and unsupported. ▮▮▮contacted a chemist who stated the substances found in NANETTE's system was consistent with a person who took an anti-depressant, which contradicted one of the investigative team's theories.

Based on her involvement in the investigation and what she learned about NANETTE's death, ▮▮▮believed ▮▮▮▮▮ had motives to kill NANETTE. ▮▮▮▮ had

FD-302a (Rev. 5-8-10)

282B-NO-3179991

Continuation of FD-302 of  (U//FOUO)  Interview of ███████████████  , On  12/03/2019  , Page  3 of 7

an affair with another woman, he had large amounts of debt, and he suffered
from mental health issues. ████ reviewed the investigation and learned
numerous guns and spent shell casing were found at the scene.  A .38 caliber
revolver was found, with three (3) corresponding shell casings on the floor,
and three (3) casings in the cylinder.  A shotgun and a spent shotgun shell
was found.  A semi-auto handgun  and corresponding spent casings were
found. ████ asked ██████ to ensure the semi-auto handgunwas sent to the lab
to be processed. ██████ contacted the lab and learned the lab could not
process the gun.

████████ told ██ that ██████ was interviewed earlier in the
investigation.  According to ██████ during the recorded interview
made comments that ██████ owed ████ a favor and that ████
would remember the favor. ████ said he spoke with ██████ off camera about
the matter, but ██████ would not say exactly what ████old him.
suggested ██████ had a romantic relationship with NANETTE, but the
issue was out of ██████ hands. ████ had also heard rumors that ████
██████ had a romantic relationship with NANETTE. ██████ did not "touch the
issue" despite ██ asking five (5) or six (6) times about the topic.

According to ████████████████████ confronted
██████directly and asked if he ██████████████ had a relationship
with NANETTE. ████████ told ██ he ██████ never knew
NANETTE.

████ asked ██████ to contact the insurance company that insured NANETTE.
████ had different excuses why he had not called the insurance company,
despite ████ asking him several times to do it.  When ██████ finally called
the insurance company he learned the insurance pay out was paid to █████ the
day before ██████ called. ████ believed if ██████ called the insurance
company when she asked, the pay out out to ██████ may have been stopped.

████████ consistently failed to provide ██████ information on a timely basis,
despite her repeated requests. ████ and ██████ once argued in the office,
resulting in ████ walking out of the office.

████ was vocal with the investigative team that the theory NANETTE
committed suicide was "bullshit."  The investigative team did not trust or
like ██ for her outspoken views.  The only person ████ trusted on the

FD-302a (Rev. 5-8-10)

**UNCLASSIFIED//FOUO**

282B-NO-3179991

Continuation of FD-302 of  (U//FOUO) Interview of ▓▓▓▓▓▓▓ , On 12/03/2019 , Page 4 of 7

investigative team was ▓▓▓▓ .  In her last months at STPSO, ▓▓▓ did not go
to the STPSO office without ▓▓▓▓ present.

In late February, 2019, ▓▓▓ walked into the investigative team's office
and saw ▓▓▓▓▓▓▓ dismantling a semi-auto handgun found at the
crime scene. ▓▓▓▓ previously worked at a gun shop and had experience with
firearms. ▓▓ was concerned because no one took steps to document the
process ▓▓▓▓ took to dismantle the handgun. ▓▓▓ told ▓▓▓▓ someone
needed to film or photograph ▓▓▓▓ process.  Eventually some photographs
of the process were taken. ▓▓▓▓ attempted to remove a bullet from the
handgun and accidently broke the primer off of the bullet. ▓▓▓▓ intervened
to ensure none of the pieces of the handgun were accidently thrown away.
After ▓▓▓▓ dismantled the handgun, ▓▓▓ immediately contacted ▓▓▓▓▓▓

▓▓▓ met ▓▓▓▓▓▓ at a Waffle House on February 25, 2019 where she
expressed her concerns with the investigation and the fact she wanted to
resign. ▓▓ explained her concerns with the manner ▓▓▓▓ and ▓▓▓▓
handled the handgun that was recovered from the crime scene. ▓▓ suggested
all the evidence needed to be properly secured. ▓▓▓▓▓▓ said he was
angered with the detectives for handling the evidence in that manner. ▓▓▓▓
told ▓▓▓ that ▓▓▓ was an "idiot" and did not need to be on the
investigation. ▓▓▓ told ▓▓▓▓ to instruct ▓▓▓ to create a timeline
of the case before he was transferred. ▓▓▓▓▓ said he would transfer
▓▓▓▓ off the investigation the next day. Ultimately, ▓▓▓▓▓ was never
removed from the investigation. ▓▓▓▓▓▓▓▓ was later brought
in to lead the investigation.

On April 11, 2019 ▓▓▓ met with ▓▓▓▓ , and ▓▓▓▓▓ Again, ▓▓▓
expressed her frustrations with the investigation and her desire to resign.
▓▓▓▓ and ▓▓▓▓▓▓ face turned white, because they did not want
▓▓▓▓ to leave before the election in November. ▓▓ told ▓▓▓▓ and
▓▓▓ that ▓▓▓▓ did not know the basics of investigations. ▓▓
said the investigative team's minds were closed to new ideas. ▓▓▓ walked
told ▓▓▓ to immediately transfer ▓▓▓ back to the road. ▓▓ walked
back her criticisms of ▓▓▓ because ▓▓ did not want ▓▓▓▓ career
ruined. Prior to her meeting ▓▓▓ and ▓▓▓▓▓▓ applied for
other jobs and received job offers. ▓▓▓ wanted to resign because she was
not being paid by STPSO and she was worried her reputation would suffer if

FD-302a (Rev 5-8-10)

282B-NO-3179991

Continuation of FD-302 of  (U//FOUO) Interview of ▓▓▓▓▓▓▓▓▓▓ , On  12/03/2019 , Page  5 of 7

she continued to work on the case.

April 18, 2019 was the last time ▓▓▓▓ spoke to ▓▓▓▓▓▓ . ▓▓▓ did not recall what was said in the meeting. ▓▓▓▓ ultimately continued to organize the case file and continued to add information to the investigative file so future detectives would have better information.

▓▓▓▓ considered ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ , who joined the investigative team, one of the best investigators within STPSO. ▓▓▓▓ and ▓▓▓▓▓▓▓ disagreed and "sparred" about the nature of NANETTE's death but their disagreements were respectful. ▓▓▓▓▓ believed it was suicide while ▓▓▓▓ believed ▓▓▓ murdered NANETTE. ▓▓▓ was helpful to ▓▓▓ and completed financial analyses when requested by ▓▓▓ In May or June, ▓▓▓ received a text from ▓▓▓▓▓▓ who told ▓▓▓ not to speak with ▓▓▓▓▓▓ . On August 15, 2019, ▓▓▓ received a text from ▓▓▓ that stated ▓▓▓ was placed on administrative leave by STPSO.

On September 4, 2019, ▓▓▓▓ told ▓▓▓ through a text message, that ▓▓▓ was terminated. ▓▓▓ later called ▓▓▓ and explained ▓▓▓ was terminated after he provided information to a federal agent, later determined to be United States Department of Housing and Urban Development (HUD) Agent Jerry Rogers (ROGERS), and that ▓▓▓▓▓▓▓ said negative things about the investigation to ROGERS. ▓▓▓ who was in charge of the investigation, later called ▓▓▓ During the conversation, ▓▓▓ indicated he was unaware of the investigation into leaked information that targeted ▓▓▓▓ After ▓▓▓▓▓▓ was terminated, ▓▓▓ referred to ▓▓▓ as a "dirty cop." ▓▓▓ recalled a conversation in which ▓▓▓ told ▓▓▓ that ROGERS was in a hotel room and wanted to commit suicide. ▓▓▓ did not recall where the hotel was located, but recalled ▓▓▓▓▓ laughed about the situation. ▓▓▓▓ said he and other detectives were going to the hotel. ▓▓▓ believed the conversation may have been on September 4. ▓▓▓ later said the arrest of ROGERS and the termination of ▓▓▓▓▓▓ were political due to the fact ▓▓▓▓▓▓ and ROGERS were believed to be helping ▓▓▓▓▓ who was running for Sheriff against ▓▓▓▓▓▓▓ .

On September 6, 2019, ▓▓▓ attended a meeting with ▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓ and ▓▓▓ ▓▓▓ thought she was only meeting with ▓▓▓ In the meeting it was discussed that NANETTE's family received emails that

FD-302a (Rev. 5-8-10)

UNCLASSIFIED//FOUO

282B-NO-3179991

Continuation of FD-302 of  (U//FOUO) Interview of  ▮▮▮▮▮▮▮▮▮  , On  12/03/2019 , Page  6 of 7

contained leaked information from the investigation.  STPSO started an
investigation into the leak of the information.   The investigation found
▮▮▮▮▮▮▮ showed crime lab photos and shared information with federal agent
ROGERS. ▮▮▮▮▮▮▮ also made negative comments to ROGERS about the
investigative team. ▮▮▮▮▮▮▮ specifically leaked the information for
ROGERS to send it to NANETTE's family.  ROGERS was referred to as a "dirty"
federal agent. ▮▮▮ felt that those in the room believed she had leaked
information too. ▮▮▮ offered to let those in the room look at her text
messages with ▮▮▮▮▮▮. ▮▮ was shown a picture and recognized ROGERS.
▮▮ believed she met ROGERS in passing during her time as US Marshal.  It
was also mentioned in the meeting that STPSO still considered arresting
▮▮▮▮▮▮. ▮▮ did not recall if the potential arrest of ROGERS was
mentioned in the meeting. ▮▮▮ believed STPSO's investigation into the leak
began by targeting her and ended with▮▮▮▮▮▮▮▮ termination.

▮▮▮ was asked by Agents if NANETTE's family's confidence in STPSO was
mentioned in the meeting. ▮▮▮ said NANETTE's family lost confidence in
STPSO's investigation long before the emails were leaked.  STPSO had no
relationship with NANETTE's family and refused to take the family's
information seriously.  Members of the investigative team said horrible
things about the family in front of other potential witnesses.

▮▮▮ did not recall hearing anyone on the investigative team speak of
using Criminal Defamation in connection with the leaked information.
Criminal Defamation was not a statute ▮▮▮ ever saw used.  When ▮▮▮ learned
ROGERS was arrested on a charge of Criminal Defamation she said it was a
"chickenshit charge" and it "isn't even a real charge." According to ▮▮▮
the civil version of defamation did not work and Criminal Defamation "never
works." She believed ROGERS' arrest was retaliatory and STPSO tried to send
a signal STPSO will "screw with you." ▮▮▮ said STPSO should have gone
through the Office of Inspector General if ROGERS did something to harm
STPSO's case.

▮▮▮ was concerned for her safety after working on the Krentel
investigation. ▮▮▮ said it was the first time in her life she slept with a
gun beside her bed. ▮▮▮ said she did not trust the STPSO detectives after
she learned of ▮▮▮▮▮▮ termination; ▮▮▮▮▮ attitude toward her and her
ideas; ▮▮▮▮▮▮▮ termination; ROGERS' arrest. ▮▮▮ felt STPSO and/or the

UNCLASSIFIED//FOUO

FD-302a (Rev. 5-8-10)

282B-NO-3179991

Continuation of FD-302 of (U//FOUO) Interview of ▓▓▓▓▓▓▓▓▓ , On 12/03/2019 , Page 7 of 7

detectives may have her arrested on false charges because she disagreed with their work on the Krentel investigation.

On multiple occasions during the interview, ▓▓▓ said, ▓▓▓▓▓▓ is clueless", "he is an idiot" and "he is a rock." ▓▓▓ believed she knew more about the Krentel investigation than ▓▓▓▓▓ . ▓▓▓ once asked ▓▓▓▓▓ what apps were on ▓▓▓▓▓▓ phone. ▓▓▓ asked because she wondered if any of the apps were spyware designed to surveil NANETTE's activity. ▓▓▓▓▓ did not know what apps were on the phone. ▓▓▓▓▓ later removed the phone from evidence to charge the phone so as to answer ▓▓▓ question. ▓▓▓ was shocked ▓▓▓▓▓ had not done the basic step of knowing what apps were on a suspect's phone. ▓▓▓▓▓ was controlled by his chain of command and did nothing on his own.

▓▓▓ offered her opinions as to why the Krentel investigation was not successful. ▓▓▓ believed STPSO's investigative team might be "incompetent" or STPSO lacked the necessary "training and expertise." ▓▓▓ believed STPSO lacked "professionalism and ethics." After ▓▓▓▓▓▓ was fired ▓▓▓ reminded the investigative team that ▓▓▓▓▓▓ had outstanding subpoenas. The investigative team needed to know where the subpoenas were sent and what to expect back. ▓▓▓ felt, without the reminder, the investigative team would have failed to complete ▓▓▓▓▓▓▓ unfinished work on the investigation. During her time on the investigation no one asked to see any reports from ▓▓▓ .

▓▓▓ who was in the process of moving to Washington, DC, had to leave the FBI New Orleans Office immediately after the interview. ▓▓▓ agreed to meet Agents at a later date to download the text messages between ▓▓▓ and STPSO personnel.

SA Epperson's original notes from the interview were made a part of the investigative file via 1A.

FD-302 (Rev. 5-8-10)



UNCLASSIFIED//FOUO

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry     12/11/2019  .

███████████████████████         date of birth (DOB) ███████████
cell phone ███████████ was interviewed telephonically after he asked
writer, via text message, to contact him.  After being advised of the
identity of the interviewing Agent and the nature of the interview,
█████████ provided the following information:

MEETING WITH █████████████

████████ met with St. Tammany Parish Sheriff's Office (STPSO) ████
███████████ and ██████ ██████████████on December 5,
2019. ████████████ who was friends with ███████ █████ran
against ███████████ in the 2019 sheriff's election. ████████asked
██████████to speak with █ █████████ and schedule a meeting for █████
to speak with ██████████

████████ and █████ █ █████████ most trusted ██████████, met
with ███████ __ █████ for a breakfast meeting. ████████ spoke directly to
██████ about the circumstances surrounding ████████ termination
from STPSO. ████████████spoke openly with ████████ about the issue and
said "This is all political." ██████████ believed Jerry Rogers (ROGERS)
obtained information about the Nanette Krentel (NANETTE)investigation for
████ to "derail" the investigation and to use the information
against ██████████ in the 2019 sheriff's election. ████████felt
████████was caught up in ██████ and ROGERS' plan. █████████ stated
that it was a difficult decision to terminate ██████████ but he believed
that ███████ unwittingly provided information to ROGERS who was
associated with ██████

█████████ showed ████████ a message he sent to a neighbor in which
he defended ███████████ and defended the credibility of the Krentel
investigation. ████████previously sent a copy of that message to two

UNCLASSIFIED//FOUO

---

Investigation on   12/10/2019   at   New Orleans, Louisiana, United States (Phone)

File #   282B-NO-3179991                                Date drafted   12/10/2019

by   Clinton D. Epperson

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 5-8-10)

282B-NO-3179991

(U//FOUO) Telephonic Interview of ▮▮▮▮▮

Continuation of FD-302 of ▮▮▮▮▮ _____ , On  12/10/2019  , Page   2 of 3

STPSO supervisors involved in the investigation that led to ▮▮▮▮▮
termination.

▮▮▮▮▮ told ▮▮▮▮▮ that the information and investigation that
lead to ▮▮▮▮▮ termination were flawed. ▮▮▮▮▮ told ▮▮▮▮▮
▮▮▮▮▮ the same detectives that rushed to judgement in their determination
that NANETTE committed suicide were the same detectives that determined
▮▮▮▮▮ leaked information to ROGERS.

▮▮▮▮▮ stated the investigation into the leak of information began
after one of NANETTE's sisters contacted STPSO ▮▮▮▮▮
and asked whether ▮▮▮▮▮ was leaving the investigation or
attempting to find other employment. STPSO surmised if NANETTE's sister
asked questions of such a specific nature, someone within the investigation
leaked information to the family. One of the Krentel sisters asked STPSO to
investigate the leaked information.

Based on the conversation, ▮▮▮▮▮ understanding of the
investigation that led to ▮▮▮▮▮ termination appeared uninformed.

▮▮▮▮▮ offered to rescind ▮▮▮▮▮ termination letter, allow
▮▮▮▮▮ to resign, and to write a recommendation letter in order for
▮▮▮▮▮ to find another job.

▮▮▮▮▮ was surprised ▮▮▮▮▮ did not mention an FBI
investigation into ROGERS' arrest and never asked ▮▮▮▮▮ if he spoke to
FBI agents.

CRIMINAL DEFAMATION

Writer asked ▮▮▮▮▮ if citizens requested Criminal Defamation to be
enforced. ▮▮▮▮▮ explained, when a citizen complained to STPSO about
online postings in which negative comments were made about the citizen, the
complaints were filed as either a telephone harassment or cyber stalking.
Criminal Defamation was not a charge that was considered.

▮▮▮▮▮ researched the Criminal Defamation statute after inaccurate
information was posted about an investigation he conducted. He spoke with
STPSO's ▮▮▮▮▮ about the issue. ▮▮▮▮▮
contacted an STPSO ▮▮▮▮▮ ultimately told

FD-302a (Rev. 5-8-10)

**UNCLASSIFIED//FOUO**

282B-NO-3179991



(U//FOUO) Telephonic Interview of ▮▮▮▮▮▮

Continuation of FD-302 of ▮▮▮▮▮▮▮▮▮▮ , On  12/10/2019 , Page   3 of 3

▮▮▮▮▮▮▮▮  nothing could be done about the inaccurate information posted.

STPSO PERSONNEL

▮▮▮▮▮▮▮▮  said STPSO ▮▮▮▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮▮▮▮
▮▮▮▮  we pushed out of STPSO after the 2019 sheriff's election.
Internal Affairs Lieutenant ▮▮▮▮▮▮  was promoted to Captain over
Internal Affairs.

▮▮▮▮▮▮ said ▮▮▮▮  a National Academy graduate, possible cell phone
number ▮▮▮▮  might be "jilted" after he left STPSO. ▮▮▮▮  was also
questioned about his conversations with ROGERS. ▮▮▮▮▮▮▮▮ thought
would have some understanding of the investigation and process that led to
ROGERS' arrest and ▮▮▮▮▮▮▮▮  termination.

▮▮▮▮▮▮ supervised the major crimes unit as well as the persons crimes
unit, the juvenile crimes unit, and the property crimes unit in the eastern
portion of the parish.

**UNCLASSIFIED//FOUO**

FD-1057 (Rev. 5-8-10)                     UNCLASSIFIED//FOUO



# FEDERAL BUREAU OF INVESTIGATION
### Electronic Communication

**Title:** (U//FOUO) New Orleans Division Requests WFO    **Date:** 12/17/2019
          Collect Text Messages From ▮▮▮▮▮▮▮▮▮

**CC:** BERGER ANDREW

**From:** NEW ORLEANS
         NO-16
         **Contact:** Clinton D. Epperson, 504-816-3000

**Approved By:** A/SSA SA J. R. Smith

**Drafted By:** Clinton D. Epperson

**Case ID #:** 282B-NO-3179991        (U//FOUO) SENSITIVE INVESTIGATIVE MATTER
                                      SUBJECTS-▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
                                      ▮▮▮▮▮▮▮▮▮▮▮▮T. TAMMANY PARISH SHERIFF'S
                                      OFFICE;
                                      VICTIM-JERRY HAMILTON ROGERS/LOCATION-ST
                                      TAMMANY PARISH;
                                      CONSPIRACY AGAINST RIGHTS

**Synopsis:** (U//FOUO) The New Orleans Division Civil Rights squad
respectfully request the Washington Field Office collect text messages
pertinent to the captioned investigation from US Department of Health and
Human Services, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**Details:**

   By way of background, on December 2, 2019, New Orleans Civil Rights
Special Agents interviewed former United States Marshal for the Eastern
District of Louisiana, ▮▮▮▮▮▮▮▮▮ DOB ▮▮▮▮▮▮▮▮▮▮ in reference
to the captioned investigation. ▮▮▮▮ was an unpaid Reserve Deputy
assigned, between November of 2018 until November of 2019, to St. Tammany

                       UNCLASSIFIED//FOUO

**UNCLASSIFIED//FOUO**

Title:  (U//FOUO) New Orleans Division Requests WFO Collect Text Messages
From █████████████████████
Re:  282B-NO-3179991, 12/17/2019

Parish Sheriff's Office's (STPSO) investigation of the 2017 homicide of
Nanette Krentel.  During the interview it was learned ████ exchanged
numerous text messages with detectives and investigators with whom she
worked while assigned to the case. The Louisiana State Fire Marshal's
Office, the Bureau of Alcohol, Tobacco, Firearms, and Explosives, and the
St. Tammany Coroner's Office were also a part of the investigation.

   █████ agreed to provide Agents access to her phone in order to download
all of her text communications, as to capture her text history with
investigators associated with the Krentel homicide investigation.

   The New Orleans Division respectfully requests Washington Field Office
execute a consent to search of ██████ personal cell phone, related to ████
████████  to retrieve all text messages between ████ and investigators
involved in he Krentel investigation.  Please complete a corresponding
FD-941 regarding a consent to search. ██████ cell phone number ████████
███████ recently began working for the United States Department of Health
and Human Services in the Thomas P. O'Neil Building, 200 C. Street SW,
Washington, DC 20024.



◆◆

FD-302 (Rev. 5-8-10)

- 1 of 4 -



UNCLASSIFIED//FOUO

## FEDERAL BUREAU OF INVESTIGATION

Date of entry _____12/18/2019_____

███████████████ date of birth (DOB) ██████████ cell phone ██████████ was interviewed at the Bureau of Alchol, Tobacco, Firearms and Explosives (ATF) office, 1 Galleria Blvd. #1700, Metairie, LA 70001.  Also present was Department of Justice Civil Rights Division Trial Attorney ██████████  After being advised of the identities of the interviewing Agents and the nature of the interview, ██████ provided the following information:

███████ was a Senior Special Agent Certified Fire Investigator for the ATF. In the summer or fall of 2018, ████████ received calls from investigators that worked on the Nanette Krentel (NANETTE) death investigation. ████████ received calls from State Fire Marshal ████████████ an investigator from the St. Tammany's Coroner's Office, St. Tammany Parish Sheriff's Office (STPSO) █████████████████████ and former United States Marshal for the Eastern District of Louisiana███████ ████████ who provided outside help to STPSO on the investigation. ██████████ whom ████████ never spoke to, was an STPSO detective that worked on financial aspects of the investigation. ████████ was not aware of any detectives that were removed or added to the investigation.

██████ met with ████████, who he had worked with previously, █████ and ████ to discuss the investigation.  After █████████ was briefed he saw there were numerous leads and investigative steps that still needed to be completed. ████████ described the processing of the fire scene as a "shit sandwich."  If the ATF had processed the fire scene, it would have been completed in a thorough methodical manner, cataloguing every item at the scene.  The investigators on the Krentel investigation went straight to NANETTE's body and did not methodically process the scene.

██████ heard rumors that STPSO initially believed NANETTE's death was a suicide and did not process the scene as thoroughly as they should have.

UNCLASSIFIED//FOUO

| | | | |
|---|---|---|---|
| Investigation on | 12/02/2019 | at | Metairie, Louisiana, United States (In Person) |

File # 282B-NO-3179991

Date drafted  12/03/2019

by  Clinton D. Epperson, DeWayne J. Horner

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 5-8-10)

UNCLASSIFIED//FOUO

282B-NO-3179991

Continuation of FD-302 of (U//FOUO) Interview of ▮▮▮▮▮▮ , On 12/02/2019 , Page 2 of 4

The investigators were open minded to ▮▮▮▮▮▮ critiques and suggestions. ▮▮▮▮▮▮ said there was no federal nexus identified in the Krentel investigation which prevented the ATF from further involvement. ▮▮▮▮▮▮ was never made aware sensitive information was leaked to NANETTE's family. Nor was STPSO ▮▮▮▮▮▮▮▮▮▮ mentioned by investigators.

▮▮▮▮▮▮ assisted the investigation informally by providing answers to questions from the investigators, by processing evidence, and by helping investigators gain access to additional resources.   When investigators considered using a "geo-fencing" technique, ▮▮▮▮▮▮ provided the required verbiage for the search warrant.  He was not sure if investigators ultimately used the technique.  ▮▮▮▮▮ put the investigators in contact with a company that attempted to retrieve video data from a DVR found at the fire scene; ultimately no data was recovered.  ▮▮▮▮▮ helped investigators gain access to the FBI's Behavioral Analysis Unit (BAU) in Quantico, VA, where members of the ATF were detailed.  He ensured the Jefferson Parish Sheriff's Office Crime Lab processed evidence through the National Integrated Ballistics Information Network.  ▮▮▮▮▮ executed a search warrant on the phone of NANETTE's husband, ▮▮▮▮▮▮▮ ▮▮▮ found the phone had been wiped of all data except for the factory settings.

The coroner's office investigator asked ▮▮▮▮▮ about specific substances found in NANETTE's lungs and whether those substances indicated NANETTE died before or after the fire was started.  ▮▮▮▮▮ said the coroner's office believed NANETTE's death resulted from a homicide.

STPSO detectives and ▮▮▮▮▮ believed NANETTE's death was a suicide, while ▮▮▮▮ believed ▮▮▮▮ murdered NANETTE.

▮▮▮▮ asked ▮▮▮▮ to peer review the Origin of Cause Report (OCR) when it was completed by ▮▮▮▮▮ ▮▮▮▮▮ agreed to review the OCR.  He learned the scene tested positive for accellerants.  ▮▮▮▮▮ told the investigators that he did not want to be briefed on the case if he was to review the OCR with an unbiased perspective.  Ultimately, ▮▮▮▮▮ was never provided the OCR.

▮▮▮▮ was invited to a January 2019 meeting wherein investigators, and other agencies involved with the investigation, presented case information.

UNCLASSIFIED//FOUO

FD-302a (Rev. 5-8-10)

UNCLASSIFIED//FOUO

282B-NO-3179991

Continuation of FD-302 of (U//FOUO) Interview of ▆▆▆▆▆▆▆▆ , On 12/02/2019 , Page 3 of 4

Prior to the meeting ▆▆▆▆ told ▆▆▆▆ that St. Tammany ▆▆▆▆▆▆▆ prohibited presenters from discussing the investigator's theories that NANETTE committed suicide. ▆▆▆▆ thought ▆▆▆▆▆▆ prohibition to discuss all plausible theories was unusual. ▆▆▆ said ▆▆▆▆▆▆▆ was concerned with the public's perception of the investigation if suicide was discussed and ▆▆▆▆▆▆▆ wanted the detectives full efforts in the investigation. There were approximately 30 to 40 people present at the meeting. After the meeting the ATF opened up a case on NANETTE's death.

▆▆▆▆ asked ▆▆▆▆ to interview ▆▆▆▆ ex-wife who lived in Texas. ▆▆▆ never conducted the interview due to the ATF's informal involvement. ▆▆▆ believed ▆▆▆ asked ▆▆▆ to participate in the interview due to the out of state location of the interview and the perception of large federal travel budgets.

▆▆▆ supported the idea of the interview because ▆▆▆ looked at the investigation from a "victimology" perspective. ▆▆▆▆▆ recalled ▆▆▆ was interested in NANETTE's medications and BAU's involvement in the investigation. ▆▆▆▆ had approximately six(6) to ten (10) conversations with ▆▆▆▆ learned ▆▆ was dissatisfied with the investigation and she was looking for employment in Washington, DC.

In September of 2019 the ATF provided general fire investigations training to STPSO. The Krentel investigation was not mentioned as a motivating factor in the training provided by the ATF.

▆▆▆▆ never spoke with ▆▆▆▆▆ about the case. ▆▆▆▆ had no information concerning whether ▆▆▆▆▆ had a relationship with ▆▆▆▆

Although most of the investigators thought NANETTE committed suicide, ▆▆▆▆▆▆▆▆ were the most likely possible suspects in the event NANETTE was murdered.

ATF Special Agent ▆▆▆▆▆ was ▆▆▆▆ counterpart on the north shore. ▆▆▆▆ said ▆▆ also had information concerning the Krentel investigation.

UNCLASSIFIED//FOUO

FD-302a (Rev. 5-8-10)

**UNCLASSIFIED//FOUO**

282B-NO-3179991

Continuation of FD-302 of  (U//FOUO) Interview of ██████████ , On  12/02/2019 , Page  4 of 4

SA Epperson's original notes from the interview were made a part of the investigative file via 1A.

FD-302 (Rev. 5-8-10)

- 1 of 3 -



UNCLASSIFIED//FOUO

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry        12/18/2019

███████████████                date of birth (DOB) █████████████, cell phone
█████████ was interviewed telephonically.  After being advised of the
identity of the interviewing Agent and the nature of the interview, ██████
provided the following information:

███████ wished to provide additional information concerning her experience
when she worked on the Nanette Krentel (NANNETE) investigation.  ████ who
was an unpaid St. Tammany Parish Sheriff's Office (STPSO) Reserve Deputy,
worked on the investigation from November of 2018 until November of 2019 at
STPSO.  ████ initially worked 30 to 50 hours a week, approximately three (3)
weeks each month from November until February of 2019 at STPSO's Slidell
office.

In February of 2019, ████ had an argument with STPSO's lead detective
████████████████████  After February, ██████ worked approximately 80 to 100
hours each month, and often worked in STPSO's Covington office.  After April
2019, ██████ worked approximately two (2) to three (3) days a week.

███████ believed three (3) things contributed to the the investigation's lack
of success:  incompetence; STPSO as an agency did not want the investigation
solved; the investigation was not important to STPSO.

According to ████████████ did not possess the skill set or experience to
conduct a murder investigation.  The Krentel investigation was more complex
than the average murder investigation.  ███████████ did not make independent
decisions on the investigation without asking his supervisors or without
being told what to do by supervisors.  ██████ believed it was possible
█████████ lack of experience and knowledge was a reason he was selected to
conduct the investigation and a reason he was never removed from the
investigation.  ██████ never saw ████████ complete any work during her time on
the investigation.  ████ learned ███████ id not work on the investigation

UNCLASSIFIED//FOUO

Investigation on  12/12/2019  at  Washington, District Of Columbia, United States (Phone)

File #  282B-NO-3179991                                    Date drafted  12/12/2019

by  Clinton D. Epperson

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FD-302a (Rev. 5-8-10)

282B-NO-3179991

(U//FOUO) Telephonic Interview of

Continuation of FD-302 of █████████████ , On 12/12/2019 , Page 2 of 3

from sometime in the winter of 2017 until early in 2018. ███████ was not at work due to a mental "melt down," possibly due to the stress of the investigation.

NANETTE's husband, ██████████████████ , was a Fire Chief and a possible suspect. ██████earned not all the security video footage was obtained from the fire station where ██████claimed to be at the time of NANETTE's murder. ██████ learned video footage from the camera that watched the backdoor of the fire station was not obtained, which illustrated ██████ was not thorough. ██████said the footage could have confirmed if ██████ left the fire station during NANETTE's murder, or if he stayed at the fire station. In either scenario the footage was vital to the investigation. ████████ and the other detectives repeatedly said they were not concerned with the case because the case would never be presented to a grand jury and it would never be solved.

██████asked ████████ to obtain the GPS data for all of the fire department vehicles for the date of NANETTE's murder. ██████believed the fire department's insurance company retained that information. ████████ chided ██████idea and said the insurance company only retained that information for 24 hours. ██████ later learned from ████████████ who formerly worked for the fire department, that the insurance company retained the GPS data for one (1) year.

████████████████████████ was a suspect in ████████ opinion, as was ██████████████████████████ . ████████ was seen on security camera footage receiving text message, and phone records confirmed ██████and ██████communicated during the time frame. ██████learned the time stamp on security footage that captured ████████activity was not accurate, but ████████did not reconcile the difference in time.

████████said ████████alibi, that he was at work at the restaurant Country Kitchen at the time of the murder, was confirmed. ██████later contacted a person she knew at County Kitchen and learned it was not confirmed that ████████was at work at the time of the murder.

Recently a Crime Stoppers tip concerning ████████was sent to STPSO. ██████learned STPSO detectives were attempting to determine the IP address of the tipster. ████████believed, based on the arrest of HUD Agent Jerry Rogers, STPSO

FD-302a (Rev. 5-8-10)

UNCLASSIFIED//FOUO

282B-NO-3179991

(U//FOUO) Telephonic Interview of

Continuation of FD-302 of ▬▬▬▬▬▬▬▬▬▬  , On  12/12/2019  , Page   3 of 3

detectives would attempt to intimidate the tipster.

▬▬▬ was present when a hairdresser, ▬▬▬▬▬▬▬▬▬ , was interviewed by STPSO detectives. ▬▬▬ elt the detectives intimidated ▬▬▬▬ which resulted in ▬▬▬ not providing all the information she had. ▬▬▬▬▬ interview was another reason ▬▬▬ thought detectives would intimidate the Crime Stoppers tipster.

▬▬▬▬ and the other detectives on the investigative team were not opened minded to any of ▬▬▬ suggestions or ideas. The investigative team felt the investigation was a waste of their time because NANETTE committed suicide. The investigative team also believed the St. Tammany Parish Coroner only concluded NANETTE's death was a homicide to save his [the Coroner's] job. The investigative team believed the Coroner actually believed NANETTE comitted suicide, even after ▬▬▬▬▬▬▬▬▬▬ who conducted the autopsy, said NANETTE's body smelled strongly of gasoline. Additionally, ▬▬▬▬▬ cited undigested food in NANETTE's stomach and the odd angle of a gunshot wound as additional evidence of a homicide.

The supervisors of the investigative team were not involved in the investigation. No one on the investigative team or who supervised the investigative team ever asked to see any of the work ▬▬▬ completed during her year on the investigation. When ▬▬▬ wrote her resignation letter on November 5th or 6th of 2019 to St. Tammany ▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬ , she offered to speak with ▬▬▬▬▬▬▬ and provide her insight into the investigation. To date, ▬▬▬ has not received any communication from ▬▬▬▬▬▬

UNCLASSIFIED//FOUO

FD-302 (Rev. 5-8-10)

- 1 of 2 -



UNCLASSIFIED//FOUO

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry ___12/18/2019___

██████████████████████████ date of birth (DOB)
cell phone ██████████████ was interviewed telephonically.  Writer contacted
████████to clarify statements ████████made during a previous interview
on December 10, 2019 with writer.  After being advised of the identity of
the interviewing Agent and the nature of the interview,████████provided
the following information:

████████████ was asked what St. Tammany Parish ██████
████ meant, when he told ██████████, "This is all political." ██████████████
explained the meeting started with the statement from
████████████understood the statement to mean Jerry Rogers (ROGERS) was
motivated by politics when he sent emails to Nanette Krentel's (NANETTE)
family criticizing the St. Tammany Parish Sheriff's Office's (STPSO)
investigation of NANETTE's death.  ROGERS was motivated by his political
association with ████████████ when he allegedly obtained information
specific to the investigation from ████████ ROGERS and ████hoped the
criticisms of the investigation would assist ████in winning the election
for St. Tammany Sheriff in November of 2019.  Politics also motivated the
press in their coverage of ROGERS' arrest. ████████████ said he and STPSO
were "beat up" in the press over ROGERS' arrest.

Unprompted, ████████████said, "I'm not the victim of this despite what
ROGERS thinks." ██████████ did not clarify who the victim of the
Criminal Defamation was. ████████ explained NANETTE's sister, who was
an attorney, requested STPSO investigate the leaked information contained in
the emails she received from ROGERS.

████████████ told ██████████████ "Jerry is going to sue y'all." ████████████
told ████████████, and ████████████████████ who was also present,
ROGERS would not be prosecuted for Criminal Defamation. ████████████ did
not disagree with ██████████ that ROGERS would sue STPSO.

UNCLASSIFIED//FOUO

Investigation on __12/12/2019__ at  Covington, Louisiana, United States (Phone)

File # _282B-NO-3179991_                                   Date drafted __12/13/2019__

by  Clinton D. Epperson

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 5-8-10)

282B-NO-3179991

(U//FOUO) 2nd Telephonic Interview of

Continuation of FD-302 of █████████████████ , On  12/12/2019  , Page   2 of 2

believed ROGERS would be prosecuted for Criminal Defamation.

█████████████ pointed out to █████████████ and ████ that ROGERS was arrested for his [ROGERS'] activities between the time frame late December of 2017 and early December of 2018. █████████ told ███████████ and ███, ███████████ termination paperwork documented ███████ violation of STPSO's rules and policy occurred between late 2018 and July of 2019. █████████ told ████ and ████ he ███████ located a personal credit card receipt that documented a computer program he immediately purchased when he learned he was assigned to the Krentel investigation.  The date of the receipt was December 26, 2018. █████████ contended the dates on the documents proved █████████ did not leak any information to ROGERS that was used in emails to NANETTE's family.

████████ offered to explore options that would allow █████████ to resign. ██████ said, "We'll have to figure out something to help you that won't expose us." █████████ understood ██████ statement to mean, ████ wanted a solution that would protect STPSO in a civil suit.

████ said ██████████████ who supervised criminal investigations, would look into the matter and call █████████ at a later date. █████████ planned to contact █████ by December 16, 2019, if █████████ did not hear from █████ .

█████████ was unsure if he would meet with ██████████ again, but agreed to contact writer in advance of any future meeting.

FD-302 (Rev. 5-8-10)

- 1 of 1 -

**OFFICIAL RECORD**

UNCLASSIFIED//FOUO

### FEDERAL BUREAU OF INVESTIGATION

Date of entry ___12/30/2019___

On December 23, 2019, ▮▮▮▮▮▮▮▮▮▮ (identifying information previously provided), met with Special Agent (SA) Andrew Berger and Information Technology Specialist / Forensic Examiner (ITS / FE) ▮▮▮▮▮▮▮ at the Federal Bureau of Investigation's (FBI) Washington Field Office (WFO), located at 601 4th Street NW, Washington, D.C.

SA Berger explained to ▮▮▮ that the FBI requested to search only text messages and related content, such as SMS, MMS, iMessages, iChats, and Contacts from her Apple iPhone. Specific search criteria were noted in the FD-26 Consent to Search.

At approximately 9:05AM, ▮▮▮ reviewed and signed the FD-26 Consent to Search and FD-597 Receipt for Property forms associated with her Apple iPhone X, telephone number ▮▮▮▮▮▮▮ serial number ▮▮▮▮▮▮▮▮ then provided the passcode to access the Apple iPhone.

ITS/FE ▮▮▮▮ immediately took possession of the Apple iPhone, conducted a logical extraction of the iPhone's contents and generated a limited report containing its contents pursuant to the FD-26 Consent to Search.

At approximately 11:50AM, SA Berger met ▮▮▮ at 200 C Street SW, Washington. D.C., and returned the Apple iPhone to her custody. ▮▮▮ signed the FD-597 Receipt for Property and was provided a copy.

All forms signed by ▮▮▮ and a working copy of the digital extraction are attached hereto as a 1A.

UNCLASSIFIED//FOUO

---

Investigation on ___12/23/2019___ at Washington D.C., District Of Columbia, United States (In Person)

File # 282B-NO-3179991                              Date drafted 12/23/2019

by BERGER ANDREW

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-1087a (Rev 5/8/10)                    UNCLASSIFIED//FOUO



# FEDERAL BUREAU OF INVESTIGATION
## Collected Item Log

**Event Title:**   (U//FOUO) Consent Search of          **Date:**  12/30/2019
█████████████ Apple iPhone

**Approved By:**  A/SSA NAGASHIMA JOHN Y

**Drafted By:**  BERGER ANDREW

**Case ID #:** 282B-NO-3179991      (U//FOUO) SENSITIVE INVESTIGATIVE MATTER
SUBJECTS-████████████████████████
█████████████ ST. TAMMANY PARISH SHERIFF'S
OFFICE;
VICTIM-JERRY HAMILTON ROGERS/LOCATION-ST
TAMMANY PARISH;
CONSPIRACY AGAINST RIGHTS

**Details:**

A digital extraction of an Apple iPhone X belonging to ████████
serial number ██████████, associated with telephone number ███████
████ subject to a limited consent search, conducted on 12/23/2019.

**Collected From:**   (U//FOUO) █████████████
United States

**Receipt Given?:**  Yes

**Holding Office:**  WASHINGTON FIELD

| Item Type | Description |
|---|---|
| 1B Digital | (U//FOUO) One (1) Blu-ray disc containing the partial contents of ████████████ Apple iPhone X, telephone number ███████████   Serial number ████████████ Collected On: 12/23/2019 12:14 PM EST Special Handling Codes:  Breakable Seizing Individual: ████████████ Located By: ████████████ Location Area:  601 4th Street NW, Washington, D.C. |

UNCLASSIFIED//FOUO

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

**UNCLASSIFIED//FOUO**

Title:  (U//FOUO) Consent Search of ▓▓▓▓▓▓▓▓▓▓ Apple iPhone
Re:  282B-NO-3179991, 12/30/2019

```
          Specific Location:  CART Room 3020
          Device Type:  Blu-Ray Disc
          Designation:  Original
          Number of Devices Collected:  1
```

◆◆

**UNCLASSIFIED//FOUO**

FD-302 (Rev. 5-8-10)

- 1 of 1 -



UNCLASSIFIED//FOUO

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry _____01/06/2020_____

On December 23, 2019, Washington Field Office (WFO) Computer Analysis
Response Team (CART) Information Technology Specialist / Forensic Examiner
(ITS/FE) ████████████ was requested to provide assistance with the
extraction of Chats including iMessages, SMS/MMS text messages and contacts
from a witnesses iPhone. The consent search was conducted at the Washington
Field Office located at 4th Street N.W., Washington, DC. Refer to CART
Request Submission ID 223970.

The following item was forensically acquired using approved FBI CART SOP's
and software writeblocking:

- **QWF_iPhoneX**: Performed an advanced logical extraction of an Apple iPhone
  X using UFED Physical Analyzer. A report containing chats (including
  iMessages), SMS/MMS text messages and contacts was generated. The phone
  is further described as: Apple iPhone X (model A1901), IMEI:
  ████████████ Serial Number: ████████████ Phone Number: ████████
  ████ Passcode: ████████

**Derivative Evidence:**

**DEWF_iPhoneX**: Two (2) BluRay discs (one master copy for evidence and one
working copy for the case agent) containing a report of all chats (including
iMessages), SMS/MMS text messages and contacts from **QWF_iPhoneX**.

**Disposition of Evidence:**

Both **DEWF_iPhoneX** discs were provided to Special Agent (SA) Andrew Berger.
The full advanced logical extraction of the device was not retained.

UNCLASSIFIED//FOUO

Investigation on  _12/23/2019_  at  Washington, District Of Columbia, United States (In Person)

File #  _282B-NO-3179991_                                    Date drafted  _12/23/2019_

by  ████████████

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-1057 (Rev. 5-8-10)                    UNCLASSIFIED//FOUO



# FEDERAL BUREAU OF INVESTIGATION
### Electronic Communication

**Title:** (U//FOUO) Request to transfer evidence item     **Date:** 01/06/2020
           1B1 from WFO to New Orleans Division

**CC:** Clinton D. Epperson

**From:** WASHINGTON FIELD
          WF-CR20
          **Contact:** BERGER ANDREW, 703-686-6274

**Approved By:** SSA ARSENI GIULIO J

**Drafted By:** BERGER ANDREW

**Case ID #:** 282B-NO-3179991        (U//FOUO) SENSITIVE INVESTIGATIVE MATTER
                                      SUBJECTS-
                                              ST. TAMMANY PARISH SHERIFF'S
                                      OFFICE;
                                      VICTIM-JERRY HAMILTON ROGERS/LOCATION-ST
                                      TAMMANY PARISH;
                                      CONSPIRACY AGAINST RIGHTS

**Synopsis:** (U//FOUO) WFO requests IS-4 (Evidence Control Center) to
transfer evidence item 1B1 to the New Orleans Division.

**Reference:** 282B-NO-3179991 Serial 27
               282B-NO-3179991 Serial 28
               282B-NO-3179991 Serial 23

**Details:**

Pursuant to a lead from New Orleans Division (see referenced serial 23),
WFO SA Andrew Berger conducted a limited consent search of an Apple
iPhone on 12/23/2019. The evidence was collected and submitted to NVRA
ECC on 12/23/2019. The evidence item was labeled 1B1. As captioned
investigation is operating out of New Orleans Division, WFO requests IS-4

                          UNCLASSIFIED//FOUO

**UNCLASSIFIED//FOUO**

Title:  (U//FOUO) Request to transfer evidence item 1B1 from WFO to New
Orleans Division
Re:  282B-NO-3179991, 01/06/2020


to transfer evidence item 1B1 to New Orleans Division ECC.



◆◆

FD-1057 (Rev. 5-8-10)



UNCLASSIFIED//FOUO

# FEDERAL BUREAU OF INVESTIGATION
### Electronic Communication

**Title:** (U//FOUO) Louisiana State Attorney          **Date:** 01/08/2020
General's Office Declined Charges

**From:** NEW ORLEANS
NO-16
**Contact:** Clinton D. Epperson, 504-816-3000

**Approved By:** SSA Vanessa M. Tibbits

**Drafted By:** Clinton D. Epperson

**Case ID #:** 282B-NO-3179991      (U//FOUO) SENSITIVE INVESTIGATIVE MATTER
SUBJECTS-█████████████████████

████████████ST. TAMMANY PARISH SHERIFF'S
OFFICE;
VICTIM-JERRY HAMILTON ROGERS/LOCATION-ST
TAMMANY PARISH;
CONSPIRACY AGAINST RIGHTS

**Synopsis:** (U//FOUO) To document a telephonic conversation between writer
and ████████████████████

**Details:**

On January 7, 2020, FBI Special Agent Clinton D. Epperson spoke with
████████████████████by phone concerning state
charges of Criminal Defamation-14:47 against Jerry Rogers.

████was assigned to review St. Tammany Parish Sherrif's Office's
(STPSO) investigative case file against Rogers.  After reviewing the
file, ████determined the Louisiana Attorney General's (AG)
Office would not pursue charges of Criminal Defamation-14:47 against
Rogers.

████████who had never seen the statute used for criminal prosecution

UNCLASSIFIED//FOUO

UNCLASSIFIED//FOUO

Title:  (U//FOUO) Louisiana State Attorney General's Office Declined
Charges
Re:  282B-NO-3179991, 01/08/2020


before, stated the use of Criminal Defamation-14:47 was unconstitutional
based on the facts of the case which indicated STPSO ███████████
██████ was the victim. ███████████ of the AG's Office, and ███████ were
scheduled to meet with St. Tammany Parish ███████████████ to inform
him of the AG's Office's declination.  The meeting was scheduled for
January 8, 2020.


◆◆

UNCLASSIFIED//FOUO

FD-1057 (Rev. 5-8-10)                    UNCLASSIFIED//FOUO



# FEDERAL BUREAU OF INVESTIGATION
### Electronic Communication

**Title:** (U) Signature confirmation for delivery of      **Date:** 01/14/2020
1B1 Transferred to NOFO per serial 30

**From:** WASHINGTON FIELD
         WF-IS4
         **Contact:** ████████████████████████

**Approved By:** ████████████

**Drafted By:** ████████████████

**Case ID #:** 282B-NO-3179991      (U//FOUO) SENSITIVE INVESTIGATIVE MATTER
                                    SUBJECTS-███████████████████████
                                    ████████████ ST. TAMMANY PARISH SHERIFF'S
                                    OFFICE;
                                    VICTIM-JERRY HAMILTON ROGERS/LOCATION-ST
                                    TAMMANY PARISH;
                                    CONSPIRACY AGAINST RIGHTS

**Synopsis:** (U) Signature confirmation for delivery of 1B1 Transferred to
NOFO per serial 30; FedEx 1521 6058 3660

**Enclosure(s):** Enclosed are the following items:
1. (U) Signature confirmation for delivery of 1B1 Transferred to NOFO
per serial 30; FedEx 1521 6058 3660

**Details:**

Signature confirmation for delivery of 1B1 Transferred to NOFO per serial
30; FedEx 1521 6058 3660


◆◆


                         UNCLASSIFIED//FOUO

FD-1036 (Rev. 10-16-2009)

UNCLASSIFIED//FOUO



# FEDERAL BUREAU OF INVESTIGATION
## Import Form

**Form Type:** EMAIL - Email                                    **Date:** 01/15/2020

**Title:** (U) Jerry Rogers Received Declination Letter from AG

**Approved By:** SSA REED RONALD

**Drafted By:** Clinton D. Epperson

**Case ID #:** 282B-NO-3179991          (U//FOUO) SENSITIVE INVESTIGATIVE MATTER
                                        SUBJECTS-████████████████████████
                                        ████████-ST. TAMMANY PARISH SHERIFF'S
                                        OFFICE;
                                        VICTIM-JERRY HAMILTON ROGERS/LOCATION-ST
                                        TAMMANY PARISH;
                                        CONSPIRACY AGAINST RIGHTS

**Synopsis:** (U) On January 10, 2020, writer received an email from Jerry
Rogers. The email contained a declination letter from Louisiana ████████
████████████████████ Attached is the email from Rogers that
contained the declination letter.


◆◆

UNCLASSIFIED//FOUO

FD-302 (Rev. 5-8-10)

-1 of 1-



UNCLASSIFIED//FOUO

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry       01/29/2020


On January 23, 2020, FBI Special Agent Clinton D. Epperson received an
envelope by mail from the State of Louisiana Attorney General's (AG)
Office.  The envelope contained a copy of the AG's case file pertaining to
St. Tammany Parish Sheriff's Office's (STPSO) investigation and arrest of
Jerry Rogers.

The contents of the envelope were made a a part of the case file via 1A.


UNCLASSIFIED//FOUO

Investigation on   01/23/2020   at   New Orlenas, Louisiana, United States (Mail, Phone)

File #  282B-NO-3179991                                    Date drafted   01/27/2020

by   Clinton D. Epperson

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FD-1057 (Rev 5-8-10)

**UNCLASSIFIED//LES**



# FEDERAL BUREAU OF INVESTIGATION
### Electronic Communication

**Title:** (U) St. Tammany Parish Sheriff's Office          **Date:** 02/05/2020
Facebook Profile

**CC:** Vanessa M. Tibbits

**From:** NEW ORLEANS
NO-20
     **Contact:** ██████████████████████████

**Approved By:** ████████████
     Clinton D. Epperson

**Drafted By:** ████████████████

**Case ID #:** 282B-NO-3179991     (U//FOUO) SENSITIVE INVESTIGATIVE MATTER
SUBJECTS-████████████████████████
████████-ST. TAMMANY PARISH SHERIFF'S
OFFICE;
VICTIM-JERRY HAMILTON ROGERS/LOCATION-ST
TAMMANY PARISH;
CONSPIRACY AGAINST RIGHTS

**Synopsis:** (U) To document screenshots captured from St. Tammany Parish
Sheriff's Office Facebook profile

**Enclosure(s):** Enclosed are the following items:
1. (U) Facebook profile screenshots

**Details:**

(U) ████████████████ searched Facebook for the St. Tammany Parish
Sheriff's Office (STPSO) Facebook profile. On 28 October 2019, a letter
was posted on the Facebook profile, which ████████████████ released to
local media outlets.

**UNCLASSIFIED//LES**

UNCLASSIFIED//LES

Title:  (U) St. Tammany Parish Sheriff's Office Facebook Profile
Re:  282B-NO-3179991, 02/05/2020


(U) The letter pertained to the Nanette Krentel investigation and the
arrest of Jerry Rogers. The letter included statements regarding Rogers
sending anonymous emails to the victim's family concerning the homicide
investigation and violation of statue LSA-14:47. ███████████ stated
Rogers "harmed" the office's ability to solve the crime and chose to seek
a warrant for Rogers' arrest. The letter stated Rogers received
psychiatric help after he threatened to commit suicide and tried to
commit "suicide by cop" after he was approached by investigators.
Facebook users' comments included positive and derogatory statements
regarding STPSO. Some users commented STPSO's Facebook profile was
deleting negative comments.

(U) The Facebook profile identified the following contact information:

- (U) Telephone: ███████████
- (U) Email: pio@stpso.com
- (U) Website: http://www.stpso.com

(U) Screenshots taken of STPSO's Facebook profile "about" section,
███████████ letter, and available comments from Facebook users have
been added to the 1A section of this case file.




◆◆

FD-1057 (Rev. 5-8-10)                    UNCLASSIFIED//FOUO



# FEDERAL BUREAU OF INVESTIGATION
### Electronic Communication

**Title:**  (U) DOJ Civil Rights Division Declined Case    **Date:**  02/11/2020

**From:**  NEW ORLEANS
         NO-12
         **Contact:**  Clinton D. Epperson, 504-816-3000

**Approved By:**  SSA Vanessa M. Tibbits

**Drafted By:**  Clinton D. Epperson

**Case ID #:** 282B-NO-3179991    (U//FOUO) SENSITIVE INVESTIGATIVE MATTER
                                  SUBJECTS-█████████████████████████
                                  ████████-ST. TAMMANY PARISH SHERIFF'S
                                  OFFICE;
                                  VICTIM-JERRY HAMILTON ROGERS/LOCATION-ST
                                  TAMMANY PARISH;
                                  CONSPIRACY AGAINST RIGHTS

**Synopsis:**  (U) Civil Rights Division of the Department of Justice (DOJ) declined to move further on the captioned matter.

**Details:**

   On February 3, 2020, SA Clinton D. Epperson spoke with DOJ Civil Rights Trial Attorney ████████████telephonically to discuss investigative strategy.

   According to ████████ DOJ supervisors determined the caption matter did not warrant further investigation based on a recent United States Supreme Court decision concerning 1st Amendment rights and the information investigators obtained to date. ████████ said a declination letter would be provided to SA Epperson at a later date.


   ◆◆

                              UNCLASSIFIED//FOUO

FD-1057 (Rev. 5-8-10)



UNCLASSIFIED//FOUO

# FEDERAL BUREAU OF INVESTIGATION
### Electronic Communication

**Title:** (U) Evidence to be retained per DOJ-CRT        **Date:** 06/09/2020

**From:**  NEW ORLEANS
       NO-12
       **Contact:** Clinton D. Epperson, 504-816-3000

**Approved By:** SSA Vanessa M. Tibbits

**Drafted By:** Clinton D. Epperson

**Case ID #:** 282B-NO-3179991        (U//FOUO) SENSITIVE INVESTIGATIVE MATTER
                           SUBJECTS- ▉▉▉▉▉▉▉▉▉▉▉▉
                           ▉▉▉▉▉/ST. TAMMANY PARISH SHERIFF'S
                           OFFICE;
                           VICTIM-JERRY HAMILTON ROGERS/LOCATION-ST
                           TAMMANY PARISH;
                           CONSPIRACY AGAINST RIGHTS

**Synopsis:** (U) Department of Justice (DOJ) Civil Rights Division (CRT) Trial Attorney ▉▉▉▉▉▉▉▉▉ requested evidence in the captioned matter be retained due to potential civil litigation. As a result, writer will place the mater in Pending Inactive status.

**Details:**

On May 28, 2020, DOJ CRT Trial Attorney ▉▉▉▉▉▉▉▉▉▉▉▉▉ emailed SA Clinton D. Epperson. ▉▉▉▉▉▉ requested the evidence in the captioned matter be retained due to the likelihood of the matter being litigated through civil proceedings.

Due to DOJ-CRT's prior declination to prosecute this matter the case will be placed in Pending Inactive status until the retention of the evidence is no longer necessary.

UNCLASSIFIED//FOUO

**UNCLASSIFIED//FOUO**

Title:  (U) Evidence to be retained per DOJ-CRT
Re:  282B-NO-3179991, 06/09/2020


◆◆