# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

|  |  |
|---|---|
| JERRY ROGERS, JR., | ) |
|  | ) |
| Plaintiff | ) |
| v. | ) Case No. 2:20-cv-00517-JTM-DMD |
|  | ) |
| SHERIFF RANDY SMITH, DANNY | ) |
| CULPEPER, and KEITH CANIZARO, | ) |
|  | ) |
| Defendants | ) |

## Memorandum in Support of Plaintiff's Motion for Partial Summary Judgment

In 2019, the St. Tammany Parish Sheriff's Office arrested Jerry Rogers for "criminal defamation." They accused Mr. Rogers of criminal defamation because he sent emails criticizing one of the Sheriff's detectives.

That arrest was indisputably unconstitutional. More than a half-century earlier, the U.S. Supreme Court had held that Louisiana's criminal defamation statute was unconstitutional as applied to speech about public officials. *Garrison v. State of La.*, 379 U.S. 64 (1964).

As a result, when this Court analyzed a sheriff's office's arrest of someone for criminal defamation for criticizing a public official, the Court began: "Some qualified immunity cases are hard. This case is not one of them."[1]

This case is not hard either. Defendants arrested Mr. Rogers in an unconstitutional application of Louisiana criminal defamation statute. And because some of Rogers' claims turn on the objective reasonableness of an arrest, not on the subjective intent of the arresting officers, they are ripe for summary judgment.

Accordingly, Plaintiff moves for summary judgment on his false arrest and false imprisonment claims.

---

[1] *Anderson v. Larpenter*, 16-cv-13733-LMA-JVM (E.D. La. July 19, 2017) at *1.

1

## I.    Statement of Facts

**A.    Jerry Rogers sent emails criticizing a STPSO detective. STPSO used a search warrant to obtain his emails, and investigated him for "criminal defamation."**

Jerry Rogers was a deputy of the St. Tammany Parish Sheriff's Office (hereinafter "STPSO") from 1998 to 2009.[2] After leaving STPSO, he continued to reside in St. Tammany Parish and kept in touch with former colleagues. He is currently a federal investigator for the United States Department of Housing and Urban Development, Office of Inspector General.[3]

On July 14, 2017, Nanette Krentel, died in St. Tammany Parish.[4] STPSO took up the investigation of the homicide. STPSO failed to solve the crime.[5]

Jerry Rogers followed the news coverage of Nanette Krentel's homicide. He felt sympathy for the family members and, when he read the articles, he disagreed with some of the choices made by STPSO in their investigation.[6] He thought that STPSO's Detective Buckner, the lead detective on the Krentel investigation,[7] was not handling the investigation properly.[8]

Jerry Rogers created an email account called "justicenanette@yahoo.com." Rogers used the email address to communicate with Kim Watson, the sister of Nanette Krentel. In those emails, Jerry Rogers expressed criticism of Detective Buckner,[9] calling Buckner "clueless" and a "stone-cold rookie" and critiquing his investigatory methods.[10]

In 2019, Sheriff Randy Smith was up for reelection. He was facing political pressure for

---

[2] Ex. B (Dec. of Jerry Rogers) at ¶ 4.

[3] *Id*. at ¶ 6.

[4] Obituary of Nanette Watson Krentel, Legacy.com (accessed on January 7, 2020), found at https://obits.nola.com/obituaries/nola/obituary.aspx?n=nanette-watson-krentel&pid=186134668&fhid=17420

[5] Ex. A, Culpeper Dep. at 16:14-16 ("Q. That death is currently unsolved, correct? A. That is correct."). Note: the exhibits attached to this motion are lettered non-consecutively. That is so that they match up to the exhibit references in the deposition transcripts.

[6] Ex. B at ¶ 8.

[7] Ex. A at 16:17-22 ("Q. Daniel Buckner was the lead investigator of the Krentel investigation, correct? A. Correct. Q. He is a detective with the St. Tammany Parish Sheriff's Office? A. Yes, sir.")

[8] Ex. B, Declaration of Jerry Rogers, ¶ 9.

[9] Ex. C, Canizaro Dep. at 30:4-9 (Buckner was lead investigator on the Krentel case for "the entire length of the investigation while the sheriff's office had it.")

[10] *Id.* at 42:17-44:5.

his failure to solve the Krentel homicide.[11]

Smith's office had learned about Jerry Rogers' emails to Krentel's sister. Defendant Keith Canizaro was tasked with "investigat[ing] possible violations of the law by one of our employees" related to the emails.[12] At the time, Canizaro was a sergeant in STPSO's Major Crimes Unit.[13]

The concern was that a STPSO investigator, Stefan Montgomery, was leaking information about the homicide investigation to Jerry Rogers. Through a criminal search warrant (that cited a non-existent "14:00000" crime), STPSO obtained Jerry Rogers' emails.[14]

In looking through his emails, Canizaro discovered that Mr. Rogers had corresponded with the Sheriff's opponents in the election.[15] Sheriff Smith was informed that the search warrant had turned up emails between Rogers and the Sheriff's opponents.[16] But the investigation concluded that "there were no facts found that elements of obstruction of justice were committed by either Mr. Rogers or Mr. Montgomery."[17]

STPSO continued, however, to investigate Jerry Rogers despite clearing him for

---

[11] Ex. D, Smith Dep. at 81:16-21 ("Q. Okay. So going back to the fall of 2019, you were running for re-election, and the election was to be held in October of 2019, right? A. Yes, sir. Q. Okay, and would you say you were under political pressure because of the Sheriff's Office, the fact that the Sheriff's Office had not yet solved the Nanette Krentel murder? A. Yes, I do agree with that.")

[12] Ex. C, Canizaro Dep. at 35:13-14.

[13] *Id.* at 25:3-6.

[14] The search warrants for Jerry Rogers' emails were improper. They alleged that they sought evidence of a crime that does not exist – the fictional crime "14:0000." Ex. A, Culpeper Dep. at 18:17-18 ("Q. 14:0000 is not any crime, is it? A. I'm not familiar with it. No, sir.") But a sheriff's search warrant has "to say what crime is alleged to have been committed," and the search warrants for Jerry Rogers' emails did not allege any crime other than the fictional 14:0000. *Id.* at 18:25-19:7 (Q. Does the sheriff's office search warrant have to say what crime is alleged to have been committed? A. I would think so, yes, sir. Q. But this one does not identify a specific crime, correct? A. Like 14 colon, no. I don't see that there.")

[15] Ex. C, Canizaro Dep. at 68:2-7 ("Q. Did you understand Jerry Rogers to be affiliated with any of the candidates or supporting any of the candidates in that race? A. Initially, no, until I saw some of the e-mails he had corresponded with Mr. Lentz and with Mr. Tranchina."); 68:15-18 ("Q. Included in those e-mails were correspondence to and from the sheriff's opponents in that race, correct? A. Yeah. I don't remember exactly what was in them, but he communicated with Mr. Lentz, and he communicated with Mr. Tranchina. He didn't communicate with our sheriff.")

[16] Ex. D, Smith Dep. at 20:23-21:7 ("Q. Okay, and that criminal search warrant also turned up emails to and from your political opponents in the race, correct? A. I do believe so, yes, both of the other opponents. Q. And -- and you found out about these emails with your political opponents prior to the arrest of Jerry Rogers, correct? A. Yes, it would been part of the investigation.")

[17] Ex. C, Canizaro Dep. at 35:16-18. Ex. A, Culpeper Dep. at 26:5-9 ("Q. And then at some point it was established that the author of these e-mails had not committed obstruction of justice, correct? A. It was looked into and decided, yes, that it did not fit.")

obstruction of justice. They began investigating him for criminal defamation under R.S. 14:47. The directive to continue investigating Rogers came directly from Sheriff Smith.[18]

There were problems with using the 14:47 statute, however. On September 3, 2019, a STPSO officer emailed Canizaro and Hotard a Fifth Circuit case about that statute.[19] That case was *McLin v. Ard*, 866 F.3d 682 (5th Cir. 2017), and Canizaro understood it to stand for the proposition that "in some circumstances it's unconstitutional to arrest someone for criminal defamation in Louisiana."[20] Specifically, Canizaro read a portion of *McLin* that stated:

> In *Garrison v. Louisiana*, the Supreme Court held that the Louisiana criminal defamation statute, La. Stat. 14:47, is unconstitutional "in the context of criticism of the official conduct of public officials."[21]

## B. Defendants met with the District Attorney's Office about potentially arresting Jerry Rogers. The DA's office warned them it could be unconstitutional.

On September 13, 2019, Canizaro went to the District Attorney's office to meet with assistant district attorneys regarding the Jerry Rogers investigation.[22] He also went with Defendant

---

[18] Ex. A, Culpeper Dep. at 67:25-68-9 (Q. To finish my question, you did communicate to other members of the St. Tammany Parish Sheriff's Office that Sheriff Smith wanted them to continue investigating Jerry Rogers, correct? A. Not put Jerry Rogers in jail like that is worded there. No, sir. But, yes, to continue the investigation, yes. Q. Of Jerry Rogers? A. That's correct.")

[19] Ex. E, Email from Det. Grey Thurman dated Sept. 3, 2019.

[20] Ex. C, Canizaro Dep. at 85:1-15:

> Q. It was forwarded to you, and you understood it to be an indication that it could be unconstitutional to arrest someone for criminal defamation, and so you needed to look and see if the circumstances here are constitutional or unconstitutional; is that correct?
>
> A. I wanted to see if the circumstances of that case were the same as the circumstances of our case.
>
> Q. Right, because you understood that in some circumstances it's unconstitutional to arrest someone for criminal defamation in Louisiana, correct?
>
> A. At least in that one, particular one, yeah, as to that case.

[21] *Id.* at 88:11-20 (Q. It says, "In Garrison v. Louisiana, the Supreme Court held that the Louisiana criminal = defamation statute, LA Stat 14:47, is unconstitutional in the context of criticism of the official conduct of public officials." Do you see that part? A. Yes, I do. Q. Is that part of the crux that you reviewed when you read McLin v. Ard? A. I was aware of that, yes, sir.)

[22] *Id.* at 91:12-18 ("Q. I want to talk a little bit more about that meeting. So you physically went to the DA's office for that meeting; is that correct? A. Yes, sir. Q. And that was September -- let's see. September 13th, 2019? A. That sounds correct."); Ex. J, Culpeper Dep. at 44:14-21.

Culpeper, who at the time was STPSO's deputy chief in charge of investigations.[23] Culpeper reported directly to Sheriff Smith.[24]

Present at the meeting were Matt Caplan and Collin Sims from the DA's office, and Canizaro, Culpeper, Hotard, and Gaudet from STPSO.[25]

At that meeting, STPSO showed the DA's office Jerry Rogers' emails and "discussed the possibility of arresting Jerry Rogers for criminal defamation."[26] The DA's office pointed the STPSO officers to the *McLin v. Ard* case regarding the constitutionality of criminal defamation,[27] and "raised the potential unconstitutionality" of arresting Rogers.[28] Assistant District Attorney Sims "referred to the law as being unconstitutional several times"[29] and said "[a]s to this case, it was ruled unconstitutional."[30]

The officers specifically discussed *McLin's* holding that "the Louisiana criminal defamation statute, LA Stat 14:47, is unconstitutional in the context of criticism of the official conduct of public officials."[31] And the DA's office specifically advised that they felt "**a police officer is a public official**."[32] For that reason, the DA's office indicated to the STPSO officers that "there could be a potential constitutional problem with arresting Jerry Rogers."[33]

---

[23] Ex. A, Culpeper Dep. at 11:1-4.

[24] *Id.* at 11:8-10.

[25] Ex. C, Canizaro Dep. at 58:7-25; 91:24-92:3.

[26] *Id.* at 92:9-13 ("Q. At that meeting, it was discussed the possibility of arresting Jerry Rogers for criminal defamation, right? A. Yes. We brought them the documents, the e-mails. We provided them with copies of e-mails 14 and things of that nature, and, basically, briefed them on where we were in the investigation.")

[27] *Id.* at 57:10-13 ("I know we had talked about that case, and I believe that is the same case that was referenced by the district attorney").

[28] *Id.* at 103:21-25 ("Q. So before you arrested Mr. Rogers, you met with the DA's office. They raised the potential unconstitutionality of the arrest; is that fair to say? A. Yes.")

[29] *Id.* at 93:24-94:5 ("A. Mr. Sims referred to the law as being unconstitutional several times, and then I asked him, as a bit of clarification, 'You keep saying it's unconstitutional. Do you mean it's unconstitutional as to the application in that case?' And he said, 'Yes, the application for that case.'")

[30] *Id.* at 59:15-23.

[31] *Id.* at 88:20-21 ("That was discussed, also, at the district attorney's office.")

[32] *Id.* at 89:22-25 ("Q. This part of McLin v. Ard was discussed at the district attorney's office? A. The feeling that a police officer is a public official.") (emphasis added)

[33] Ex. A, Culpeper Dep. at 46:9-12 ("Q. Did they bring it up to suggest that there could be a potential constitutional problem with arresting Jerry Rogers? A. Yes. Yes, sir.")

According to Defendant Canizaro, the DA's office did not give a "definitive answer" as to whether arresting Jerry Rogers would be unconstitutional, but said they would get back to the STPSO officers.[34] Captain Gaudet's recollection was slightly different: he recalled that "St. Tammany District Attorney's Office, Chief of Trials, Collin Sims, indicated that La. R.S. 14:47 was declared unconstitutional as applied to the investigation and that charges based upon that statute should not be pursued."[35] But either way, STPSO officers did not consult with other lawyers other than the DA's office. According to Canizaro, "the DA's office . . . was the only lawyers consulted about the possibility of arresting Jerry Rogers before it happened."[36]

**C.     Defendants Canizaro, Culpeper, and Sheriff Smith met to discuss the arrest of Jerry Rogers. They discussed the potential unconstitutionality of the arrest. Sheriff Smith directed them to "move forward," because arresting Jerry Rogers for defamation was "very important" to him.**

On the morning of September 16, 2019, three days after the DA meeting, Sheriff Smith held a meeting in a conference room adjacent to his office. The topic was arresting Jerry Rogers for criminal defamation.[37] Defendant Canizaro, Defendant Culpeper, Lt. Hotard, Captain Gaudet, and possibly Major Sharp were all present.[38] At that meeting, they discussed "information [they] had learned about a previous case that was ruled unconstitutional by the state."[39] They talked about the meeting with the DA's office.[40]

---

[34] Ex. C, Canizaro Dep. at 94:14-19 ("Q. So an attorney from the DA's office expressed that they felt that a public official included a police officer but didn't give you a definitive answer and said they would get back to you; is that correct? A. Basically, yes.")

[35] Ex. F, Affidavit of Steve M. Gaudet, Sr., at ¶ 4.

[36] Ex. C , Canizaro Dep. at 66:10-14 ("Q. So the DA's office, to your knowledge, was the only lawyers consulted about the possibility of arresting Jerry Rogers before it happened, correct? A. Correct."); *see also* Ex. A, Culpeper Dep. at 36:16-18 ("I don't recall if I had a conversation with our in-house counsel. No, sir. I don't recall."), *and* Ex. D, Smith Dep. at 35:24-36:2 ("prior to Jerry Rogers' arrest, did you consult with a lawyer about criminal defamation or the arrest of Jerry Rogers? A. I did not.")

[37] Ex. C, Canizaro Dep. at 51:19-54:2.

[38] *Id.* at 52:5-15; 53:16-54:2.

[39] *Id.* at 55:3-7.

[40] *Id.* at 62:1-6 ("we said, 'Yeah, that's the same case that Mr. Sims was talking about in his office,' we had already talked to him about that in the office, and had that, I guess, that clarity as far as the law is not unconstitutional. It was unconstitutional through this application in this case.")

They talked about how "it was discussed that in this case, *McLin v. Ard*, criminal defamation had been decided to be, at least in that context, unconstitutional as applied there."[41] But the STPSO officers decided "apples aren't apples" and that *McLin* was distinguishable because it "involved council members and Facebook posts, that it was not in the context of being in the middle of a homicide investigation, and it wasn't the same kind of case."[42] No lawyers were present at the meeting.[43]

According to Culpeper, despite being explicitly warned that the statute had been ruled unconstitutional in some applications, the "totality of [his] analysis" was to compare "Jerry Rogers' situation to the text of the statute."[44] The Sheriff's analysis was the same: according to Canizaro, "the sheriff approved that if Jerry Rogers had met the elements of the criminal statute, to put the arrest affidavit in front of the judge and then arrest Jerry Rogers."[45] He told them to "move forward."[46] Sheriff Smith testified that "arresting Jerry Rogers for criminal defamation" was "very important" to him.[47]

So Defendant Culpeper informed the unit that "Sheriff Smith wanted Mr. Jerry Rogers in jail for La. R.S. 14:47; Criminal Defamation."[48] He directed Canizaro to file the arrest affidavit.[49]

---

[41] *Id.* at 56:16-20 ("Q. So at the meeting on September 16, 2019, it was discussed that in this case, *McLin v. Ard,* criminal defamation had been decided to be, at least in that context, unconstitutional as applied there, correct? A. Correct.")

[42] *Id.* at 55:8-10.

[43] See fn. 35, *supra.*

[44] Ex A, Culpeper Dep. at 41:16-19 ("Q. You compared Jerry Rogers' situation to the text of the statute, and that was the totality of your analysis; is that correct? A. Yeah. Yes, sir.")

[45] Ex. C, Canizaro Dep. at 54:20-25 ("Q. So at that briefing, the sheriff approved that if Jerry Rogers had met the elements of the criminal statute, to put the arrest affidavit in front of the judge and then arrest Jerry Rogers, correct? A. Correct.")

[46] *Id.* at 116:20-21 ("We had a meeting with everyone, briefed the sheriff. The sheriff said move forward."); Ex. J at 63:15-18 ("Q. So the sheriff approved the decision to move forward with the application for arrest of Jerry Rogers, agreed? A. The affidavit, yes, sir.")

[47] Ex. D, Smith Dep. at 50:3-5 ("Q. Okay. Was arresting Jerry Rogers for criminal defamation very important to you? A. As well, yes.")

[48] Ex. F, Affidavit of Steve M. Gaudet, Sr. at ¶ 5.

[49] Ex. C, Canizaro Dep. at 52:1-3 ("I went back downstairs, and Chief Culpeper called me and said, 'Yeah, go ahead and put it before the judge,' and that's when I typed the arrest form."); Ex. J at 43:7-9 (Culpeper Dep.) ("Q. And so you approved the decision to bring the arrest before -- the potential arrest before the judge, correct? A. I was one of the people, yes, sir.")

**D.      That same day, the DA's office called and specifically advised that "it would be unconstitutional to arrest Jerry Rogers." <u>After</u> that, Defendants arrested Rogers.**

That same morning of September 16, 2019, members of the DA's office met to discuss the potential arrest of Jerry Rogers. Their comments from that discussion included:

- "To think someone can be arrested for this is crazy."[50]

- It is "so obvious" that if STPSO arrested Rogers on that charge the deputies would not have qualified immunity.[51]

- "I don't think we can refuse the charges fast enough."[52]

After that meeting, ADA Collin Sims had a phone call with Defendant Culpeper at STPSO.[53] The call occurred between 10:30 and 11:00 a.m.,[54] several hours <u>before</u> the arrest of Jerry Rogers.[55] Culpeper told Sims that they "were moving forward" with the arrest of Jerry Rogers.[56] Sims said explicitly that he "<u>he thought it would be unconstitutional to arrest Jerry Rogers</u>."[57] Sims' statement was so clear that Culpeper later told Sims that he wished Sims "would have kept [his] opinions to [him]self."[58]

Defendants proceeded with the arrest anyway. That same day, September 16, 2019, Defendant Keith Canizaro submitted an affidavit in support of an arrest warrant for Jerry Rogers, for criminal defamation.[59] Canizaro testified that the basis for the criminal defamation allegation was four specific statements by Jerry Rogers:

1.  That Detective Buckner was "clueless";

---

[50] R. Doc. 116-3, FBI Investigatory File, at p. 6.
[51] *Id* at 9.
[52] *Id.*
[53] Ex. A, Culpeper Dep. at 47:2-3.
[54] R. Doc. 116-3, at p. 6.
[55] Ex. A, Culpeper Dep. at 47:6-8.
[56] *Id.* at 48:5 ("I basically told him that we were moving forward.")
[57] *Id.* at 48:6 ("You know, he said he thought it would be unconstitutional."); 48:18-21 ("Q. And Collin Sims told you that he thought it would be unconstitutional to arrest Jerry Rogers? A. Yeah.") (emphasis added).
[58] *Id.* at 53:1-6 ("Q. Okay. Got it. In a conversation with Collin Sims, did you at any point say anything to the effect of, if you were going to recuse yourself, I wish you would have kept your opinions to yourself? A. Yeah.")
[59] R. Doc. 1-2, Affidavit for Arrest Warrant and Arrest Warrant.

2. That "anything was better" than Detective Buckner;

3. That Detective Buckner was a "stone-cold rookie"; and

4. Something about Detective Buckner "not having any experience."[60]

Only the first two of these appeared in the arrest warrant application.[61]

Although Buckner was not identified by name in the warrant application, he was identified as the "victim" of the alleged criminal defamation in Canizaro's police report.[62] Buckner's "victim type" was identified in that report as "law enforcement officer."[63] In sum, Canizaro sought the arrest of Jerry Rogers "for what he said about Daniel Buckner about how Daniel Buckner was handling the investigation into the death of Nanette Krentel."[64]

Canizaro did <u>not</u>, however, include any information in the submission to the judge about the DA's warning that the arrest might be unconstitutional. Canizaro admitted:

```
Q.   Did you make the judge aware that you had
consulted with the DA's office, and they raised
concerns about the constitutionality of the arrest?
     A.   No, I did not.
     Q.   Do you think you should have made the
judge aware of that?
     A.   I can't answer that.                    65
```

---

[60] Ex. C, Canizaro Dep. at 43:22-44:5 ("Q. So the defamatory statements for which you sought the arrest of Jerry Rogers were that 24 Daniel Buckner was clueless, that anything is better than Daniel Buckner, something to the effect of Daniel Buckner being a stone-cold rookie, and something to -- about Daniel Buckner not having any experience; is that correct? A. Yes. In the midst of a homicide investigation, yes.")

[61] R. Doc. 1-2, at 1-2.

[62] Ex. G, Police Report at p. 5; Ex. C , Canizaro Dep. at 32:24-33:2 ("Q. So Daniel Buckner was the one victim of the criminal defamation charge that you drafted this report for, correct? A. Correct.")

[63] Ex. C., Canizaro Dep. at 33:3-14 ("Q. And it says here, 'Victim Type LE Officer.' Does that stand for law enforcement officer? A. Yes, sir. . . . Q. So Daniel Buckner is listed here as the victim in his capacity as a law enforcement officer, correct? A. Correct."); Ex. A, Culpeper Dep. at 20:1-5 ("Do you recall that Captain Canizaro testified that Detective Buckner, as a victim, was a victim in his capacity as a law enforcement officer? A. Yes, sir. Q. Does that match your recollection as well? A. Yes, sir.")

[64] Ex. D, Smith Dep. at 24:8-12 ("Q. And Jerry Rogers was arrested for what he said about Daniel Buckner about how Daniel Buckner was handling the investigation into the death of Nanette Krentel, correct? A. Yes, sir.")

[65] Ex. C, Canizaro Dep. at 110:1-4. *See also*, Ex. A, Culpeper Dep. at 76:23-77:2 ("Q. To your knowledge, did anyone communicate to the judge the DA's office opinion that it would be unconstitutional to arrest Jerry Rogers for that crime? A. No, sir. crime?")

The judge who signed the warrant, however, <u>very much</u> thought that he should have been made aware of the DA's warning. Although he approved the arrest warrant,[66] the judge explained in a later FBI interview that:

> [I]f a law enforcement officer knew Criminal Defamation had been found unconstitutional the law enforcement officer should not submit affidavits or seek a warrant for a person's arrest.
>
> Additionally, if the law enforcement officer had information that a law was possibly unconstitutional, the law enforcement officer should make those questions or concerns known to the judge prior to the review of an affidavit and warrant.[67]

The judge explained that he "assumed law enforcement officers requested arrest warrants and search warrants in good faith and would bring attention to all known facts, to include if the law enforcement officer suspected a law was possibly unconstitutional."[68]

Sheriff Smith agrees with the judge that the DA's warning should have been put before the judge. He testified that "if the DA's Office had been consulted and suggested that a charge might be unconstitutional with regard to a particular person," that should "absolutely" be included in an affidavit in support of an arrest warrant.[69]

It was not.

**E.    With the improperly procured arrest warrant in hand, Canizaro sent officers to arrest Jerry Rogers and bring him to the St. Tammany Parish Jail.**

Since criminal defamation was a misdemeanor, Rogers' arrest could "be handled either by issuing [] a summons, which doesn't require actually physically bringing them to the jail and booking them, or [STPSO] can physically arrest them, bring them to the jail and book them."[70]

---

[66] R. Doc. 1-2, Affidavit for Arrest Warrant and Arrest Warrant, at 3.
[67] R. Doc. 116-3, FBI Investigatory Report, at p. 53.
[68] *Id.*
[69] Ex. D, Smith Dep. at 77:4-11 ("Q. Okay, and if -- and if the DA's Office had been consulted and suggested that a charge might be unconstitutional with regard to a particular person, is that the kind of thing that should be included in an Affidavit in support of an arrest warrant? A. Absolutely, if -- if it occurred, I would 11 say yes.")
[70] Ex. C, Canizaro Dep. at 72:9-15.

Defendant Canizaro "decided to send people to arrest" Rogers.[71]

On September 16, 2019, at approximately 2:33 p.m., STPSO deputies arrested Jerry Rogers at his home.[72] He was "arrested, cuffed, and booked at the jail."[73]

Fifteen minutes after his arrest, at 2:48 p.m., STPSO issued a press release announcing the arrest of Jerry Rogers.[74]

Mr. Rogers was strip-searched and incarcerated at the St. Tammany Parish Prison until he posted bail of $3,500 later that day.[75]

After Jerry Rogers was arrested, Canizaro sent a "formal complaint" to Rogers' employer, the Department of Housing and Urban Development.[76] Canizaro had never done this with any other law enforcement officer before.[77] To Sheriff Smith's knowledge, STPSO had never done it for any arrestee ever besides Jerry Rogers.[78]

When ADA Collin Sims found out about the arrest, he said to Canizaro, "[m]an, y'all made the arrest anyway."[79]

On September 18, 2019, the District Attorney's office recused itself from the prosecution of Jerry Rogers,[80] which resulted in it being referred to the Attorney General's office. In the recusal letter, the District Attorney's office wrote: "our office would like to alert the Office of the Attorney General that the offense charged, La. R.S. 14:47, has been declared unconstitutional in at least

---

[71] *Id*. at 75:14-17 ("Q. And you decided to send people to arrest him, correct? A. I decided to send people to arrest him, correct.")

[72] Ex. G, Police Report at 3; Ex. C, Canizaro Dep. at 80:10-12 ("Q. So that would be 2:33 in the afternoon is the approximate time of Jerry Rogers' arrest? A. Yes, sir.")

[73] Ex. A, Culpeper Dep. at 54:9-11.

[74] Ex. H, Press Release. Canizaro could not recall any other time a press release about an arrest went out before an arrestee was booked. Ex. C, Canizaro Dep. at 79:11-16.

[75] Ex. B, Declaration of Jerry Rogers, ¶ 12.

[76] Ex. C, Canizaro Dep. at 82:12-22.

[77] *Id.* at 82:23-83:1 ("Q. Have you ever filed a formal complaint about any other law enforcement officer? A. Not that I know of. No, sir. Not that I can recall.")

[78] Ex. D, Smith Dep. at 51:15-19 ("Q. Okay. So you don't know of any time anyone from the Sheriff's Office has after an arrest then filed a formal complaint with the arrestee's employer, agreed? A. Agreed")

[79] Ex. C, Canizaro Dep. at 116:6.

[80] Ex. I, Letter from ADA J. Collin Sims to Patrick Magee, dated September 18, 2019.

some of its applications. *See State v. Defley*, 395 So.2d 759 (La. 1981)."[81]

On October 28, 2019, Sheriff Randy Smith published another press release re-announcing the arrest of Jerry Rogers for defamation. In that press release, he acknowledged that:

> Regarding the constitutionality of the LSA-14:47, the statue [sic] that Mr. Rogers was charged with violating, I am aware that some courts have ruled that the statute may be unconstitutional insofar as it relates to any public expressions about public officials.[82]

He then attacked Jerry Rogers for being politically aligned with his opponent, attacked Rogers' mental health, and encouraged the media to "share it with the public."[83]

**F.     After Jerry Rogers' arrest, Judge Gardner found that there was no probable cause for the arrest. The Attorney General's Office declined the case, explaining that due to the unconstitutionality of the arrest, it was "precluded by law from moving forward with any criminal action."**

On November 8, 2019, Judge Scott Gardner held a hearing on a motion for preliminary examination for Jerry Rogers.[84] Judge Gardner found there was "no probable cause" for Roger's arrest and released him from his $3,500 bond.[85]

The St. Tammany Parish District Attorney's Office recused itself from the prosecution of Jerry Rogers. For that reason, decisions about prosecution fell to the Louisiana Department of Justice to decide.

On January 8, 2020, the Louisiana Department of Justice declined the criminal charge under La. R.S. 14:47.[86] Assistant Attorney General M. Joseph LeBeau and Director of the Criminal Division Pat Magee wrote

> The Louisiana Supreme Court held Criminal Defamation is unconstitutional insofar as it applies to statements made in reference to public figures engaged in public affairs. Determining whether an individual is a public figure requires a case-by-case, fact specific analysis. In this case, the subject of the statement is considered a

---

[81] *Id.* at ¶ 2.
[82] Ex. J, October 28, 2019 Press Release.
[83] *Id.*
[84] R. Doc. 1-4, Minutes of Preliminary Hearing.
[85] *Id.*
[86] R. Doc. 1-5, Declination of Charges.

public figure, as the statements made by Jerry Rogers were aimed directly towards a public function of a member of state government. Because the alleged conduct under these specific facts involve statements aimed at a public official performing public duties, this office is precluded by law from moving forward with any criminal action.[87]

A member of the Attorney General's office later explained to the FBI that the STPSO detectives were "idiots" for using the criminal defamation statute to arrest a person.[88] He also noted that the fact that STPSO had not quickly submitted the investigatory file to the Attorney General's office was "completely atypical."[89]

### G. Even though the District Attorney, the Attorney General, and Judge Gardner advised that the arrest of Jerry Rogers was unconstitutional, each Defendant nonetheless testified that they **would do it again**.

At their depositions, each Defendant was asked whether they would arrest Jerry Rogers all over again, even knowing what they know now.

Defendant Canizaro admitted that before he arrested Jerry Rogers, the DA's office "raised the potential unconstitutionality of the arrest."[90]And after the arrest, Canizaro reviewed Judge Gardner's finding of "no probable cause."[91] And Canizaro saw the AG's declination of charges, which Canizaro understood to indicate that they "they can't move forward because it wouldn't be constitutional to prosecute Jerry Rogers for criminal defamation."[92]

---

[87] *Id.*
[88] R. Doc. 116-3, FBI Investigatory File, at 20.
[89] *Id.*
[90] Ex. C, Canizaro Dep. at 103:21-25 (Q. So before you arrested Mr. Rogers, you met with the DA's office. They raised the potential unconstitutionality of the arrest; is that fair to say? A. Yes.")
[91] R. Doc. 1-4, Minutes of Preliminary Hearing; Ex. C, Canizaro Dep. at 99 (Canizaro reviewing minutes of hearing).
[92] Ex. C, Canizaro Dep. at 103:13 ("I see it."); 103:14-20.

But Canizaro testified that even <u>knowing all that</u> he would <u>still</u> arrest Jerry Rogers for criminal defamation.[93] He testified that he did not know of anything he would have done anything differently.[94]

Defendant Culpeper was directly told that ADA Sims thought arresting Jerry Rogers would be unconstitutional.[95] And he knows that Judge Gardner "concluded there was no probable cause for Jerry Rogers' arrest."[96] And he reviewed the AG's opinion that it was "precluded, by law, from moving forward with any criminal action."[97] And even "with these opinions in hand, if the same situation was presented to him today," Culpeper testified that he <u>would do "the same thing"</u> again.[98]

Same with Defendant Smith. He was asked: "you have now subsequent to the arrest of Jerry Rogers received some correspondence from the DA's Office, from the Attorney General's Office. Knowing what you know now if presented with the same facts with regard to Jerry Rogers, would you still arrest him for criminal defamation?"

Sheriff Smith's answer? "Yes, I would."[99]

---

[93] *Id.* at 104:24-105:6 ("Q. Setting aside the repeal of the law, knowing what you know now, would you still have arrested Jerry Rogers for criminal defamation? MR. COLLINGS: Object to the form of the question. BY MR. MOST: Q. You can answer. A. Yes, sir.")

[94] *Id.* at 105:16-22.

[95] *Id.* at 48:2-6.

[96] Ex. A, Culpeper Dep. at 73:15-19 ("Q. And the judge at the preliminary examination for Jerry Rogers concluded there was no probable cause for Jerry Rogers' arrest. Were you aware of that? A. I was aware, yes, of that judge, yes.")

[97] *Id.* at 77:12-22.

[98] *Id.* at 79:23-80:7 ("Q. Respectfully, Major, that's not an answer. My question was, with these opinions in hand, if the same situation was presented to you today, would you do the same thing? MR. COLLINGS: Object to the form THE WITNESS: 5I would do the same thing as far as getting all my evidence and facts in front of the judge. Yes, sir.")

[99] Ex. D, Smith Dep. at 80:12-23.

## II.     Discussion

### A.     Legal Standard

Summary judgment is appropriate when there "is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."[100] The non-movant must offer "specific facts" rather than "mere allegations or denials" in order to defeat summary judgment.[101]

### B.     Over six decades, courts repeatedly held Louisiana's criminal defamation statute to be unconstitutional regarding speech against public officials.

"[C]riticism of public officials lies at the very core of speech protected by the First Amendment."[102] For that reason, the First Amendment limits the government's ability to impose liability on speech critical of the conduct of public officials.[103]

 In the landmark case of *New York Times v. Sullivan*, the U.S. Supreme Court applied the First Amendment to civil defamation statutes. The *New York Times* rule "prohibits a public official from recovering [civil] damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not."[104]

This rule was soon extended to criminal defamation statutes. In 1964 in *Garrison v. Louisiana*—a constitutional challenge to Louisiana's criminal defamation statute (La. R.S. §§ 14:47-49)—the U.S. Supreme Court held that the government is constitutionally limited in its power "to impose criminal sanctions for criticism of the official conduct of public officials."[105]

In the years immediately following *Garrison*, the Louisiana criminal defamation statute remained unchanged in all respects material to *Garrison's* holding. While the Louisiana

---

[100] Fed. R. Civ. Proc., Rule 56(a).
[101] *Morris v. Covan World Wide Moving, Inc*., 144 F.3d 377, 380 (5th Cir. 1998).
[102] *Colson v. Grohman*, 174 F.3d 498, 507 (5th Cir. 1999).
[103] *See New York Times v. Sullivan*, 376 U.S. 254 (1964) (civil liability); *Garrison v. Louisiana*, 379 U.S. 64 (1964) (criminal liability).
[104]  376 U.S. at 279-80.
[105] 379 U.S. at 67.

legislature amended La. R.S. § 14:47's penalty provision, it did not amend the substantive offense of criminal defamation.[106] Nor did the legislature amend § 14:48 (presumption of malice)[107] or § 14:49 (qualified privilege).[108]

In 1973, Louisiana's highest court then reconsidered §§ 14:47-49 in *State v. Snyder*, 277 So.2d 660 (La. 1973) (on rehearing).[109] Concluding that "[i]t is for the [state] Legislature to correct [§§ 14:47-49's] constitutional infirmity"—namely, "its overbroad application" as identified in Garrison—the Louisiana Supreme Court held §§ 14:47-49 "to be unconstitutional insofar as they attempt to punish public expression and publication concerning public officials, public figures, and private individuals engaged in public affairs."[110]

In *Snyder*, the court held that "§ 14:47 in its current form cannot to any 'expression and publication concerning public officials, public figures, or private individuals who are engaged in public affairs,' regardless of the speaker's veracity or *mens rea*."[111]

The criminal defamation law's partial unconstitutionality was no secret. Prior to 2021, the Louisiana State Legislature noted on its website for R.S. 14:47 that: "This provision of law was

---

[106] *See* West's Louisiana Statutes Annotated, Revised Statutes, Sections 14:41 to 14:63.12, at 308-10 (Thomson Reuters 2016).

[107] "Where a non-privileged defamatory publication or expression is false it is presumed to be malicious unless a justifiable motive for making it is shown. Where such a publication or expression is true, actual malice must be proved in order to convict the offender." La. R.S. § 14:48.

[108] "A qualified privilege exists and actual malice must be proved, regardless of whether the publication is true or false, in the following situations: (1) Where the publication or expression is a fair and true report of any judicial, legislative, or other public or official proceeding, or of any statement, speech, argument, or debate in the course of the same. (2) Where the publication or expression is a comment made in the reasonable belief of its truth, upon, (a) The conduct of a person in respect to public affairs; or (b) A thing which the proprietor thereof offers or explains to the public. (3) Where the publication or expression is made to a person interested in the communication, by one who is also interested or who stands in such a relation to the former as to afford a reasonable ground for supposing his motive innocent. (4) Where the publication or expression is made by an attorney or party in a judicial proceeding." La. R.S. § 14:49.

[109] Westlaw lists the Louisiana Supreme Court's 1973 opinion in *State v. Snyder* as being reversed by *State v. Snyder*, 304 So.2d 334 (La. 1974). This Court has already reviewed both decisions and concluded that "the 1974 opinion did not reverse, and in no way calls into question the holding of, the 1973 opinion." *Anderson v. Larpenter*, 16-cv-13733-LMA-JVM, R. Doc. 92 at fn. 36 (E.D. La., July 19, 2017).

[110] *Id*. at 668; *see also State v. Defley*, 395 So.2d 759, 761 (La. 1981) (observing that § 14:47 "is unconstitutional insofar as it punishes public expression about public officials").

[111] As explained in *Anderson v. Larpenter*, 16-cv-13733-LMA-JVM, R. Doc. 92 at *24-25 (E.D. La., July 19, 2017).

included in the Unconstitutional Statutes Biennial Report to the Legislature, dated March 14,

2016." *See* Figure 1, *infra.*



*Figure 1*, Screenshot of Louisiana State Legislature, found at
https://www.legis.la.gov/legis/Law.aspx?d=78544 (red circle emphasis added).

In 2014, the Advocate newspaper ran an article entitled "*Unconstitutional laws still on the*

*books to get fresh look*," which described "Louisiana's law banning criminal defamation" and

pointed out that "[p]arts of that law have been found unconstitutional by various courts over

decades."[112]

Louisiana courts also repeatedly reminded sheriffs of the unconstitutionality of the

criminal defamation statute. In 2014, for example, the Middle District of Louisiana explained in

a civil suit against the Sheriff of Livingston Parish that "there is no legitimate government

interest in enforcing a penal statute that was declared unconstitutional as applied to punishing

---

[112] Ben Wallace, *Unconstitutional laws still on the books to get fresh look*, The Advocate (Nov. 16, 2014).

public expression about public officials."[113]

In 2016, the Louisiana First Circuit Court of Appeal quashed a sheriff's search warrant for criminal defamation because the criminal defamation statute "has been declared unconstitutional by both the United States Supreme Court and the Louisiana Supreme Court as it applies to public expression and publication concerning public officials, public figures and private individuals engaged in public affairs."[114] As such, the Court of Appeal held that any warrant for criminal defamation against a public official therefore "lacks probable cause." *Id.*

In 2017, the Fifth Circuit reiterated that "Speech criticizing the official conduct of public officials is protected by the First Amendment and does not constitute criminal defamation."[115]

Also in 2017, this Court reviewed the Terrebonne Parish Sheriff's office's criminal defamation search warrant and held that "the facts and circumstances known to Sheriff Larpenter—yet again— would not have led a prudent person to conclude that the items sought by the search warrant constituted evidence of any crime."[116] The Court explained that was so because criticism of a public official "'is not a criminally actionable offense'—and any prudent person would have known so."[117]

That was the legal backdrop against which Defendants chose to arrest Jerry Rogers in 2019 for criminal defamation for his criticism of Detective Buckner.

After the arrest of Jerry Rogers, the criminal defamation statute was stricken from Louisiana's Revised Statutes entirely.[118]

---

[113] *McLin v. Ard*, No. 13-538, 2014 WL 545743, at *4 (M.D. La. Feb. 10, 2014) (Dick, J.)) ("As a matter of law, there could be no articulable reasonable suspicion that evidence of a crime existed, when 'criminal defamation' is not a crime."), *rev'd on other grounds*, 611 Fed. App'x 806 (5th Cir. 2015) (*per curiam*).
[114] *Terrebonne Parish Sheriff's Office v. Anderson*, 2016 KW 1093 (La. Ct. App. 1st, Aug. 25, 2016), *citing Sullivan, Garrison, Snyder, and Defley*. A copy of this Court of Appeal decision is in the record of this Court at 16-cv-13733-LMA-JVM, R. Doc. 71-7.
[115] *McLin v. Ard*, 866 F.3d 682, 695 (5th Cir. 2017).
[116] *Anderson v. Larpenter*, 16-cv-13733-LMA-JVM, R. Doc. 92 at *23 (E.D. La., July 19, 2017).
[117] *Id*.
[118] Acts 2021, No. 60, §1 (repealing R.S. 14:47).

**C.    The motion should be granted because Defendants arrested Rogers for criminal defamation for criticizing a public official.**

As described above, the key factor in determining whether a Louisiana criminal defamation arrest is unconstitutional is whether it is for criticizing a public official. And in Louisiana, sheriff's deputies are public officials according to long-established law. In 1967, the Louisiana Supreme Court held that:

> At this phase of our deliberation we must decide whether Thompson, a deputy sheriff, is a "public official" within the meaning of the rule announced in the New York Times Case. We hold that he is.[119]

The Fifth Circuit has likewise repeatedly held that sheriffs' deputies are public officials.[120] That is consistent with the law across the country. (A fifty-state survey of libel and criminal defamation laws in 1999 found consistent holdings that police officers are "public officials."[121])

Defendants themselves agree that sheriffs' deputies are public officials. In their Answer, each Defendant "assert[s] that they are entitled to and protected by the qualified immunity afforded to public officials."[122]

Here, Defendants all concede that Jerry Rogers was arrested for his criticism of Sheriff's Deputy Detective Daniel Buckner.[123] Detective Buckner is a "law enforcement officer with the

---

[119] *Thompson v. St. Amant*, 196 So. 2d 255, 261 (La. 1967) ("The deputy is a representative of the sheriff in his official capacity; he is a public officer or official whose authority and duty are regulated by law. So far as the public is concerned, the acts of a deputy are the acts of the sheriff himself.")

[120] *Collins v. Ainsworth*, 382 F.3d 529 (5th Cir. 2004) (Mississippi sheriffs' deputies are public officials); *Brister v. Jefferson Parish*, 747 F.2d 1019, fn 2 (5th Cir. 1984) (referring to the "a sheriff's deputy or similar public official"); *Turner v. Driver*, 848 F.3d 678, 690 (2017), *affirming Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2011) (police officers are "government officials" for the purposes of First Amendment analysis). *See also United States v. Chairez* 03-10879 (5th Cir. 2011) (*per curiam*) (citing U.S. SENTENCING GUIDELINES MANUAL § 2C1.1 cmt. n.4(B), and noting that the sentencing guidelines treat law enforcement officers as "public officials".) And most recently, in *Villarreal v. The City of Laredo*, 20-40359 (5th Cir. 2021), the Fifth Circuit described a plaintiff "asking a police officer a question" as "asking questions of public officials."

[121] *Gritchen v. Collier*, 73 F. Supp. 2d 1148 (C.D. Cal. 1999), *citing, e.g., Karr v. Townsend*, 606 F. Supp. 1121, 1131 (W.D. Ark. 1985) (a deputy sheriff "is a public official").

[122] R. Doc. 27 at 4 (emphasis added).

[123] Ex. C, Canizaro Dep. at 47:5-18; Ex. D, Smith Dep. at 24:8-12.

St. Tammany Parish Sheriff's Office."[124] Detective Buckner was listed as the victim of criminal

defamation "in his capacity as a law enforcement officer."[125] And the supposedly defamatory

statements – that Detective Buckner was clueless, that anything was better than him, *etc*. –

addressed Detective Buckner's official actions in the context of the Krentel investigation.[126]

Accordingly, it is established that Defendants arrested Rogers for criticizing a public

official.

**D.     Because Defendants caused Jerry Rogers to be arrested without probable cause,
         summary judgment should be granted on Plaintiff's federal false arrest claim.**

To prevail on a § 1983 false arrest claim, a plaintiff must show that the arresting officers

"did not have probable cause to arrest him."[127]

False arrest is decided on an objective standard; it is not necessary for defendants to be

subjectively aware that an arrest is unconstitutional to be liable.[128] When a warrant for criminal

defamation alleges defamation against a public official, the "warrant lacks probable cause

because the conduct complained of is not a criminally actionable offense."[129] And so "no

reasonable police officer could have believed that probable cause existed" for a criminal

---

[124] *Id.* at 30:10-12 ("Q. Buckner is a law enforcement officer with the St. Tammany Parish Sheriff's Office? A. Yes, he is.")

[125] *Id.* at 33:11-14 ("Q. So Daniel Buckner is listed here as the victim in his capacity as a law enforcement officer, correct? 14 A. Correct.")

[126] *Id.* at 47:5-18 ("Q. By clueless, it was clueless in the context of the Nanette Krentel investigation, correct? A. In the context of the e-mail, that's what it appeared to be, yes, sir. Q. And anything is better than Daniel Buckner, that is in the context of the Nanette Krentel investigation, correct? A. That's what it appeared to be, yes. Q. The same is true about Daniel Buckner's lack of experience and being a rookie, that is in the context of his role as a detective with the St. Tammany Parish Sheriff's Office, correct? A. I believe so, yes.")

[127] *Haggerty v. Tex. S. Univ.*, 391 F.3d 653, 655 (5th Cir. 2004); *see also Brown v. Lyford*, 243 F.3d 185, 189 (5th Cir. 2001) (internal quotation marks omitted) ("The constitutional tort of false arrest ... require[s] a showing of no probable cause.").

[128] *Whren v. United States*, 517 U.S. 806 (1996). *See also Lockett v. New Orleans City*, 607 F.3d 992, 998 (5th Cir.) (in determining whether there was probable cause to arrest, courts consider the "facts within the officer's knowledge-- not whether the officer was aware of the legal consequences of the facts."), *cert. denied*, 131 S. Ct. 507 (2010); *Ulrich v. Pope Cnty.*, 715 F.3d 1054, 1060 (8th Cir. 2013) (". . . the existence of probable cause or arguable probable cause depends on the viewpoint of an objectively reasonable officer, not on the viewpoint of the particular arresting officer.")

[129] *Terrebonne Parish Sheriff's Office v. Anderson*, 2016 KW 1093 (La. Ct. App. 1st, Aug. 25, 2016).

defamation warrant regarding criticism of a public official.[130]

Here, Defendants caused the arrest of Jerry Rogers for criminal defamation.[131] They caused the arrest because of what Rogers "said about Daniel Buckner about how Daniel Buckner was handling the investigation into the death of Nanette Krentel."[132] That is to say, Defendants caused the arrest of Rogers for what he said about how a public official was handling his public duties. And because the allegation was criminal defamation against Detective Buckner, a public official performing public duties, no probable cause existed for the arrest.[133]

And because false arrest is judged pursuant to an objective standard, it is not necessary for Defendants to have been actually warned of the unconstitutionality of arresting Jerry Rogers in advance. But Defendants *were* warned in advance.[134]

Defendants may point to the fact that a judge approved the warrant for Jerry Rogers' arrest. That does not protect Defendants from liability, however. As this Court explained in *Larpenter,*

> "[T]he fact that a neutral magistrate issues a warrant is *not* dispositive of whether [an officer's] underlying actions were objectively reasonable." *Winfrey v. San Jacinto Cnty.*, 481 Fed. App'x 969, 978 (5th Cir. 2012) (emphasis added); see also *Messerschmidt v. Millender*, 565 U.S. 535, 547 (2012) ("[T]he fact that a neutral magistrate has issued a warrant authorizing the allegedly unconstitutional search or seizure does not end the inquiry into [an officer's] objective reasonableness.").[135]

That is because "[q]ualified immunity will not attach if a 'reasonably well-trained officer

---

[130] *See also Larpenter, supra*, at *32

[131] Canizaro admits he caused the arrest when he filed the affidavit in support of the arrest warrant. Ex. C, Canizaro Dep. at 37:24-38:4 ("Q. So you filed an affidavit in support of an arrest warrant for Jerry Rogers, correct? A. Correct. Q. And then that caused him to be arrested once the judge had signed the warrant, correct? A. Correct."). Culpeper caused the arrest when he approved Canizaro to do so. *Id.* at 52:1-3 ("I went back downstairs, and Chief Culpeper called me and said, 'Yeah, go ahead and put it before the judge,' and that's when I typed the arrest form.") And Smith caused the arrest when he told the other officers to move forward with it. Ex. C at 116:20-21 ("We had a meeting with everyone, briefed the sheriff. The sheriff said move forward."); Ex. A, Culpeper Dep. at 63:15-18 ("Q. So the sheriff approved the decision to move forward with the application for arrest of Jerry Rogers, agreed? A. The affidavit, yes, sir.")

[132] Ex. D, Smith Dep. at 24:8-12 ("Q. And Jerry Rogers was arrested for what he said about Daniel Buckner about how Daniel Buckner was handling the investigation into the death of Nanette Krentel, correct? A. Yes, sir.")

[133] *Terrebonne Parish Sheriff's Office, supra; Larpenter, supra.*

[134] *See, e.g.,* Ex. D, Smith Dep.at 67:24-68:7 ("Q. Okay. So in 2019 you were aware in some way that there was some issues surround -- surrounding the constitutionality of criminal defamation arrests in some applications, agreed? A. Agreed. Q. Okay. Were you aware of that prior to the arrest of Jerry Rogers? A. Yes.")

[135] *Larpenter, supra*, at *26.

in [the officer's] position would have known that [the] affidavit [in support of the search warrant] failed to establish probable cause.'"[136] A warrant will not shield an officer from suit where "it is obvious that no reasonably competent officer would have concluded that a warrant should issue."[137]

It is especially true here, where the judge who signed the warrant for Jerry Rogers specifically indicated that critical information had been withheld from him. The judge explained to the FBI that "if the law enforcement officer had information that a law was possibly unconstitutional, the law enforcement officer should make those questions or concerns known to the judge prior to the review of the affidavit and warrant."[138] The judge explained that he signed the warrant because he wrongly "assumed law enforcement officers requested arrest warrants and search warrants in good faith and would bring attention to all known facts, to include if the law enforcement officer suspected a law was possibly unconstitutional."[139] Defendants did not.

Here, no reasonably competent officer could conclude that arresting Jerry Rogers for criminal defamation would be constitutional – especially when the District Attorney had specifically said it would *not* be constitutional. For that reason, the arrest warrant will not immunize Defendants from liability.

And because there was no probable cause for the arrest of Jerry Rogers, summary judgment should be granted on Plaintiff's false arrest claim under the federal constitution.

---

[136] *Id., quoting Winfrey*, 481 Fed. App'x at 978;

[137] *See also Messerschmidt*, 565 U.S. at 547 (quoting Malley, 475 U.S. at 341). *See also Anderson v. Sheriff Larpenter*, 16-cv-13733-LMA-JVM, p.26 (E.D. La. July 19, 2017) (rejecting argument that warrant signed by judge immunized officers from liability in context of criminal defamation).

[138] R. Doc. 116-3, FBI Investigatory File, at 53.

[139] *Id*.

**C.      Because of the unlawfulness of Rogers' arrest, the Court should grant him summary judgment on the claims of state-law false arrest and false imprisonment**

Under state law, a claim for false arrest or false imprisonment "requires the following elements: (1) detention of the person; and (2) the unlawfulness of the detention."[140] Accordingly, when those two elements are met, a plaintiff is entitled to summary judgment.[141]

As described above, Plaintiff Jerry Rogers was detained. The detention was unlawful. Defendants are therefore liable for the state law tort of false arrest. And Sheriff Smith, who also acts as jailor of the St. Tammany Parish Prison,[142] is additionally liable for the state law tort of false imprisonment. Accordingly, summary judgment should issue for Plaintiff for the claims of state-law false arrest and false imprisonment.

## III.      CONCLUSION

For the reasons stated above, partial summary judgment should issue on Plaintiff's claims of false arrest in violation of the federal and Louisiana constitutions.

Respectfully Submitted:

*/s/ William Most*
**WILLIAM MOST (La. Bar No. 36914)**
**HOPE PHELPS (La. Bar No. 37259)**
**DAVID LANSER (La. Bar No. 37764)**
201 St. Charles Ave., Ste. 114, # 101
New Orleans, LA 70170
T: (504) 256-4615
Email: hopeaphelps@outlook.com
***Counsel for Plaintiff, Jerry Rogers, Jr.***

---

[140] *Richard v. Richard*, 74 So. 3d 1156, 1159 (La. 2011) (false arrest); *McNeal v. DPS&C*, 2020 WL 798321, 18-cv-00736 (M.D. La., Feb. 18, 2020) (false imprisonment), *citing Tabora v. City of Kenner*, 94-613 p. 8 (La. App. 5 Cir. 1/18/95), 650 So. 2d 319, 322, writ denied, 95-0402 (La. 3/30/95), 651 So. 2d 843.
[141] *McNeal, supra* (granting plaintiff's motion for summary judgment on false imprisonment).
[142] *See* https://www.stpso.com/divisions/corrections/corrections/.