UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


JERRY ROGERS, JR.,                    CIVIL ACTION

         Plaintiff                    NO. 20-517

VERSUS                                JUDGE MILAZZO

                                      MAG. DOUGLAS

SHERIFF RANDY SMITH, DANNY

CULPEPER, AND KEITH CANIZARO

         Defendants


          DEPOSITION OF MAJOR DANIEL R. CULPEPER,
II, given in the above-entitled cause, via Zoom
videoconferencing, pursuant to the following
stipulation, before Sandra P. DiFebbo, Certified
Shorthand Reporter, in and for the State of
Louisiana, on the 29th day of November, 2021,
commencing at 1:50 PM.

1      A.   I was a deputy chief.  I was over Major

2  Crimes.  Well, I'm sorry.  Investigations in

3  general.  Crime lab.  I believe HR might have been

4  under my scope as well at the time.

5      Q.   So in 2019, you were deputy chief.  Does

6  that mean that you reported directly to the

7  sheriff?

8      A.   Yes, sir.  I don't think we had a chief

9  deputy at that time, so my communication would have

10 been directly to the sheriff.

11     Q.   Currently, do you report directly to the

12 sheriff?

13     A.   No, sir.  I have a deputy chief above me

14 currently.

15     Q.   This may be a stupid question.  Is a

16 deputy chief and a chief deputy the same thing or

17 are those different roles?

18     A.   They're different.  Chief deputy falls

19 directly underneath the sheriff.  Consider the

20 sheriff the number one.  The chief deputy would be

21 number two in the department.

22     Q.   So there is the sheriff, the chief

23 deputy, and below that there is deputy chiefs?

24     A.   Correct.

25     Q.   So currently you are a major who reports

1    A.    After the homicide, yes.  I didn't know

2  her personally.

3    Q.    So you know that Nanette Krentel was a

4  person in St. Tammany Parish who died in 2017, and

5  the sheriff's office investigated her death,

6  correct?

7    A.    Correct.

8    Q.    Do you know whether the sheriff's office

9  initially considered it to be a suicide or a

10  homicide?

11    A.    No, sir.  We continued to work it

12  throughout.  We don't make the rulings on that.

13  That would be the coroner's office.

14    Q.    That death is currently unsolved,

15  correct?

16    A.    That is correct.

17    Q.    Daniel Buckner was the lead investigator

18  of the Krentel investigation, correct?

19    A.    Correct.

20    Q.    He is a detective with the St. Tammany

21  Parish Sheriff's Office?

22    A.    Yes, sir.

23    Q.    I take it you know who Jerry Rogers is?

24    A.    I do.

25    Q.    Did you know him when he was at the St.

1  Tammany Parish Sheriff's Office?

2       A.   I knew him.  I didn't really -- I'm sure

3  -- I'm not even sure.  I'm pretty sure our paths

4  probably crossed.  I think he was in investigations

5  at one point in time, but I knew of him. Personally

6  don't know him.

7       Q.   He left the sheriff's office and became a

8  federal investigator, correct?

9       A.   That's what I heard, yes, sir.

10      Q.   In 2019, the sheriff was up for

11 re-election, correct?

12      A.   That is correct.

13      Q.   In 2019, did you know whether Jerry

14 Rogers was aligned politically with the sheriff or

15 one of his opponents?

16      A.   No.  No, sir.

17      Q.   Jerry Rogers was ultimately arrested by

18 St. Tammany Parish Sheriff's Office for criminal

19 defamation; is that correct?

20      A.   That's correct.

21      Q.   Prior to that, there were some search

22 warrants which obtained his e-mails, correct?

23      A.   That is correct.

24      Q.   Did you see those search warrant

25 applications?

1        A.    No, sir.  I don't recall seeing them.

2        Q.    I'm going to pull up -- I can also zoom

3   in.  Just let me know any time you want me to.

4        A.    That's fine.  I got my glasses.

5        Q.    Do you see this is a search warrant for

6   the e-mails of the justicenanette@yahoo.com

7   address?

8        A.    Correct.

9        Q.    Do you see that the contents are believed

10  to be related to a violation, and you see what it

11  is alleging as a violation here?

12       A.    Where it says constitutes a violation of,

13  yes, sir.

14       Q.    It says one count of 14:0000, Structure

15  Fire Death Investigation.  You see that?

16       A.    Yes, sir.

17       Q.    14:0000 is not any crime, is it?

18       A.    I'm not familiar with it.  No, sir.

19       Q.    Is it proper for a search warrant to not

20  identify a crime when seeking a criminal search

21  warrant?

22       A.    I'm not sure what is in the narrative or

23  what is being explained. Normally, it would be

24  explained throughout the narrative.

25       Q.    Does the sheriff's office search warrant

```
 1   have to say what crime is alleged to have been
 2   committed?
 3         A.   I would think so, yes, sir.
 4         Q.   But this one does not identify a specific
 5   crime, correct?
 6         A.   Like 14 colon, no.  I don't see that
 7   there.
 8         Q.   Captain Canizaro was the sheriff's office
 9   officer who investigated Jerry Rogers, correct?
10         A.   Yes, sir.  One of them.
11         Q.   Did you hear his testimony earlier that
12   he concluded that Jerry Rogers had committed an act
13   of criminal defamation against one victim,
14   specifically, Detective Daniel Buckner?  Did you
15   hear that?
16         A.   Yes, sir, I did.
17         Q.   Does that match your recollection as
18   well?
19         A.   Yes, sir.
20         Q.   Did you hear him identify that Detective
21   Daniel Buckner, as a victim, was identified as
22   being a victim type of law enforcement officer?  Do
23   you recall that?
24         A.   I'm sorry.  Can you repeat the question?
25         Q.   Sure.  Do you recall that Detective --
```

1    let me start over.  Do you recall that Captain

2    Canizaro testified that Detective Buckner, as a

3    victim, was a victim in his capacity as a law

4    enforcement officer?

5         A.   Yes, sir.

6         Q.   Does that match your recollection as

7    well?

8         A.   Yes, sir.

9         Q.   Did you see or receive the contents of

10   the e-mails that were received subject to the

11   search warrants?

12        A.   Probably in the early stages of them when

13   we first got them I might have read over them, but

14   I don't recall. I hadn't seen them since.

15        Q.   Do you recall seeing e-mails between the

16   justicenanette e-mail address and the sheriff's

17   opponents in the re-election campaign for sheriff?

18        A.   Yeah, but I remember seeing the ones from

19   -- back and forth with the family.  I don't

20   remember seeing the other ones.

21        Q.   Were you aware that the search warrant

22   had turned up e-mails between someone and the

23   sheriff's opponents in the race for sheriff?

24        A.   Yes, sir.  I had word of that.

25        Q.   Were any special steps taken with regard

1   we're dealing with, what we're dealing with, what

2   the person may, may not know.  So, yeah, we're

3   obligated at this point, in my opinion, to run out

4   that lead.

5        Q.   And then at some point it was established

6   that the author of these e-mails had not committed

7   obstruction of justice, correct?

8        A.   It was looked into and decided, yes, that

9   it did not fit.

10       Q.   At some point it was determined that the

11  author of these e-mails was Jerry Rogers, right?

12       A.   That's correct.

13       Q.   So it was determined to be Jerry Rogers.

14  There was no obstruction of justice.  Why did the

15  investigation continue after that point?

16       A.   It was brought to our attention that once

17  we discovered who it was, that we looked into -- we

18  were looking at obstruction of justice on two

19  people, actually.  That did not fit, but the

20  detective brought it up to my attention that

21  defamation fit to a T in reference to Jerry Rogers

22  for what he was doing, what he had done.

23       Q.   Did you agree with that, that the

24  elements of criminal defamation had been met by

25  Jerry Rogers' actions?

1    Q.    So setting aside a meeting with the DA's

2  office, aside from that one meeting in the

3  conference room adjacent to the sheriff's office,

4  were there any other discussions you had where the

5  potential constitutionality of arresting Jerry

6  Rogers was raised?

7    A.    We had a meeting with the DA's office.

8    Q.    That meeting aside, any others within the

9  sheriff's office?

10   A.    Not that I can recall, no, sir.

11   Q.    Without telling me the contents of any

12 communications with any attorney, did you consult

13 with any attorney other than the DA's office about

14 the potential constitutionality of arresting Jerry

15 Rogers?

16   A.    I don't recall if I had a conversation

17 with our in-house counsel.  No, sir.  I don't

18 recall.

19   Q.    So you said this Livingston Parish case

20 was discussed, and you concluded that that case was

21 sufficiently different than Jerry Rogers' case such

22 that it would be constitutional to arrest Jerry

23 Rogers?  Was that your conclusion?

24   A.    The application of it, yes, sir.

25   Q.    So what was different about Jerry Rogers'

```
 1    distinguishing characteristics?
 2         A.   Yeah.  I mean, misleading the family,
 3    inserting himself into an investigation.
 4    Basically, you know, leading a family in things
 5    that were not true in the middle of a homicide
 6    investigation.
 7         Q.   I understand.  Those are what you believe
 8    were significant, right?  What I'm trying to figure
 9    out is why did you think those were significant.
10    Was there something in the case you read that said
11    those mean -- those are legally significant for the
12    constitutional analysis?
13         A.   You are looking at a law that -- so you
14    are comparing it to the law, which we've been over
15    already, and it fit, so that is my answer.
16         Q.   You compared Jerry Rogers' situation to
17    the text of the statute, and that was the totality
18    of your analysis; is that correct?
19         A.   Yeah.  Yes, sir.
20         Q.   So then you concluded that it would be
21    permissible to arrest Jerry Rogers for criminal
22    defamation, agreed?
23         A.   No.  We made a decision to bring the
24    evidence and facts in front of a judge who made the
25    decision to arrest.
```

```
 1        Q.   But you couldn't bring it to the judge if
 2   you thought it was unconstitutional to arrest him
 3   for that crime, though, agreed?
 4            MR. COLLINGS:
 5                 Object to the form.
 6            THE WITNESS:
 7                 Repeat the question.
 8   BY MR. MOST:
 9        Q.   Sure.  You would not have been lawfully
10   able to go to the judge and seek an arrest warrant
11   if you thought it would be unconstitutional to
12   arrest Jerry Rogers for that crime, agreed?
13            MR. COLLINGS:
14                 Same objection.
15            THE WITNESS:
16                 Like I said, that's why we brought
17               it to a judge, to let him make that
18               decision.
19   BY MR. MOST:
20        Q.   But prior to going to the judge, you had
21   concluded that it would be constitutional to arrest
22   Jerry Rogers for criminal defamation, agreed?
23            MR. COLLINGS:
24                 Object to form.
25            THE WITNESS:
```

```
 1                    Just looking over the evidence and
 2               facts we have in front of us.
 3   BY MR. MOST:
 4        Q.   So the answer is yes, agreed?
 5        A.   That's the way I'm going to answer my
 6   question, sir.
 7        Q.   And so you approved the decision to bring
 8   the arrest before -- the potential arrest before
 9   the judge, correct?
10        A.   I was one of the people, yes, sir.
11        Q.   If you had said no, would it have still
12   happened?
13             MR. COLLINGS:
14                  Object to form.
15             THE WITNESS:
16                  I'm sorry?
17   BY MR. MOST:
18        Q.   It's okay.  Chad is objecting to the form
19   of questions.  He has to make an objection to
20   preserve the record.  You can then answer the
21   question unless he tells you otherwise.
22        A.   Okay.  And I was listening.  Can you
23   repeat the question, please?
24        Q.   Sure.  So if you had said no, would the
25   arrest application have moved forward?
```

```
 1              MR. COLLINGS:
 2                   Object to the form.  Answer, if you
 3                can.
 4              THE WITNESS:
 5                   I don't know.  That might have been
 6                a decision that the sheriff would
 7                ultimately make.  I can't answer that.
 8                The decision wasn't that, so I can't
 9                answer that.
10   BY MR. MOST:
11         Q.   Did you review a draft of the affidavit
12   in support of the arrest application?
13         A.   No, sir.
14         Q.   So let's talk about the meeting with the
15   DA's office.  So my understanding is that on
16   September 13th, three days before the arrest of
17   Jerry Rogers, you and certain other members of the
18   St. Tammany Parish Sheriff's Office physically went
19   to the DA's office and met with some members of the
20   DA's office; is that correct?
21         A.   That's correct.
22         Q.   It was to brief the DA's office about the
23   potential arrest of Jerry Rogers for criminal
24   defamation, correct?
25         A.   Correct.
```

1      Q.    Whose decision was it to go to the DA's

2   office to brief them in advance?

3      A.    I'm not sure who made the exact decision

4   at that time.  I don't recall.

5      Q.    What was it about the potential arrest of

6   Jerry Rogers that made it significant enough to go

7   to the district attorney's office?

8      A.    Probably because it was a law enforcement

9   officer or a federal agent.  It is not uncommon for

10  us to have these meetings with the DA's office.

11     Q.    What was discussed at that meeting?

12     A.    The main discussion of that meeting was

13  just kind of let them know what we had at that

14  point and know where we were at in the

15  investigation.  We wanted to run it by them.  So

16  basically talked about the application of what we

17  were dealing with.  They brought up -- I believe at

18  one point -- I believe his name was Caplan.  He

19  came in.  We discussed that Livingston case.  We

20  were talking about they thought that case was

21  unconstitutional, but we got into the application

22  of what we were dealing with on our end, so we

23  discussed that, at which time they did not have a

24  decision.  It wasn't definitely, no, you can't do

25  that type situation.  They said it was something

```
1    they would have to look into further.
2         Q.   So at that meeting at the DA's office,
3    the DA's office brought up the potential
4    unconstitutionality of the arrest of Jerry Rogers
5    but didn't give you a firm answer at the meeting;
6    is that --
7         A.   They brought up a case dealing with
8    defamation.  That's the case that they used.
9         Q.   Did they bring it up to suggest that
10   there could be a potential constitutional problem
11   with arresting Jerry Rogers?
12        A.   Yes.  Yes, sir.  That's why it came up.
13   I'm assuming that's why they brought it up.
14        Q.   That was your understanding of why they
15   brought it up, agreed?
16        A.   Agreed, but they were discussing about
17   our case and the application of our case.
18        Q.   But they didn't give you a firm answer of
19   whether they thought for sure it would be
20   unconstitutional to arrest Jerry Rogers for that
21   crime or not at that meeting, agreed?
22        A.   At that meeting, no, sir.
23        Q.   Did you have a subsequent conversation by
24   telephone or in person with anyone from the DA's
25   office about the potential arrest of Jerry Rogers
```

```
 1   for criminal defamation?
 2         A.   I had a follow-up phone call with Collin
 3   Sims I believe Monday, maybe, the following Monday.
 4         Q.   But still before the arrest of Jerry
 5   Rogers?
 6         A.   I don't know the timing.  It was before
 7   that physical arrest, but I think it was after the
 8   decision we made to move forward.
 9         Q.   What did Collin Sims tell you in that
10   phone call?
11         A.   We had communicated, I believe, earlier
12   that morning when we left that meeting that we just
13   discussed.  They said they were going to check into
14   it.  There was no official call you back on a
15   certain date type information.  I did call him
16   Monday morning.  He said they still had not met and
17   discussed it.  We were meeting already that
18   morning.  Like I said, we already ended.  Our
19   investigation was complete at this point.  So we
20   had actually met, made a decision already, being
21   that the DA's office didn't have their decision
22   yet, to go ahead and let a judge make a decision.
23   And, basically, that's what they do.  So the
24   decision was made to move forward with an affidavit
25   with the facts and bring it before a judge.  So
```

1    that was done.  So that was in the process.  I

2    believe later on -- the timing was close, but I did

3    have another conversation with Collin Sims, and,

4    basically, during that conversation, I basically

5    told him that we were moving forward.  You know, he

6    said he thought it would be unconstitutional.  We

7    kind of talked about the application a little bit

8    more.  There was no, you cannot do this.  It was

9    just another quick conversation that didn't last

10   long, and that was it.

11        Q.   So this was -- you're not sure when

12   exactly, but it was before the arrest of Jerry

13   Rogers; is that correct?

14        A.   The physical arrest, yes, sir.  I don't

15   know what time the physical arrest happened.  I

16   believe it was in the afternoon.  We had made a

17   decision to bring it in front of a judge.

18        Q.   And Collin Sims told you that he thought

19   it would be unconstitutional to arrest Jerry

20   Rogers?

21        A.   Yeah.  We talked briefly again about just

22   the application of things.  We told him we're going

23   to move forward with it.  I'm not going out and

24   physically arresting him, but I'm moving forward

25   with -- you know, he's not a judge.  Collin Sims is

1      Q.   Okay.  Got it.  In a conversation with

2  Collin Sims, did you at any point say anything to

3  the effect of, if you were going to recuse

4  yourself, I wish you would have kept your opinions

5  to yourself?

6      A.   Yeah.  That did come up, but that did not

7  come up on that same day.  That came up two days

8  later.  I believe it was three days later where

9  Collin Sims had sent a letter to the sheriff's

10 department.  It was well after the fact of the

11 arrest of Jerry Rogers.  It's dated on the letter.

12 I think it was the 18th when we received the letter

13 at the sheriff's department.  He was basically

14 recusing himself and giving an opinion all on the

15 same letter.

16          I did have a conversation with Collin.  I

17 said, "You are recusing yourself on a letter, but

18 yet you are giving your opinion on the same

19 letter."  I said, "I thought if you recuse

20 yourself, you don't put an opinion down," and I

21 said, "Here you are sending us a letter saying you

22 are recusing yourself, but here is my opinion at

23 the same time."  So I said, "That don't make no

24 sense to me.  I don't understand that, Collin.

25 What is that all about?"  We kind of went back and

1    forth.  He said, "You know what, Danny?"  He
2    admitted it.  He said, "I understand your point of
3    view on what you're saying."  I said, "Well, thank
4    you.  Kind of late now, but thanks for that."  That
5    conversation was not the same day.  It was after we
6    received that letter.  I believe it was two days
7    later where now he is recusing himself on a letter
8    but giving his opinion, which I thought was odd.
9         Q.   So Jerry Rogers was arrested, cuffed, and
10   booked at the jail, correct?
11        A.   That is correct.
12        Q.   Since it's a misdemeanor, he could have
13   instead simply been served with a summons to appear
14   and not have been cuffed and not have been booked,
15   agreed?
16        A.   It could have, yes, sir.
17        Q.   Were you part of the decision to conduct
18   a physical arrest rather than a service of summons?
19        A.   I was part of that conversation, yes,
20   sir.
21        Q.   What was the reason for conducting a
22   physical arrest rather than a service of summons?
23        A.   Just like Captain Canizaro had concern in
24   reference to, of course, several days prior,
25   basically, a situation in Monroe where the SWAT

1   him as I was getting the information, you know.  We
2   were dealing with an agent.
3       Q.   What did the sheriff tell you, if
4   anything, to do with the Jerry Rogers' situation?
5       A.   He wanted to continue to look into it.
6   If he broke the law, he wanted to address it.  So
7   we continued looking into our investigation, and
8   when it concluded, we gave him the information, and
9   we discussed it, and we decided to put it in front
10  of a judge, the facts in evidence, to see if it --
11  if he would sign our arrest warrant.
12      Q.   The sheriff was part of that decision to
13  put it in front of the judge?
14      A.   Yes, he was.
15      Q.   So the sheriff approved the decision to
16  move forward with the application for arrest of
17  Jerry Rogers, agreed?
18      A.   The affidavit, yes, sir.
19      Q.   Did the sheriff at any point tell you to
20  handle the situation with regards to Jerry Rogers?
21      A.   As far as -- what do you mean handle the
22  situation?
23      Q.   Did he say anything to that effect to
24  you?
25      A.   No.  I mean, I don't recall him saying

1  communicate to other members of the St. Tammany

2  Parish Sheriff's Office that Sheriff Smith wanted

3  them to continue investigating Jerry Rogers,

4  correct?

5      A.   Not put Jerry Rogers in jail like that is

6  worded there.  No, sir.  But, yes, to continue the

7  investigation, yes.

8      Q.   Of Jerry Rogers?

9      A.   That's correct.

10     Q.   I'm going to pull up Exhibit U. You see

11 that this is the FBI investigatory file?

12     A.   Yes.

13     Q.   You reviewed this?

14     A.   Let me see.  I'm sure I have.  What am I

15 reading here exactly?

16     Q.   I'm just talking about this document

17 generally.

18     A.   The whole document? Yes, sir, I reviewed

19 the whole FBI thing, but I don't know what page or

20 what this is in reference to.

21     Q.   Fair enough.  I'm going to Page 35 here.

22 Do you see in the bottom paragraph here someone

23 says, "We're not done with Jerry, and that

24 investigators would see what HUD thinks about

25 this?"

1        Q.   The attorney general's office likewise
2   concluded that they would be precluded by law from
3   moving forward with any prosecution of Jerry
4   Rogers, agreed?
5        A.   Agreed.
6        Q.   Because it would be unconstitutional,
7   agreed?
8            MR. COLLINGS:
9                Object to the form.
10            THE WITNESS:
11                I don't recall seeing the paperwork
12            on any of that, so I don't want to be
13            specific on that.
14   BY MR. MOST:
15        Q.   And the judge at the preliminary
16   examination for Jerry Rogers concluded there was no
17   probable cause for Jerry Rogers' arrest.  Were you
18   aware of that?
19        A.   I was aware, yes, of that judge, yes.
20        Q.   Then you reviewed the FBI report, so you
21   saw that the FBI agent concluded that a civil
22   rights violation occurred when Jerry Rogers was
23   arrested for criminal defamation.  Did you see
24   that?
25        A.   Where at in the report?  Can you find it

1    review it and learned later on that he had a law

2    clerk review it as well.  So, yeah, those are the

3    things that we did.

4        Q.    So you think the DA's office got it

5    wrong?

6        A.    I'm not saying the DA's office got it

7    right or wrong.  They didn't have an opinion for us

8    the first time we met.  The second time I

9    communicated with them they still did not have an

10   opinion.  We moved forward.  Once again, we got a

11   timeline right there where they come back and said,

12   no, we don't think it is.  We talked about the

13   application again.  We were moving forward to put

14   it in front of a judge who ultimately makes that

15   decision.  It is not the DA's office or us.  It is

16   the judge, and that's what we did.

17       Q.    Did you communicate to the judge that the

18   DA's office had expressed their opinion that it was

19   unconstitutional?

20       A.    I didn't communicate with the judge at

21   all, no, sir, but the facts and the evidence was in

22   the affidavit.

23       Q.    To your knowledge, did anyone communicate

24   to the judge the DA's office opinion that it would

25   be unconstitutional to arrest Jerry Rogers for that

```
 1   not agree.  Like I said, it's an opinion, so I
 2   really don't know.  I don't know how to answer
 3   that.
 4              MR. COLLINGS:
 5                   Objection for asking opinion
 6                testimony of a fact witness.
 7   BY MR. MOST:
 8        Q.   Sure.  Knowing what you know now, now
 9   having received the opinions of the DA's office and
10   the attorney general's office, would you still
11   arrest Jerry Rogers for criminal defamation if the
12   same facts were present to you today?
13              MR. COLLINGS:
14                   Object to the form.
15              THE WITNESS:
16                   Once again, I'm going to say every
17                investigation is different.  Everything
18                is different.  We did what we did.  As
19                far as giving the evidence and facts in
20                front of a judge, that's where I'm
21                going to draw it.
22   BY MR. MOST:
23        Q.   Respectfully, Major, that's not an
24   answer. My question was, with these opinions in
25   hand, if the same situation was presented to you
```