UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


JERRY ROGERS, JR.,                    CIVIL ACTION

       Plaintiff                     NO. 20-517

VERSUS                                JUDGE MILAZZO

                                   MAG. DOUGLAS

SHERIFF RANDY SMITH, DANNY

CULPEPER, AND KEITH CANIZARO

       Defendants




       DEPOSITION OF CAPTAIN KEITH A. CANIZARO, given in the above-entitled cause, via Zoom videoconferencing, pursuant to the following stipulation, before Sandra P. DiFebbo, Certified Shorthand Reporter, in and for the State of Louisiana, on the 29th day of November, 2021, commencing at 9:36 AM.


**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

1    correct?

2         A.    Yes, sir.

3         Q.    At the time of Jerry Rogers' arrest, what

4    part of the sheriff's office were you part of?

5         A.    I was the sergeant in the Major Crimes

6    Unit.

7         Q.    What does the Major Crimes Unit do?

8         A.    We handle all death investigations, any

9    investigation on a criminal -- any criminal

10   investigation of an employee of the sheriff's

11   office.  It varies.  Serious offenses, stranger

12   kidnappings, stranger rapes.  It kind of fluctuates

13   in those -- that area, serious violent crimes.

14        Q.    So the Major Crimes Unit handles death

15   investigations, internal criminal investigations,

16   and serious other crimes, correct?

17        A.    Yeah.  And, basically, whatever -- they

18   can designate major crimes to investigate anything

19   they want, but, mainly, we -- those are the areas

20   that are day-to-day operations in Major Crimes.

21        Q.    Does the Major Crimes Unit investigate

22   misdemeanors?

23        A.    No.  Not specifically, no.

24        Q.    Can you recall any time the Major Crimes

25   Unit investigated misdemeanors while you were part

1    status with our agency, and they wanted somebody to

2    go with her, and at that time, I was the sergeant

3    in Major Crimes, so that's about it.

4        Q.   At one point, Daniel Buckner was the lead

5    investigator on the Krentel death investigation; is

6    that correct?

7        A.   From what I understand, he was the lead

8    the entire length of the investigation while the

9    sheriff's office had it.

10       Q.   Buckner is a law enforcement officer with

11   the St. Tammany Parish Sheriff's Office?

12       A.   Yes, he is.

13       Q.   I take it you know who Jerry Rogers is?

14       A.   I do.

15       Q.   Jerry Rogers is a former St. Tammany

16   Parish sheriff's officer, correct?

17       A.   Correct.  I don't know exactly when he

18   left.  I don't know if I was there when he left. I

19   kind of remember him being in the property world.

20   At that time, we were really split as far as

21   investigations on the east side of the parish and

22   the west side of the parish.  So, yeah, I knew

23   Jerry from just law enforcement.

24       Q.   You understand that at some point after

25   he was a sheriff's office deputy and after the

1  death of Nanette Krentel, he sent e-mails to a

2  family member of Nanette Krentel, correct?

3      A.   Yes.

4      Q.   Those e-mails were critical of the St.

5  Tammany Parish Sheriff's Office investigation into

6  that death, correct?

7      A.   Among other things, yeah.

8      Q.   Among other things, they were

9  specifically critical of Daniel Buckner, correct?

10     A.   Correct.

11     Q.   And you authored an affidavit in support

12 of an arrest warrant for the arrest of Jerry Rogers

13 for criminal defamation, correct?

14     A.   Yes.

15     Q.   I'm going to pull up Exhibit L, as in

16 Larry.  Can you see this, Captain?

17     A.   Yes.

18     Q.   What is this document we're looking at

19 here?

20     A.   It's an entry for the arrest warrant in

21 the RMS system for Jerry Rogers.

22     Q.   What is the RMS system?

23     A.   It's our report management system for the

24 sheriff's office.  Just the name that's assigned to

25 it.

1      Q.   So this is a printout from your
2  electronic records management system?
3      A.   Yes.
4      Q.   It says here the defendant is Jerry
5  Rogers, and the offense is Misdemeanor Defamation
6  14:47; is that correct?
7      A.   Correct.
8      Q.   And it says here you are the reporting
9  officer on this, at the bottom?
10     A.   Yes.
11     Q.   I'm going to turn to Page 4 of this
12  document.
13     A.   This is the offense report.
14     Q.   Is this something that you wrote?
15     A.   Yeah.  It would be the report I typed,
16  yes.
17     Q.   I'm looking at the bottom of Page 4.  It
18  says, "One offense, one victim, one offender."  Is
19  that correct?
20     A.   Correct.
21     Q.   I'm looking at Page 5 of this Exhibit L.
22  This lists the victim as Daniel Buckner, correct?
23     A.   Correct.
24     Q.   So Daniel Buckner was the one victim of
25  the criminal defamation charge that you drafted

1    this report for, correct?

2         A.    Correct.

3         Q.    And it says here, "Victim Type LE

4    Officer."  Does that stand for law enforcement

5    officer?

6         A.    Yes, sir.

7         Q.    And the address, 300 Brownswitch Road, is

8    that Mr. Buckner's home address or is that the St.

9    Tammany Parish Sheriff's Office address?

10        A.    It's the sheriff's office address.

11        Q.    So Daniel Buckner is listed here as the

12   victim in his capacity as a law enforcement

13   officer, correct?

14        A.    Correct.

15        Q.    So if Daniel Buckner was the victim of

16   the criminal defamation, then Jerry Rogers -- you

17   filed an affidavit in support of the arrest for him

18   for what he said or wrote about Daniel Buckner,

19   correct?

20        A.    Correct. Can I expound on my answer

21   briefly?

22        Q.    Of course.

23        A.    His actions in whole of what he wrote and

24   how it affected -- and what the, I guess, reactions

25   of a family member to those actions, and, yes,

1  that's why, but it's for what he wrote in e-mails,
2  correct.
3        Q.   So Jerry Rogers -- you sought the arrest
4  of Jerry Rogers for what he wrote about Daniel
5  Buckner in e-mails and the effect you anticipated
6  it would have, correct?
7        A.   The effect that was over that, yes.
8        Q.   I'm sorry?
9        A.   That I could see of that, yes.
10       Q.   So to restate, you sought the arrest of
11  Jerry Rogers for criminal defamation for what he
12  wrote about Detective Daniel Buckner and the
13  effects you saw that it was having; is that
14  correct?
15       A.   Not saw.  The effect it had and the
16  application to the law itself and what the law
17  said.
18       Q.   Okay.  I'll rephrase.  So you sought the
19  arrest of Jerry Rogers for criminal defamation for
20  what he wrote about Detective Daniel Buckner and
21  the effects it did have; is that correct?
22       A.   I can tell you that I -- the reason I
23  sought the arrest of Jerry Rogers is because he
24  violated the statute of criminal defamation and the
25  elements that are listed therein.

1    Q.   Okay.

2    A.   That's the correct answer to -- my

3    correct and true answer to your question.

4    Q.   Okay.  And he violated those elements in

5    what he wrote in e-mails about Detective Daniel

6    Buckner and the effects that those e-mails did

7    have; is that correct?

8    A.   From what I see, yes.  That was a tool he

9    used to violate the elements of that crime.

10    Q.   So you investigated these e-mails from

11    Jerry Rogers to Kim Watson, correct?

12    A.   It was part of the investigation.

13    Initially, I was charged to investigate possible

14    violations of the law by one of our employees, and

15    after conducting the investigation as to

16    obstruction of justice, there were no facts found

17    that elements of obstruction of justice were

18    committed by either Mr. Rogers or Mr. Montgomery,

19    but that Mr. Rogers had, in fact, violated the law

20    of criminal defamation, of the elements in criminal

21    defamation.  That's how the investigation started.

22    You had asked earlier if Major Crimes investigates

23    misdemeanors.  Well, it's part and parcel to a

24    criminal investigation of one of our employees, so

25    yes.

1   rights and privileges to officers under Garrity,

2   and it is separate and distinct from a criminal

3   investigation.   An Internal Affairs investigation

4   is a violation of policy by the employee, not by

5   criminal law.

6        Q.   I got you.  Okay.  So Internal Affairs is

7   administrative or disciplinary investigations which

8   are separate from criminal investigations.  I got

9   you. Is that correct?

10       A.   Yes.

11       Q.   So you were conducting an internal

12  criminal investigation into potential obstruction

13  of justice, correct?

14       A.   Correct.

15       Q.   And you concluded that neither Jerry

16  Rogers nor Stefan Montgomery had committed acts

17  that met the elements of obstruction of justice,

18  correct?

19       A.   Correct.

20       Q.   But you did conclude that Jerry Rogers

21  had committed actions that met the elements of

22  criminal defamation, correct?

23       A.   Correct.

24       Q.   So you filed an affidavit in support of

25  an arrest warrant for Jerry Rogers, correct?

1      Q.   Okay.

2      A.   The view just changed on my screen.

3      Q.   Yes.  I pulled down Exhibit L.

4      A.   Oh, okay.  Thank you.

5      Q.   I'm now going to share my screen with

6  Exhibit A.  Do you see this, Captain?

7      A.   I do.

8      Q.   This is the affidavit in support of an

9  arrest warrant for Jerry Rogers, correct?

10      A.   Yes, sir.

11      Q.   This is the affidavit that you wrote?

12      A.   Yes.  It appears to be.

13      Q.   We can look at the bottom of Page 2 here.

14  Is that your electronic signature there?

15      A.   It is. When we changed systems, it

16  changed, but, yes, it is.

17      Q.   So this is a printout of the arrest

18  affidavit that you drafted and submitted to the

19  judge for the arrest of Jerry Rogers, correct?

20      A.   Correct.

21      Q.   So at the top of Page 2, it says, "The

22  unknown author referred to the lead investigator as

23  clueless and anything is better than the lead

24  investigator."  Do you see this here?

25      A.   Yes.

1    Q.    The lead investigator being Daniel
2  Buckner, correct?
3    A.    Correct.
4    Q.    The unknown author is later described as
5  Jerry Rogers, correct?
6    A.    Yes.
7    Q.    Clueless and anything is better than.
8  Are these the defamatory statements that you sought
9  the arrest of Jerry Rogers for?
10    A.    There was another that was not included
11  in there.  I believe it was he portrayed him as a
12  stone-cold rookie.  Something to that effect in the
13  e-mails, but, yes.
14    Q.    So the defamatory statements for which
15  you sought the arrest of Jerry Rogers were that
16  Daniel Buckner was clueless, that anything is
17  better than Daniel Buckner, and something to the
18  effect of Daniel Buckner being a stone-cold rookie;
19  is that correct?
20    A.    And having no experience investigating
21  homicides, yes.
22    Q.    So the defamatory statements for which
23  you sought the arrest of Jerry Rogers were that
24  Daniel Buckner was clueless, that anything is
25  better than Daniel Buckner, something to the effect

1  of Daniel Buckner being a stone-cold rookie, and

2  something to -- about Daniel Buckner not having any

3  experience; is that correct?

4      A.   Yes.  In the midst of a homicide

5  investigation, yes.

6      Q.   I'll take down Exhibit A.  So what is

7  your understanding of what defamation is?

8      A.   What I understand is derogatory comments

9  that are purposely made to erode public trust and

10  confidence, and that was the part of the law that I

11  recall that specifically was an element in this

12  case.

13      Q.   Do those statements have to be false?

14      A.   From what I understand, they have to be

15  false, not truthful as why we didn't look to other

16  things or anything else that he wrote about anybody

17  else in there, in his e-mail.

18      Q.   And they have to be false statements of

19  fact, correct?

20      A.   Correct.

21      Q.   So you understood at the time of the

22  arrest of Jerry Rogers that a false opinion is not

23  defamation, correct?

24      A.   Correct.

25      Q.   So Jerry Rogers describing Daniel Buckner

1      A.    I don't believe -- it was his belief --

2    it was his belief that he was stating it as fact.

3    I guess that's the best way I can describe what I

4    saw.

5      Q.    By clueless, it was clueless in the

6    context of the Nanette Krentel investigation,

7    correct?

8      A.    In the context of the e-mail, that's what

9    it appeared to be, yes, sir.

10      Q.    And anything is better than Daniel

11    Buckner, that is in the context of the Nanette

12    Krentel investigation, correct?

13      A.    That's what it appeared to be, yes.

14      Q.    The same is true about Daniel Buckner's

15    lack of experience and being a rookie, that is in

16    the context of his role as a detective with the St.

17    Tammany Parish Sheriff's Office, correct?

18      A.    I believe so, yes.

19      Q.    Going back to Exhibit A, it says in here

20    that a family member requested that they find the

21    identity of the unknown author.

22      A.    Correct.

23      Q.    What family member was that?

24      A.    I believe that was Gina Watson.

25      Q.    How did you know that Gina Watson had

1    requested that the St. Tammany Parish Sheriff's

2    Office find the identity of the unknown author?

3         A.   Prior to my beginning this investigation,

4    I was briefed in about the internal investigation

5    that was taking place by Lieutenant Hotard and

6    Buckner himself about the e-mails and about those

7    things.  I don't know if it was -- I don't remember

8    who exactly.  It was either Danny Buckner or Alvin

9    Hotard, or both, that told me that it was Gina

10   Watson that had reached out to Danny Buckner and

11   requested we find out who is sending -- I think it

12   was in the context -- I remember being told, who is

13   sending this, because it's causing problems in the

14   family.

15        Q.   So we talked a little bit about other

16   arrests by the St. Tammany Parish Sheriff's Office

17   for criminal defamation.  So, to your knowledge, as

18   long as there has been electronic records, at

19   least, the St. Tammany Parish Sheriff's Office has

20   arrested three people for criminal defamation; is

21   that correct?

22        A.   Four counting Mr. Rogers, yes.

23        Q.   Thank you.  Four counting Mr. Rogers.

24   Other than Mr. Rogers, have you ever personally

25   sought the arrest of anyone for criminal defamation

1  attorney's office.

2       Q.   We'll come back to that one.  Anyone

3  else?

4       A.   I don't remember specifically.  I doubt

5  it.  I think maybe Tim Crabtree, because he was my

6  corporal at the time, but I don't remember exactly

7  who.

8       Q.   So then at some point you drafted the

9  affidavit in support of the arrest warrant,

10  correct?

11       A.   Yeah.  At some point, yes.

12       Q.   Did anyone else review that affidavit

13  before you submitted it to the judge?

14       A.   I don't recall.  I don't believe so.  It

15  was done on a computer.  Maybe if Lieutenant Hotard

16  was in my office and read it over once.  I don't

17  really recall.  It wasn't printed out and brought

18  anywhere or anything like that, that I remember.

19       Q.   Did anyone approve the decision to arrest

20  Jerry Rogers for criminal defamation?

21       A.   At one point in time, when we were called

22  to brief the sheriff on where we were with the

23  investigation, we were in a meeting upstairs in the

24  conference room, and all the sheriff said was,

25  "Well, if he violated the law, then put it before a

judge," and I went back downstairs, and Chief
Culpeper called me and said, "Yeah, go ahead and
put it before the judge," and that's when I typed
the arrest form.

     Q.   So the meeting upstairs, was that in the
sheriff's office?

     A.   No.  It was in a conference room adjacent
to his office.

     Q.   Who else was present for that meeting?

     A.   I believe my rank structure all the way
up, I believe.  Myself, Lieutenant Hotard.  I
believe Captain Gaudet was there.  I believe, if my
memory serves me, Major Sharp was there, Chief
Culpeper.  I believe that was everybody in the
room, and then the sheriff came into the room.

     Q.   So before you filed the arrest affidavit,
was it the same day that you filed the arrest
affidavit?

     A.   Yeah.  I believe that meeting was.

     Q.   I'm looking at Exhibit A here.  The
arrest affidavit is dated September 16, 2019 at
11:25 AM.  Is that correct?

     A.   That's correct.

     Q.   So prior to 11:25 AM on September 16,
2019, you met with the sheriff, Culpeper, Hotard,

1    and possibly Gaudet and Sharp, correct?

2         A.    Yeah.  I know the captain was in the

3    meeting, Captain Gaudet was in the meeting.  The

4    only person I'm unsure of that was in the meeting

5    was Major Sharp, but I would assume -- I hate to

6    assume anything, but it would make sense that he

7    was there, because we were actually discussing the

8    potential arrest of a federal agent, which doesn't

9    happen every day in our parish, but it has happened

10   before.  That's why everybody kind of weighs in on

11   the case as far as -- and everybody has to be

12   informed up the rank structure, because we're

13   possibly going to arrest a federal agent.  Even

14   though it's for a misdemeanor, it's still an

15   arrest.

16        Q.    Okay.  So before 11:25 AM on September

17   16th, 2019, you met with Sheriff Smith, Captain

18   Gaudet, Hotard, Culpeper, and possibly Sharp in a

19   conference room adjacent to the sheriff's office,

20   correct?

21        A.    Correct.  We were there prior to the

22   sheriff coming in the room, yes.

23        Q.    At that meeting, it was discussed the

24   possibility of arresting Jerry Rogers for criminal

25   defamation, correct?

1    A.   Correct.   Moving forward to present it to

2  a judge, an affidavit to the judge, yep.

3    Q.   For what Jerry Rogers had written in

4  e-mails about Daniel Buckner in e-mails to the

5  member of the Krentel family, correct?

6    A.   Which we felt violated -- I felt which

7  violated the elements or at least some of the

8  elements, and I believe the required elements, in

9  the criminal defamation statute, yes, sir.

10    Q.   Okay.   The sheriff said if he had

11  violated -- if the elements of the criminal statute

12  had been met to go ahead and make the arrest; is

13  that correct?

14    A.   To draft a warrant and put it before a

15  judge, yes, sir. I think that's the only thing --

16  the only -- not I think.  I know that's the only

17  time that I recall meeting with the sheriff or

18  being in a meeting where the sheriff was there and

19  this case was discussed, that briefing.

20    Q.   So at that briefing, the sheriff approved

21  that if Jerry Rogers had met the elements of the

22  criminal statute, to put the arrest affidavit in

23  front of the judge and then arrest Jerry Rogers,

24  correct?

25    A.   Correct.

1      Q.   Did anyone at that meeting express a

2   different point of view or object to the arrest?

3      A.   I don't think anybody objected to any

4   arrest.  I think we discussed information we had

5   learned about a previous case that was ruled

6   unconstitutional by the state and that it -- apples

7   aren't apples.  I mean, it was not the same as the

8   case that we had.  It involved council members and

9   Facebook posts, that it was not in the context of

10  being in the middle of a homicide investigation,

11  and it wasn't the same kind of case.

12         From my understanding or from all our

13  understanding is that the law was not ruled

14  unconstitutional.  The application of that law was

15  ruled unconstitutional in that particular case, so,

16  yeah, that was discussed.  I don't know if the

17  sheriff was in the room when it was discussed.  It

18  might have been prior to him walking in, but we had

19  that discussion amongst ourselves.

20     Q.   So either before or after the sheriff

21  walked in, the group discussed the fact that the

22  criminal defamation statute had been declared

23  unconstitutional in some context; is that correct?

24     A.    In the application to that particular

25  case.  I believe it was from Livingston Parish,

```
 1   yes.  I don't know the specifics of that case.  I
 2   remember reviewing it to the fact that it wasn't
 3   the same as our case, and we wanted to put our case
 4   before a judge at that time.
 5        Q.   Okay.  I'm going to pull up Exhibit W at
 6   Page 3.  Do you see this case, McLin v. Ard here?
 7        A.   Yes, sir.
 8        Q.   You see that this is against Jason Ard in
 9   his official capacity as sheriff of Livingston
10   Parish?
11        A.   Yes.
12        Q.   Is this the case you are talking about?
13        A.   I believe that is the case I was
14   referring to out of Livingston Parish, yes, sir.
15        Q.   So at the meeting on September 16, 2019,
16   it was discussed that in this case, McLin v. Ard,
17   criminal defamation had been decided to be, at
18   least in that context, unconstitutional as applied
19   there, correct?
20        A.   Correct.
21        Q.   Was it discussed any other cases, any
22   Supreme Court or Louisiana Supreme Court cases?
23        A.   I believe that was the case that we were
24   referred to, that we were aware of, because of
25   prior -- a detective had some discussion with the
```

1    district attorney's office about a potential -- one

2    of his cases prior to all of this, and that

3    district attorney -- that ADA had provided that

4    case to that detective at the time, so we were

5    aware of that case.

6          Q.   At the September 16th meeting, in the

7    conference room adjacent to the sheriff's office,

8    did you discuss your meeting with the district

9    attorney's office?

10         A.   Well, I don't know.  I don't recall.  I

11   know we had talked about that case, and I believe

12   that is the same case that was referenced by the

13   district attorney, so it may have been, yeah, we

14   already know about that, and we don't feel that our

15   case mirrors that case, and the elements in our

16   case are different, vastly different from that

17   case.  So I don't think a lot of time was spent

18   like in-depth discussion.

19               At that point in time, we were there to

20   brief the sheriff on where we were at this point,

21   and we had come to an end of the investigation, and

22   this is where we were, and, basically, to brief him

23   on that, because, like I said, it involved a

24   federal agent.  Just like we would whenever we had

25   to investigate an FBI agent for domestic things or

1    -- which we have in the past, and any time we're

2    investigating another officer, whether it be

3    federal or local, the sheriff gets briefed on it.

4         Q.   You said the district attorney's office

5    pointed you to this case, McLin v. Ard, in the

6    context of Jerry Rogers, correct?

7         A.   When we had that meeting with the DA's

8    office, I believe his name is Matt Caplan.  He is

9    with the district attorney's office, and he does

10   research.  From what it appears, he does a lot of

11   their research.  I know -- I don't know if he tries

12   anything.  I think he is a research attorney, and

13   he brought up that case in that meeting.  We never

14   got a definitive answer from the district

15   attorney's office either way at that point in time.

16        Q.   So the district attorney's office at

17   least pointed you to that the arrest might be

18   unconstitutional because of this McLin v. Ard case.

19   Are saying they didn't give you a definitive

20   answer?

21        A.   They did not give us a definitive answer.

22   We gave them copies of what we had, some of the

23   e-mails and such.  It was Mr. Sims.  I don't know

24   if Mr. Dearing was there or not, but it was

25   Mr. Sims.  Definitely Matt Caplan came in the room.

59

```
1    I don't know if he stayed the whole time.  We was
2    in Mr. Sims' office.  It was a bunch of us, but we
3    left that meeting with he'll let us know.
4         Q.   Okay.  But just to answer the first part
5    of my question --
6         A.   I'm sorry.
7         Q.   It's okay.  The district attorney's
8    office pointed you to McLin v. Ard to suggest that
9    the arrest of Jerry Rogers under these facts might
10   be unconstitutional, correct?
11        A.   When you say pointed -- he pointed to it,
12   their contention was -- I won't say contention,
13   because they didn't come to a decision, but their
14   initial response to us was, well, you know, several
15   times Mr. Sims said that the statute was
16   unconstitutional, and I had -- I actually stopped
17   him and said -- and asked for clarification, and
18   said, "Well, Mr. Sims, you are referring" -- I
19   said, "Collin, are you referring the application as
20   to that case, correct?" And he corrected himself.
21   He says, "Yes.  As to this case, it was ruled
22   unconstitutional," because it had not been repealed
23   at that time.  It was still in the law book. That's
24   -- I think that is what I wanted to get.  If any
25   clarification came in that meeting, it was to me
```

1    when we said, "Yeah, that's the same case that

2    Mr. Sims was talking about in his office," we had

3    already talked to him about that in the office, and

4    had that, I guess, that clarity as far as the law

5    is not unconstitutional.  It was unconstitutional

6    through this application in this case.

7              Mr. Sims did clear that up for us.  I

8    thought that's what it was, but he was able to

9    clear that up at least personally for me to know

10   that I'm not chasing an unconstitutional law that

11   -- just act and don't have the repeal under it, you

12   know.  So when we say discussed, it wasn't like a

13   long, drawn-out discussion about every sentence of

14   this case.

15        Q.   But you understood that the case McLin v.

16   Ard held that it was unconstitutional for the

17   Livingston Parish Sheriff's Office to arrest McLin

18   in that context under the criminal defamation

19   statute, correct?

20        A.   Correct.

21        Q.   What made the arrest, the potential

22   arrest, of Jerry Rogers different than the arrest

23   of Mr. McLin?

24        A.   If I remember correctly, the case in

25   Livingston Parish was more Facebook, Facebook posts

1    any discussions you had with a lawyer, can you --

2    did you consult with a lawyer, other than lawyers

3    at the DA's office, about arresting Jerry Rogers?

4         A.   No.  I don't believe.  Me personally, no.

5         Q.   Without telling me the contents of any

6    conversations, do you know if anyone else consulted

7    a lawyer about the possibility of arresting Jerry

8    Rogers other than the DA's office?

9         A.   I don't know.

10        Q.   So the DA's office, to your knowledge,

11   was the only lawyers consulted about the

12   possibility of arresting Jerry Rogers before it

13   happened, correct?

14        A.   Correct.  At the time of that meeting, we

15   were aware that his wife was employed by the

16   district attorney's office, also.

17        Q.   So speaking of Jerry Rogers' wife, you

18   contacted her during this investigation, correct?

19        A.   Correct. I did.

20        Q.   Why did you do that?

21        A.   Initially, if I remember correctly, one

22   of the phone numbers was -- it was her phone number

23   attached to one of the e-mail accounts.  It was a

24   very brief meeting in which I just understood that

25   she didn't want to have an interview with us, and

1    that was it.  It was in a witness room in the

2    courthouse.

3         Q.   So you went to the courthouse and asked

4    her to join you in a witness room to interview her?

5         A.   Yeah.  I actually spoke initially with --

6    I don't know if it was with Collin or Bruce Dearing

7    just to see if, you know, they could speak to her

8    first to let her know that we wanted to talk with

9    her, and because she was working at the time.  We

10   definitely didn't want to do it in their office, if

11   we were going to have any kind of conversation.

12           So I think she met me in a witness room

13   in the hallway of the courthouse.  I very briefly

14   introduced myself.  I explained to her I understood

15   why she wouldn't want to talk to us, and at that

16   time, Brian Trainor was representing her husband.

17   I said, "You might want to speak to Brian about it.

18   Just let us know if you want to talk to us," and

19   that was it.

20        Q.   Okay.  So September 2019.  This was

21   shortly before the sheriff's re-election, correct?

22        A.   Yes.  I'm sorry.  Yeah.  I was trying to

23   run dates in my head, yes.

24        Q.   There was an election in October and then

25   a run-off in November of 2019?

1      A.    Yes, sir.

2      Q.    Did you understand Jerry Rogers to be

3  affiliated with any of the candidates or supporting

4  any of the candidates in that race?

5      A.    Initially, no, until I saw some of the

6  e-mails he had corresponded with Mr. Lentz and with

7  Mr. Tranchina.

8      Q.    So when you say you saw the e-mails,

9  there was a search warrant for the e-mail account

10  that Mr. Rogers was using, and you saw the e-mails

11  that were obtained from that search warrant,

12  correct?

13      A.    Right.  It was under a false name.

14  Justicenanette, I believe, yes.

15      Q.    Included in those e-mails were

16  correspondence to and from the sheriff's opponents

17  in that race, correct?

18      A.    Yeah.  I don't remember exactly what was

19  in them, but he communicated with Mr. Lentz, and he

20  communicated with Mr. Tranchina.  He didn't

21  communicate with our sheriff.  It just looked like

22  he was involving himself in communicating with all

23  parties involved in addition to extending the

24  family information.

25      Q.    So what did you do when you saw that

```
 1        Q.   But when you were familiar with them, it
 2   typically involved a strip search?
 3        A.   At some point in time I believe.  Again,
 4   the jail end of the business, at this agency, I've
 5   never -- I've been on the enforcement side.
 6        Q.   Mr. Rogers was being accused of a
 7   misdemeanor, correct?
 8        A.   Correct.
 9        Q.   And so a misdemeanor can be handled
10   either by issuing someone a summons, which doesn't
11   require actually physically bringing them to the
12   jail and booking them, or you can physically arrest
13   them, bring them to the jail and book them,
14   correct?
15        A.   Correct.
16        Q.   Mr. Rogers was not issued a summons.  He
17   was physically arrested and brought to the jail,
18   correct?
19        A.   Correct.
20        Q.   And do you know why that was?
21        A.   We -- I don't want to say we. I came to
22   the decision that just two weeks prior, he had a
23   confrontation with -- had an incident in Monroe
24   Parish where he attempted suicide by police, and I
25   was concerned that any advance notice to his
```

```
 1   via a misdemeanor summons or arrest, correct.
 2        Q.   So could you have done -- sent three
 3   officers to do a surprise service of a summons?
 4        A.   You are asking me what I could have done
 5   or what I couldn't have done.  I'm not dealing in
 6   hypotheticals.  I did what I did.
 7        Q.   Respectfully, Captain, you are answering
 8   the questions, right.  I can ask even these
 9   hypotheticals.  I'm just trying to understand your
10   decision-making process, right.  You were deciding
11   between sending people to arrest him or sending
12   people to serve him a summons, right?
13        A.   Correct.
14        Q.   And you decided to send people to arrest
15   him, correct?
16        A.   I decided to send people to arrest him,
17   correct.
18        Q.   I guess what I'm confused about is why
19   couldn't you have just sent three officers to
20   surprise him, serve him with a summons?  I don't
21   understand why he needed to be arrested and booked
22   as part of that as well.
23        A.   He violated the misdemeanor offense.
24   What we did was not a policy.  It was not -- he
25   violated a misdemeanor offense, and he was arrested
```

1    Q.   Were you consulted by anyone in the

2    preparation of that press release?  I mean, they

3    had to get the information from somewhere, right?

4    A.   Yeah.  I don't know if Captain Lee --

5    sometimes he -- at the time, Captain Lee was a PIO,

6    if I'm not mistaken.  Sometimes they ask us for a

7    copy of our affidavit so they can surmise or a

8    brief on the case.  Whatever he would have

9    requested I would have gave to him.  I don't recall

10   in this particular matter what he requested.

11       Q.   Had you ever seen a press release about

12   an arrest that went out before the person was even

13   booked?

14       A.   No.  None that I can remember.  Not that

15   I know of. You mean post-arrest, prior to the

16   booking process? I don't know.

17       Q.   That seems really fast to me that a press

18   release would be out before someone was even

19   booked.  Would that surprise you as well?

20       A.   I wouldn't say surprised.  Sometimes that

21   happens.  We have people who go to the hospital.

22   We have people that aren't booked immediately in

23   the booking process.  I really don't have a, I

24   guess, a knowledgeable opinion on that.

25       Q.   I'm going to pull up Exhibit L.  Do you

1    see that this is -- looking at Page 3.  Do you see

2    that this is the narrative of the arrest of Jerry

3    Rogers?

4         A.   Yes.

5         Q.   You see it says at approximately 1433

6    hours, they arrested Jerry Rogers?  Is that

7    correct?

8         A.   It looks that way from the report, yes,

9    sir.

10        Q.   So that would be 2:33 in the afternoon is

11   the approximate time of Jerry Rogers' arrest?

12        A.   Yes, sir.

13        Q.   Now, pulling up Exhibit T, do you see

14   this is the press release regarding the arrest of

15   Jerry Rogers?

16        A.   I do.

17        Q.   You see this came out at 2:48 PM, so

18   approximately 15 minutes after the arrest of Jerry

19   Rogers?

20        A.   Yes, sir.

21        Q.   That seems incredibly fast to me.  Have

22   you ever seen a press release issued so quickly

23   upon someone's arrest?

24        A.   As I said before, I don't really notice

25   those types of things in investigations.  I'm on

1    the other side of it.

2        Q.   Does it surprise you that there was a

3    press release ready and published approximately 15

4    minutes after the arrest of Jerry Rogers?

5        A.   No.  I wouldn't say surprised in any

6    case, not just this one.

7        Q.   How many times in your career, after you

8    have sought the arrest of someone, how often have

9    you then reported them to their employer?

10       A.   Only in cases involving law enforcement.

11       Q.   And you did that with Jerry Rogers,

12   correct?

13       A.   We did.  I did.

14       Q.   Do you do that every time you have an

15   arrest involving a member of law enforcement?

16       A.   Yes, sir.  Or me personally, yeah.  I've

17   only arrested one other police officer.  I've

18   investigated a couple and have at the request of

19   their agencies, so they already knew about it, but,

20   yeah, if we arrest a LEO of any variety, federal,

21   state, local, we have to inform the agency.

22       Q.   Is there a difference between informing

23   the agency of their arrest and filing a formal

24   complaint about that person's conduct?

25       A.   Yeah.  I would believe there is a

 1   difference.

 2       Q.   So it is policy that every time you

 3   arrest a law enforcement officer you have to inform

 4   their agency; is that right?

 5       A.   I'm unsure if it's policy.  I know it's

 6   been practice ever since I've been involved in

 7   these types of investigations.

 8       Q.   So it's at least your practice to inform

 9   the agency if you arrest a law enforcement officer,

10   correct?

11       A.   Correct.

12       Q.   Is it your practice to also file a formal

13   complaint about that officer each time if you

14   arrest a law enforcement officer?

15       A.   No, no.  It's not policy or practice.

16   It's a case-by-case issue, and if you're asking --

17   if we're going to go to the point where you are

18   asking me why did we do that, because Mr. Rogers

19   injected himself as a federal agent anonymously

20   into a homicide investigation.  So we did think his

21   actions, by doing that, warranted a formal

22   complaint to his department.

23       Q.   Have you ever filed a formal complaint

24   about any other law enforcement officer?

25       A.   Not that I know of.  No, sir.  Not that I

1      Q.   It was forwarded to you, and you under-

2  stood it to be an indication that it could be

3  unconstitutional to arrest someone for criminal

4  defamation, and so you needed to look and see if

5  the circumstances here are constitutional or

6  unconstitutional; is that correct?

7      A.   I wanted to see if the circumstances of

8  that case were the same as the circumstances of our

9  case.

10     Q.   Right, because you understood that in

11  some circumstances it's unconstitutional to arrest

12  someone for criminal defamation in Louisiana,

13  correct?

14     A.   At least in that one, particular one,

15  yeah, as to that case.

16     Q.   Now I am pulling up Exhibit Z-A, which is

17  what you've got in front of you.  These are the

18  three cases that you had someone pull prior?

19     A.   Yeah.  I'm familiar with what you are

20  showing me.

21     Q.   These are pulled from St. Tammany Parish

22  Sheriff's Office RMS system and the Clerk of Court

23  system, correct?

24     A.   Correct.

25     Q.   Did you have access to these systems in

can enforce and what we can't enforce, yes, if that
answers your question.

     Q.    That was my question so thank you.

     A.    And it's a case-by-case basis, to my
understanding.

     Q.    I am pulling up -- you said you looked at
the crux of McLin v. Ard.  Looking at Page 16 here,
do you see this first sentence on Page 16 of this
Exhibit W? Do you see this first sentence here?

     A.    I do.

     Q.    It says, "In Garrison v. Louisiana, the
Supreme Court held that the Louisiana criminal
defamation statute, LA Stat 14:47, is
unconstitutional in the context of criticism of the
official conduct of public officials."  Do you see
that part?

     A.    Yes, I do.

     Q.    Is that part of the crux that you
reviewed when you read McLin v. Ard?

     A.    I was aware of that, yes, sir. That was
discussed, also, at the district attorney's office.

     Q.    This part of McLin v. Ard was discussed
at the district attorney's office?

     A.    The feeling that a police officer is a
public official.  At the time, they, meaning the

1    DA's office, could not cite any rule or order by

2    any court deeming a police officer as a public

3    official.  In this case, they -- I take it as a

4    public official they're speaking of were the three

5    councilmen, not the police officer who made the

6    arrest, or not the police officer.  That's what I

7    understood by this statute then and up until now.

8         Q.   You think it is unconstitutional to

9    arrest someone for criticizing the official conduct

10   of council members?

11        A.   No.  The official -- if they're an

12   elected public official.  I mean, in this day and

13   age of social media and things like that, correct.

14   That's what I felt, that that is what this ruling

15   was regarding.

16        Q.   You think it is constitutional to arrest

17   someone for criminal defamation for their criticism

18   of the official conduct of police officers?

19        A.   The official conduct?  What do you mean?

20   If they proved to have done wrong? Now, in this

21   state, it's not constitutional to arrest anybody

22   for defamation, because it's been repealed, so I

23   can only enforce the laws on the books when they're

24   on the books, and they're not on the books anymore.

25        Q.   Yeah.  I understand.

1      A.    That's my feeling.  My feeling is

2  whatever the law tells me to do is what I'll do,

3  because that's what I've done my whole career is

4  follow the law.

5      Q.    Right.  You understand that the law in

6  2019 was that it was unconstitutional to arrest a

7  person in the context of criticism of the official

8  conduct of public officials like council members,

9  right?  That was your understanding in 2019?

10     A.    That was my understanding of this

11 particular case.  That's why I had the -- that's

12 why we felt that it was comparing apples to oranges

13 and not apples to apples.  The cases were

14 different.

15     Q.    Because it was comparing council members

16 to police officers?

17     A.    Elected officials to police officers,

18 yes, sir.

19     Q.    I'm pulling up Exhibit Y at Page 24.

20 These are discovery responses that were provided in

21 this case.  Do you see that this refers here, sort

22 of the middle of the page, a meeting involving --

23 the first meeting says that meeting included not

24 only the sheriff but Detective Canizaro, Lieutenant

25 Hotard, Major Sharp, Steven Gaudet, Culpeper.  Is

```
1   that the meeting upstairs in the conference room
2   adjacent to the sheriff's office that you were
3   describing earlier?
4        A.   I believe so.  That was the same people
5   that were there.
6        Q.   Then the next sentence talks about one or
7   more sheriff's office employees, including
8   Detective Canizaro, discussed the Rogers
9   investigation with members of the DA's office.
10  That is the DA's office you were talking about?
11       A.   Yes, sir.
12       Q.   I want to talk a little bit more about
13  that meeting.  So you physically went to the DA's
14  office for that meeting; is that correct?
15       A.   Yes, sir.
16       Q.   And that was September -- let's see.
17  September 13th, 2019?
18       A.   That sounds correct.
19       Q.   So about three days before the arrest of
20  Jerry Rogers, you went physically to the DA's
21  office?
22       A.   Yes, sir.
23       Q.   And who was present at that meeting?
24       A.   To the best of my recollection, it was
25  myself, Lieutenant Hotard, Captain Gaudet.  I do
```

1    not know if Major Sharp was there or not.  He may

2    or may not have been.  I don't remember

3    specifically, and Chief Culpeper.  Then some of the

4    district attorneys.  Again, I'm not sure if

5    Mr. Sims was there.  I know Mr. Caplan was there.

6    I don't know if he was there the entire time, and I

7    believe Mr. Dearing was there, also, but I'm not

8    totally sure.

9         Q.   At that meeting, it was discussed the

10   possibility of arresting Jerry Rogers for criminal

11   defamation, right?

12        A.   Yes.  We brought them the documents, the

13   e-mails.  We provided them with copies of e-mails

14   and things of that nature, and, basically, briefed

15   them on where we were in the investigation.

16        Q.   I assume you don't do that for every

17   investigation.  Was there something special about

18   the Jerry Rogers investigation that made you want

19   to brief the DA's office in advance of an arrest?

20        A.   We don't do it with every investigation.

21   We do, however, consult with the DA's office on a

22   number of investigations.  They usually never

23   provide us with a definite answer, but we ask for

24   their input sometimes.  Sometimes we agree with

25   them and sometimes we don't.  That is not uncommon.

1  However, this case being a misdemeanor, albeit a

2  misdemeanor, involved the arrest of -- or a

3  potential arrest for violation by a federal

4  officer.  I believe that's why -- I don't know who

5  made the decision that we go meet with them.  I was

6  just told that we were meeting with them.

7      Q.  You had already received McLin v. Ard and

8  reviewed it prior to this meeting, correct?

9      A.  Correct.  We were familiar with it.  I

10  didn't know it chapter and verse, but we were

11  familiar with the issues that that case had, and we

12  had already felt that it differed from our case,

13  correct.

14      Q.  Was the fact that this statute had been

15  declared unconstitutional in some context part of

16  the reason to go to the DA's office to consult?

17      A.  I don't know.  I was just told to go to

18  the meeting.

19      Q.  At that meeting, if I heard you

20  correctly, an attorney from the DA's office pointed

21  out that this law was unconstitutional, and you

22  remind them unconstitutional in some context,

23  correct?

24      A.  Mr. Sims referred to the law as being

25  unconstitutional several times, and then I asked

 1   him, as a bit of clarification, "You keep saying

 2   it's unconstitutional.  Do you mean it's

 3   unconstitutional as to the application in that

 4   case?"  And he said, "Yes, the application for that

 5   case."

 6        Q.   Did he say anything about the application

 7   to Jerry Rogers?

 8        A.   Mr. Caplan was unsure or felt that a

 9   public official was a police officer.  That's what

10   he felt.  He was unsure of it.  That's why we never

11   left there with an answer.  They said -- I don't

12   remember the exact words, but we'll get back to

13   y'all.

14        Q.   So an attorney from the DA's office

15   expressed that they felt that a public official

16   included a police officer but didn't give you a

17   definitive answer and said they would get back to

18   you; is that correct?

19        A.   Basically, yes.

20        Q.   Do you know if the DA's office ever got

21   back to anyone at the sheriff's office?

22        A.   I didn't know at the time, but I know now

23   that a phone call was placed at a much later date

24   or at a later date.  I don't know whether it was

25   with an answer or whether it was anything.

1    for the bail, for his posting bail, release bail.

2    That's how it was explained to me by the AG's

3    office, release of bail.

4        Q.   So we can look at -- this is Exhibit D.

5    You see that this is the minutes of a preliminary

6    hearing?

7        A.   I do.

8        Q.   Do you see it says the Court finding no

9    probable cause?

10       A.   It says, "Defendant relieved of his bond

11   obligation."  That's what was explained to me, that

12   it was his bond obligation.

13       Q.   Because the Court found there was no

14   probable cause for his arrest, correct?

15       A.   Correct.  No. Strike that last correct,

16   because I don't know if that's, in fact, what

17   happened here at this hearing.  That's not how it

18   was presented to me by the AG's office.  The AG's

19   office did not say that the case was in any way,

20   shape, or form dismissed at that time, that they

21   would not carry forward.

22       Q.   So you're talking about a conversation

23   with the DA's office?

24       A.   No.  The attorney general's office.

25       Q.   I'm sorry.

1            know who is the authority.  Obviously,

2            the U.S. Supreme Court is, but, yes,

3            they would be a credible source. I

4            guess.  Short answer, yes.

5    BY MR. MOST:

6        Q.   Do you see here at the last sentence of

7    this declination of charges, Exhibit E, "Because

8    the alleged conduct under these specific facts

9    involved statements aimed at a public official

10   performing public duties, this office is precluded

11   by law from moving forward with any criminal

12   action?"

13       A.   Correct.  I see it.

14       Q.   So they're saying they can't move forward

15   because it wouldn't be constitutional to prosecute

16   Jerry Rogers for criminal defamation, right?

17       A.   It differs from what Mr. Magee told me

18   personally, myself, and the lieutenant.

19       Q.   But that is what this is saying, right?

20       A.   That is what that -- Yes, sir.

21       Q.   So before you arrested Mr. Rogers, you

22   met with the DA's office.  They raised the

23   potential unconstitutionality of the arrest; is

24   that fair to say?

25       A.   Yes.

1        Q.    And then after the arrest, the AG's

2    office said they would be precluded from moving

3    forward with any prosecution of Mr. Rogers,

4    correct?

5        A.    That is what it says in the declination

6    of charges, yes.

7        Q.    You still feel like you were right to

8    arrest Mr. Rogers for criminal defamation?

9        A.    I don't judge right and wrong.  I know

10   that I acted under the cover of law.  I know that I

11   carried out my duties as a law enforcement officer,

12   and I applied the elements -- applied the facts to

13   the elements of the crime and made a lawful arrest

14   or authored a lawful warrant, reviewed by a judge,

15   and signed by a judge, and there were no inaccurate

16   statements in the application for the warrant, and

17   the judge signed it.  That's what I know.

18       Q.    Knowing what you know now, would you

19   still have arrested Jerry Rogers for criminal

20   defamation?

21       A.    Knowing the law is no longer valid. I

22   mean, the law has been repealed, so, no, I wouldn't

23   because of that.

24       Q.    Setting aside the repeal of the law,

25   knowing what you know now, would you still have

```
 1   arrested Jerry Rogers for criminal defamation?
 2              MR. COLLINGS:
 3                   Object to the form of the question.
 4   BY MR. MOST:
 5        Q.   You can answer.
 6        A.   Yes, sir.
 7        Q.   Setting aside the repeal of the law,
 8   would you do anything differently knowing what you
 9   know now with regard to Jerry Rogers?
10              MR. COLLINGS:
11                   Object to the form.  Answer, if you
12           can.
13              THE WITNESS:
14                   I don't know.
15   BY MR. MOST:
16        Q.   You don't know if you would do anything
17   differently?
18        A.   I don't know if I would have done
19   anything differently, correct, because I can't see
20   into the future to know what is going to happen in
21   the future, yes.  So, no, I don't know if I would
22   have done anything differently.
23        Q.   I'm going to pull back up Exhibit U
24   again.  You see this is the FBI file?
25        A.   Yes.
```

```
 1         Q.   Did you make the judge aware that you had
 2    consulted with the DA's office, and they raised
 3    concerns about the constitutionality of the arrest?
 4         A.   No, I did not.
 5         Q.   Do you think you should have made the
 6    judge aware of that?
 7         A.   I can't answer that.
 8              MR. MOST:
 9                   We are, I think, getting close to
10                the end here.  I'm going to take five
11                and review my notes and see if there is
12                anything I've missed.  I may have some
13                questions, and then if Mr. Collings
14                would like to ask follow-up questions,
15                he is welcome to.  Let's take five and
16                reconvene at 12:25.  All right.
17              THE WITNESS:
18                   Thank you.
19                   {BRIF RECESS, 12:20-12:25}
20    BY MR. MOST:
21         Q.   I have just a couple more questions.
22    It's not going to take long I don't think.  So the
23    document that we received here, which is labeled as
24    Z-A, this is -- what is in front of you here is the
25    State v. Baudot case.
```

1    going to move forward and put it before a judge.  I
2    think that's what I was trying to relay to Mr. Sims
3    at the time, because he asked me.  I saw him in the
4    DA's office on an unrelated issue in Major Crimes.
5    He said, "Man, y'all" -- something to the effect of
6    "Man, y'all made the arrest anyway," and I think I
7    was trying to explain to him it wasn't like
8    everybody said at one time, let's go arrest Jerry
9    Rogers.  That's not what I was trying to convey to
10   him as far as the timing.  I don't remember saying
11   timing.  I did have that conversation with him,
12   yes.  It was just a one sentence, and Collin just
13   dropped it.  That was kind of at the end.
14        Q.   I don't totally understand. You said
15   something -- it wasn't my decision to something.
16   Maybe not the timing?
17        A.   It wasn't -- meaning it wasn't my
18   decision on when we were going to move forward with
19   putting it in front of the judge, meaning my mind
20   only.  We had a meeting with everyone, briefed the
21   sheriff.  The sheriff said move forward.  I think
22   that's what I was referring to when I said that.
23        Q.   You are saying it wasn't me alone making
24   the --
25        A.   It wasn't totally my decision to do this.