```
 1          political opponents?
 2    A.    We didn't know that at the time.  We
 3          thought actually it was somebody possibly
 4          within our agency.  We had received a
 5          complaint from one of the Krentel family
 6          members, and they were very concerned about
 7          the information being shared, because I
 8          believe they were receiving the same
 9          information, and we -- we thought it was
10          somebody internal or somebody who was
11          involved in the investigation inhouse at
12          the Sheriff's Office.
13    Q.    Okay.  So there was an anonymous email
14          address.  Your office conducted criminal
15          search warrants to obtain the emails,
16          correct?
17    A.    That's correct.
18    Q.    And that criminal search warrant revealed
19          that it was Jerry Rogers who was sending
20          those emails, correct?
21    A.    That's from what I understand being briefed
22          on the investigation, yes.
23    Q.    Okay, and that criminal search warrant also
24          turned up emails to and from your political
25          opponents in the race, correct?
```

| | | |
|---|---|---|
| 1 | Q. | It arrested him for criminal defamation |
| 2 | | because of what he said about Detective |
| 3 | | Daniel Buckner, correct? |
| 4 | A. | Yes, sir, and again, that was after the |
| 5 | | investigation was conducted and concluded |
| 6 | | that enough probable cause initiated for an |
| 7 | | arrest warrant. |
| 8 | Q. | And Jerry Rogers was arrested for what he |
| 9 | | said about Daniel Buckner about how Daniel |
| 10 | | Buckner was handling the investigation into |
| 11 | | the death of Nanette Krentel, correct? |
| 12 | A. | Yes, sir. It's a very high profile |
| 13 | | homicide investigation, and we were going |
| 14 | | to follow up or we followed up on every |
| 15 | | lead. Anybody that knew anything about the |
| 16 | | case, we were following up on, and this |
| 17 | | individual who we didn't identify at the |
| 18 | | time was saying a lot of things that we |
| 19 | | didn't even have in -- in our |
| 20 | | investigation. So we had to verify whether |
| 21 | | the credibility of -- of these accusations |
| 22 | | or whether we were doing it right or what |
| 23 | | we were doing wrong. |
| 24 | Q. | All right, and do you know of any other |
| 25 | | times that your -- the Sheriff's Office has |

1       against you, yes.
2 Q.  Okay, and how do you know what criminal
3       defamation is?
4 A.  I'm just going -- going back in memory, but
5       never have studied the charge or studied
6       the language, but just again, based on the
7       -- based on the civil and criminal aspects,
8       it's intentional depriving or -- the
9       intentional credibility issue with someone
10      or using false statements or false
11      accusations against someone.
12 Q. Okay. So what I'm trying to figure out --
13 A. But I guess really is I don't know the --
14      the actual, you know, legal definition of
15      defamation in this. I know there's a civil
16      and a criminal.
17 Q. Understand. So sometime after Jerry
18      Rogers' arrest, did you read the criminal
19      defamation statute?
20 A. I have not, no, sir.
21 Q. Prior to Jerry Rogers' arrest, and I don't
22      want to know the contents of any
23      communications with an attorney, but prior
24      to Jerry Rogers' arrest, did you consult
25      with a lawyer about criminal defamation or

```
1        to you?
2   A.   Yes, sir.
3   Q.   Okay.  Was arresting Jerry Rogers for
4        criminal defamation very important to you?
5   A.   As well, yes.
6   Q.   The second part of that quote says, "He
7        wants to move on this."  Do you see that
8        that is referring to the Sheriff?
9   A.   I assume it's -- it means me.
10  Q.   Okay.  Do you recall directing anyone to
11       move on the arrest of Jerry Rogers?
12  A.   Not to move on it.  To take the advice of
13       the investigations and Chief Culpeper to
14       move forward of getting the warrant signed,
15       yes.
16  Q.   Okay.
17  A.   But I don't remember telling anybody that I
18       want to move on this.
19  Q.   Okay.  You don't recall using those words
20       verbatim?
21  A.   I do not, no, sir.
22  Q.   Okay.  Okay.  I'm turning to Page 35 of
23       this PDF, "Exhibit U."  Were you aware that
24       after the arrest of Jerry Rogers a formal
25       complaint was made to his employer?
```

```
 1   A.   I did not know that, no, sir.
 2   Q.   Okay.  Do you know that -- you didn't know
 3        it at the time or -- or you don't know it
 4        today or both?
 5   A.   Both.  I didn't -- I wasn't aware of a
 6        complaint filed with his place of work, no,
 7        sir.
 8   Q.   Is it typical for the Sheriff's Office to
 9        file a complaint with someone's employer
10        after they arrest someone?
11   A.   Not necessarily, no.
12   Q.   Okay.  Have you ever known that to be -- to
13        happen at all?
14   A.   Not that I'm aware of, no, sir.
15   Q.   Okay.  So you don't know of any time anyone
16        from the Sheriff's Office has after an
17        arrest then filed a formal complaint with
18        the arrestee's employer, agreed?
19   A.   Agreed.
20   Q.   So it would be unusual to your knowledge if
21        -- if that were to have happened with Jerry
22        Rogers, agreed?
23   A.   Not necessarily.  I mean, because of his
24        position with HUD, I would -- wouldn't say
25        it's not unusual to let them know that he
```

```
 1        surrounding the constitutionality of
 2        criminal defamation arrests in some
 3        applications, agreed?
 4   A.   Agreed.
 5   Q.   Okay.  Were you aware of that prior to the
 6        arrest of Jerry Rogers?
 7   A.   Yes.
 8   Q.   Okay.  So at some point prior to the arrest
 9        of Jerry Rogers someone raised with you the
10        fact that criminal defamation is
11        unconstitutional in some applications,
12        correct?
13   A.   Yeah, from what I remember unconstitutional
14        --
15   Q.   Right.
16   A.   -- as it relates to a public -- any public
17        expressions -- public expressions about a
18        public official, and I'm the public
19        official, not the detective who was
20        assigned, the lead detective in the Krentel
21        case.
22   Q.   Okay.  So who discussed with you the
23        potential unconstitutionality of criminal
24        defamation in some context?  Was that
25        Culpeper?
```

1  A.   Yes, sir.
2  Q.   Okay.  Anybody else?
3  A.   No, sir.
4  Q.   Did he -- did he articulate the -- the con
5       -- the specific context in which criminal
6       defamation would be unconstitutional?
7  A.   No, sir.
8  Q.   Okay.
9  A.   The only -- the only other information that
10      I had in a letter form was from Collin Sims
11      at the DA's Office, which was around two or
12      three days after the arrest of Mr. Rogers,
13      and basically Mr. Sims wrote a letter
14      deferring the case to the AG's Office,
15      recusing themselves from prosecuting the
16      case.  It also stipulated in his letter
17      that -- that he felt that there's a --
18      there's a possibility it was
19      unconstitutional, the arrest.
20 Q.   Okay, and in the sense --
21 A.   That's -- that's where I learned that there
22      -- there was a -- a possibility of this
23      being a con -- an unconstitutional issue.
24 Q.   Okay.  So you learned about it, the
25      potential unconstitutionality from Danny

```
 1            an arrest warrant, they have to include all
 2            relevant facts, correct?
 3      A.    Yes.
 4      Q.    Okay, and if -- and if the DA's Office had
 5            been consulted and suggested that a charge
 6            might be unconstitutional with regard to a
 7            particular person, is that the kind of
 8            thing that should be included in an
 9            Affidavit in support of an arrest warrant?
10      A.    Absolutely, if -- if it occurred, I would
11            say yes.
12      Q.    Okay, and then do you know what the AG's
13            Office expressed with regard to prosecution
14            of Jerry Rogers?
15      A.    Repeat the question.
16      Q.    Sure.  So the DA's Office recused itself.
17            It went up to the AG, right?
18      A.    Yes, sir.
19      Q.    Okay.  Do you know what the Attorney
20            General's Office expressed with regard to
21            the prosecution of Jerry Rogers?
22      A.    They dismissed the case from what I
23            remember.
24      Q.    Okay.  I'm going to pull up "Exhibit E"
25            here.  Do you see that this is the
```

1       incorrect about that?
2  A.   It's their opinion.
3  Q.   Right, but do you agree with their opinion?
4              MR. COLLINGS:
5                  Object to the form.  Calls for a
6           legal conclusion.
7              THE WITNESS:
8                  Yeah, I don't know.
9  BY MR. MOST:
10 Q.   Okay.
11 A.   I'm not a lawyer.
12 Q.   Okay.  So you have now subsequent to the
13      arrest of Jerry Rogers received some
14      correspondence from the DA's Office, from
15      the Attorney General's Office.  Knowing
16      what you know now if presented with the
17      same facts with regard to Jerry Rogers,
18      would you still arrest him for criminal
19      defamation?
20             MR. COLLINGS:
21                 Object to the form.
22             THE WITNESS:
23                 Yes, I would.  I -- again, it
24          wasn't like we didn't do an
25          investigation, develop probable

Case 2:20-cv-00517-JTM-DMD Document 158-7 Filed 01/10/22 Page 10 of 10

81

```
1              cause, identify who the fictitious
2              emails were being sent from or why.
3              We did uncover that during our
4              investigation, and again, we
5              obtained an arrest warrant for Mr.
6              Rogers and -- and again, based on
7              the totality of -- of the
8              circumstances and the information
9              and evidence that we uncovered, yes.
10   BY MR. MOST:
11   Q.   Okay.  So going back to the fall of 2019,
12        you were running for re-election, and the
13        election was to be held in October of 2019,
14        right?
15   A.   Yes, sir.
16   Q.   Okay, and would you say you were under
17        political pressure because of the Sheriff's
18        Office, the fact that the Sheriff's Office
19        had not yet solved the Nanette Krentel
20        murder?
21   A.   Yes, I do agree with that.
22   Q.   Okay.  In fact, prior to Jerry Rogers, the
23        Sheriff's Office had made no arrests
24        connected to the Nanette -- Nanette Krentel
25        death at all, correct?
```

(504)488-1112