UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


JERRY ROGERS, JR.                CIVIL ACTION NO. 20-517
        Plaintiff

VERSUS                           JUDGE MILAZZO

SHERIFF RANDY SMITH,               MAG. JUDGE DOUGLAS
DANNY CULPEPER, AND
KEITH CANIZARO
        Defendants


        DEPOSITION OF SHERIFF RANDALL CARTER

SMITH, given in the above-entitled cause via

Zoom Videoconferencing, pursuant to the

following stipulation, before Raynel E. Schule,

Certified Shorthand Reporter in and for the

State of Louisiana, commencing at 10:00 o'clock

a.m., on Tuesday, the 30th day of November,

2021.

EXHIBIT A

1                       I N D E X

2                                       Page

3    Caption                            1

4    Appearances                        3

5    Agreement of Counsel               4

6    Examination

7         MR. MOST                      6

8    Reporter's Certificate            87

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1    APPEARANCES (Via Videoconferencing):

2

     For the Plaintiff:
3
     LAW OFFICES OF WILLIAM MOST
4    Attorneys at Law
     BY:  WILLIAM MOST, ESQ.
5         HOPE PHELPS, ESQ.
     201 St. Charles Avenue, Suite 114#101
6    New Orleans, Louisiana   70170

7
     For the Defendants:
8
     MESSRS. MILLING, BENSON, WOODWARD, L.L.P.
9    Attorneys at Law
     BY:  CHADWICK W. COLLINGS, ESQ.
10   68031 Capital Trace Row
     Mandeville, Louisiana   70471
11

12   Also Present:  Jerry Rogers

13
     Reported By:  Raynel E. Schule
14                 Certified Shorthand Reporter
                   State of Louisiana
15

16

17

18

19

20

21

22

23

24

25
```

S T I P U L A T I O N

1                S T I P U L A T I O N

2          It is stipulated and agreed by and

3  among Counsel for the parties hereto that the

4  deposition of SHERIFF RANDALL CARTER SMITH is

5  hereby being taken pursuant to the Federal Rules

6  of Civil Procedure for all purposes in

7  accordance with law;

8          That the formalities of reading and

9  signing are not specifically waived;

10          That the formalities of sealing,

11  certification, and filing are hereby

12  specifically waived.

13          That all objections, save those as to

14  the form of the question and responsiveness of

15  the answer, are hereby reserved until such time

16  as this deposition or any part thereof is used

17  or sought to be used in evidence.

18                * * * * *

19          Raynel E. Schule, Certified

20  Shorthand Reporter in and for the State of

21  Louisiana, officiated in administering the oath

22  to the witness.

23

24

25

                      PROCEEDINGS

1              THE COURT REPORTER:

2              Would counsel please identify

3         themselves and their affiliations

4         and also stipulate that by agreement

5         of all parties this deposition is

6         being held via videoconferencing,

7         and there is no objection to the

8         witness being sworn in remotely.

9              MR. MOST:

10             This is William Most on behalf of

11        Plaintiff Jerry Rogers, and we so

12        stipulate.

13             MR. COLLINGS:

14             This is Chadwick Collings on

15        behalf of Defendants.  We agree.

16             THE COURT REPORTER:

17             I have no au -- I have no video

18        of Mr. Collins nor the deponent.

19             MR. COLLINGS:

20             Oh, okay.

21             THE COURT REPORTER:

22             Do you, William?

23             MR. MOST:

24             No.  I think Chad is going to try

```
 1              and start his camera.
 2                   MR. COLLINGS:
 3                   Okay.  There, we're up.
 4                   MR. MOST:
 5                   There we go.  Thank you.
 6                   MR. COLLINGS:
 7                   Good?
 8                   THE COURT REPORTER:
 9                   Yes.
10          SHERIFF RANDALL CARTER SMITH, having
11      been first duly sworn by Raynel E. Schule,
12      was examined and testified on his oath as
13      follows:
14                   EXAMINATION
15  BY MR. MOST:
16  Q.  Great.  Good morning, Sheriff.  My name is
17      William --
18  A.  Good morning.
19  Q.  Good morning.  My name is William Most.
20      I'm an attorney.  I represent Jerry Rogers
21      in this case.  How are you doing today?
22  A.  Good, thank you.
23  Q.  Great.
24                   MR. MOST:
25                   And this is a question for Chad.
```

```
 1                    Chad, can we stipulate that the
 2                    deposition was properly noticed and
 3                    that the court reporter, Raynel from
 4                    Southern Court Reporters, is duly
 5                    qualified?
 6                        MR. COLLINGS:
 7                        We can agreed it was properly
 8                    noticed, and again, just like
 9                    yesterday, I assume she's a properly
10                    qualified court reporter, but, you
11                    know --
12                        MR. MOST:
13                        Sure.
14                        MR. COLLINGS:
15                        -- subject to that, yeah, no
16                    problem.
17                        MR. MOST:
18                        All right.
19    BY MR. MOST:
20    Q.   Great, and Sheriff, could you give us your
21         full name and title for the record.
22    A.   Randall, R-a-n-d-a-l-l, Carter,
23         C-a-r-t-e-r, Smith, S-m-i-t-h, and I am the
24         Sheriff of St. Tammany Parish, Louisiana.
25    Q.   All right, and Sheriff, have you ever given
```

1      a deposition before?

2  A.    Yes, sir.

3  Q.  Approximately how many depositions have you

4      given?

5  A.    I'd say probably around 15 or so.

6  Q.   Okay, and were you a defendant in those

7      cases, a plaintiff in those cases, a

8      witness, or some of all the above?

9  A.   Some -- some were civil; some was the

10     defendants; and one was the plaintiffs.

11  Q.   Okay.  What cases were you the plaintiff

12     in?

13  A.  Mostly recently was the Fred Oswald case.

14              MR. COLLINGS:

15              You were the defendant in that

16         case.

17              THE WITNESS:

18              I was the defendant.

19              MR. COLLINGS:

20              Right.

21              THE WITNESS:

22              Okay, not the plaintiff.

23  BY MR. MOST:

24  Q.   That's all right.  Were there any cases

25     where you were the person suing someone

```
1        else?
2   A.   Possibly.  I don't remember exactly, but
3        there were some civil -- civil cases that
4        I've had to be deposed on.
5   Q.   Okay.  So since you've given more than a
6        dozen or so depositions, you understand
7        that today in this deposition, you are
8        under oath, correct?
9   A.   Yes, sir.
10  Q.   You understand that your answers here today
11       have the same force as if we were in a
12       courtroom with a Judge and Jury?
13  A.   Yes, sir.
14  Q.   And Sheriff, is there anything, whether
15       it's medication, illness, lack of sleep, or
16       anything else that will prevent you from
17       giving us your full attention and truthful
18       and complete answers?
19  A.   No, sir.
20  Q.   Thank you.  And, you know, this is in many
21       ways like giving testimony in a courtroom,
22       but unlike a courtroom, it doesn't have to
23       be continuous.  We can take breaks.  So if
24       you need to take a break at any point to,
25       you know, use the restroom, get a drink of
```

1      water, or handle urgent Sheriff's Office

2      business, just let me or your lawyer know,

3      all right?

4  A.   You've got it.

5  Q.   Okay.  I will tell you in advance, however,

6      that it's my general practice after such

7      breaks to ask whether you reviewed any

8      documents or spoke to anyone during the

9      break, and I will ask you whether you

10     talked even to your attorney and what you

11     talked about as there is not necessarily

12     the guarantee of confidentiality during a

13     break, all right?

14  A.   You've got it.

15  Q.   Okay.  One thing you're already doing

16     effectively is waiting until I'm finished

17     answering my question before you answer,

18     and I will, in turn, try to extend you the

19     same courtesy of waiting until you're

20     finished speaking before I start, and that

21     way it will be easier on our court reporter

22     to have a clean transcript, okay?

23  A.   Yes, sir.

24  Q.   If I ask you a question that either you

25     don't understand or my question isn't

```
 1        clear, will you agree to tell me that you
 2        don't understand or that it's not clear
 3        rather than just trying to answer it?
 4   A.   Yes, sir.
 5   Q.   Thank you.  And because this deposition is
 6        being conducted by Zoom, we can't see the
 7        room that you're in, not the entirety of
 8        it.  Who's present with you currently in
 9        the room?
10   A.   Counsel.  It's Chad Collings.
11   Q.   Okay.  Anyone else?
12   A.   No, sir.
13   Q.   And likewise, we would not be able to
14        necessarily see if someone tries to
15        communicate with you during this
16        deposition, which would be improper.  So
17        will you agree to tell me if anyone,
18        including your counsel, tries to
19        communicate with you during the deposition,
20        whether it is by hand signal, written note,
21        whispers, text message, electronic message,
22        anything like that?
23   A.   Yes, sir.
24   Q.   Okay.  The only exception, of course, is if
25        your counsel makes an objection and we can
```

```
 1        hear it, you don't need to notify us of
 2        that.  Sheriff, do you know what case
 3        you're here for today?
 4   A.   Yes, sir.
 5   Q.   What's your understanding just in a broad
 6        sense of what that case is?
 7   A.   Jerry Rogers' case, an arrest that was made
 8        on him by my agency back in September '19 I
 9        believe it was.
10   Q.   Okay, and do you understand that you are a
11        Defendant in that case; you're a person
12        being sued?
13   A.   Yes, sir.
14   Q.   Okay, and when did you begin preparing for
15        this deposition?
16   A.   Wow, I think there was a couple of dates
17        scheduled to be deposed earlier this year
18        that were continued or postponed, and I was
19        notified and scheduled, I don't know, a few
20        weeks ago to be here this morning for this
21        deposition.
22   Q.   And what did you do over that period of
23        time that you just described to prepare for
24        this deposition?
25   A.   Not much at all to be honest with you.
```

1      Spoke to Chad Collings.

2  Q.   Okay, and I don't need to know about the

3       contents of your communications with him?

4  A.   Okay.  Just to -- just to be prepared and

5       share --

6              MR. COLLINGS:

7              Yeah, Sheriff --

8              THE WITNESS:

9              -- a few documents this morning,

10         but other than that --

11 BY MR. MOST:

12 Q.   Okay.

13 A.   -- that's about it.

14 Q.   Did you talk to anyone besides your counsel

15      to prepare for this deposition?

16 A.   I did not.

17 Q.   You said you reviewed some documents to

18      prepare for this deposition.  What were

19      those documents?

20 A.   I have a document from the 22nd Judicial

21      District Court, which was a copy of the

22      warrant, the arrest warrant of Jerry

23      Rogers.  I have a document, a letter from

24      the State of Louisiana Department of

25      Justice, which is the Attorney General's

```
 1        Office, and I have a letter from Collin
 2        Sims from the DA's Office.
 3                  MR. COLLINGS:
 4                  And William, just so you
 5             understand, those are -- those are
 6             the things you sent me that were
 7             going to be attached to the
 8             deposition.  I just printed a few
 9             hard copies of it for his
10             convenience.
11                  MR. MOST:
12                  Okay.  That's great.  Thank you,
13             Chad.
14   BY MR. MOST:
15   Q.   Other -- so the -- the three documents you
16        looked at were the arrest warrant, a letter
17        from the AG's Office, a letter from Collin
18        Sims.  Anything else besides those three
19        documents, Sheriff?
20   A.   That's all I have.  That's all I reviewed
21        this morning, yes, sir.
22   Q.   Did you review any other documents prior to
23        this morning to prepare for this
24        deposition?
25   A.   I did not.
```

1    Q.    Okay.  Did you look up any statutes or

2          research any law to prepare for this

3          deposition?

4    A.    I did not.

5    Q.    Okay.  Did you take any handwritten notes

6          to prepare for this deposition?

7    A.    No, sir.

8    Q.    All right.  Could you give us the -- the

9          short nutshell version of your education

10         and career history.

11   A.    I've been in law enforcement now 34 years.

12         Education, high school with several credit

13         -- college credited courses, throughout the

14         years of additional training and in-service

15         training, a lot of -- lot of years of

16         experience and knowledge about the job.

17   Q.    Okay, and have you worked at agencies, law

18         enforcement agencies other than the St.

19         Tammany Parish Sheriff's Office?

20   A.    Yes, sir.  One.  That was the Slidell

21         Police Department where I served as Chief

22         for six years.

23   Q.    Okay.  So you were with the Slidell Police

24         for six years and then approximately 28

25         years with the St. Tammany Parish Sheriff's

1      Office?

2  A.    Yes, sir.

3  Q.    Okay.  All right.  So you're correct that

4        we are here for the case about Jerry Rogers

5        in which Jerry Rogers is the Plaintiff, and

6        I'll -- I'll start sort of maybe at closer

7        to the beginning.  Do you know who Nanette

8        Krentel is?

9  A.    Yes, I do.

10 Q.    Okay.  Did you know her personally prior to

11       her death?

12 A.    No.  I had met her one time, and that was

13       at a 9 -- 911 banquet prior to her

14       homicide.  She was with her -- her then

15       husband, Chief -- Fire Chief Krentel.

16 Q.    Okay, and you described her death as a

17       homicide.  Is that how the Sheriff's Office

18       initially considered it after her death?

19 A.    It was ruled a homicide by the St. Tammany

20       Parish Coroner, Dr. Charles Preston.

21 Q.    All right, but my question was, what did

22       the Sheriff's Office initially consider it

23       to be?

24 A.    A homicide.

25 Q.    Okay.  Has the Sheriff's Office always

```
 1        considered it, Ms. Krentel's death to be a
 2        homicide?
 3   A.   Yes, from Day One, the -- the case was
 4        worked as an -- an investigation was
 5        conducted into a homicide, yes, as a
 6        homicide.
 7   Q.   Okay, and that case is currently unsolved,
 8        correct?
 9   A.   Correct.
10   Q.   Do you know who Jerry Rogers is?
11   A.   I do, yes.
12   Q.   He was at one point a deputy of the St.
13        Tammany Parish Sheriff's Office, correct?
14   A.   Yes.
15   Q.   Did you know him or did you overlap with
16        him at the St. Tammany Parish Sheriff's
17        Office?
18   A.   Yes, in some capacity, yes.
19   Q.   Did you know him when you were both at the
20        Sheriff's Office?
21   A.   Yes.
22   Q.   All right, and you mentioned that 2019 was
23        the year that the St. Tammany Parish
24        Sheriff's Office arrested Jerry Rogers,
25        correct?
```

1    A.    I believe it was 2019, September, yes.

2    Q.    Yeah.  And that was the year that you were

3          first up for re-election as Sheriff of St.

4          Tammany Parish, correct?

5    A.    I believe so, yes.

6    Q.    Okay.  When you say you believe so, do you

7          know it was '19 or -- or you're not sure?

8    A.    I don't recall exactly when qualifying was

9          and when was the election was, but yes, it

10         was -- it would have been, yes, 2019.

11   Q.    Okay.

12   A.    The election was in October, and the runoff

13         was December I believe.

14   Q.    All right, and in 2019, did you understand

15         -- prior to Jerry Rogers' arrest, did you

16         understand Jerry Rogers to be aligned with

17         any of your opponents in that political

18         race?

19   A.    No.

20   Q.    Did you after Jerry Rogers' arrest

21         understand him to be aligned with any of

22         your political opponents?

23   A.    I did not.

24   Q.    Do you currently know whether Jerry Rogers

25         was aligned with any of your political

```
 1        opponents in the 2019 race?
 2   A.   I'm not sure.  I had two opponents, and I'm
 3        not sure who, if anyone, he was -- was
 4        supporting.
 5   Q.   Okay.  So it's your testimony that you have
 6        never known anything about Mr. Rogers'
 7        political activities when it comes to the
 8        2019 Sheriff's race?  Is that your
 9        testimony?
10   A.   Yes, I did not know who he was supporting.
11   Q.   Aside from who he was supporting, did you
12        then or now know whether Jerry Rogers was
13        exchanging correspondence with any of your
14        political opponents?
15   A.   From what I recall, it was both of them.
16        There was -- during the investigation,
17        there were emails found that where he was
18        sharing information under an anonymous
19        person about the Krentel homicide to both
20        of -- both of the other candidates in that
21        race, yes.
22   Q.   All right, and you found out that Jerry
23        Rogers was exchanging emails with your
24        political -- I'm sorry -- it was Jerry
25        Rogers who was exchanging emails with your
```

```
 1        political opponents?
 2   A.   We didn't know that at the time.  We
 3        thought actually it was somebody possibly
 4        within our agency.  We had received a
 5        complaint from one of the Krentel family
 6        members, and they were very concerned about
 7        the information being shared, because I
 8        believe they were receiving the same
 9        information, and we -- we thought it was
10        somebody internal or somebody who was
11        involved in the investigation inhouse at
12        the Sheriff's Office.
13   Q.   Okay.  So there was an anonymous email
14        address.  Your office conducted criminal
15        search warrants to obtain the emails,
16        correct?
17   A.   That's correct.
18   Q.   And that criminal search warrant revealed
19        that it was Jerry Rogers who was sending
20        those emails, correct?
21   A.   That's from what I understand being briefed
22        on the investigation, yes.
23   Q.   Okay, and that criminal search warrant also
24        turned up emails to and from your political
25        opponents in the race, correct?
```

```
 1   A.   I do believe so, yes, both of the other
 2        opponents.
 3   Q.   And -- and you found out about these emails
 4        with your political opponents prior to the
 5        arrest of Jerry Rogers, correct?
 6   A.   Yes, it would been part of the
 7        investigation.  It revealed the anonymous
 8        email address or IP address came back to
 9        Mr. Rogers.
10   Q.   Okay.  When you found out that a criminal
11        search warrant had revealed emails to and
12        from your political opponents, did you
13        instruct your office to do anything
14        differently with those emails because of
15        the sensitive nature of them, segregate
16        them or keep them private or anything like
17        that?
18   A.   No, sir.
19   Q.   Okay.  In fact, you revealed to the press
20        that the contents of the search warrant
21        return that there had been correspondence
22        with your political opponents, correct?
23   A.   I don't recall.  I don't remember exactly
24        what was said in the email -- correction or
25        the press release that was sent out after
```

```
 1        Mr. Rogers' arrest, but we did -- we did
 2        have a lot of heat from not only the
 3        Krentel family, but a lot of media outlets
 4        were also involved and had knowledge of
 5        what was going on.
 6   Q.   Okay.  If you as a law enforcement officer
 7        obtain emails with your political opponents
 8        through a criminal search warrant, do you
 9        think it's appropriate to publicize that
10        fact to the press?
11   A.   I think it shows -- yes, I think that it --
12        I don't know if it was in the press
13        release.  Again, I don't -- I don't know
14        whether it was a press release or a letter
15        to the editor that was done around the same
16        time, but that came -- that came from our
17        Public Information Officer at the time,
18        which would have been Captain Scott Lee.
19   Q.   So you don't think there's any problem with
20        a law enforcement officer obtaining emails
21        with his political opponents through a
22        criminal search warrant and then
23        publicizing that fact to the press?  You
24        don't see any problem with that?
25   A.   No, sir.
```

```
 1                    MR. COLLINGS:
 2                    Object to the form.
 3   BY MR. MOST:
 4   Q.   You can answer, Sheriff, unless your
 5        counsel instructs you not to.
 6   A.   No, sir.
 7   Q.   Okay.  So you indicated before that you
 8        have no knowledge about Jerry Rogers'
 9        support for anyone in the 2019 election,
10        correct?
11   A.   Not until after the arrest, he became
12        involved I believe with the Lentz campaign.
13   Q.   Okay.  So it's your testimony that you did
14        know about Jerry Rogers' political
15        affiliations in the 2019 Sheriff's race,
16        but after his arrest, but not before.  Is
17        that your testimony?
18   A.   That's my testimony, yes, sir.
19   Q.   Okay.  Okay, and do you know what Jerry
20        Rogers was arrested for?
21   A.   Defamation of character.
22   Q.   And defamation is -- is often a civil
23        matter, but your office arrested Jerry
24        Rogers for criminal defamation, correct?
25   A.   Yes, sir.
```

1   Q.   It arrested him for criminal defamation

2        because of what he said about Detective

3        Daniel Buckner, correct?

4   A.   Yes, sir, and again, that was after the

5        investigation was conducted and concluded

6        that enough probable cause initiated for an

7        arrest warrant.

8   Q.   And Jerry Rogers was arrested for what he

9        said about Daniel Buckner about how Daniel

10       Buckner was handling the investigation into

11       the death of Nanette Krentel, correct?

12  A.   Yes, sir.  It's a very high profile

13       homicide investigation, and we were going

14       to follow up or we followed up on every

15       lead.  Anybody that knew anything about the

16       case, we were following up on, and this

17       individual who we didn't identify at the

18       time was saying a lot of things that we

19       didn't even have in -- in our

20       investigation.  So we had to verify whether

21       the credibility of -- of these accusations

22       or whether we were doing it right or what

23       we were doing wrong.

24  Q.   All right, and do you know of any other

25       times that your -- the Sheriff's Office has

```
1          arrested someone for criminal defamation?
2     A.   Yes.
3     Q.   Okay.  What were those other times?
4     A.   I don't know exactly, but from what I was
5          advised on that there was two or three
6          other arrests that we had done the same --
7          the same arrest, same charge under the same
8          statute, and those were submitted to the
9          DA's Office as well.
10    Q.   Okay.  You were advised about this prior to
11         the arrest of Jerry Rogers?
12    A.   No.  This was just -- actually, it was this
13         morning.
14    Q.   Oh, okay.
15                   MR. COLLINGS:
16                   Sheriff, you can't talk about
17              anything that you and I talked
18              about.  So I just -- I think you --
19              with that said, I'm going to just
20              ask the witness not to answer that
21              ques -- line of questioning.
22                   MR. MOST:
23                   Yeah.  I won't ask about it.  I
24              mean, he can volunteer it.
25    BY MR. MOST:
```

1    Q.   But I certainly won't ask you, Sheriff,

2         about any of your contents of your

3         communications with your counsel, and

4         you're not obligated to provide me with any

5         of the contents of your communications with

6         your counsel.  So let me -- let me put it

7         this way, prior to today, were you aware of

8         any other instances when the Sheriff's

9         Office arrested someone for criminal

10        defamation?

11   A.   I was reminded about it, and yes, we had --

12        there was mention that we had during the

13        investigation, after the investigation, the

14        criminal investigation was concluded, it

15        was brought to my attention that this is

16        not the first time we had used that charge;

17        that we had -- we had made this arrest

18        three -- probably three times prior to

19        Jerry's arrest, and that these cases were

20        submitted to the DA's Office.  I don't know

21        what the outcome was or what the dis --

22        disposition was on these cases, but I was

23        familiar with being briefed on this case,

24        that it -- that it was not uncommon to use

25        that -- that charge.

```
1    Q.   Okay.  So if I'm understanding you
2         correctly, before Jerry Rogers was
3         arrested, you were advised that the St.
4         Tammany Parish Sheriff's Office had made
5         perhaps three other arrests for criminal
6         defamation at some point in the past,
7         correct?
8    A.   Yes.
9    Q.   Okay, but you were not told whether the DA
10        accepted those charges, refused those
11        charges, or otherwise disposed of them?
12   A.   Did not.  No, did not know that
13        information, no, sir.
14   Q.   Okay.  In the discussion about these other
15        criminal defamation cases, was it discussed
16        at all the -- the nature or capacity of the
17        victim of the criminal defamation?
18   A.   No, sir, it was not.
19   Q.   So you didn't know at the time whether
20        these other criminal defamation arrests
21        were about, you know, criminal defamation
22        about private citizens or council members
23        or law enforcement officers?  You didn't
24        know anything about that at the time,
25        correct?
```

```
1    A.    Did not, no, sir.

2    Q.    Okay.  When did you first find out -- well,

3          let me back up.  Was it your idea to use

4          the criminal defamation statute with regard

5          to Jerry Rogers?

6    A.    No, sir, it was not.

7    Q.    When did you first find out that -- about

8          the possibility of arresting Jerry Rogers

9          for criminal defamation?

10   A.    Once we had received a complaint from one

11         of the family members of Nanette Krentel,

12         the investigation was kicked off by our

13         Criminal Investigations Division, which

14         again, led to the search warrant, led to

15         the identification of the IP addresses that

16         were being used, and I was -- basically

17         after the investigation was conducted, I

18         was in a meeting with Deputy Chief Culpeper

19         at the time, who was over our Criminal

20         Investigations Unit, and briefed me on the

21         defamation charge.  He said that they had

22         used that before; it's not uncommon, and

23         that they were going to move forward with

24         an arrest warrant.  They felt they had

25         enough probable cause, and I agreed and
```

1    said, "If you have enough probable cause

2    and there's -- there's enough to arrest

3    this individual, then do so.  If not, leave

4    it alone.  Don't fool with it."

5 Q.   And was that an one-on-one meeting with

6    Culpeper?

7 A.   Yes, sir.

8 Q.   Okay.  I may use these officers, just their

9    last name rather than their rank, because

10    their ranks have changed over time, and

11    that could be a little confusing.  So it's

12    not intended to disrespect if I just say

13    Culpeper.  All right.  So you had this

14    initial one-on-one meeting with Culpeper

15    where he talked about the possibility of

16    arresting Jerry Rogers for criminal

17    defamation, correct?

18 A.   Yes, sir.

19 Q.   And he -- had you ever heard of the crime

20    of criminal defamation prior to that?

21 A.   I've heard of the -- the civil side more

22    than the criminal aspect of it, but I took

23    these investigators' words for their -- you

24    know, what they had done in the past and

25    what they have done on this case, and I had

1    no reason to doubt them, but I was very

2    straight forward with whether or not, you

3    know, this was going to -- this was a good

4    arrest or not.  I mean, we're not going to

5    proceed with a -- a charge that's not used,

6    that we haven't used before or something

7    that's unconstitutional, and based on the

8    information provided to me and the probable

9    cause that they said they had to get a

10   warrant signed, I supported it.

11  Q.   Okay.  So you reviewed the facts and the

12   law and agreed with their conclusion that

13   there was probable cause for the crime?

14  A.   I took their advice and their

15   recommendation to move forward and agreed

16   that if they had enough to move forward to

17   get a warrant, then we would.

18  Q.   Okay.  Did you agree that they had enough?

19  A.   Based on the information provided to me and

20   later signed by the Judge, yes, I agreed.

21  Q.   Okay.  Did you agree that they had probable

22   cause to move forward prior to the -- the

23   Judge signing it?

24  A.   Based on the information that was provided

25   to me, yes.

1   Q.   Okay.  So you said that when you -- when
2        Culpeper first came to you with this
3        possibility of criminal defamation, you
4        said you had heard of civil defamation,
5        correct?
6   A.   Correct.
7   Q.   Had you ever heard of criminal defamation
8        prior to that?
9   A.   Yes.  I was not very familiar with it, but
10        yes.
11   Q.   Okay.  So it's a criminal statute; you
12        weren't very familiar with.  Did you look
13        up the criminal statute?
14   A.    I did not, no, sir.
15   Q.   Okay.  Did you read anywhere about criminal
16        defamation more generally?
17   A.    I did not.
18   Q.   Did you do anything to assess what the law
19        of criminal defamation is?
20   A.    No.  I took the word of the investigator --
21        lead investigators in the case and Deputy
22        Chief Culpeper at the time.
23   Q.   Okay.  Did Chief Culpeper or anyone else
24        describe to you the elements of criminal
25        defamation?

1   A.   Yes and no.  Yes, that they had the

2        elements there to proceed with getting a

3        warrant signed, enough probable cause and

4        that they would -- that they felt confident

5        that that would be a charge that could be

6        -- you know, that would be used in that

7        case.

8   Q.   Okay.  So if I'm understanding you

9        correctly, Culpeper told you that they had

10       enough to meet the elements of criminal

11       defamation, but he didn't tell you what the

12       elements of criminal defamation were,

13       correct?

14  A.   That is correct.

15  Q.   Nor did anyone else tell you what the

16       elements of criminal defamation were,

17       correct?

18  A.   They did not.

19  Q.   Nor did you do any research or anything

20       else to find out what the elements of

21       criminal defamation were, correct?

22  A.   I did not.

23  Q.   Okay.  So I guess what I don't know is how

24       did you come to the conclusion that you

25       agreed with their assessment that there was

1        probable cause for criminal defamation
2        based on the evidence provided to you if
3        you didn't know what the elements of
4        criminal defamation were?
5    A.   I took their experience and knowledge based
6        on their positions in the criminal
7        investigation world, and again, I remember
8        clearly that, you know, if we have enough
9        to proceed, then do so.  If not, then
10       don't.  It was very simple, and they were
11       -- Deputy Chief Culpeper was pretty
12       positive then that we had enough evidence
13       to move forward and enough probable cause
14       do get a Judge to sign a warrant.
15   Q.   You testified a few minutes ago, Sheriff,
16       that you agreed with Culpeper that the --
17       that there was probable cause based on what
18       evidence you saw, correct?
19                   MR. COLLINGS:
20                   Object to the form.
21                   THE WITNESS:
22                   I agreed that the -- that we
23               would move forward if, indeed, there
24               was enough probable cause, which I
25               was advised we had plenty of

```
 1              probable cause and that this was not
 2              uncommon to move forward with this
 3              type of charge.
 4  BY MR. MOST:
 5  Q.   Do you recall testifying a few minutes ago
 6       that you actually agreed with the
 7       assessment that there was probable cause?
 8              MR. COLLINGS:
 9              Object to the form.
10              THE WITNESS:
11              Again, based on the information
12              provided to me from these
13              individuals, I agreed to move
14              forward with getting the warrant
15              signed.
16  BY MR. MOST:
17  Q.   Okay.  Do you know what criminal defamation
18       is?  Do you know what it is?
19  A.   It's intentional -- I would base it on the
20       -- the intentional -- I'm trying to
21       remember exactly.  Defamation would be the
22       intentional credibility or the credibility
23       issue with someone where you're
24       intentionally making false accusations
25       against someone that could be used or held
```

```
 1          against you, yes.
 2     Q.   Okay, and how do you know what criminal
 3          defamation is?
 4     A.   I'm just going -- going back in memory, but
 5          never have studied the charge or studied
 6          the language, but just again, based on the
 7          -- based on the civil and criminal aspects,
 8          it's intentional depriving or -- the
 9          intentional credibility issue with someone
10          or using false statements or false
11          accusations against someone.
12     Q.   Okay.  So what I'm trying to figure out --
13     A.   But I guess really is I don't know the --
14          the actual, you know, legal definition of
15          defamation in this.  I know there's a civil
16          and a criminal.
17     Q.   Understand.  So sometime after Jerry
18          Rogers' arrest, did you read the criminal
19          defamation statute?
20     A.   I have not, no, sir.
21     Q.   Prior to Jerry Rogers' arrest, and I don't
22          want to know the contents of any
23          communications with an attorney, but prior
24          to Jerry Rogers' arrest, did you consult
25          with a lawyer about criminal defamation or
```

```
 1        the arrest of Jerry Rogers?
 2   A.   I did not.
 3   Q.   Okay.  Subsequent to Jerry Rogers' arrest,
 4        have you read the statute on criminal
 5        defamation?
 6   A.   I have not.
 7   Q.   So where are you getting what you just told
 8        me about criminal defamation?  Are you
 9        imagining what criminal defamation is or
10        are you -- someone told you what it is or
11        --
12   A.   No, no, just from what I understand.
13        Again, there's a civil defamation that I am
14        familiar with somewhat, and then there's
15        the criminal aspect.  The -- I guess, the
16        meaning of the word, "defamation," is again
17        to insult or try to ruin someone's
18        credibility on the part of defamation.
19        That's the -- the word I come up with is
20        credibility, whether it's true or false.
21   Q.   I understand.
22   A.   It has to be false information provided to
23        ruin the credibility of someone.  Now, I
24        don't have the -- I haven't looked up the
25        Webster's version of what defamation means
```

```
 1        or the criminal statute itself, no, sir.
 2   Q.   Okay.  So if I'm understanding you
 3        correctly, you have a broad sense of
 4        generally what -- what the civil -- what
 5        civil defamation is, and you are inferring
 6        that that is also what criminal defamation
 7        is.  Is that accurate?
 8   A.   No.  Defamation, the word.  Not -- not the
 9        difference in what's criminal and what's
10        civil.
11   Q.   Okay.  So you have a -- a broad sense of
12        what the word defamation means, and you're
13        inferring that that's what the criminal
14        statute on defamation consists of.  Is that
15        accurate?
16   A.   Again, I don't have it in front of me, so I
17        wouldn't know what the --
18   Q.   I --
19   A.   -- what the wording is in the statute.
20   Q.   Right.  I understand that, but --
21   A.   But the basic concept, yes.
22   Q.   Okay.  So you have an understanding of the
23        basic concept of what defamation as a
24        concept is, and you are inferring that that
25        is what the criminal statute of criminal
```

```
 1          defamation consists of, correct?
 2   A.    Yes, sir.
 3   Q.    Okay, and that is the extent of your
 4          knowledge about criminal defamation either
 5          now or prior to the arrest of Jerry Rogers,
 6          correct?
 7   A.    Yes, yes, sir.
 8   Q.    Okay.  So the arrest of Jerry Rogers -- I
 9          mean, Jerry Rogers at the time was a
10          federal agent, correct?
11   A.    I believe so, yes, with HUD I believe it
12          was.
13   Q.    And, I mean, it's a sensitive matter for
14          your office to be arresting a federal
15          agent, correct?
16   A.    I would say yes.
17   Q.    Okay, and so members of your team came to
18          you and proposed, you know, the possibility
19          of arresting a federal agent under a
20          statute that you didn't know the details
21          of.  Why didn't you look up what criminal
22          defamation was?
23   A.    Well, at the time, I didn't know exactly
24          what Jerry Rogers did.  I didn't know he
25          was a Federal agent.  From what I remember,
```

```
1        he was an investigator with HUD.  Now, is
2        that defined as a -- as a federal
3        investigator, federal agent?  That, I don't
4        know.
5   Q.   Okay.  So it -- it would be a sensitive
6        matter to arrest a federal agent.  That's
7        what you said earlier?
8   A.   Yes.
9   Q.   Okay.  Do you consider -- and you knew at
10       the time that Jerry Rogers was an
11       investigator for the U.S. Housing --
12       Department of Housing & Urban Development?
13  A.   Yes, sir.
14  Q.   Okay.  Do you consider an investigator for
15       the U.S. Department of Housing & Urban
16       Development to be a federal agent?
17  A.    I didn't now at the time, no, sir.
18  Q.   Okay.  Did -- do you think it's a sensitive
19       matter to -- for your office to arrest an
20       investigator of the U.S. Department of
21       Housing & Urban Development?
22  A.   Do I think what now?  What was the
23       question?
24  Q.   Yeah.  Do you think it's a sensitive matter
25       for the St. Tammany --
```

```
1   A.    Yes.
2   Q.    Okay.  So given that it was -- that this
3         proposal was the proposed arrest of a
4         federal investigator, which you said is a
5         sensitive matter, a statute you were
6         unfamiliar with, why didn't you take any
7         steps to see what the statute was that was
8         being proposed to arrest him under?
9   A.    Again, I took the -- the word and the
10        advice of the investigation conducted --
11        conducted by the individuals that were
12        involved and from Deputy Chief Culpeper,
13        who made clear that if -- if this is a good
14        arrest, we have the probable cause needed,
15        then proceed.  If not, leave it -- leave it
16        alone.
17  Q.    Okay.
18  A.    Based on their information and their -- the
19        advice provided to me from their study,
20        their investigation into the matter, I
21        agreed and -- agreed that they would move
22        forward.
23  Q.    Okay.  So you had an initial one-on-one
24        meeting with -- with Culpeper.  Did you
25        have subsequent meetings about the
```

1      potential arrest of Jerry Rogers?

2   A.   Not that I remember, no, sir.

3   Q.   Do you recall that on the day of Jerry

4      Rogers' arrest in the morning you met with

5      the team to discuss the potential arrest of

6      Jerry Rogers?

7   A.   No, I do not.  I remember specifically

8      being briefed on this investigation by

9      Chief Culpeper himself.

10  Q.   Okay.  Do you recall any meetings about the

11     arrest of Jerry Rogers -- about the

12     potential arrest of Jerry Rogers other than

13     that one-on-one meeting with Culpeper?

14  A.   I do not.

15  Q.   Okay.  I'm going to pull up a document that

16     I'm -- is labeled as "Exhibit Y."  Do you

17     see this, Sheriff?

18  A.   I do.

19  Q.   Okay.  Do you see that these are Responses

20     to Plaintiff's Request for Information?

21  A.   Yes, sir.

22  Q.   Okay, and you see in the paragraph

23     entitled, "Now into Court" that these are

24     in part on your behalf?

25  A.   Yes, sir.

```
1    Q.   Okay, and this isn't a gotcha.  This is to
2         refresh your memory.  Do you -- do you see
3         that -- I'm looking at Page 24 now.  It
4         says -- the question is, "Identify each
5         person, any defendant, or employee of STPSO
6         consulted related to the criminal charges
7         sought against Jerry Rogers and when those
8         consultations occurred."  Do you see that
9         it says in the response, "Sheriff Smith
10        responds that he recalls only one meeting
11        where the Rogers investigation was
12        discussed.  That meeting included not only
13        the Sheriff, but Detective Canizaro,
14        Lieutenant Hotard, Major Doug Sharp, Steven
15        Gaudet, and Chief Danny Culpeper."  Do you
16        see that?
17   A.   I do.
18   Q.   Okay.  Does -- does that refresh your
19        recollection that there might have been a
20        meeting with -- with those persons?
21   A.   There is a possibility, but again, I don't
22        remember meeting with all those
23        individuals.  I remember meeting directly
24        with Chief Danny Culpeper at the time.
25   Q.   Okay.  Look, I'll -- I'll tell you that
```

1       Canizaro and -- and Culpeper testified that

2       there was a meeting in the conference room

3       adjacent to your office on the morning of

4       Jerry Rogers' arrest that you were present

5       for to discuss his potential arrest.  Do

6       you recall that meeting?

7  A.   I do not, but I'm not saying it didn't

8       happen.  I just don't remember all these

9       individuals being in -- in that meeting.  I

10      just remember meeting with Danny Culpeper.

11  Q.   Okay.  Do you see in the next sentence, it

12      says, "Sheriff Smith is also aware of at

13      least one meeting where one or more of his

14      employees, including Detective Canizaro

15      discussed the Rogers investigation with

16      members of the 22nd JDC DA"?

17  A.   I do see that, yes.

18  Q.   Okay, and that's referring to the District

19      Attorney's Office?

20  A.   Yes, sir.

21  Q.  So prior to Jerry Rogers' arrest, were you

22      aware that members of the Sheriff's Office

23      had met with members of the District

24      Attorney's Office to discuss Jerry Rogers'

25      investigation?

1   A.   I -- I don't remember.

2   Q.   Okay.

3   A.   That's not unusual on any type of case.

4       Normally, with the -- the older

5       administration and the new administration

6       of the -- of the new DA, Warren Montgomery,

7       we try to -- we try to work together with

8       them and sit down and -- and discuss cases.

9       So I'm not saying they didn't.  That's not

10      -- like I said, that's not unusual.

11  Q.   Yeah.  Part of the purpose of meeting with

12      the DA's Office is to keep them briefed and

13      -- and work out any maybe, you know, legal

14      issues that might be involved with a

15      potential arrest or prosecution.  Is that

16      right?

17  A.   That is correct.

18  Q.   Because the DA's Office are lawyers, and

19      the Sheriff's deputies generally are not,

20      correct?

21  A.   Correct.

22  Q.   Okay.  So if -- if the DA's Office is

23      consulted prior to an arrest and the DA's

24      Office says it would be unconstitutional to

25      arrest that person, should the Sheriff's

```
 1        Office continue with the arrest?
 2                    MR. COLLINGS:
 3                    Object to the form.
 4                    THE WITNESS:
 5                    No, sir.
 6   BY MR. MOST:
 7   Q.   Okay.  Do you know whether the DA's Office
 8        expressed an opinion about -- prior to
 9        Jerry Rogers' arrest about the
10        constitutionality of arresting him for
11        criminal defamation?
12   A.   I do not know that, no, sir.
13   Q.   Okay, but if someone from the DA's Office
14        had told someone from the Sheriff's Office
15        that it would be unconstitutional to arrest
16        Jerry Rogers for criminal defamation, that
17        arrest should not have moved forward,
18        correct?
19                    MR. COLLINGS:
20                    Object to the form.
21                    THE WITNESS:
22                    That would make -- yes, that
23                would probably make it -- make us
24                not pursue an arrest warrant against
25                Mr. Rogers if that, indeed,
```

```
 1              happened, but again, I -- I don't --
 2              I don't know if it happened or it
 3              didn't happen.
 4  BY MR. MOST:
 5  Q.   Right.  So if that happened, the arrest
 6       should not be carried out, agreed?
 7                   MR. COLLINGS:
 8                   Object to the form.
 9                   THE WITNESS:
10                   I would have to agree.
11  BY MR. MOST:
12  Q.   Okay.  Are you aware, Sheriff, that there
13       was a FBI investigation into the arrest of
14       Jerry Rogers for criminal defamation?
15  A.   Yes.
16  Q.   Okay.  Have you reviewed the FBI
17       investigatory file of that investigation?
18  A.   I have not, no, sir.
19  Q.   Okay.  Has a copy of it been provided to
20       you even if you didn't review it?
21  A.   No, sir.
22  Q.   Okay.  Okay.  I am pulling up here "Exhibit
23       U," and -- and do you see that this is a --
24       a FBI document here?
25  A.   Yes, sir.
```

1    Q.   Okay.  Do you see the synopsis that it says
2         -- it discuss potential civil rights
3         violation occurred when Jerry Rogers was
4         arrested by the St. Tammany Sheriff's
5         Office?
6    A.   No, sir, I have not seen that.
7    Q.   I'll -- I'll represent to you that this is
8         the FBI's investigatory file into that
9         arrest as indicated by the synopsis here.
10        I understand that you haven't reviewed it
11        prior to today.  Are you -- are you aware
12        that you have acc -- had access to this
13        investigatory file prior to today?
14   A.   I -- possibly.  I don't -- like I said,
15        I've -- I've never seen it.  I did know it
16        existed, that there was a FBI investigation
17        into his arrest, but first time I'm seeing
18        it.
19   Q.   Okay.  It's -- it's a little surprising to
20        me that you would not want to have reviewed
21        a FBI -- the results of a FBI investigation
22        into your office.  Is there a reason why
23        you declined to -- to review this document
24        prior to today?
25                  MR. COLLINGS:

```
 1                    Object to the form.
 2                    THE WITNESS:
 3                    I just -- I didn't -- I knew
 4               there was an investigation from the
 5               FBI, but it was more on the grounds
 6               at a request of Rogers or his -- his
 7               position as -- as a HUD
 8               investigator.
 9   BY MR. MOST:
10   Q.   Okay.  So this is a redacted version of the
11        FBI's investigatory file.  Many of the
12        names have been redacted here.  You are
13        entitled if you wish to receive an
14        unredacted version of it.  Your counsel has
15        so far declined to take steps to obtain the
16        unredacted version so we'll look at the
17        redacted version today.  I'm going to turn
18        to Page 28 of this, 28 of the PDF.  Do you
19        see the paragraph in the middle of the page
20        that begins, "On Friday, September 13"?
21   A.   I do.
22   Q.   And -- and do you know -- are you aware
23        that Jerry Rogers was arrested on September
24        16th, 2019?
25   A.   That, I don't know.
```

1   Q.   Okay.

2   A.   I know it was in that timeframe, but I

3        don't know the exact date.

4   Q.   Yeah, fair enough.  Do you see at the end

5        of that paragraph, the last couple of

6        sentences of that paragraph say that

7        someone told someone, "This is very

8        important to the Sheriff.  He wants to move

9        on this"?  Do you see that -- that line?

10  A.   Yes, sir.

11  Q.   Do you see that's in the context of the

12       potential arrest of Jerry Rogers?

13  A.   I do.

14  Q.   Okay.  Did you ever tell anyone that the

15       arrest of Jerry Rogers was very important

16       to you?

17  A.   I don't recall or remember, no.

18  Q.   Okay.  Do you recall or remember saying

19       anything, words to that effect, even if

20       it's not those words exactly?

21  A.   Well, it was -- it was very important to me

22       as the Sheriff when dealing with the

23       Krentel case.  Absolutely, it was very

24       important.

25  Q.   Okay.  The Krentel case was very important

1       to you?

2   A.   Yes, sir.

3   Q.   Okay.  Was arresting Jerry Rogers for

4        criminal defamation very important to you?

5   A.   As well, yes.

6   Q.   The second part of that quote says, "He

7        wants to move on this."  Do you see that

8        that is referring to the Sheriff?

9   A.   I assume it's -- it means me.

10  Q.   Okay.  Do you recall directing anyone to

11       move on the arrest of Jerry Rogers?

12  A.   Not to move on it.  To take the advice of

13       the investigations and Chief Culpeper to

14       move forward of getting the warrant signed,

15       yes.

16  Q.   Okay.

17  A.   But I don't remember telling anybody that I

18       want to move on this.

19  Q.   Okay.  You don't recall using those words

20       verbatim?

21  A.   I do not, no, sir.

22  Q.   Okay.  Okay.  I'm turning to Page 35 of

23       this PDF, "Exhibit U."  Were you aware that

24       after the arrest of Jerry Rogers a formal

25       complaint was made to his employer?

```
1    A.   I did not know that, no, sir.
2    Q.   Okay.  Do you know that -- you didn't know
3         it at the time or -- or you don't know it
4         today or both?
5    A.   Both.  I didn't -- I wasn't aware of a
6         complaint filed with his place of work, no,
7         sir.
8    Q.   Is it typical for the Sheriff's Office to
9         file a complaint with someone's employer
10        after they arrest someone?
11   A.   Not necessarily, no.
12   Q.   Okay.  Have you ever known that to be -- to
13        happen at all?
14   A.   Not that I'm aware of, no, sir.
15   Q.   Okay.  So you don't know of any time anyone
16        from the Sheriff's Office has after an
17        arrest then filed a formal complaint with
18        the arrestee's employer, agreed?
19   A.   Agreed.
20   Q.   So it would be unusual to your knowledge if
21        -- if that were to have happened with Jerry
22        Rogers, agreed?
23   A.   Not necessarily.  I mean, because of his
24        position with HUD, I would -- wouldn't say
25        it's not unusual to let them know that he
```

```
 1        was arrested and -- and what the arrest
 2        circumstances related to the arrest were.
 3   Q.   I understand it -- it might be.
 4   A.   I don't know if that's a complaint or just
 5        advising them of the -- of the arrest.
 6   Q.   Yeah.
 7   A.   That their computer was being used I think,
 8        yeah, that would -- that would definitely
 9        be information needed to be shared with
10        them, no doubt.
11   Q.   Okay.  I understand.  So it -- it wouldn't
12        be unusual --
13   A.   Okay.
14   Q.   -- to give the arrestee's in that context
15        employer a heads-up of the arrest?
16   A.   Correct, not -- not -- yeah, not a
17        complaint.
18   Q.   Okay.
19   A.   That a complaint was filed no, sir.
20   Q.   But it would be unusual to file something
21        saying this is a formal complaint about
22        this person's conduct about an arrestee to
23        their employer, agreed?
24   A.   Agreed.
25                  MR. COLLINGS:
```

```
 1                    Object to the form.
 2    BY MR. MOST:
 3    Q.   Was the answer, "Agreed"?
 4    A.   Yes.
 5    Q.   Okay.  Do you know who Steven Gaudet is?
 6    A.   I do.
 7    Q.   Okay.  Just roughly ballpark how many years
 8         did you work with Steven Gaudet?
 9    A.   Probably ten years.  I'd say about ten.
10    Q.   Okay.  In your interactions with Steven
11         Gaudet, did you ever have reason to believe
12         him to be untruthful?
13                    MR. COLLINGS:
14                    Object to the form.
15                    THE WITNESS:
16                    No.
17    BY MR. MOST:
18    Q.   Okay.
19    A.   I don't know him that well, but no, I
20         wouldn't -- I wouldn't say he was
21         untruthful, no.
22    Q.   Okay.  Okay.  I'm going to share my screen
23         which is "Exhibit M," and -- and do you see
24         that this says at the top, "Affidavit of
25         Steven Gaudet"?
```

```
 1    A.    I do.
 2    Q.    Okay.  Do you see at the bottom it has got
 3          the signature of what appears to be Steven
 4          Gaudet?
 5    A.    Yes, sir.
 6    Q.    Okay.  Any reason to think this isn't an
 7          Affidavit of Steven Gaudet?
 8    A.    No, sir.
 9    Q.    Okay.  Do you see Paragraph 5 of this
10          Affidavit saying that "The affiant was
11          present when Chief Danny Culpeper informed
12          the unit that Sheriff Randy Smith wanted
13          Mr. Jerry Rogers in jail for Louisiana RS
14          1447, criminal defamation"?
15    A.    Do I see it?  Yes.
16    Q.    Okay.
17    A.    Did I say it?  No.
18    Q.    So it's your testimony you never said any
19          words to that effect?
20    A.    That is correct.  I would -- I wouldn't
21          have done that.
22    Q.    Okay.  So I want to talk a little about
23          press releases.  So the Sheriff's Office
24          issues press releases sometimes with your
25          name and signature on them, correct?
```

1    A.    That is correct.

2    Q.    Okay, and when something has got your

3          signature on it, do you take a look at it

4          before it goes out?

5    A.    Sometimes.  It depends on the nature of the

6          press release, what it involves.  A lot of

7          times I do not.

8    Q.    Okay.  What kind of press releases do you

9          not review before they go out?

10   A.    Just a lot of different press releases.

11         It's -- it's -- it depends on if it's a

12         response.  It depends on the situation of

13         why we're releasing it in the first place.

14         A lot of it is -- is questions regarding a

15         case before we've even submitted a press

16         release on it.  A lot of times they go out

17         without my knowledge or I review it after

18         the fact.

19   Q.    If a -- if there's a press release about a

20         sensitive investigation or arrest, do you

21         review that before it goes out?

22   A.    Some I may or I may not.  It's just hard to

23         tell depending on the nature of the -- of

24         the arrest or the situation of the

25         incident.  Would I review all, every press

```
 1        release that goes out?  Absolutely not.
 2   Q.   And sometimes press releases are issued
 3        after someone is arrested, correct?
 4   A.   Sometimes, yes, sir.
 5   Q.   Just roughly how long does it usually take
 6        to get those press releases out?  Is it
 7        minutes, hours, days, weeks?
 8   A.   Wow, I'd say usually it's pretty quick,
 9        within a couple of hours of just because
10        we've learned in the past that in -- the
11        prior way of doing things may be a day or
12        two later.  By the time an incident
13        occurred, you know, we like to get it out
14        to the public based -- according to now
15        social media or -- or website, the media
16        outlets are following everything we do.
17        They -- they want the news now.  They don't
18        want to wait.  So in changing of the guard,
19        the way we do things are different from the
20        old administration, and -- and I've learned
21        myself being the Sheriff that the
22        information, once it's verified that we
23        want to get it out as quick as possible,
24        and a lot of times they already know.  The
25        media will already have some inside
```

1      information that are asking us about
2      something that we haven't even gotten out
3      yet, and I'm -- and I'm telling you that
4      happens pretty -- pretty quick and pretty
5      often.
6   Q.   When a press release has a direct quote,
7      like, in the quotation marks from you, is
8      that something you review before it goes
9      out?
10  A.   Usually, but not all the time.  I -- I
11     mean, we send press releases out daily, and
12     a lot of times, it's -- it's a repetitive
13     quote that I may have made on a similar
14     case that they just use repetitively.
15  Q.   Okay.  If it's not a repetitive quote, but
16     it is a direct quote to you, will you
17     review that before it goes out?
18  A.   Normally, yes, or have insight into what
19     needs to be said or what I feel that should
20     be said.
21  Q.   Okay.
22  A.   And again, it's -- it could be corrected by
23     me or it could be corrected my PIO or
24     worded differently, but cover what I'm
25     trying to say in the press release.

1    Q.   Have you ever known a press release to be

2         issued about someone being arrested before

3         they were booked?

4    A.   Yes.

5    Q.   Okay.  One or more than one?

6    A.   I just know that -- that there's probably

7         been a few, especially when it's a --

8         again, a high profile case or arrest or

9         could be -- it could be anything.  I know

10        there has been several press releases that

11        have been released, I mean, just prior to

12        an arrest or prior to the booking.  That's

13        -- that's all public record, and we don't

14        -- we don't try to hide it.  We want to get

15        it out again as quick as possible.

16   Q.   Okay.  I'm going to share with you "Exhibit

17        T" as in Tom.  Do you see that this is the

18        press release issued Monday, September

19        16th, 2019, about the arrest of Jerry

20        Rogers?

21   A.   Yes, sir.

22   Q.   Did you review this press release before it

23        went out?

24   A.   I did not.

25   Q.   Okay.  You see the -- the bottom paragraph

```
 1        has a direct quote from you?
 2   A.    Huh-huh, yes, sir.
 3   Q.    It talks about an individual whose intent
 4        was motivated by his efforts to defame,
 5        create distrust, and otherwise prey on the
 6        emotions of the victim's family?
 7   A.    Yes, the Krentel family, yes, sir.
 8   Q.    Okay.  So it's your testimony that you did
 9        not review this press release or provide
10        that quote prior to this press release
11        being issued?
12   A.    I don't remember.  I'm sure I discussed
13        this with my PIO, Scott Lee at the time and
14        wanted to show some kind of sympathy
15        towards the family and the investigation
16        into the Krentel murder, which again, this
17        started with a family member bringing this
18        to our attention.
19   Q.    Okay.  So if I understand you correctly,
20        you did talk with your Public Information
21        Officer about the arrest of Jerry Rogers
22        before this press release went out, but you
23        did not review the actual text of the
24        release.  Is that your testimony?
25   A.    That is --
```

```
 1                    MR. COLLINGS:
 2                    Object to the form.
 3                    THE WITNESS:
 4                    That is correct.
 5      BY MR. MOST:
 6      Q.   Okay.  I'm going to pull up "Exhibit G"
 7           here.  Do you see that this is a letter to
 8           the media, citizens, "Re:  Nanette Krentel
 9           investigation and the recent arrest of
10           Jerry Rogers"?
11      A.   Yes, sir.
12      Q.   Dated October 28th, 2019?
13      A.   Yes, sir.
14      Q.   Okay, and you see that -- well, it -- it
15           says, "Sincerely, Randy Smith" at the
16           bottom, correct?
17      A.   It does.
18      Q.   Okay.  Do you recall this -- this letter?
19      A.   I do.
20      Q.   Okay.  Did you write this letter?
21      A.   I didn't type it, but yes, I sat down with
22           my Public Information Officer and discussed
23           a rebuttal from an editorial that was done
24           I believe from the Times Picayune or maybe
25           the Advocate, either one.
```

```
1    Q.   Okay.  So you didn't type this out but --
2         but you sat with the Public Information
3         Officer as he wrote it and dictated parts
4         of it?
5    A.   Yeah, I believe that's -- yeah, this was a
6         -- again, this was a rebuttal to a -- to an
7         editorial by -- I don't remember the guy's
8         name, but it was -- it was -- it was
9         actually a blast towards me of the handling
10        of the Krentel investigation and the arrest
11        of Jerry Rogers, and it included -- and
12        again, I don't have that part in front of
13        me, but it was a rebuttal to what was
14        written about me and the DA's Office, and
15        it just gives details, and I don't know if
16        it was ever printed or not.  And again, I
17        -- I said it was Scott Lee, but it -- it --
18        I'm not -- I'm not positive.  I'm just
19        assuming that's who I would have sat down
20        with to type this up.
21   Q.   You see this last paragraph on Page 2?
22   A.   Yes, sir.
23   Q.   You see that this talks about a mental
24        health incident involving Jerry Rogers?
25   A.   Yes, sir.
```

```
 1   Q.   Why did you feel compelled to discuss Jerry
 2        Rogers' mental health in this letter to the
 3        press and to the public?
 4   A.   Because it -- it showed that he was
 5        unstable at that time, and this was brought
 6        to our attention from a police department,
 7        Monroe, West Monroe Police Department I
 8        believe that brought this -- this
 9        information to us.
10   Q.   So do you think this justified the arrest
11        of Jerry Rogers?
12                MR. COLLINGS:
13                Object to the form.
14                THE WITNESS:
15                I don't think that it -- that had
16           -- this was after the fact I
17           believe.  I don't remember if this
18           occurred prior or after.  I think
19           this -- no.  This happened prior to
20           the arrest.
21   BY MR. MOST:
22   Q.   Right.  So I'm trying to understand why is
23        this mental health incident -- why are you
24        discussing in this letter about the arrest
25        of Jerry Rogers just do say he's a guy with
```

1      mental health issues?

2                    MR. COLLINGS:

3                    Object to the form.

4                    THE WITNESS:

5                    Well, we thought -- I thought for

6              sure that this was information that

7              -- that strongly shows his

8              credibility on the issues on why he

9              was doing what he was doing.

10             There's something definitely not

11             normal with that, and of course,

12             that's not what the -- the media had

13             their -- their story from whoever,

14             but again, it goes back to what

15             promoted him to do what he did in

16             this Krentel investigation.

17     BY MR. MOST:

18     Q.   So if someone had mental health issues and

19          was saying potentially defamatory

20          statements, wouldn't the fact that they had

21          mental health issues make it less likely

22          that they were criminally culpable for

23          defamation rather than more likely?

24                    MR. COLLINGS:

25                    Object to the form.  It calls

```
 1                    for a legal conclusion.
 2                         THE WITNESS:
 3                         That could go either way.  That
 4                    -- that's -- of course, somebody
 5                    with mental health issues, we want
 6                    to get them help, and again, this --
 7                    this incident was brought up to us
 8                    after the arrest of Jerry Rogers.
 9    BY MR. MOST:
10    Q.   Did you think you were getting Jerry Rogers
11         help by arresting him?
12    A.   I -- I don't know.  That's -- that's --
13                         MR. COLLINGS:
14                         Object to the form.
15                         THE WITNESS:
16                         That's -- that's a possibility.
17                    Again, this didn't have anything to
18                    do with our decision to charge him,
19                    no.
20    BY MR. MOST:
21    Q.   So the -- the Jerry Rogers' mental health
22         incident did not have anything to do with
23         the decision to charge Jerry Rogers with
24         criminal defamation.  Is that your
25         testimony?
```

```
1    A.    Again, I'm not -- I don't know the date
2          this incident occurred, but I do believe it
3          was -- it was prior.
4    Q.    Yeah, but my -- my question --
5    A.    It was prior.
6    Q.    -- was I think I just heard you say the
7          mental health incident had no part of the
8          decision to charge Jerry Rogers --
9    A.    This came up after -- this -- yeah, this
10         came up after the arrest of Jerry Rogers if
11         I'm not mistaken.
12   Q.    Okay.  So is my statement accurate, the
13         mental incident had no part in the decision
14         making about whether to charge -- arrest
15         Jerry Rogers for criminal defamation?  Is
16         that true?
17   A.    That is true.
18   Q.    Okay.  So if it had no part in the decision
19         to arrest Jerry Rogers, why is it relevant
20         in this press release?
21                   MR. COLLINGS:
22                   Object to the form.
23                   THE WITNESS:
24                   I think it -- to me, it showed a
25                different side of Jerry Rogers that
```

```
 1              was being portrayed by the media on
 2              his arrest and based on the
 3              editorial that I remember.
 4    BY MR. MOST:
 5    Q.   Okay.  So you --
 6    A.    Again, I don't even know if this was
 7         printed by the paper or not.
 8    Q.    Okay.  Okay.  Moving to page -- Page 3, do
 9         you see this top paragraph that begins,
10         "Regarding the constitutionality"?
11    A.    Yes, sir.
12    Q.    Okay.  You see it says, "Regarding the
13         constitutionality of the LSA 1447, the
14         statute that Mr. Rogers was charged with
15         violating, I am aware that some courts have
16         ruled that the statute may be
17         unconstitutional insofar as it relates to
18         any public expressions about public
19         officials."  Do you see that part?
20    A.    I do.
21    Q.    Okay.  Did you participate in the drafting
22         of this paragraph?
23    A.    Yes, sir.
24    Q.    Okay.  So in 2019 you were aware in some
25         way that there was some issues surround --
```

```
 1          surrounding the constitutionality of
 2          criminal defamation arrests in some
 3          applications, agreed?
 4     A.   Agreed.
 5     Q.   Okay.  Were you aware of that prior to the
 6          arrest of Jerry Rogers?
 7     A.   Yes.
 8     Q.   Okay.  So at some point prior to the arrest
 9          of Jerry Rogers someone raised with you the
10          fact that criminal defamation is
11          unconstitutional in some applications,
12          correct?
13     A.   Yeah, from what I remember unconstitutional
14          --
15     Q.   Right.
16     A.   -- as it relates to a public -- any public
17          expressions -- public expressions about a
18          public official, and I'm the public
19          official, not the detective who was
20          assigned, the lead detective in the Krentel
21          case.
22     Q.   Okay.  So who discussed with you the
23          potential unconstitutionality of criminal
24          defamation in some context?  Was that
25          Culpeper?
```

```
 1   A.    Yes, sir.
 2   Q.    Okay.  Anybody else?
 3   A.    No, sir.
 4   Q.    Did he -- did he articulate the -- the con
 5         -- the specific context in which criminal
 6         defamation would be unconstitutional?
 7   A.    No, sir.
 8   Q.    Okay.
 9   A.    The only -- the only other information that
10         I had in a letter form was from Collin Sims
11         at the DA's Office, which was around two or
12         three days after the arrest of Mr. Rogers,
13         and basically Mr. Sims wrote a letter
14         deferring the case to the AG's Office,
15         recusing themselves from prosecuting the
16         case.  It also stipulated in his letter
17         that -- that he felt that there's a --
18         there's a possibility it was
19         unconstitutional, the arrest.
20   Q.    Okay, and in the sense --
21   A.    That's -- that's where I learned that there
22         -- there was a -- a possibility of this
23         being a con -- an unconstitutional issue.
24   Q.    Okay.  So you learned about it, the
25         potential unconstitutionality from Danny
```

```
 1        Culpeper before the arrest and then also
 2        from Collin Sims' letter after the arrest,
 3        correct?
 4   A.   Not before the arrest.  The -- the -- the
 5        information from Collin Sims came a couple
 6        of days after the arrest.
 7   Q.   Okay, but you just testified a few minutes
 8        ago that Danny Culpeper had raised the --
 9        the issue to you before the arrest.  Is --
10        are you changing your testimony?
11   A.   No, that's not what I said.  I said that
12        based on his information and prior accounts
13        of using that statute, we didn't see a
14        problem with moving forward with obtaining
15        the arrest warrant.  There was never any
16        mention from Danny Culpeper that this was
17        any -- any -- anywhere found to be
18        unconstitutional; only when regarding to my
19        position as the elected official or public
20        official.
21   Q.   Okay.
22   A.   There was -- there was discussion, and it
23        wasn't -- it wasn't about me, the elected
24        official, the public elected official.  It
25        was about the detective -- the detective,
```

1          the lead detective that was assigned to
2          that case.
3     Q.   Are you saying there -- there was nothing
4          criticizing you, the Sheriff, in Jerry
5          Rogers' emails or you're saying that's not
6          what he was arrested for?
7     A.   No, I was not the victim.  I was not -- he
8          was not charged with -- with the criminal
9          statute for defamation by -- by attacking
10         me and -- and making misleading statements
11         about me or the case.  It was more the
12         detective that was working that -- that
13         investigation, Buckner, Detective Buckner.
14    Q.   Okay.  So you -- if I'm understanding you
15         correctly, you did have a conversation with
16         Danny Culpeper prior to the arrest of Jerry
17         Rogers about the unconstitutionality of a
18         criminal defamation arrest in some cases,
19         but you concluded with Danny Culpeper that
20         that would not apply to the arrest of Jerry
21         Rogers.  Is that accurate?
22    A.   I don't remember the exact terminology that
23         was used, but again, I was not the victim
24         in this case.
25    Q.   Right.  So you -- you had -- prior to the

1    arrest of Jerry Rogers, you had a

2    discussion with Danny Culpeper about the

3    significance of who the victim of criminal

4    defamation was, correct?

5  A.   Yes, sir.

6  Q.   Okay, and that was in the context of what

7    the Courts had said when it would be

8    constitutional to use criminal defamation,

9    correct?

10 A.   Yes, sir.

11 Q.   Okay, and your sentence here in this -- in

12   this open letter, it says, "I'm aware that

13   some courts," you see that part?

14 A.   Yes, sir.

15 Q.   Does that "some courts" include the U.S.

16   Supreme Court?

17 A.   As it relates to the letter I received a

18   couple of days later, that it was declared

19   unconstitutional in one or more issues with

20   that charge --

21 Q.   Okay.

22 A.   -- but it was -- it was more -- it was

23   based on a State -- a State ruling, not a

24   Supreme Court ruling.

25 Q.   Okay.  The State Supreme Court?

```
 1   A.   Yes, sir.

 2   Q.   Okay.  So when you talk about --

 3   A.   Again, the first time again that came up on

 4        the issue of the arrest was from Collin

 5        Sims.

 6   Q.   Okay.

 7   A.   And again that letter was received two days

 8        or three days after the arrest of Mr.

 9        Rogers.

10   Q.   So when you were saying, "some courts," in

11        this sentence, you're referring to some

12        courts including the Louisiana Supreme

13        Court, correct?

14   A.   Yes, sir.

15   Q.   Okay.  What other courts?  Does that

16        include Federal Courts as well?

17   A.   I -- I would assume so.

18   Q.   Okay.  The next sentence says, "Mr. Rogers'

19        activity, however, does not fit within that

20        description."  Do you see that part?

21   A.   Yes, sir.

22   Q.   Okay.  Why does Mr. Rogers' activity not

23        fit within that description?

24                  MR. COLLINGS:

25                      Object to the form.  It calls for
```

```
 1              a legal conclusion.
 2    BY MR. MOST:
 3    Q.   Mr. -- Sheriff, your -- your lawyer will
 4         make objections to establish the record.
 5    A.   Yes, I know.
 6    Q.   That's the objection.  Unless he says to
 7         not answer, you can just go on and answer.
 8    A.   Again, based on me not being the victim,
 9         when it says, "I am aware about public
10         officials," and that's talking about me,
11         the Sheriff, the elected official, not the
12         detective.  So Mr. Rogers' activity,
13         however, does not fit within that
14         description.
15    Q.   Okay.  So Mr. Rogers was arrested for
16         criminal defamation of a detective rather
17         than a Sheriff, and so for that reason you
18         concluded that it would be constitutional
19         to arrest him, agreed?
20    A.   Based on the information provided to me
21         from the investigators on that case, yes.
22    Q.   Okay.  Any other reasons why Mr. Rogers'
23         activity does not fit within that
24         description other than that one you
25         articulated?
```

```
 1                     MR. COLLINGS:
 2                     Again, same objection.  Calls for
 3            a legal conclusion.
 4                     THE WITNESS:
 5                     I don't know.
 6      BY MR. MOST:
 7      Q.   Okay.  So you mentioned earlier that you
 8           have a broad understanding generally of the
 9           idea of defamation that involves false
10           statements, right?
11      A.   Yes.
12      Q.   And do you understand that they have to be
13           false statements of fact rather than, say,
14           opinion?
15      A.   I don't know.  I don't -- I don't know the
16           legal determination of it, no.
17      Q.   Okay.  I mean, do you think your Sheriff's
18           Office can arrest someone for expressing
19           their opinions?
20      A.   No.
21      Q.   Okay.  Do you think your Sheriff's Office
22           can arrest someone for calling someone else
23           clueless?
24      A.   No, sir.
25                     MR. COLLINGS:
```

```
 1                    Object to the form.
 2     BY MR. MOST:
 3     Q.   Do you think your Sheriff's Office can
 4          arrest someone for -- for saying anything
 5          is better than somebody?
 6                    MR. COLLINGS:
 7                    Object to the form.
 8                    THE WITNESS:
 9                    No, sir.
10     BY MR. MOST:
11     Q.   Okay.  Do you think your Sheriff's Office
12          can arrest someone for calling someone a
13          stone cold rookie?
14     A.   The possibility is there, yes.
15     Q.   Okay.
16     A.   And again, it would be the totality of the
17          circumstances involving that particular
18          case or incident.
19     Q.   So do you know what happened with regard to
20          the prosecution of Jerry Rogers after the
21          arrest of Jerry Rogers?
22     A.   The DA's Office recused themselves, sent me
23          a letter from Collin Sims, with --
24          basically referring the case to the AG's
25          Office to handle because there was a
```

```
 1          conflict of interest.  The conflict, I've
 2          never confirmed, but supposedly Jerry
 3          Rogers' wife works for the DA's Office and
 4          Collin Sims.  So that's the -- the reason
 5          that we found out that he referred the care
 6          -- deferred the case to the AG's Office.
 7    Q.    Okay.
 8    A.    That's when he also gave his opinion that
 9          there was a possibility of it being
10          unconstitutional.
11    Q.    And by, "it being unconstitutional," you
12          mean the arrest of Jerry Rogers?
13    A.    Yes.  Yes, the charge.
14    Q.    Okay.  Did you know then that subsequently
15          Judge Gardiner found no probable cause for
16          the arrest?
17    A.    I don't know.  That was a bond hearing I
18          believe.  Again, we had sufficient probable
19          cause to submit to Judge Childress, who
20          signed the arrest warrant.
21    Q.    Okay.
22    A.    So I'm not familiar with Judge Gardner and
23          -- and the bond hearing, no.
24    Q.    When you submit an Affidavit -- when your
25          office submits an Affidavit in support of
```

1       an arrest warrant, they have to include all
2       relevant facts, correct?
3    A.   Yes.
4    Q.   Okay, and if -- and if the DA's Office had
5       been consulted and suggested that a charge
6       might be unconstitutional with regard to a
7       particular person, is that the kind of
8       thing that should be included in an
9       Affidavit in support of an arrest warrant?
10   A.   Absolutely, if -- if it occurred, I would
11      say yes.
12   Q.   Okay, and then do you know what the AG's
13      Office expressed with regard to prosecution
14      of Jerry Rogers?
15   A.   Repeat the question.
16   Q.   Sure.  So the DA's Office recused itself.
17      It went up to the AG, right?
18   A.   Yes, sir.
19   Q.   Okay.  Do you know what the Attorney
20      General's Office expressed with regard to
21      the prosecution of Jerry Rogers?
22   A.   They dismissed the case from what I
23      remember.
24   Q.   Okay.  I'm going to pull up "Exhibit E"
25      here.  Do you see that this is the

1         declination of charges in the investigation

2         of Jerry Rogers by the AG's Office?

3    A.   I do.

4    Q.   Okay, and do you see the last sentence that

5         says, "Because the alleged conduct under

6         these specific facts involve statements

7         aimed at a public official performing

8         public duties, this office is precluded by

9         law from moving forward with any criminal

10        action."  Do you see that part?

11   A.   I do.

12   Q.   Okay.  So they're not just dismissing the

13        charges, but they're also expressing the

14        opinion that it would be unconstitutional

15        to proceed with the prosecution of Jerry

16        Rogers, agreed?

17   A.   I -- I can't answer what -- what they

18        wrote.  I can -- I can -- it says, "the

19        alleged conduct under these specific facts

20        involve statements aimed at a public

21        official performing public duties.  This

22        office is" -- "with any criminal action,"

23        but it doesn't stipulate unconstitutional.

24   Q.   Okay.  So they're at least expressing that

25        because of the facts here, they are

```
 1          precluded by law from moving forward with
 2          the prosecution, correct?
 3                    MR. COLLINGS:
 4                    Object to the form.  The document
 5               speaks for itself.
 6                    THE WITNESS:
 7                    Yeah, I can't answer for them
 8               what they're -- what they're -- what
 9               they believed the reason was.
10   BY MR. MOST:
11   Q.   Right, but is it your --
12   A.   That's right.
13   Q.   -- understanding reading this that the
14        Attorney General's Office is expressing
15        that they're precluded from -- by law from
16        moving forward with the prosecution of
17        Jerry Rogers?
18                    MR. COLLINGS:
19                    Object to the form.
20                    THE WITNESS:
21                    That's what they're claiming.
22               That's -- that's -- they have that
23               right.
24   BY MR. MOST:
25   Q.   Okay, and do you think they're correct or
```

```
 1        incorrect about that?
 2   A.   It's their opinion.
 3   Q.   Right, but do you agree with their opinion?
 4              MR. COLLINGS:
 5              Object to the form.  Calls for a
 6          legal conclusion.
 7              THE WITNESS:
 8              Yeah, I don't know.
 9   BY MR. MOST:
10   Q.   Okay.
11   A.   I'm not a lawyer.
12   Q.   Okay.  So you have now subsequent to the
13        arrest of Jerry Rogers received some
14        correspondence from the DA's Office, from
15        the Attorney General's Office.  Knowing
16        what you know now if presented with the
17        same facts with regard to Jerry Rogers,
18        would you still arrest him for criminal
19        defamation?
20              MR. COLLINGS:
21              Object to the form.
22              THE WITNESS:
23              Yes, I would.  I -- again, it
24          wasn't like we didn't do an
25          investigation, develop probable
```

```
 1              cause, identify who the fictitious
 2              emails were being sent from or why.
 3              We did uncover that during our
 4              investigation, and again, we
 5              obtained an arrest warrant for Mr.
 6              Rogers and -- and again, based on
 7              the totality of -- of the
 8              circumstances and the information
 9              and evidence that we uncovered, yes.
10  BY MR. MOST:
11  Q.   Okay.  So going back to the fall of 2019,
12       you were running for re-election, and the
13       election was to be held in October of 2019,
14       right?
15  A.   Yes, sir.
16  Q.   Okay, and would you say you were under
17       political pressure because of the Sheriff's
18       Office, the fact that the Sheriff's Office
19       had not yet solved the Nanette Krentel
20       murder?
21  A.   Yes, I do agree with that.
22  Q.   Okay.  In fact, prior to Jerry Rogers, the
23       Sheriff's Office had made no arrests
24       connected to the Nanette -- Nanette Krentel
25       death at all, correct?
```

```
 1   A.    No, sir.
 2   Q.    So, "No, sir," I'm correct in saying there
 3         were no arrests, right?
 4   A.    There were no arrests, and to this day,
 5         there has not been an arrest that I'm aware
 6         of, no, sir.
 7   Q.    Okay.  In fact, the only arrest to date
 8         that your office has made of anyone even
 9         marginally connected to the Nanette Krentel
10         death is Jerry Rogers, correct?
11   A.    That, I don't know, and the only reason why
12         I say that is because a year ago, back just
13         over a year ago, the DA's Office requested
14         the entire Krentel case from us, and we
15         submitted the entire case file over to the
16         DA's Office for their review, not knowing
17         -- and that was through a -- that was
18         actually through a -- a subpoena.  So we
19         turned the case over to them, and what
20         they've done with that case since then, I'm
21         not sure.  I haven't heard any -- any
22         movement in that case, but I'm not -- I'm
23         not sure if there has been any other
24         arrests or what they've done with the case
25         in the last year.
```

1    Q.   Okay.

2    A.   So I -- I mean, you know, as far as any

3         arrests pertaining -- remotely pertaining

4         to that case, the only one I would know of

5         would be Jerry.

6    Q.   At least as of the October 2019 Sheriff's

7         election, there had been no arrests other

8         than Jerry Rogers in any way connected to

9         the Nanette Krentel death, agreed?

10   A.   No arrests.  Several search warrants and

11        interviews, and again, you know, years of

12        -- years of investigating that crime.

13   Q.   Okay.  Was the decision to arrest Jerry

14        Rogers for criminal defamation motivated in

15        any part by the political pressure that

16        your office was facing regarding the

17        Nanette Krentel investigation?

18   A.   Absolutely not.

19   Q.   Okay.

20   A.   And again, I didn't know at that time who

21        Jerry was supporting for the position.

22   Q.   Okay.  So we may be close to the end.  If

23        it's all right with you, let's take a

24        ten-minute break.  I'm going to go over my

25        notes and -- and -- and see if there's any

```
 1        remaining questions, and then you're
 2        attorney, Mr. Collings, will have the right
 3        to ask you any questions if he so chooses,
 4        and then unless I've got any redirect, then
 5        we'll be done, all right?
 6   A.    You've got it.
 7   Q.    So let's reconvene at 11:45.
 8                   MR. COLLINGS:
 9                   Okay.
10                   (Break in proceedings.)
11   BY MR. MOST:
12   Q.    All right.  Sheriff, during that break, did
13        you review any documents?
14   A.    No, sir.
15   Q.    Did you talk to anyone other than your
16        attorney?
17   A.    No, sir.
18   Q.    Okay.  Well, that's all the questions I've
19        got, reserving the right for redirect.
20                   MR. MOST:
21                   Chad, do you have any questions?
22                   MR. COLLINGS:
23                   I have none.
24   BY MR. MOST:
25   Q.    Okay.  Sheriff, thank you for your time.
```

1        We appreciate it, and unless there's any

2        objections, we'll -- we'll close the

3        deposition now.

4                    MR. COLLINGS:

5                    All right.   Thank you.

6                    THE WITNESS:

7                    Thank you.

8                    MR. COLLINGS:

9                    Have a good day.

10                   (Whereupon, the taking of the

11              witness' testimony was concluded.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    WITNESS' CERTIFICATE

2

3          I, SHERIFF RANDALL CARTER SMITH, have

4    read or have had the foregoing testimony read to

5    me pursuant to Rule 30(e) of the Federal Rules

6    of Civil Procedure and/or Article 1445 of the

7    Louisiana Code of Civil Procedure and do hereby

8    certify that to the best of my ability and

9    understanding, it is a true and correction

10   transcription of my testimony.

11

12

13   Please check one:

14

15   _____Without corrections

16

17   _____With correction (see errata sheet)

18

19   _____    _____

20   WITNESS' SIGNATURE                       DATE

21

22

23

24

25

1               C E R T I F I C A T E
2               THIS CERTIFICATION IS VALID ONLY FOR
A TRANSCRIPT ACCOMPANIED BY MY ORIGINAL
3     SIGNATURE AND ORIGINAL REQUIRED SEAL ON THIS
PAGE.
4
              I, RAYNEL E. SCHULE, Certified Court
5     Reporter, #77005, in good standing, in and for
the State of Louisiana, as the officer before
6     whom this testimony was taken, do hereby certify
that SHERIFF RANDALL CARTER SMITH, after having
7     been duly sworn by me upon authority of R.S.
37:2554, did testify as hereinbefore set forth
8     in the foregoing 85 pages; that this testimony
was reported by me in stenotype reporting
9     method, was prepared and transcribed by me or
under my personal direction and supervision, and
10    is a true and correct transcript to the best of
my ability and understanding; that the
11    transcript has been prepared in compliance with
transcript format guidelines required by statute
12    or by rules of the Board, that I have acted in
compliance with the prohibition on contractual
13    relationships, as defined by Louisiana Code of
Civil Procedure Article 1434 and in rules and
14    advisory opinions of the Board; that I am not of
counsel, not related to counsel or to the
15    parties herein, nor am I otherwise interested in
the outcome of this matter.
16
17
18    _____   _____
      Date               Raynel E. Schule, CSR
19                       Certified Shorthand Reporter
                         State of Louisiana
20
21
22
23
24
25