UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


JERRY ROGERS, JR.,                    CIVIL ACTION

      Plaintiff                     NO. 20-517

VERSUS                                JUDGE MILAZZO

                                      MAG. DOUGLAS

SHERIFF RANDY SMITH, DANNY

CULPEPER, AND KEITH CANIZARO

      Defendants




      DEPOSITION OF MAJOR DANIEL R. CULPEPER,
II, given in the above-entitled cause, via Zoom
videoconferencing, pursuant to the following
stipulation, before Sandra P. DiFebbo, Certified
Shorthand Reporter, in and for the State of
Louisiana, on the 29th day of November, 2021,
commencing at 1:50 PM.

EXHIBIT B

```
 1    APPEARANCES (Via Zoom):

 2

 3              MOST & ASSOCIATES
              BY: WILLIAM MOST,
 4            ATTORNEY AT LAW -and-
              HOPE PHELPS,
 5            ATTORNEY AT LAW
              201 St. Charles Avenue
 6            Suite 114, #101
              New Orleans, Louisiana  70170
 7            Representing the Plaintiff

 8

 9

10              MILLING, BENSON, WOODWARD, LLP
              BY:  CHADWICK W. COLLINGS,
11            ATTORNEY AT LAW
              68031 Capital Trace Row
12            Mandeville, Louisiana  70471
              Representing the Defendants

13

14    Also Present:

15              Jerry Rogers (via Zoom)

16

17    Reported By:

18

19              Sandra P. DiFebbo
20            Certified Shorthand Reporter
              State of Louisiana

21

22

23

24

25
```

3

```
 1     E X A M I N A T I O N        I N D E X
 2
 3                                    Page
 4   BY MR. MOST:                      6
 5   BY MR. COLLINGS:                  81
 6
 7
 8
 9     E X H I B I T              I N D E X
10
11                          Page
12
13   Exhibit M                        64
14   Exhibit U                        67
15   Exhibit O                        77
16
17
18
19
20
21
22
23
24
25
```

1              S T I P U L A T I O N

2

3              It is stipulated and agreed by and

4    between Counsel for the parties hereto that the

5    deposition of MAJOR DANIEL R. CULPEPER, II, is

6    hereby being taken pursuant to the Federal Rules of

7    Civil Procedure for all purposes in accordance with

8    law;

9              That the formalities of reading and

10   signing are specifically reserved;

11             That the formalities of sealing,

12   certification, and filing are hereby specifically

13   waived.

14             That all objections, save those as to

15   the form of the question and responsiveness of the

16   answer are hereby reserved until such time as this

17   deposition or any part thereof is used or sought to

18   be used in evidence.

19                    * * * * *

20             Sandra P. DiFebbo, Certified Shorthand

21   Reporter, in and for the State of Louisiana,

22   officiated in administering the oath to the witness

23   via Zoom.

24

25

```
 1   EXAMINATION BY MR. MOST:
 2        Q.    Good afternoon.   What is your title so I
 3   know what to call you?
 4        A.    Major.
 5        Q.    Major.   Okay.   Major Culpeper.   Good
 6   afternoon.   I think you know who I am, since you
 7   sat in on the previous deposition.   I'm the lawyer
 8   representing Jerry Rogers.   I may call you Major
 9   Culpeper, officer.   If I call you Mr. Culpeper, it
10   is not intended as a slight.   It may just slip out.
11        A.    That's fine.
12        MR. MOST:
13              Chad, can we stipulate that this
14           deposition was properly noticed, and
15           the court reporter is duly qualified,
16           subject to your prior comment in the
17           prior deposition?
18        MR. COLLINGS:
19              Sure.
20   BY MR. MOST:
21        Q.    All right.   So, Major, would you give us
22   your full name and title for the record?
23        A.    Yeah.   My full name is Daniel Culpeper,
24   C-U-L-P-E-P-E-R, middle name Ray, R-A-Y.   I'm the
25   second, and I go by Danny.
```

```
 1        Q.    Thank you. Major, have you ever given a
 2   deposition before?
 3        A.    Yes, sir, I have.
 4        Q.    Approximately how many have you given?
 5        A.    One previous.
 6        Q.    What case was that in?
 7        A.    That was in the Fred Oswald case.
 8        Q.    Are you a defendant in that case?
 9        A.    A witness.
10        Q.    So you understand that today you are
11   under oath, correct?
12        A.    Correct.
13        Q.    That your answers here today have the
14   same force as if we were in a courtroom with a
15   judge or jury?
16        A.    Yes, sir.
17        Q.    Is there anything major that would
18   prevent you from giving me your full attention and
19   complete and truthful answers whether it is
20   medication, illness, lack of sleep, or anything
21   else?
22        A.    None of the above.
23        Q.    And like with Captain Canizaro, if you
24   need to take any breaks at any point, please, just
25   let me or Chad know, and we'll take breaks,
```

```
 1   although, as with Captain Canizaro, I may ask you
 2   what you reviewed during the break and who you
 3   spoke to and what you spoke about, even if it's
 4   your attorney.  All right?
 5        A.   Yes, sir.
 6        Q.   Will you agree that if I ask you a
 7   question that you don't understand or I'm not clear
 8   in what I'm asking, you will tell me that you don't
 9   understand or that I'm not being clear rather than
10   just trying to answer the question anyway?
11        A.   Yes, sir.
12        Q.   As with Captain Canizaro, this is a Zoom
13   deposition.  Who is present in the room with you
14   since we can't see them?
15        A.   Just Chad Collings.
16        Q.   Because it's a Zoom deposition, we can't
17   see if anyone tries to communicate with you, which
18   wouldn't be proper during a deposition, so will you
19   agree now to tell me if at any point during this
20   deposition someone tries to communicate with you
21   whether it's via hand signals, whispers, text
22   message, a passed note, or anything else?
23        A.   Yes, sir.
24        Q.   And, Major, do you know what case you are
25   here for today?
```

1      A.    Jerry Rogers.

2      Q.    Do you understand that you are a

3  defendant in that case?

4      A.    Yes, sir.

5      Q.    Roughly, when did you begin preparing for

6  this deposition?

7      A.    I prepared for it when I was notified by

8  y'all that I was being sued.

9      Q.    What did you do, aside from talking to a

10  lawyer, which I won't ask you about?  Aside from

11  talking to a lawyer, what did you do to prepare for

12  this deposition?

13      A.    Just kind of went over the timeline of

14  things that I could remember at that point in the

15  beginning and just recently reviewed the FBI

16  report, the redacted FBI report, as well.

17      Q.    So let's take those one at a time.  You

18  said you reviewed the timeline.  Does that mean you

19  looked at some documents or you just thought things

20  over in your head?

21      A.    Just thought things over.

22      Q.    Then you reviewed the redacted version of

23  the FBI report.  Have you seen the unredacted

24  version?

25      A.    No, sir, I have not.

1     Q.    Have you signed anything that would allow
2    you to see the unredacted version?
3     A.    I have not.
4           MR. MOST:
5                 Chad, this is a question for you.
6              Chad, have you signed the privacy act
7              waiver?
8           MR. COLLINGS:
9                 I have not.
10          MR. MOST:
11                Okay. We can discuss that later, but
12             you are welcome to do so and obtain an
13             unredacted copy.  I think that is
14             available to you.
15          MR. COLLINGS:
16                Okay.
17   BY MR. MOST:
18    Q.    Did you, Major, review any documents in
19   preparation for this deposition other than the
20   redacted FBI report?
21    A.    Maybe earlier on I might have looked at
22   the affidavit.  That would have been early on.  It
23   was mainly just the -- the main documentation was
24   the FBI report that I received.
25    Q.    The affidavit.  Which affidavit are you

1    describing?

2         A.    The affidavit of arrest for Jerry Rogers.

3         Q.    Other than your attorney, did you talk to

4    anyone to prepare for today's deposition?

5         A.    No, sir.

6         Q.    And I believe you were present for the

7    entirety of Captain Canizaro's deposition; is that

8    right?

9         A.    Yes, sir, I was.

10        Q.    Were you able to hear his testimony?

11        A.    I did.

12        Q.    Major, what is your current job title and

13   role at the sheriff's office?

14        A.    Right now I'm a major.  Of course I'm

15   over our Special Operations Division.  That's our

16   Marine Division, our Traffic Division.  I'm also

17   over our Narcotics Division as well.  Over our

18   radio room as well.  Courtroom security, and, also,

19   SWAT team, dive team, bomb team, falls under my

20   category as well.

21        Q.    Is that the role you held at the time of

22   Jerry Rogers' arrest in 2019?

23        A.    No, sir.

24        Q.    What was your role at the time of Jerry

25   Rogers' arrest in 2019?

1    A.    I was a deputy chief.  I was over Major

2  Crimes.  Well, I'm sorry.  Investigations in

3  general.  Crime lab.  I believe HR might have been

4  under my scope as well at the time.

5    Q.    So in 2019, you were deputy chief.  Does

6  that mean that you reported directly to the

7  sheriff?

8    A.    Yes, sir.  I don't think we had a chief

9  deputy at that time, so my communication would have

10 been directly to the sheriff.

11   Q.    Currently, do you report directly to the

12 sheriff?

13   A.    No, sir.  I have a deputy chief above me

14 currently.

15   Q.    This may be a stupid question.  Is a

16 deputy chief and a chief deputy the same thing or

17 are those different roles?

18   A.    They're different.  Chief deputy falls

19 directly underneath the sheriff.  Consider the

20 sheriff the number one.  The chief deputy would be

21 number two in the department.

22   Q.    So there is the sheriff, the chief

23 deputy, and below that there is deputy chiefs?

24   A.    Correct.

25   Q.    So currently you are a major who reports

```
 1   to a chief deputy, who reports to the deputy chief,
 2   who reports to the sheriff?
 3        A.   Yes, sir.
 4        Q.   Does that mean that you were demoted at
 5   some point between 2019 and today?
 6        A.   Yes, sir.
 7        Q.   When were you demoted?
 8        A.   I have not looked at the paperwork.  '19,
 9   '20, maybe. I'm sorry.  I don't have the exact
10   date.
11        Q.   That's okay.  What were the circumstances
12   surrounding that demotion?
13        A.   It was for a policy violation and work
14   ethics.
15        Q.   What was the policy violation that you
16   were alleged to have committed?
17        A.   Not following the chain of command.
18        Q.   What was the act that you were alleged to
19   have done that was alleged to be a policy
20   violation?
21        A.   I had received a phone call, 2:00 AM,
22   3:00 AM in the morning.  At the time, I was over
23   the jail and made a decision to release somebody
24   with a DWI that was trying to get out of the jail.
25   Didn't ask the pertinent questions I think at that
```

1   time that I should have asked.  So that was the

2   work ethics part of it.

3        Q.   And did you say that the FBI was trying

4   to get out of the jail?

5        A.   Oh, no, no.  I'm sorry.  No.  I didn't

6   say anything about the FBI.  I said, basically, it

7   was a DWI.

8        Q.   Okay.

9        A.   It was a DWI case.

10       Q.   I got you.  Okay.  I know what you are

11  talking about.  Could you give us just the very

12  nutshell version of your education and career

13  history?

14       A.   Sure.  I graduated from Slidell High

15  School.  Then I went to McNeese State University

16  where I graduated with a bachelor's degree.

17       Q.   Have you worked at the St. Tammany Parish

18  Sheriff's Office since finishing school?

19       A.   Yes, sir.

20       Q.   What year did you first become a law

21  enforcement officer?

22       A.   1994.

23       Q.   So you've been a St. Tammany Parish

24  Sheriff's officer of one kind or another for

25  approximately 27 years?

1   A. Twenty-seven years at this department,

2 yes, sir.

3   Q. Have you ever served at any other

4 departments?

5   A. No, sir.

6   Q. So in 2019, at the time of Jerry Rogers'

7 arrest, the Major Crimes Unit reported up to you,

8 correct?

9   A. Correct.

10   Q. And Keith Canizaro was in that chain of

11 command.  He reported to Lieutenant Hotard, who

12 reported to Steve Gaudet, who reported to Major

13 Sharp, who reported to you, correct?

14   A. Yes, sir.

15   Q. How many years were you involved with,

16 either as a member of or supervisory over, the

17 Major Crimes Unit, just approximately?

18   A. It depends on what level you are talking

19 about.  The majority of my career would have been

20 in investigations.  The majority of my promotions

21 has been through investigations.  Basically, from

22 the time I left patrol after three or four years,

23 after being hired, moved to narcotics, which is

24 considered investigations, and then from there

25 basically investigations, a journey here or there

1    and to patrol as well as supervisors.  Kind of

2    jumped around a lot throughout my career.

3         Q.   Specifically with regards to the Major

4    Crimes Unit, how many years, approximately, would

5    you say with Major Crimes or over Major Crimes?

6         A.   Maybe ten years, eight years.  Somewhere

7    in there.  It's hard to say, because I moved around

8    quite a bit.  I went from investigations to patrol

9    and kind of jumped around.  I would say about eight

10   or nine years.

11        Q.   Other than the arrest of Jerry Rogers,

12   can you recall any time that the Major Crimes Unit

13   arrested someone for a misdemeanor violation?

14        A.   I can't think of anything in particular,

15   but depending, you know, on what was going on in

16   investigations.  If something popped up or any

17   major case, it was dealt with, with that crew.  I

18   can't particularly think of anything off the top of

19   my head.  I mean, just to expound on that a little

20   bit further.  You know, Major Crimes was set up as

21   well to deal with any employees, any type of other

22   law enforcement people outside of our agency and

23   stuff like that.  Those type of cases would have

24   been ran through Major Crimes.

25        Q.   Do you know who Nanette Krentel was?

```
 1        A.   After the homicide, yes.  I didn't know
 2   her personally.
 3        Q.   So you know that Nanette Krentel was a
 4   person in St. Tammany Parish who died in 2017, and
 5   the sheriff's office investigated her death,
 6   correct?
 7        A.   Correct.
 8        Q.   Do you know whether the sheriff's office
 9   initially considered it to be a suicide or a
10   homicide?
11        A.   No, sir.  We continued to work it
12   throughout.  We don't make the rulings on that.
13   That would be the coroner's office.
14        Q.   That death is currently unsolved,
15   correct?
16        A.   That is correct.
17        Q.   Daniel Buckner was the lead investigator
18   of the Krentel investigation, correct?
19        A.   Correct.
20        Q.   He is a detective with the St. Tammany
21   Parish Sheriff's Office?
22        A.   Yes, sir.
23        Q.   I take it you know who Jerry Rogers is?
24        A.   I do.
25        Q.   Did you know him when he was at the St.
```

```
 1    Tammany Parish Sheriff's Office?
 2         A.   I knew him.  I didn't really -- I'm sure
 3    -- I'm not even sure.  I'm pretty sure our paths
 4    probably crossed.  I think he was in investigations
 5    at one point in time, but I knew of him. Personally
 6    don't know him.
 7         Q.   He left the sheriff's office and became a
 8    federal investigator, correct?
 9         A.   That's what I heard, yes, sir.
10         Q.   In 2019, the sheriff was up for
11    re-election, correct?
12         A.   That is correct.
13         Q.   In 2019, did you know whether Jerry
14    Rogers was aligned politically with the sheriff or
15    one of his opponents?
16         A.   No.  No, sir.
17         Q.   Jerry Rogers was ultimately arrested by
18    St. Tammany Parish Sheriff's Office for criminal
19    defamation; is that correct?
20         A.   That's correct.
21         Q.   Prior to that, there were some search
22    warrants which obtained his e-mails, correct?
23         A.   That is correct.
24         Q.   Did you see those search warrant
25    applications?
```

1        A.    No, sir.  I don't recall seeing them.

2        Q.    I'm going to pull up -- I can also zoom

3   in.  Just let me know any time you want me to.

4        A.    That's fine.  I got my glasses.

5        Q.    Do you see this is a search warrant for

6   the e-mails of the justicenanette@yahoo.com

7   address?

8        A.    Correct.

9        Q.    Do you see that the contents are believed

10  to be related to a violation, and you see what it

11  is alleging as a violation here?

12       A.    Where it says constitutes a violation of,

13  yes, sir.

14       Q.    It says one count of 14:0000, Structure

15  Fire Death Investigation.  You see that?

16       A.    Yes, sir.

17       Q.    14:0000 is not any crime, is it?

18       A.    I'm not familiar with it.  No, sir.

19       Q.    Is it proper for a search warrant to not

20  identify a crime when seeking a criminal search

21  warrant?

22       A.    I'm not sure what is in the narrative or

23  what is being explained. Normally, it would be

24  explained throughout the narrative.

25       Q.    Does the sheriff's office search warrant

1   have to say what crime is alleged to have been

2   committed?

3        A.   I would think so, yes, sir.

4        Q.   But this one does not identify a specific

5   crime, correct?

6        A.   Like 14 colon, no.  I don't see that

7   there.

8        Q.   Captain Canizaro was the sheriff's office

9   officer who investigated Jerry Rogers, correct?

10       A.   Yes, sir.  One of them.

11       Q.   Did you hear his testimony earlier that

12  he concluded that Jerry Rogers had committed an act

13  of criminal defamation against one victim,

14  specifically, Detective Daniel Buckner?  Did you

15  hear that?

16       A.   Yes, sir, I did.

17       Q.   Does that match your recollection as

18  well?

19       A.   Yes, sir.

20       Q.   Did you hear him identify that Detective

21  Daniel Buckner, as a victim, was identified as

22  being a victim type of law enforcement officer?  Do

23  you recall that?

24       A.   I'm sorry.  Can you repeat the question?

25       Q.   Sure.  Do you recall that Detective --

1    let me start over.  Do you recall that Captain

2    Canizaro testified that Detective Buckner, as a

3    victim, was a victim in his capacity as a law

4    enforcement officer?

5         A.   Yes, sir.

6         Q.   Does that match your recollection as

7    well?

8         A.   Yes, sir.

9         Q.   Did you see or receive the contents of

10   the e-mails that were received subject to the

11   search warrants?

12        A.   Probably in the early stages of them when

13   we first got them I might have read over them, but

14   I don't recall.  I hadn't seen them since.

15        Q.   Do you recall seeing e-mails between the

16   justicenanette e-mail address and the sheriff's

17   opponents in the re-election campaign for sheriff?

18        A.   Yeah, but I remember seeing the ones from

19   -- back and forth with the family.  I don't

20   remember seeing the other ones.

21        Q.   Were you aware that the search warrant

22   had turned up e-mails between someone and the

23   sheriff's opponents in the race for sheriff?

24        A.   Yes, sir.  I had word of that.

25        Q.   Were any special steps taken with regard

1    to those e-mails to or from the sheriff's opponents

2    in the race?

3         A.    Further steps.  No, sir.  I could care

4    less about anything else except for anything that

5    was dealing with the homicide.

6         Q.    Do you think it would be proper for the

7    sheriff to publicize the fruits of a criminal

8    search warrant that involved e-mails between

9    someone and his political opponents?

10              MR. COLLINGS:

11                   Object to the form of the question.

12              THE WITNESS:

13                   Could you be a little more specific?

14   BY MR. MOST:

15        Q.    Maybe I can back up.  It seems to me

16   quite significant that a criminal search warrant

17   turned up private e-mails between the subject of an

18   investigation and the sheriff's opponents in an

19   election.  Would you agree with that?

20        A.    No.  If you're talking about the reason

21   why we got the search warrant, it was because of

22   information from a family member with concerns of

23   who this person was and what they were telling the

24   family.  No.  I never heard anything about

25   opponents or anything like that.

1    Q.   But you were aware that the search
2  warrant turned up e-mails?  Even if the sheriff's
3  opponents were not the target of the search
4  warrant, you were aware at the time that --
5    A.   Yes, sir.  That was pulled up, yeah.  I
6  did hear that information, yes, sir.
7    Q.   To your knowledge, no special steps were
8  taken to segregate those e-mails with the sheriff's
9  opponents from the stuff that was related to the
10  investigation, agreed?
11    A.   Separated?  Like I said, the only thing
12  we were concerned on was the Krentel information.
13  That was it.
14    Q.   So the fact that Jerry Rogers was
15  e-mailing with the sheriff's political opponents
16  was not relevant to any criminal investigation; is
17  that correct?
18    A.   That's correct.
19    Q.   So if the sheriff publicized the fact
20  that Jerry Rogers was e-mailing with the sheriff's
21  political opponents, that would not have been
22  relevant to any criminal investigation by the
23  sheriff's office, agreed?
24    A.   You would have to ask the sheriff that.
25  I can't answer for him.

1      Q.   So at the time of Jerry Rogers' arrest,

2  were you aware of any other times the sheriff's

3  office had arrested someone for criminal

4  defamation?

5      A.   I was informed that we had -- the DA's

6  office had accepted a defamation case prior to that

7  arrest we had on Jerry.

8      Q.   Who told you that?

9      A.   It came up in a discussion, one of our

10 discussions we had prior to doing that.  It was a

11 group discussion we had, and it was brought up.  No

12 specific case was brought up.  They just said the

13 DA's office had accepted a defamation case.

14     Q.   Was it discussed in the context of that

15 defamation case who the victim of the defamation

16 was or what their status was?

17     A.   Prior, no, sir.

18     Q.   So the only thing that was discussed was

19 one time the sheriff's office had arrested someone

20 for criminal defamation, and the DA's office had

21 accepted that, but it was not discussed whether

22 that person was -- the victim of the defamation was

23 a council member, law enforcement officer, regular

24 citizen?  That did not come up?

25     A.   No.  The word "one time" wasn't even

1  used.  I think it was just said that defamation has

2  been used with the DA's office, to my

3  understanding.

4      Q.   And in your approximately 27 years as a

5  law enforcement officer, aside from Jerry Rogers,

6  have you ever been involved in the arrest of

7  someone for criminal defamation other than Jerry

8  Rogers?

9      A.   Me personally, not that I recall.  No,

10  sir.

11      Q.   So when did you first learn -- well, let

12  me back up.  Were you the person who proposed that

13  Jerry Rogers might have committed criminal

14  defamation?

15      A.   No, sir.

16      Q.   When did you first learn about the idea

17  of potentially arresting Jerry Rogers for criminal

18  defamation?

19      A.   How we started the investigation in

20  general? You want me -- how specific --

21      Q.   Sure.  Why don't you start with your

22  understanding and recollection when you first

23  learned about the investigation of Jerry Rogers.

24  How about that?

25      A.   Sure. It was brought to my attention from

1   supervisors that during their investigation,

2   Detective Buckner was reached out by a family

3   member in reference to an anonymous person sending

4   e-mails claiming to be a law enforcement officer

5   and alarming the family and thought that that

6   needed to be checked into to find out what is going

7   on there.  So that was brought up to the

8   detectives, to the supervisors, and eventually

9   brought up to one of them.

10       Q.   So why is someone contacting the family

11   and alarming them a law enforcement matter?

12       A.   I beg your pardon?

13       Q.   Why is someone claiming to be a law

14   enforcement officer and alarming the family, why is

15   that a law enforcement matter?  Is that a crime?

16       A.   Well, we were in the middle of a homicide

17   investigation at this point.  Yeah.  It's our duty

18   to find out who that person is, what that person

19   knows.  We didn't know what we were dealing with at

20   this point.  We are at a stage in the investigation

21   right now where we are running out every lead

22   possible.  We have a task force set up to look into

23   this.  So, yeah, we're obligated at this point,

24   especially if a family member brings this to us and

25   says, "What is going on here?"  We don't know who

1    we're dealing with, what we're dealing with, what

2    the person may, may not know.  So, yeah, we're

3    obligated at this point, in my opinion, to run out

4    that lead.

5        Q.   And then at some point it was established

6    that the author of these e-mails had not committed

7    obstruction of justice, correct?

8        A.   It was looked into and decided, yes, that

9    it did not fit.

10       Q.   At some point it was determined that the

11   author of these e-mails was Jerry Rogers, right?

12       A.   That's correct.

13       Q.   So it was determined to be Jerry Rogers.

14   There was no obstruction of justice.  Why did the

15   investigation continue after that point?

16       A.   It was brought to our attention that once

17   we discovered who it was, that we looked into -- we

18   were looking at obstruction of justice on two

19   people, actually.  That did not fit, but the

20   detective brought it up to my attention that

21   defamation fit to a T in reference to Jerry Rogers

22   for what he was doing, what he had done.

23       Q.   Did you agree with that, that the

24   elements of criminal defamation had been met by

25   Jerry Rogers' actions?

1       A.   Yes, sir.  Eventually down the road,

2   after looking at everything and things being

3   brought to my attention, it did fit.

4       Q.   So what detective proposed the criminal

5   defamation idea to you?

6       A.    It was a group.  It was not one

7   particular person.  Being a deputy chief at the

8   time, I wasn't in their day-to-day activities or

9   everything that was going on.  We met so often at

10  my level.  I was informed of them, of course,

11  opening the investigation, certain things

12  throughout the investigation.  I don't recall one

13  particular person.  When I met with people, they

14  normally were in groups.  I communicated with my

15  major as well.  I don't recall one particular

16  person coming up to me and saying that.  I think it

17  was more so of a communication of this is what we

18  have found.

19      Q.   Who is the we in that group that proposed

20  that?

21      A.   That would be the supervisors.  I am

22  assuming that would have been my major, which would

23  have been Doug Sharp at the time, probably the

24  captain, Steve Gaudet, Lieutenant -- a lot of times

25  we'd meet with just rank.  Sometimes Detective

1    Buckner would be present in these conversations.
2    Sometimes it would be the task force we had set up.
3    So depending on what meeting you are talking about.
4    Like I said, we didn't have that many meetings at
5    my level, as much as they were meeting daily on the
6    investigation, so.
7         Q.   So they were meeting daily about the
8    Jerry Rogers investigation?
9         A.   No, no.  No, sir.  I'm talking about
10   information getting up to me.  I'm sure at some
11   point Detective Canizaro was working daily on it.
12   We worked daily on a lot of investigations.
13        Q.   So you testified just a moment ago that
14   you concluded that the criminal defamation statute
15   matched Jerry Rogers' actions, correct?
16        A.   Correct.
17        Q.   And you had never arrested someone for
18   criminal defamation before, so how did you know
19   that the statute matched Jerry Rogers' actions?
20        A.   Through the information and the evidence
21   and the things that were brought to my attention
22   from the investigators.
23        Q.   Maybe I'll back up.  Did you look at the
24   criminal defamation statute?
25        A.   Yes, sir, I did.

29

1       Q.    Where did you look at it?

2       A.    It was the law book, Louisiana revised

3   law book.

4       Q.    Is that the Westlaw book?

5       A.    Yes, sir.

6       Q.    Do you have a copy of that book in your

7   office?

8       A.    No, sir, I don't.  I did at one point but

9   not now.

10      Q.    Do you know if the sheriff's office has a

11  copy of that law book?

12      A.    Yeah.  We should have several.

13      Q.    Do you know where they would be?

14      A.    Probably in the detectives -- I mean,

15  they're throughout the whole department.

16      Q.    Did you look up the statute anywhere

17  else?  Online or anywhere else?

18      A.    No, sir.  I just looked at it from the

19  law books.

20      Q.    What is your understanding of what

21  criminal defamation is?

22      A.    The law itself is -- public confidence.

23  Taking away the public confidence of that detective

24  in the middle of his investigation.  From our

25  context, looking at it the way the law read.  I

```
 1   believe the law states that it's malicious
 2   publication or expression in any manner which tends
 3   to expose a person to, I think, hatred, ridicule,
 4   contempt.  You know, deprive that person of public
 5   confidence and social intercourse, is I think the
 6   exact definition.  It goes down to some other
 7   sections as well, and that fit exactly what we were
 8   dealing with in this case.
 9         Q.   So that's an extraordinarily good recall
10   of it.
11         A.   I have looked at it since then, yes, sir.
12         Q.   Did you look at the statute in preparing
13   for this deposition?
14         A.   I did.
15         Q.   Did you look at anything else in addition
16   to the statute and the FBI file in preparing for
17   this deposition?
18         A.   No.  I'm dealing with defamation, so I'm
19   going to well look at the defamation statute.  I
20   figured you would ask me about it, so I figured I
21   would freshen up on it.
22         Q.   So in 2019, you looked at the statute,
23   and you concluded that Jerry Rogers' actions were
24   criminal defamation, agreed?
25         A.   Along with the evidence and information
```

1    we had, yes, sir.

2         Q.    And did you understand at the time that

3    for something to be defamation, it has to be false?

4         A.    Repeat that, please.

5         Q.    Yeah.  In 2019, did you understand that

6    for something to be defamation, it has to be false?

7         A.    Calculated falsehoods, yes, sir.

8         Q.    Did you understand at the time, in 2019,

9    that for something to be defamation, it has to be a

10   false statement of fact rather than an opinion? Did

11   you understand that?

12        A.    Yeah.  I just read the exact law that I

13   read to you, so that's what I was going off of.

14        Q.    Did you understand at the time that if

15   something is just someone's opinion, it's not

16   defamatory?  Like if you say, I think someone

17   sucks, that can't be defamation, agreed?

18        A.    Agreed.

19        Q.    If I say someone is an idiot, that is my

20   opinion, that is not defamation, agreed?

21        A.    You are talking about a homicide

22   investigation, too, sir, so we're looking at a

23   fatality, not just words being said, but what words

24   and actions are being portrayed by that as well.

25        Q.    Do you think if someone is just

1    expressing their opinion, but it is in the context

2    of a homicide investigation, that makes it

3    defamation?

4         MR. COLLINGS:

5              Let me make a note or an objection

6              as to the form of the question, if it

7              calls for a legal conclusion.  Dan, if

8              you can answer the question.

9         THE WITNESS:

10             Yeah.  No, like I said, I mean,

11             we're leaving out the evidence and

12             facts of the investigation which all

13             comes together here.

14   BY MR. MOST:

15        Q.   So was it your contention in 2019 that if

16   someone is expressing an opinion about a homicide

17   investigation, that could make it subject to

18   criminal defamation?

19        A.   Well, just like I said, it's the totality

20   of more things.  I mean, that is just a random

21   question.  I mean, you got an anonymous person here

22   who has basically inserted himself in a homicide

23   investigation who was communicating with a family,

24   who is alarming for the family members.  And, so,

25   yeah, it is a little different than just putting it

1    the way you said it.  And misleading the family.

2        Q.   But misleading a family is not a crime,

3    right?

4        A.   You've got to put together everything

5    that we're dealing with, all of the evidence and

6    facts.

7        Q.   Right.  Jerry Rogers was arrested for

8    criminal defamation, for saying certain things

9    about Daniel Buckner in the context of a homicide

10   investigation, agreed?

11       A.   And alarming the family, correct.

12       Q.   Those things that he said that were the

13   basis for the defamation arrest included that

14   Daniel Buckner was clueless, correct?

15       A.   That was one of the things I believe,

16   yes.

17       Q.   And that anything would be better than

18   Daniel Buckner, agreed?

19       A.   That is, also, correct, and, also,

20   leading the family to believe he had no experience,

21   homicide experience, as well.

22       Q.   Do you think calling a detective clueless

23   in the context of a homicide investigation is

24   criminal defamation?

25       A.   Calculated falsehoods, leading the

1   family, inserting yourself anonymously, yes.  I

2   believe the applications of that fit the criteria.

3        Q.   Same with someone saying that anything

4   would be better than a detective in the context of

5   a homicide investigation, you think that would be

6   criminal defamation?

7        A.   I think everything together that he was

8   saying to the family, yes.

9        Q.   So you were a participant to meetings in

10  which the idea of arresting Jerry Rogers for

11  criminal defamation came up, and you looked at the

12  statute, correct?

13       A.   Correct.

14       Q.   At those meetings, was it discussed any

15  of the case law holding that Louisiana's criminal

16  defamation statute is unconstitutional in certain

17  applications?

18       A.   I believe in one meeting it came up, yes,

19  sir.

20       Q.   Which meeting was that?

21       A.   I don't have the date.  It was toward the

22  end of the investigation.  I believe it might have

23  came up in conversation that there was one case.

24  The Livingston Parish case might have came up.  We

25  talked about the application of that.  They didn't

1    think it was -- had the same criteria as ours.

2        Q.   The meeting where it was discussed, the

3    potential unconstitutionality of the criminal

4    defamation statute, in some context, was that the

5    meeting in the conference room adjacent to the

6    sheriff's office?

7        A.   I believe it was, yes, sir.

8        Q.   Was the sheriff present for that

9    discussion?

10       A.   Not that discussion.  I don't believe so.

11   I don't remember.  I don't think so.  No, sir.

12       Q.   So you mentioned the Livingston Parish

13   case.  That's McLin v. Ard, the Fifth Circuit case?

14       A.   I believe so.  I don't remember.  I mean,

15   I did hear Captain Canizaro say it was.  I don't

16   recall at that time.  What I know now wouldn't have

17   been then.  It was a brief conversation about that

18   case at that point.

19       Q.   Was it ever discussed a U.S. Supreme

20   Court case holding that the criminal defamation

21   statute is unconstitutional in certain contexts?

22       A.   I don't recall that, no, sir.

23       Q.   What about a Louisiana Supreme Court case

24   holding the same?

25       A.   I don't recall that, no, sir.

1    Q.   So setting aside a meeting with the DA's
2  office, aside from that one meeting in the
3  conference room adjacent to the sheriff's office,
4  were there any other discussions you had where the
5  potential constitutionality of arresting Jerry
6  Rogers was raised?
7    A.   We had a meeting with the DA's office.
8    Q.   That meeting aside, any others within the
9  sheriff's office?
10    A.   Not that I can recall, no, sir.
11    Q.   Without telling me the contents of any
12  communications with any attorney, did you consult
13  with any attorney other than the DA's office about
14  the potential constitutionality of arresting Jerry
15  Rogers?
16    A.   I don't recall if I had a conversation
17  with our in-house counsel.  No, sir.  I don't
18  recall.
19    Q.   So you said this Livingston Parish case
20  was discussed, and you concluded that that case was
21  sufficiently different than Jerry Rogers' case such
22  that it would be constitutional to arrest Jerry
23  Rogers?  Was that your conclusion?
24    A.   The application of it, yes, sir.
25    Q.   So what was different about Jerry Rogers'

1   case from the Livingston Parish case that made it

2   unconstitutional in the Livingston Parish case but

3   constitutional to arrest Jerry Rogers?

4        A.   That was several things.  One, it was a

5   Facebook post.  I believe it was council members,

6   elected council officials, that were involved in

7   that one as well.  This was not a -- that one was

8   not a homicide investigation.  There was no one

9   hiding behind -- anonymously inserting himself into

10  a homicide investigation and alarming -- but,

11  basically, an investigation.

12       Q.   Anything else?

13       A.   That's the gist of what I can remember.

14       Q.   So the four things I heard there that you

15  concluded distinguished the Livingston Parish case

16  from Jerry Rogers' situation were, one, that it was

17  via Facebook versus e-mail; two, that the

18  defamation was about council members versus a

19  detective; three, whether it was anonymous; and

20  four, whether it was in the context of a homicide

21  investigation.  Were those the four differences

22  that you identified that made one arrest

23  constitutional and the other not constitutional?

24       A.   Yeah, and inserting himself in an

25  investigation that he was not part of.

```
 1        Q.   So the first distinguishing
 2   characteristic was Facebook post versus e-mail.  Do
 3   you think that is what makes the difference between
 4   it being constitutional to arrest versus
 5   unconstitutional to arrest someone for criminal
 6   defamation?
 7               MR. COLLINGS:
 8                    Same objection about asking this
 9                 witness for legal opinions.
10               MR. MOST:
11                    That's fine.  We'll construe that
12                 objection for this whole line of
13                 questioning, Chad.  I think that's
14                 fair.
15               THE WITNESS:
16                    Like I said, the totality of
17                 everything.  It's not just one thing
18                 that we're looking at.  It was
19                 everything I just mentioned.  So it's
20                 not one particular thing.  Looking at
21                 the application of it and what we were
22                 dealing with. You know, this isn't
23                 somebody calling somebody a name on
24                 Facebook.  This is a homicide
25                 investigation that we are actively
```

```
 1                  working, so it is the totality of
 2                  everything is what I'm going to say
 3                  throughout them all.
 4     BY MR. MOST:
 5          Q.   So I'll still ask.  Do you think it makes
 6     a difference whether someone is saying what Jerry
 7     Rogers said versus it via e-mail versus a Facebook
 8     post for the purpose of constitutionality?
 9          A.   I do.
10          Q.   What is the basis for you thinking that?
11          A.   Well, Facebook posts are generally
12     public.  He was hiding behind the e-mail, an
13     anonymous e-mail at the time.
14          Q.   The second distinction was that in the
15     Livingston Parish case it was defamation against
16     council members.  Here it was defamation against a
17     detective.  Did you think that made a difference
18     for whether it was constitutional to arrest Jerry
19     Rogers or not?
20          A.   Like the official versus a police
21     officer.
22          Q.   So the answer is yes, you think that
23     makes a constitutional difference?
24          A.   I do.
25          Q.   The third distinction was whether it was
```

```
 1    anonymous or not anonymous.  Do you think that
 2    makes a difference for whether it is constitutional
 3    to arrest someone for criminal defamation or not?
 4         A.   Yeah.  I mean, I'm going to use the word
 5    "application," but yes.
 6         Q.   The fourth criteria was in the context of
 7    inserting someone's self into a homicide
 8    investigation.  You think that makes a difference
 9    for whether it's constitutional to arrest that
10    person for their speech, yes or no?
11         A.   I believe it's all calculated falsehoods.
12         Q.   So the answer is yes?
13         A.   Correct.
14         Q.   Those four criteria, those four
15    distinctions, was there something in the case that
16    you read that made you think those were significant
17    distinctions in terms of the legality of arresting
18    someone for criminal defamation?
19         A.   Going off the evidence and the facts and
20    the law we were looking at, it fit.
21         Q.   Right, but my question was, you
22    identified these four distinguishing
23    characteristics between the two applications.  Was
24    there something in the case that you read that made
25    you think those were legally significant
```

```
 1   distinguishing characteristics?
 2        A.   Yeah.   I mean, misleading the family,
 3   inserting himself into an investigation.
 4   Basically, you know, leading a family in things
 5   that were not true in the middle of a homicide
 6   investigation.
 7        Q.   I understand.   Those are what you believe
 8   were significant, right?   What I'm trying to figure
 9   out is why did you think those were significant.
10   Was there something in the case you read that said
11   those mean -- those are legally significant for the
12   constitutional analysis?
13        A.   You are looking at a law that -- so you
14   are comparing it to the law, which we've been over
15   already, and it fit, so that is my answer.
16        Q.   You compared Jerry Rogers' situation to
17   the text of the statute, and that was the totality
18   of your analysis; is that correct?
19        A.   Yeah.   Yes, sir.
20        Q.   So then you concluded that it would be
21   permissible to arrest Jerry Rogers for criminal
22   defamation, agreed?
23        A.   No.   We made a decision to bring the
24   evidence and facts in front of a judge who made the
25   decision to arrest.
```

```
 1        Q.   But you couldn't bring it to the judge if
 2   you thought it was unconstitutional to arrest him
 3   for that crime, though, agreed?
 4             MR. COLLINGS:
 5                  Object to the form.
 6             THE WITNESS:
 7                  Repeat the question.
 8   BY MR. MOST:
 9        Q.   Sure.  You would not have been lawfully
10   able to go to the judge and seek an arrest warrant
11   if you thought it would be unconstitutional to
12   arrest Jerry Rogers for that crime, agreed?
13             MR. COLLINGS:
14                  Same objection.
15             THE WITNESS:
16                  Like I said, that's why we brought
17                it to a judge, to let him make that
18                decision.
19   BY MR. MOST:
20        Q.   But prior to going to the judge, you had
21   concluded that it would be constitutional to arrest
22   Jerry Rogers for criminal defamation, agreed?
23             MR. COLLINGS:
24                  Object to form.
25             THE WITNESS:
```

```
 1                    Just looking over the evidence and
 2               facts we have in front of us.
 3   BY MR. MOST:
 4        Q.   So the answer is yes, agreed?
 5        A.   That's the way I'm going to answer my
 6   question, sir.
 7        Q.   And so you approved the decision to bring
 8   the arrest before -- the potential arrest before
 9   the judge, correct?
10        A.   I was one of the people, yes, sir.
11        Q.   If you had said no, would it have still
12   happened?
13             MR. COLLINGS:
14                  Object to form.
15             THE WITNESS:
16                  I'm sorry?
17   BY MR. MOST:
18        Q.   It's okay.  Chad is objecting to the form
19   of questions.  He has to make an objection to
20   preserve the record.  You can then answer the
21   question unless he tells you otherwise.
22        A.   Okay.  And I was listening.  Can you
23   repeat the question, please?
24        Q.   Sure.  So if you had said no, would the
25   arrest application have moved forward?
```

```
 1              MR. COLLINGS:
 2                   Object to the form.  Answer, if you
 3                 can.
 4              THE WITNESS:
 5                   I don't know.  That might have been
 6                 a decision that the sheriff would
 7                 ultimately make.  I can't answer that.
 8                 The decision wasn't that, so I can't
 9                 answer that.
10    BY MR. MOST:
11         Q.   Did you review a draft of the affidavit
12    in support of the arrest application?
13         A.   No, sir.
14         Q.   So let's talk about the meeting with the
15    DA's office.  So my understanding is that on
16    September 13th, three days before the arrest of
17    Jerry Rogers, you and certain other members of the
18    St. Tammany Parish Sheriff's Office physically went
19    to the DA's office and met with some members of the
20    DA's office; is that correct?
21         A.   That's correct.
22         Q.   It was to brief the DA's office about the
23    potential arrest of Jerry Rogers for criminal
24    defamation, correct?
25         A.   Correct.
```

```
 1        Q.   Whose decision was it to go to the DA's

 2   office to brief them in advance?

 3        A.   I'm not sure who made the exact decision

 4   at that time.  I don't recall.

 5        Q.   What was it about the potential arrest of

 6   Jerry Rogers that made it significant enough to go

 7   to the district attorney's office?

 8        A.   Probably because it was a law enforcement

 9   officer or a federal agent.  It is not uncommon for

10   us to have these meetings with the DA's office.

11        Q.   What was discussed at that meeting?

12        A.   The main discussion of that meeting was

13   just kind of let them know what we had at that

14   point and know where we were at in the

15   investigation.  We wanted to run it by them.  So

16   basically talked about the application of what we

17   were dealing with.  They brought up -- I believe at

18   one point -- I believe his name was Caplan.  He

19   came in.  We discussed that Livingston case.  We

20   were talking about they thought that case was

21   unconstitutional, but we got into the application

22   of what we were dealing with on our end, so we

23   discussed that, at which time they did not have a

24   decision.  It wasn't definitely, no, you can't do

25   that type situation.  They said it was something
```

1   they would have to look into further.

2       Q.   So at that meeting at the DA's office,

3   the DA's office brought up the potential

4   unconstitutionality of the arrest of Jerry Rogers

5   but didn't give you a firm answer at the meeting;

6   is that --

7       A.   They brought up a case dealing with

8   defamation.  That's the case that they used.

9       Q.   Did they bring it up to suggest that

10  there could be a potential constitutional problem

11  with arresting Jerry Rogers?

12      A.   Yes.  Yes, sir.  That's why it came up.

13  I'm assuming that's why they brought it up.

14      Q.   That was your understanding of why they

15  brought it up, agreed?

16      A.   Agreed, but they were discussing about

17  our case and the application of our case.

18      Q.   But they didn't give you a firm answer of

19  whether they thought for sure it would be

20  unconstitutional to arrest Jerry Rogers for that

21  crime or not at that meeting, agreed?

22      A.   At that meeting, no, sir.

23      Q.   Did you have a subsequent conversation by

24  telephone or in person with anyone from the DA's

25  office about the potential arrest of Jerry Rogers

1  for criminal defamation?

2  　　A.　I had a follow-up phone call with Collin

3  Sims I believe Monday, maybe, the following Monday.

4  　　Q.　But still before the arrest of Jerry

5  Rogers?

6  　　A.　I don't know the timing.  It was before

7  that physical arrest, but I think it was after the

8  decision we made to move forward.

9  　　Q.　What did Collin Sims tell you in that

10  phone call?

11  　　A.　We had communicated, I believe, earlier

12  that morning when we left that meeting that we just

13  discussed.  They said they were going to check into

14  it.  There was no official call you back on a

15  certain date type information.  I did call him

16  Monday morning.  He said they still had not met and

17  discussed it.  We were meeting already that

18  morning.  Like I said, we already ended.  Our

19  investigation was complete at this point.  So we

20  had actually met, made a decision already, being

21  that the DA's office didn't have their decision

22  yet, to go ahead and let a judge make a decision.

23  And, basically, that's what they do.  So the

24  decision was made to move forward with an affidavit

25  with the facts and bring it before a judge.  So

```
1    that was done.  So that was in the process.  I
2    believe later on -- the timing was close, but I did
3    have another conversation with Collin Sims, and,
4    basically, during that conversation, I basically
5    told him that we were moving forward.  You know, he
6    said he thought it would be unconstitutional.  We
7    kind of talked about the application a little bit
8    more.  There was no, you cannot do this.  It was
9    just another quick conversation that didn't last
10   long, and that was it.
11        Q.   So this was -- you're not sure when
12   exactly, but it was before the arrest of Jerry
13   Rogers; is that correct?
14        A.   The physical arrest, yes, sir.  I don't
15   know what time the physical arrest happened.  I
16   believe it was in the afternoon.  We had made a
17   decision to bring it in front of a judge.
18        Q.   And Collin Sims told you that he thought
19   it would be unconstitutional to arrest Jerry
20   Rogers?
21        A.   Yeah.  We talked briefly again about just
22   the application of things.  We told him we're going
23   to move forward with it.  I'm not going out and
24   physically arresting him, but I'm moving forward
25   with -- you know, he's not a judge.  Collin Sims is
```

```
 1    not a judge, nor am I, so the decision was made to
 2    put it in front of a judge.
 3         Q.   You told that to Collin Sims?
 4         A.   I don't know what my exact wording was,
 5    but we said we were going to move forward with it,
 6    yes, sir.
 7         Q.   So it sounds to me like the phone call
 8    with Collin Sims was before the arrest affidavit
 9    was submitted to the judge; is that accurate?
10         A.   I can't say that.  The timing was right
11    then and there.  I'm not sure.
12         Q.   So I understand all the caveats that
13    you've expressed, but it sounds to me like your
14    testimony is that the sheriff's office, before they
15    arrested Jerry Rogers, was advised by the district
16    attorney's office that it would be unconstitutional
17    to do so; is that accurate?
18              MR. COLLINGS:
19                   Object to the form.
20              THE WITNESS:
21                   You can say the physical arrest but
22               not us putting the affidavit in front
23               of the judge.
24    BY MR. MOST:
25         Q.   You're not sure whether it happened
```

```
1    before or after the affidavit?
2         A.   I do not.
3         Q.   So it is a true fact that the sheriff's
4    office, the St. Tammany Parish Sheriff's Office,
5    was advised before the physical arrest of Jerry
6    Rogers for criminal defamation that it would be
7    unconstitutional to arrest Jerry Rogers for
8    criminal defamation, agreed?
9              MR. COLLINGS:
10                  Object to the form.
11             THE WITNESS:
12                  No.  I think that might have been
13                  their opinion, but, once again, I don't
14                  know the timing of it.  So you keep
15                  saying the physical arrest.  I think
16                  the physical arrest happened later on
17                  that afternoon.  My first conversation
18                  with Collin Sims he did not have an
19                  answer for me.  We had a meeting
20                  scheduled.  We decided at that meeting
21                  if they did not have an answer for us,
22                  that we were going to bring it before a
23                  judge.  So that decision was made.
24                  That process was in motion prior to
25                  that second conversation I had with
```

1              Collin Sims.  The timing of the signing

2              of everything and that second phone

3              call with Collin, I can't confirm when

4              that was.

5    BY MR. MOST:

6         Q.   You testified earlier it was before the

7    physical arrest, agreed?

8         A.   Once again, the physical arrest didn't

9    happen until, I believe, later on that afternoon.

10        Q.   So the answer is yes, it happened before

11   the arrest?

12        A.   I keep answering the same question.  If

13   the arrest happened later on that afternoon, yes,

14   the process.  Everything took place way before

15   then.

16        Q.   So then it's a true fact that before the

17   physical arrest of Jerry Rogers, the sheriff's

18   office was advised of the district attorney's

19   office's opinion that it would be unconstitutional

20   to carry out that arrest, agreed?

21        A.   Before the physical arrest.

22             MR. COLLINGS:

23                  Object to the form.

24   BY MR. MOST:

25        Q.   With the caveat that before the physical

```
 1   arrest, my statement is true, correct?
 2        A.   That that conversation I had with Collin
 3   Sims, that second phone call, happened prior to,
 4   yes, the arrest.  The physical arrest.
 5        Q.   Anything else inaccurate about my
 6   statement?
 7             MR. COLLINGS:
 8                  Object to the form.
 9             THE WITNESS:
10                  Besides the judge signing our
11                affidavit for arrest prior to that.
12                Prior to both of the things you are
13                telling me.
14   BY MR. MOST:
15        Q.   Well, respectfully, Major, you testified
16   earlier you were not sure which came first, right?
17        A.   I'm talking about -- no.  I'm talking
18   about the first meeting that we had.
19        Q.   Okay.
20        A.   Earlier on and then the meeting we had
21   that morning.  The conversation I had with Collin
22   where he did not have an answer for me and then the
23   decision to move forward, and then that timing
24   right there, yes.  That timing right there could
25   have been either way.
```

1      Q.   Okay.  Got it.  In a conversation with

2    Collin Sims, did you at any point say anything to

3    the effect of, if you were going to recuse

4    yourself, I wish you would have kept your opinions

5    to yourself?

6      A.   Yeah.  That did come up, but that did not

7    come up on that same day.  That came up two days

8    later.  I believe it was three days later where

9    Collin Sims had sent a letter to the sheriff's

10   department.  It was well after the fact of the

11   arrest of Jerry Rogers.  It's dated on the letter.

12   I think it was the 18th when we received the letter

13   at the sheriff's department.  He was basically

14   recusing himself and giving an opinion all on the

15   same letter.

16           I did have a conversation with Collin.  I

17   said, "You are recusing yourself on a letter, but

18   yet you are giving your opinion on the same

19   letter."  I said, "I thought if you recuse

20   yourself, you don't put an opinion down," and I

21   said, "Here you are sending us a letter saying you

22   are recusing yourself, but here is my opinion at

23   the same time."  So I said, "That don't make no

24   sense to me.  I don't understand that, Collin.

25   What is that all about?"  We kind of went back and

1    forth.  He said, "You know what, Danny?"  He

2    admitted it.  He said, "I understand your point of

3    view on what you're saying."  I said, "Well, thank

4    you.  Kind of late now, but thanks for that."  That

5    conversation was not the same day.  It was after we

6    received that letter.  I believe it was two days

7    later where now he is recusing himself on a letter

8    but giving his opinion, which I thought was odd.

9         Q.   So Jerry Rogers was arrested, cuffed, and

10   booked at the jail, correct?

11        A.   That is correct.

12        Q.   Since it's a misdemeanor, he could have

13   instead simply been served with a summons to appear

14   and not have been cuffed and not have been booked,

15   agreed?

16        A.   It could have, yes, sir.

17        Q.   Were you part of the decision to conduct

18   a physical arrest rather than a service of summons?

19        A.   I was part of that conversation, yes,

20   sir.

21        Q.   What was the reason for conducting a

22   physical arrest rather than a service of summons?

23        A.   Just like Captain Canizaro had concern in

24   reference to, of course, several days prior,

25   basically, a situation in Monroe where the SWAT

```
 1    team had to be notified of a possible suicide by
 2    cop situation.  So taking caution to -- he wanted
 3    to be -- he didn't want anybody to be in that
 4    position and felt it safer and better for everybody
 5    to just arrest instead of trying to get him to come
 6    in on a summons, which pretty much everybody
 7    agreed, and so that decision was made.
 8         Q.   Let me get this straight, because this is
 9    very confusing to me.  You believe that someone had
10    recently attempted the suicide by cop?
11         A.   That's correct.
12         Q.   So you thought that the safest thing to
13    do rather than notifying their attorney and
14    arranging for a service of summons would be to
15    confront them with armed police officers?
16         A.   Unannounced, yes, sir.
17         Q.   Could you have served a summons
18    unannounced?
19         A.   We could have done a lot of things.
20         Q.   So the answer is yes, you could serve a
21    summons unannounced, correct?
22         A.   You could, yes.
23         Q.   The fact of sending people unannounced,
24    not wanting to surprise -- or wanting to surprise
25    the person, that goal could have been effected by
```

or carried out by either conducting a physical

arrest or a service of summons, agreed?

    A.   It could have been done either way, yes,

sir.

    Q.   It seems to me that the decision whether

to carry out a physical arrest or a service of

summons did not turn on the issue of surprise,

agreed?

    A.   No.  I don't follow you.  Repeat that.

    Q.   So this person had had an incident, and

so you didn't want to give him advance notice,

right?

    A.   Well, let's talk about the incident,

because that's important.

    Q.   Okay.

    A.   When somebody two or three days prior or

whenever that was, pretty close to that, has a

situation where they have to have a SWAT team

called out on scene and acts like he is drawing

down on police officers, as they put suicide by

cop, why try to make another situation like that or

give heads-up on something like that where it could

just be done differently.  So that was the thought

process on it from us.

    Q.   Right.  So that's the reason why.

1    Because of those circumstances, you didn't want to

2    give this person advanced notice that people were

3    coming, so you just do it by surprise, agreed?

4          A.   Agreed.  That was part of it, yes, sir.

5          Q.   Was there another part of it?

6          A.   No.  I mean, basically, we thought that

7    would be the safest way.  Look, you can look at

8    what-ifs on a situation like this.  Every situation

9    is different.  Every outcome is different.  We can

10   go back and forth on what could happen, what could

11   not happen.  If we do it one way, and something

12   don't work out, well, why didn't you do it this

13   way?  Well, you know, why didn't y'all just show up

14   over there?  Why did y'all call him in?  And he

15   ended up killing himself or hurting someone else.

16   So we can what-if this game back and forth.  I've

17   been in scenarios where things can go either way.

18         Q.   I got you.  I'm just trying to --

19         A.    It was discussed.  We felt that was the

20   safest way.  We can go back and forth on what-ifs

21   and what happened.  Sometimes we're put in

22   positions where we just have to make a decision

23   what we think is the safest off of our experience,

24   and that is the decision.  I supported Sergeant

25   Canizaro at the time on that decision.  We thought

```
 1    that probably would be the best way to handle it,
 2    so we handled it that way.
 3         Q.   I got you, Major.  You decided that the
 4    safest thing to do would be to surprise Jerry
 5    Rogers with the initiation of criminal prosecution,
 6    agreed?
 7         A.   It could avoid a suicide by cop
 8    situation, yes, sir.
 9         Q.   And you could have surprised him with a
10    summons or you could have surprised him with an
11    arrest, right?
12         A.   We could have, yes.  We could have done
13    several things.
14         Q.   So why did you choose to surprise him
15    with an arrest rather than surprise him with a
16    summons?
17              MR. COLLINGS:
18                   Object to the form.  Asked and
19                answered multiple times.
20              THE WITNESS:
21                   Yeah.  I mean, I'll give you the
22                same answer again.  We discussed it,
23                and that's what we decided to do.
24    BY MR. MOST:
25         Q.   So you can't articulate any reason why it
```

1    was decided to surprise him with an arrest rather

2    than surprise him with a summons?  I got why you

3    wanted a surprise, but --

4         A.   Once again, we didn't want to put a

5    situation like that, that happened three days prior

6    with the same subject.  That's what we discussed.

7    That was on the forefront.  This was fresh

8    information.  It just happened a couple of days

9    ago.  That could have been an extremely horrible

10   situation for everybody involved in Monroe, and we

11   didn't want to go down that same road.  That was

12   our main focus.  It was fresh information.  We

13   weren't sure what kind of state he was in.

14   Obviously, we looked at what we were dealing with,

15   so, yes, that decision was made for what we thought

16   would be the best.

17        Q.   You wanted to get him into the jail

18   rather than leave him on the street?

19        A.   Once again, we thought that was the

20   safest way to do it.

21        Q.   To get him into the jail rather than

22   leave him on the street; is that correct?

23        A.   To end this investigation is what we

24   wanted to do.

25        Q.   End the investigation by placing him in

1    jail rather than leaving him on the street with a
2    summons, agreed?
3          A.    Arrest him.  Yes, sir.
4          Q.    Are you familiar with the sheriff's
5    office booking process in 2019?
6          A.    Somewhat.
7          Q.    Were you aware that the sheriff's office
8    booking process in 2019 involved a strip search?
9          A.    I heard of it.  I'm not that familiar
10   with the whole process of booking.  I would have to
11   say no.
12         Q.    If someone said they were strip searched
13   incident to an arrest in 2019, you wouldn't have
14   any reason to think that is inaccurate, agreed?
15         A.    Agreed.
16         Q.    So I think you listened to, as we
17   discussed in Captain Canizaro's deposition, that a
18   press release was issued approximately 15 minutes
19   after Jerry Rogers arrest and before he was booked.
20   Did you hear that?
21         A.    Somewhere down the road, but I had no
22   idea what goes on with the presses. That is not my
23   concern, my wheelhouse, so I can't really discuss
24   that.  You can ask me, but I probably won't know.
25         Q.    In your 27 years with the St. Tammany

1   Parish Sheriff's Office, have you ever seen a press
2   release issued so quickly after an arrest?
3        A.   Once again, I've seen press releases come
4   out so many times, some early, some late.  For me
5   to sit here and try to remember every press release
6   that I had nothing to do with, I can't answer that.
7        Q.   So Steven Gaudet came up.  That name came
8   up earlier.  What was his rank in 2019?
9        A.   He was a captain.
10       Q.   Approximately how many years did you work
11  with Captain Gaudet?
12       A.   I have no idea. You tell me how long he
13  has been at the department, and I'll probably say,
14  yeah, that's how long.  I worked with him off and
15  on.
16       Q.   So is it safe to say many years?
17       A.   Yeah.
18       Q.   In your many years of knowing Steven
19  Gaudet, did you know him to be truthful?
20            MR. COLLINGS:
21                 Object to the form.
22            THE WITNESS:
23                 I mean, I worked with Steve.  He was
24             a supervisor of mine.  I never had any
25             issues with him.  Besides that, that's

```
 1              about what I can tell you.
 2   BY MR. MOST:
 3       Q.   You know of no reason to think of him as
 4   untruthful, agreed?
 5       A.   No.  I mean, truthful, untruthful.  Like
 6   I said, just my knowledge of working with him I
 7   never had any issues with him.
 8       Q.   So we established that there was a
 9   meeting with the sheriff about the potential arrest
10   of Jerry Rogers in the conference room adjacent to
11   the sheriff's office, correct?
12       A.   Correct.
13       Q.   That was the morning of Jerry Rogers'
14   arrest, correct?
15       A.   I believe so, correct.
16       Q.   Had you discussed the potential of
17   arresting Jerry Rogers with the sheriff at any
18   point prior to that?
19       A.   Me, personally, I believe probably me and
20   the sheriff had -- I mean, I was communicating with
21   the sheriff as this was unfolding, so I would have
22   to say either yes or no at one point me and the
23   sheriff probably did.  Probably did.  I couldn't
24   tell you when or how.  Are we moving forward with
25   everything?  Because, of course, I was informing
```

 1   him as I was getting the information, you know.  We

 2   were dealing with an agent.

 3        Q.   What did the sheriff tell you, if

 4   anything, to do with the Jerry Rogers' situation?

 5        A.   He wanted to continue to look into it.

 6   If he broke the law, he wanted to address it.  So

 7   we continued looking into our investigation, and

 8   when it concluded, we gave him the information, and

 9   we discussed it, and we decided to put it in front

10   of a judge, the facts in evidence, to see if it --

11   if he would sign our arrest warrant.

12        Q.   The sheriff was part of that decision to

13   put it in front of the judge?

14        A.   Yes, he was.

15        Q.   So the sheriff approved the decision to

16   move forward with the application for arrest of

17   Jerry Rogers, agreed?

18        A.   The affidavit, yes, sir.

19        Q.   Did the sheriff at any point tell you to

20   handle the situation with regards to Jerry Rogers?

21        A.   As far as -- what do you mean handle the

22   situation?

23        Q.   Did he say anything to that effect to

24   you?

25        A.   No.  I mean, I don't recall him saying

1    handle the situation.  We were doing our job like
2    we're expected to.
3         Q.   Did the sheriff ever tell you that he
4    wanted Jerry Rogers in jail for criminal
5    defamation?
6         A.   No, sir.  He said he wanted us to look
7    into it and tell him what we end up with.
8         Q.   Did you ever tell anybody that the
9    sheriff wanted Jerry Rogers in jail for criminal
10   defamation?
11        A.   If you are referring to the FBI report
12   with the conversation with Steve Gaudet, I did have
13   a conversation with Gaudet that, yeah, the sheriff
14   wanted us to continue to look into it and see what
15   we're dealing with and what we got.  So that was, I
16   think, the context mainly we were given that.  It
17   wasn't specific, he wants Jerry Rogers in jail.  It
18   was, yeah, he wanted us to move forward with it,
19   and laws were broken, and we would address it.
20        Q.   Let's look at Exhibit M. You see that
21   this is an affidavit of Steven Gaudet?
22        A.   I do.
23        Q.   Looking at Paragraph 5 here, do you see
24   that it says he, meaning Steven Gaudet, was present
25   when Chief Danny Culpeper informed the unit that

```
 1   Sheriff Randy Smith wanted Jerry Rogers in jail for
 2   Louisiana RS 14:47, Criminal Defamation?
 3       A.   He wanted us to further look into it, so,
 4   yeah.  Keep investigating it and let him know what
 5   we got, yeah.
 6       Q.   Is Paragraph 5 here an accurate
 7   description of something you said?
 8           MR. COLLINGS:
 9               Object to the form.
10           THE WITNESS:
11               No.  I mean, the wording of it, no.
12            We are on Paragraph 5 you said? I
13            didn't come out and say Sheriff Randy
14            Smith wanted Jerry Rogers put in jail,
15            no.  He wanted us to continue to
16            investigate Jerry Rogers, but, no, not
17            --
18   BY MR. MOST:
19       Q.   So you did communicate with the unit the
20   sheriff's wishes with regard to Jerry Rogers; is
21   that correct?
22       A.   The ranking supervisors, yes, sir.
23       Q.   So you did communicate with the ranking
24   supervisors that the sheriff wanted you to continue
25   investigating Jerry Rogers; is that correct?
```

1          A.   We're investigating a law enforcement

2     officer, so, yes.  These conversations took place

3     between me and the sheriff just like any other

4     case, any other investigation, yeah.  I wouldn't

5     start this investigation on a law enforcement

6     officer or anything else without informing our

7     sheriff what was going on.  That's normal practice.

8     We've always done it.  This isn't the first time

9     we've investigated a law enforcement person, an

10    employee, or anything of that matter, so,

11    absolutely.

12         Q.   I understand all of that context.  My

13    question was you communicated to the ranking

14    supervisors that the sheriff wanted the office to

15    continue --

16         A.   I probably had that conversation with my

17    chief and my major, if I had to take a guess, that,

18    yeah, let's move forward.  I mean, you know, if we

19    said we didn't want to look into it or just stop

20    looking into it, but, once again, we are dealing

21    with a law enforcement officer, a federal agent,

22    so, yeah.  I'm communicating to the sheriff and

23    letting him know, the guys know, yeah, continue the

24    investigation.  Let me know what you got.

25         Q.   To finish my question, you did

1    communicate to other members of the St. Tammany

2    Parish Sheriff's Office that Sheriff Smith wanted

3    them to continue investigating Jerry Rogers,

4    correct?

5         A.   Not put Jerry Rogers in jail like that is

6    worded there.  No, sir.  But, yes, to continue the

7    investigation, yes.

8         Q.   Of Jerry Rogers?

9         A.   That's correct.

10        Q.   I'm going to pull up Exhibit U. You see

11   that this is the FBI investigatory file?

12        A.   Yes.

13        Q.   You reviewed this?

14        A.   Let me see.  I'm sure I have.  What am I

15   reading here exactly?

16        Q.   I'm just talking about this document

17   generally.

18        A.   The whole document? Yes, sir, I reviewed

19   the whole FBI thing, but I don't know what page or

20   what this is in reference to.

21        Q.   Fair enough.  I'm going to Page 35 here.

22   Do you see in the bottom paragraph here someone

23   says, "We're not done with Jerry, and that

24   investigators would see what HUD thinks about

25   this?"

```
 1        A.   I see where your dot is at.  Where does
 2   the sentence begin?  I'm sorry. Right there.
 3   "We're not done with Jerry."  Is that it?
 4        Q.   Yeah.
 5        A.   You want me to pick up at?
 6        Q.   Yeah.
 7        A.   Start reading from, "We're not done?"
 8        Q.   Yeah. Did you --
 9        A.   I'm reading it.  We're not done with
10   Jerry.  The investigators would see what -- blank
11   was unaware there was a current leak investigation
12   and blank never mentioned anyone was under -- I'm
13   picking up in the middle of this.  I don't know
14   what this is.
15        Q.   Fair enough.  Do you recall anyone,
16   yourself or anyone else, saying, "We're not done
17   with Jerry?"
18        A.   I don't recall that, no, sir.
19        Q.   Are you confident that you did not say
20   that?
21        A.   Yes, sir.  I don't ever recall saying
22   that.
23        Q.   Starting on the next page, 36.  You see
24   it says, "Someone stated Rogers wasn't aligned
25   politically with somebody in his reelection
```

1    campaign?"

2        A.   Uh-huh.  I never heard that.

3        Q.   In all the discussions of the potential

4    arrests of Jerry Rogers, did it ever come up Jerry

5    Rogers' alignment with anybody's political

6    campaign?

7        A.   No, sir.  I'm worried about a homicide

8    right now.  Like I said, I could care less about

9    the, you know, who knows who or who knows what or

10   anything else.  My main concern -- look at those

11   e-mails.  We are dealing with a homicide here.

12   Okay.  This is the worst of the worst of what we're

13   dealing with.  We've been dealing with it for a

14   long time.  I could care less about political

15   aspects that is going on at this time.  We're

16   focused on a homicide here.  And so you are going

17   to hear me say that over and over again, is we're

18   focused on a homicide.

19       Q.   Respectfully, Major --

20       A.   Well, no.  But people are skirting out

21   underneath the table, and it really upsets me.

22   This is what we're doing.  We're working on a

23   homicide.  Okay.  Don't give a shit who Jerry

24   Rogers is for or not for.  My personal opinion.

25   I'm worried about a homicide.

1    Q.    But you didn't arrest him for a homicide.
2    You arrested him for criminal defamation, which is
3    not a homicide.
4    A.    No, sir, but the act of inserting himself
5    into a homicide anonymously and leading the family
6    in a direction -- in the middle of a homicide, yes.
7    He just inserted himself.  The family came to us.
8    They were concerned.  So, yes, he inserted himself
9    in a homicide investigation.
10   Q.    So the sheriff's office arrested him for
11   doing so?
12   A.    No, sir, for the defamation.
13   Q.    For what he said about Daniel Buckner?
14   A.    For leading the family off of what he was
15   leading or --
16   Q.    Okay.
17   A.    -- public confidence which is back to the
18   statute again.
19   Q.    When you say the family came to you, who
20   do you mean?
21   A.    My understanding was it was -- a family
22   member reached out to Buckner.  I'm drawing a blank
23   right now.
24   Q.    Okay.  I don't need a name.  I want to
25   know whether it was one family member or multiple

1  family members.

2       A.   I think it was one family member that

3  reached out to Daniel Buckner but said other family

4  members had concerns as well, if I remember

5  correctly.  Gina I believe was her name.  Gina

6  Watson.

7       Q.   So you didn't know Nanette Krentel

8  personally; is that correct?

9       A.   No, sir, I did not.

10      Q.   Are you aware that she had a romantic

11  relationship with anyone besides her husband?  Did

12  that ever come up?

13      A.   I don't recall.  I don't know about her.

14  I'd have to go back and look at that report.  Like

15  I said, I wasn't day-to-day activity on that, so

16  for me to sit here and say that right now, I don't

17  know.

18      Q.   So you don't have any recollection of

19  anyone suggesting that Nanette Krentel had a

20  romantic or sexual relationship with anyone other

21  than her husband, agreed?

22      A.   Yeah.  I mean, I don't recall.

23      Q.   Have you ever given a recorded or

24  handwritten statement in relation to the

25  investigation of Jerry Rogers?

```
1        A.    No, sir.  I don't believe I have, no.

2        Q.    Or a typed up statement?

3        A.    No, sir.

4        Q.    So the DA's office, you said before the

5    arrest of Jerry Rogers, expressed its opinion that

6    it would be unconstitutional to arrest Jerry

7    Rogers, and then they related that also in their

8    written recusal letter, correct?

9        A.    Can you repeat the question?

10       Q.    Sure.  I want to go through some of the

11   different agencies involved.  The DA's office,

12   before the physical arrest of Jerry Rogers, advised

13   that the arrest -- their opinion was the arrest

14   would be unconstitutional, and they also put that

15   in their -- that opinion in their recusal letter,

16   agreed?

17             MR. COLLINGS:

18                  Object to the form.

19             THE WITNESS:

20                  It was in the recusal letter, yes,

21          sir.

22   BY MR. MOST:

23       Q.    So then the attorney general's office

24   took it up from there, correct?

25       A.    That's correct.
```

```
1        Q.   The attorney general's office likewise
2   concluded that they would be precluded by law from
3   moving forward with any prosecution of Jerry
4   Rogers, agreed?
5        A.   Agreed.
6        Q.   Because it would be unconstitutional,
7   agreed?
8            MR. COLLINGS:
9                Object to the form.
10           THE WITNESS:
11               I don't recall seeing the paperwork
12            on any of that, so I don't want to be
13            specific on that.
14   BY MR. MOST:
15       Q.   And the judge at the preliminary
16   examination for Jerry Rogers concluded there was no
17   probable cause for Jerry Rogers' arrest.  Were you
18   aware of that?
19       A.   I was aware, yes, of that judge, yes.
20       Q.   Then you reviewed the FBI report, so you
21   saw that the FBI agent concluded that a civil
22   rights violation occurred when Jerry Rogers was
23   arrested for criminal defamation.  Did you see
24   that?
25       A.   Where at in the report?  Can you find it
```

1    for me?

2         Q.    Sure.  Yeah, absolutely.

3         A.    You said the FBI agent?

4         Q.    Yeah.  Page 1.  It says, "Synopsis." Do

5    you see this?

6         A.    Yeah.  I got it.

7         Q.    "Writer requests a full investigation

8    into the below matter to investigate allegations

9    that reasonably indicate a civil right violation

10   occurred when Jerry Rogers was arrested by the St.

11   Tammany Parish Sheriff's Office for violating

12   Louisiana State Statute 14:47, Defamation."  Do you

13   see that?

14        A.    Allegations, yes, sir.  I see the part

15   where it says allegations and everything below

16   that.

17        Q.    The allegations reasonably indicate a

18   civil rights violation, correct?

19        A.    That was the allegations, yes, sir.

20        Q.    So the DA's office concluded that it

21   would be unconstitutional to arrest Jerry Rogers.

22   The AG's office concluded they couldn't move

23   forward with prosecution of Jerry Rogers under this

24   charge.  The FBI -- you've seen what their

25   conclusion was, and the judge found no probable

1    cause.  Do you think all of them were wrong?

2         A.    Where does the FBI give their conclusion?

3    I'm sorry.  I see a synopsis of an allegation, but

4    I don't see a conclusion of that, unless I missed

5    it.

6         Q.    Let's cut the FBI out.  The DA's office

7    expressed the opinion that arresting Jerry Rogers

8    for criminal defamation would be unconstitutional.

9    The AG's office concluded that they were precluded

10   by law from proceeding with prosecution of Jerry

11   Rogers under that statute, and the judge concluded

12   that there was no probable cause for the arrest of

13   Jerry Rogers.  Are they all wrong?

14        A.    The one judge you are talking about, I

15   don't even think we were -- we didn't know that

16   happened, if I'm not mistaken.  If I'm thinking

17   about the same judge you are talking about.  We

18   were unaware of that hearing.  But before we did

19   any of these things, yes, we went to a judge with

20   an affidavit with the facts, the evidence that we

21   had, and he reviewed it, signed it.  We looked into

22   the statute book prior to that at a law that was in

23   the statute.  I was informed that the DA's office

24   had accepted charges already on defamation, and we

25   were aware that -- like I said, the judge did

1   review it and learned later on that he had a law

2   clerk review it as well.  So, yeah, those are the

3   things that we did.

4        Q.   So you think the DA's office got it

5   wrong?

6        A.   I'm not saying the DA's office got it

7   right or wrong.  They didn't have an opinion for us

8   the first time we met.  The second time I

9   communicated with them they still did not have an

10  opinion.  We moved forward.  Once again, we got a

11  timeline right there where they come back and said,

12  no, we don't think it is.  We talked about the

13  application again.  We were moving forward to put

14  it in front of a judge who ultimately makes that

15  decision.  It is not the DA's office or us.  It is

16  the judge, and that's what we did.

17       Q.   Did you communicate to the judge that the

18  DA's office had expressed their opinion that it was

19  unconstitutional?

20       A.   I didn't communicate with the judge at

21  all, no, sir, but the facts and the evidence was in

22  the affidavit.

23       Q.   To your knowledge, did anyone communicate

24  to the judge the DA's office opinion that it would

25  be unconstitutional to arrest Jerry Rogers for that

1   crime?

2       A.   No, sir.

3       Q.   Do you think the AG's office was wrong

4   when they said they were precluded from, by law,

5   from proceeding with the prosecution?

6       A.   No.  I mean, we've never said that. Did I

7   lose you.

8       Q.   No.  Just the exhibit.  I'll share with

9   you Exhibit O.  This is the declination of charges

10  by the attorney general's office.

11      A.   Yes, sir.

12      Q.   Do you see the last sentence that says,

13  "Because the alleged conduct under these specific

14  facts involves statements in that a public official

15  performing public duties, this office is precluded,

16  by law, from moving forward with any criminal

17  action?"

18      A.   Yeah.  Sorry.  Where does the sentence

19  begins at?

20      Q.   The very last sentence of the paragraph

21  here.

22      A.   Okay.  Yes, sir.  I see that.

23      Q.   Do you think the AG's office got it wrong

24  here?

25      A.   Got what wrong?

1        Q.   Their conclusion that because of the
2   specific facts of Jerry Rogers, they were
3   precluded, by law, from moving forward with
4   criminal action against him?
5        A.   Meaning the public official part you are
6   talking about?
7        Q.   Do you disagree with any part of that
8   sentence?
9        A.   That's their opinion, right.  Yes.
10   That's their opinion.  So, yeah, that's their
11   opinion.
12        Q.   You think their opinion is wrong?
13        A.   I didn't say it was wrong.
14        Q.   Well, do you think it's wrong?
15        A.   That's their opinion.  I'm not here nor
16   there.  All I know is we put it in front of a
17   judge.  Everybody has an opinion on whatever, so
18   I'm not --
19        Q.   Okay.  What is your opinion?
20        A.   I'm not a judge.  I am going to let the
21   judge do that.  I'm not going to judge it.
22        Q.   So you are going to refuse to answer the
23   question whether you agree or disagree with this
24   conclusion?
25        A.   I don't know.  I don't know if I agree or

1    not agree.  Like I said, it's an opinion, so I

2    really don't know.  I don't know how to answer

3    that.

4              MR. COLLINGS:

5                   Objection for asking opinion

6                   testimony of a fact witness.

7    BY MR. MOST:

8        Q.   Sure.  Knowing what you know now, now

9    having received the opinions of the DA's office and

10   the attorney general's office, would you still

11   arrest Jerry Rogers for criminal defamation if the

12   same facts were present to you today?

13             MR. COLLINGS:

14                  Object to the form.

15             THE WITNESS:

16                  Once again, I'm going to say every

17                  investigation is different.  Everything

18                  is different.  We did what we did.  As

19                  far as giving the evidence and facts in

20                  front of a judge, that's where I'm

21                  going to draw it.

22   BY MR. MOST:

23       Q.   Respectfully, Major, that's not an

24   answer. My question was, with these opinions in

25   hand, if the same situation was presented to you

1   today, would you do the same thing?

2              MR. COLLINGS:

3                   Object to the form.

4              THE WITNESS:

5                   I would do the same thing as far as

6                getting all my evidence and facts in

7                front of the judge.  Yes, sir.

8              MR. MOST:

9                   We might be close to the end.  Why

10               don't we take five.  I'm going to look

11               over my notes and see if we have any

12               further questions.

13                  {BRIEF RECESS, 3:30-3:37}

14  BY MR. MOST:

15      Q.   Just a few final questions, and then

16  Mr. Collings will have the right to ask you

17  questions.  Just to sum up, Major, did you review

18  any of the search warrants or arrest affidavit

19  prior to them being filed for Jerry Rogers?

20      A.   No, sir, I did not.

21      Q.   Have you taken any continuing education

22  classes on law in your capacity as an officer of

23  the St. Tammany Parish Sheriff's Office?

24      A.   Throughout my years I have, yes, sir.  I

25  couldn't tell you when or the last time.

1          Q.    Do you recall any of them touching on

2    criminal defamation?

3          A.    I don't recall.

4          Q.    Has the sheriff's office changed anything

5    about its policies, practices, guidance, anything

6    at all related to criminal defamation subsequent to

7    the arrest of Jerry Rogers?

8          A.    Not that I know of, no, sir.

9          MR. MOST:

10               I think that's the questions I've

11          got subject to redirect or recross as

12          necessary.  Chad, do you have any

13          questions?

14         MR. COLLINGS:

15               Yeah.  I got one or two.

16   EXAMINATION BY MR. COLLINGS:

17         Q.    Major, you were asked a whole series of

18   questions, multiple ones, and I was trying to write

19   down notes, so if I got anything wrong, tell me,

20   but I want to make sure I'm clear on this point.

21   Prior to the arrest of Jerry Rogers, so from the

22   time the investigation began up until the point

23   where he was arrested, did Collin Sims or anyone at

24   the DA's office ever definitively tell you or

25   anyone at the department, to your knowledge, that

1   to arrest him was unconstitutional for criminal

2   defamation, Jerry Rogers?  Him being Jerry Rogers.

3        A.   To physically arrest him, no, sir.  The

4   words "you cannot arrest him" never came out of

5   their mouth.  Like I said, the first conversation

6   that would be closest would be that last

7   conversation we had which we talked about that time

8   frame.  He did not say no, you cannot arrest him.

9   This could be unconstitutional, and we had a little

10  bit more discussion in reference to application of

11  it.  Like I said, it was not a long conversation at

12  that point.  We were, you know, ready to move

13  forward with putting it in front of a judge, if I

14  answered that.

15       Q.   My follow-up to that then was did they

16  give you -- did they, being the DA's office, Collin

17  or anyone else, give you or anyone at the sheriff's

18  office, to your knowledge, anything in writing

19  expressing that concern prior to Jerry Rogers'

20  arrest?

21       A.   Prior, no, sir.

22       Q.   The first written correspondence from the

23  DA's office was that letter from Collin where he

24  recused himself and, at the same time, expressed

25  his opinion on the legality of the arrest?  Of that

1    statute.

2        A.    Yeah.  I think that was on the 18th.  It

3    was after.

4            MR. COLLINGS:

5                I think that's all I have.  Thank

6            you.

7    BY MR. MOST:

8        Q.    Okay.  Just for completeness sake, Major,

9    during the breaks we took during this deposition,

10   did you review any documents?

11       A.    No, sir.

12       Q.    Did you talk to anyone during those

13   breaks?

14       A.    No, sir.

15           MR. MOST:

16               Then that is all the questions I've

17           got for today.  Thank you very much for

18           your time, Major, and we will close

19           this deposition.

20               [End of deposition, 3:41]

21

22

23

24

25

```
 1                    WITNESS CERTIFICATE
 2
 3
 4
 5               I, MAJOR DANIEL R. CULPEPER, II,
 6     have read or have had the foregoing testimony read
 7     to me pursuant to Rule 30(e) of the Federal Rules
 8     of Civil Procedure and do hereby certify that to
 9     the best of my ability and understanding, it is a
10     true and correct transcription of my testimony.
11
12
13     Please check one:
14
       _____Without corrections
15
16
       _____With corrections (see errata sheet)
17
18
19
20     _____        _____
       MAJOR DANIEL R. CULPEPER, II                 Date
21
22
23
24
25
```

1               C E R T I F I C A T E

2

3               This certification is valid only for
a transcript accompanied by my original signature
4  and original required seal on this page.

5               I, SANDRA P. DIFEBBO, Certified
Court Reporter, in and for the State of Louisiana,
6  as the officer before whom this testimony was
taken, do hereby certify that MAJOR DANIEL R.
7  CULPEPER, II, after having been duly sworn by me
upon authority of R.S. 37:2554, did testify as
8  hereinbefore set forth in the foregoing 84 pages;

9               That the testimony was reported by
me in stenotype, was prepared and transcribed by me
10 or under my personal direction and supervision, and
is a true and correct transcript to the best of my
11 ability and understanding;

12              That the transcript has been
prepared in compliance with transcript format
13 guidelines required by statute or by rules of the
board, that I have acted in compliance with the
14 prohibition on contractual relationships as defined
by Louisiana Code of Civil Procedure Article 1434
15 and in rules and advisory opinions of the board;

16              That I am not related to Counsel or
to the parties herein, nor am I otherwise
17 interested in the outcome of this matter.

18

19

20

21 _____
   Sandra P. DiFebbo,
22 Certified Shorthand Reporter

23 Date:  _____

24

25