UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


JERRY ROGERS, JR.,                    CIVIL ACTION

      Plaintiff                     NO. 20-517

VERSUS                                JUDGE MILAZZO

                                      MAG. DOUGLAS

SHERIFF RANDY SMITH, DANNY

CULPEPER, AND KEITH CANIZARO

      Defendants


      DEPOSITION OF CAPTAIN KEITH A. CANIZARO,
given in the above-entitled cause, via Zoom
videoconferencing, pursuant to the following
stipulation, before Sandra P. DiFebbo, Certified
Shorthand Reporter, in and for the State of
Louisiana, on the 29th day of November, 2021,
commencing at 9:36 AM.

EXHIBIT C

```
1    APPEARANCES (Via Zoom):

2

3              MOST & ASSOCIATES
               BY: WILLIAM MOST,
4              ATTORNEY AT LAW -and-
               HOPE PHELPS,
5              ATTORNEY AT LAW
               201 St. Charles Avenue
6              Suite 114, #101
               New Orleans, Louisiana  70170
7              Representing the Plaintiff

8

9

10             MILLING, BENSON, WOODWARD, LLP
               BY:  CHADWICK W. COLLINGS,
11             ATTORNEY AT LAW
               909 Poydras Street
12             Suite 2300
               New Orleans, Louisiana  70112
13             Representing the Defendants

14

15   Also Present:

16             Jerry Rogers (via Zoom)
               Major Danny Culpeper

17

18   Reported By:

19

20             Sandra P. DiFebbo
               Certified Shorthand Reporter
21             State of Louisiana

22

23

24

25
```

1    E X A M I N A T I O N        I N D E X

2

3                                    Page

4    BY MR. MOST:                    6

5    BY MR. COLLINGS:                117

6

7

8

9    E X H I B I T               I N D E X

10

11                    Page

12

13   Exhibit L                      31

14   Exhibit A                      42

15   Exhibit W                      56

16   Exhibit T                      80

17   Exhibit Z-A                    85

18   Exhibit Y                      90

19   Exhibit U                      95

20   Exhibit N                      96

21   Exhibit D                      99

22   Exhibit E                      102

23

24

25

S T I P U L A T I O N

1
2
3          It is stipulated and agreed by and
4  between Counsel for the parties hereto that the
5  deposition of CAPTAIN KEITH A. CANIZARO, is hereby
6  being taken pursuant to the Federal Rules of Civil
7  Procedure for all purposes in accordance with law;
8          That the formalities of reading and
9  signing are specifically reserved;
10          That the formalities of sealing,
11  certification, and filing are hereby specifically
12  waived.
13          That all objections, save those as to
14  the form of the question and responsiveness of the
15  answer are hereby reserved until such time as this
16  deposition or any part thereof is used or sought to
17  be used in evidence.
18                    * * * * *
19          Sandra P. DiFebbo, Certified Shorthand
20  Reporter, in and for the State of Louisiana,
21  officiated in administering the oath to the witness
22  via Zoom.
23
24
25

```
 1          THE COURT REPORTER:
 2               Will counsel please identify
 3            themselves and their affiliations and
 4            also stipulate that by agreement of all
 5            parties this deposition is being held
 6            via videoconferencing, and there is no
 7            objection to the witness being sworn in
 8            remotely.
 9          MR. MOST:
10               This is William Most for plaintiff,
11            Jerry Rogers, and we so stipulate.
12          MR. COLLINGS:
13               This is Chadwick Collings on behalf
14            of the defendants, and we agree.
15        CAPTAIN KEITH A. CANIZARO, 300
16      Brownswitch Road, Slidell, Louisiana, 70458,
17      having been first duly sworn, was examined and
18      testified on his oath as follows:
19          MR. MOST:
20               Chad, before we get started, can we
21            stipulate that this deposition was
22            properly noticed, and the court
23            reporter is duly qualified?
24          MR. COLLINGS:
25               I assume she is duly qualified.  I
```

1              don't know who she is, but I'll take
2              her word for her.
3          MR. MOST:
4              Well, hearing no objection, other
5              than lack of knowledge about her
6              identity, we can provide that to you
7              later, upon request.  We can get
8              started.
9      EXAMINATION BY MR. MOST:
10         Q.   Good morning.  Was it Sergeant Canizaro?
11         A.   It was then.  It's Captain Canizaro.
12     Keith is fine, also.
13         Q.   I may call you Keith or captain or
14     officer.  Do you have any preference there?
15         A.   No, no preference.  Whatever you are
16     comfortable with.
17         Q.   Great.  Thank you, Captain.  Could you,
18     just for the record now, give us your full name and
19     title?
20         A.   Sure.  It's Keith Anthony Canizaro.  I'm
21     a captain with the St. Tammany Parish Sheriff's
22     Office.
23         Q.   And, Captain, have you ever given a
24     deposition before?
25         A.   I have.

1     Q.   Approximately how many depositions have

2  you given?

3     A.   At least three.

4     Q.   So you realize that you are under oath

5  here today, correct?

6     A.   I do.

7     Q.   And you understand that your answers here

8  today have the same force as if we were in a

9  courtroom with a judge and jury?

10     A.   I do.

11     Q.   Captain, is there anything today, whether

12  it is medications, illness, lack of sleep, or

13  anything else that will prevent you from giving me

14  your full attention and truthful and complete

15  answers to questions?

16     A.   No.  There is nothing.

17     Q.   And, as you have learned from past

18  depositions, we will be asking questions, but

19  unlike a courtroom, this doesn't have to be

20  continuous.  We can take breaks as needed to use

21  the restroom, get a snack.  Just let me or your

22  attorney know, and we will take a break as needed.

23  All right?

24     A.   Thank you, sir.

25     Q.   And I will warn you that if we take a

1  break, I will, after every break, ask you whether

2  you viewed any documents during the break and

3  whether you talked to anyone during the break, even

4  if it's your attorney, and what you talked about.

5  There is not necessarily a guaranteed attorney-

6  client confidentiality during breaks.  That is at

7  least our position.  So I'm giving you a heads-up.

8  I will ask those questions after each break.  All

9  right?

10      A.   Okay.

11      Q.   And one thing you are already doing

12  really well, and I appreciate, is waiting for me to

13  finish my questions before answering.  In response,

14  I will try and extend to you the same courtesy of

15  waiting until you are finished talking before I ask

16  the next question.  That way we'll have a cleaner

17  record for the court reporter.  All right?

18      A.   No problem.

19      Q.   One thing I would ask of you is will you

20  agree that if you don't understand a question I ask

21  or it's not clear, will you tell me that you don't

22  understand or that it's not clear rather than just

23  trying to answer?

24      A.   Of course.

25      Q.   And because this is via Zoom, we're not

1    physically in the room with you.  Who is currently

2    physically in the room with you right now?

3           A.    Mr. Chad Collings and Danny Culpeper.

4           Q.    And it's not permissible for them to try

5    and communicate directly with you during this

6    deposition, so if anyone, whether they or anyone

7    else, tries to communicate with you during this

8    deposition, whether it's by hand signal, whisper, a

9    message on a piece of paper, a text message,

10   anything else, will you agree that you will tell me

11   that that is happening?

12          A.    Yes, I will.

13          Q.    Thank you.  Captain, do you know what

14   case you are here for today?

15          A.    Yes, I do.

16          Q.    What is your broad understanding of that

17   case?

18          A.    In general, the whole entire case? It was

19   due to the investigation and obtaining an arrest

20   warrant for Jerry Rogers for the charge of criminal

21   defamation.

22          Q.    And you understand that you are a

23   defendant in that case?

24          A.    I do.

25          Q.    When did you start preparing for this

 1   deposition, approximately?

 2        A.   In one way or another, basically, once we

 3   were -- I was notified that we were -- that your

 4   filings were made and that I was a defendant in

 5   this case.

 6        Q.   Did you spend any time in the recent days

 7   or weeks preparing for this deposition in

 8   particular?

 9        A.   I reviewed the case file and reviewed

10   your documents, your filings, and some other cases.

11   That's about it.

12        Q.   Other than your attorney, did you speak

13   to anyone to prepare for this deposition?

14        A.   No.

15        Q.   So you reviewed some documents, the case

16   file, and some other cases to prepare for this

17   deposition.  Let's take those one by one.  When you

18   say you reviewed the case file, what documents

19   specifically did you review to prepare for this

20   deposition?

21        A.   My complaint and arrest report.  My

22   affidavit and arrest warrant.  Some other cases

23   that were accepted by the district attorney's

24   office or filed through the district attorney's

25   office for defamation I had known previously.  I

1    just reviewed them.  I'm trying to think of what

2    else.  Your filings and the complaint and the sub-

3    complaint that you filed.  I just read through

4    those.

5         Q.   You talked about other cases accepted by

6    the DA.  By this DA, you mean the St. Tammany

7    Parish District Attorney's Office?

8         A.   Correct.  Yes, sir.

9         Q.   So what were those other cases of

10   criminal defamation that you are talking about?

11        A.   Prior to the Rogers case, there was three

12   other cases that were -- arrests were made by our

13   agency, meaning the St. Tammany Sheriff's Office

14   and tendered to the district attorney's office.

15   One was accepted, and the charges were actually

16   changed to some type of computer electronic

17   harassment.  One was not accepted.  It was in a

18   litany of other charges, and they dropped that

19   charge.  It was declined.  And then one was

20   accepted as is for criminal defamation, and an

21   arrest was made.  They accepted the case, and that

22   defendant pled guilty to criminal defamation.

23        Q.   So at some point you did some research,

24   and you found three arrests made by the St.

25   Tammany Parish Sheriff's Office for criminal

1  defamation, correct?

2       A.   Correct.

3       Q.   One was accepted, and there was a plea to

4  criminal defamation, and two were not accepted by

5  the DA's office, one, because it was changed to

6  cyberstalking or something similar, and one was

7  just flat not accepted, agreed?

8       A.   Correct.

9       Q.   And those were the only three criminal

10  defamation arrests you could find from the St.

11  Tammany Parish Sheriff's Office?

12       A.   In addition to Mr. Rogers, correct.

13       Q.   In addition to Mr. Rogers, of course.

14  When did you conduct this research to find these

15  three cases?

16       A.   Initially, prior to Mr. Rogers --

17  actually, not all of them prior.  I had knowledge

18  of one prior to Mr. Rogers just because I was the

19  supervisor in the unit at that time, and I was

20  aware of an additional one after I was no longer

21  the supervisor of that particular unit in which a

22  military officer was the victim.

23       Q.   So you did this research and found these

24  three cases prior to filing the affidavit in

25  support of an arrest warrant for Jerry Rogers; is

1    that correct?

2         A.   I was aware that these three existed

3    prior to that, yes.

4         Q.   Were you aware of the disposition of

5    those three prior to filing the affidavit in

6    support of an arrest warrant for Jerry Rogers?

7         A.   I was not -- I was aware of one case in

8    particular, the case that I was a supervisor on

9    that was actually brought up for cyberstalking.

10        Q.   So you were aware of the arrest and the

11   disposition of the cyberstalking one.  You were

12   aware of the arrest but not the disposition of the

13   other two?

14        A.   I don't recall if I was aware of the

15   arrest and disposition.  I just knew they existed.

16        Q.   So I just want to make sure we're

17   precise.  So aware -- let me start over.  Prior to

18   filing the arrest warrant affidavit for Jerry

19   Rogers, you were aware of three past arrests by the

20   St. Tammany Parish Sheriff's Office for criminal

21   defamation, and you were aware of the disposition

22   of one of them, which was--

23        A.   The cyberstalking one, correct.

24        Q.   And you can't recall if you were aware of

25   the disposition of the other two, correct?

1        A.    I don't remember.  I just knew of the

2   cyberstalking one, because it was actually one of

3   the people in my unit that did it at the time.

4        Q.    Do you recall if you looked these three

5   cases up prior to filing the arrest affidavit for

6   Jerry Rogers?

7        A.    No.  I didn't personally.

8        Q.    But you've looked them up subsequent to

9   this case being filed?

10        A.    Yes.

11        Q.    When you say you looked them up, what

12   does that mean?  I'm not really sure what that

13   means exactly.

14        A.    I actually had somebody in our records

15   division pull the case file for me.  Pull the

16   actual cases.

17        Q.    When you pull the actual cases, what does

18   that mean?

19        A.    They looked them up in the computer and

20   printed them.  That was very recent that I had them

21   printed for me.

22        Q.    You have those printouts with you today?

23        A.    I do.

24              MR. MOST:

25                  Chad, do you think you could have

1          someone -- actually, let me pause
2          there.
3    BY MR. MOST:
4        Q.   Did you bring any other documents here
5    with you today?
6        A.   I have those cases and a sheet of paper
7    attached to them.  I have only documents that y'all
8    already have.  Your complaint.  Your two complaints
9    that were filed.  I have a copy of the redacted FBI
10   report, and a copy of -- I'm trying to remember
11   exactly.  And a copy of my actual report. My -- the
12   criminal report on Jerry Rogers and the affidavit.
13   And the affidavit and arrest warrant attached.
14            MR. MOST:
15              Chad, do you think you could scan
16            and send us the documents that we don't
17            have, which are those three case files?
18            MR. COLLINGS:
19              I can.  Do you want them now?
20            MR. MOST:
21              Yeah.  I don't think I need to look
22            at them now, but if there is someone in
23            your office, you could just have them
24            scan and send over to us.  We can
25            revisit them later in this deposition.

```
 1          MR. COLLINGS:

 2               Yeah.  Let me walk out of the room

 3            and get somebody to do it.

 4          MR. MOST:

 5               Sure.  Thank you.

 6          MR. COLLINGS:

 7               Okay.  I will have them to you

 8            shortly.

 9          MR. MOST:

10               Thank you, Chad.

11   BY MR. MOST:

12        Q.   Captain, when you had -- you said you had

13   someone pull these three case files for you?

14        A.   Yes.  I just had somebody look them up

15   and print them for me last week.

16        Q.   Approximately how long did it take you to

17   ask someone to do that?

18        A.   Probably not long at all.  I'm in the

19   records section now, so I just had one of my

20   assistants do it.

21        Q.   So you just had to turn to someone in

22   your office and say, could you please pull any --

23   why don't you just tell me what you asked them.

24        A.   I just -- I had previously had the case

25   numbers, and I just asked them if they could print
```

1   these cases for me.

2       Q.   Where did you get those case numbers

3   from?

4       A.   Previously from another detective.  I

5   don't know how long ago.  It was some time ago.

6       Q.   So at some point, another detective gave

7   you these three case numbers, and what did he or

8   she tell you about them?

9       A.   That they were just prior cases where

10  arrests were made by the St. Tammany Sheriff's

11  Office for criminal defamation.

12      Q.   Was that after this civil suit was filed

13  or before this civil suit was filed?

14      A.   It was after the civil suit was filed,

15  but I had knowledge that it had been used prior to.

16  I just didn't know the exact case numbers and what

17  the cases were referring to.

18      Q.   Did you ask the detective to get those

19  case numbers for you or did they provide it to you

20  unsolicited?

21      A.   I didn't ask them to do it.

22      Q.   Do you remember who the detective was

23  that gave you those case numbers?

24      A.   It was Sergeant Jared Lunsford.

25      Q.   Jared Lunsford.  Could you spell that

```
 1   last name?

 2        A.   L-U-N-S-F-O-R-D.

 3        Q.   What was the context that he gave you

 4   those numbers in?

 5        A.   I just asked him, because I know that he

 6   was gathering information in assistance to this

 7   lawsuit, so I asked him.

 8        Q.   What did you ask him?

 9        A.   Do you have those case numbers from the

10   three prior arrests made by our agency.

11        Q.   And did you ask him for case numbers for

12   all criminal defamation arrests by the St. Tammany

13   Parish Sheriff's Office or the three specific ones

14   that you remembered?

15        A.   It was if we made arrests for criminal

16   defamation, and it was in our system.  I think it

17   started in 2000.  I don't know.  I think our

18   computer system that we use started in 2000.

19        Q.   So, essentially, you were asking Lunsford

20   to pull any criminal defamation arrests from the

21   last two decades, approximately, correct?

22        A.   Just -- it wasn't -- that request wasn't

23   that specific. Okay.

24        Q.   But you asked him to pull any criminal

25   defamation arrests he could find?
```

1        A.   I did not ask him.  He had them.  I asked

2   him -- I knew that he had done some research on the

3   case, in assistance, and I asked him, hey, do you

4   have those numbers again, because I knew that my

5   deposition was coming up, and I wanted to brush up

6   on that information.

7        Q.   So you were able to ask Lunsford for

8   those numbers, and he was able to look up in the

9   St. Tammany Parish Sheriff's Office electronic

10   system and find past criminal defamation arrests

11   and see the disposition of them; is that correct?

12        A.   I believe so.  I don't know if -- yeah,

13   he did see them. I don't know what he was able to

14   see or not see.  I just know that he was able to

15   provide the case numbers on them.

16        Q.   But you now know the disposition of those

17   three arrests, correct?

18        A.   Correct.

19        Q.   How do you know the disposition of them?

20        A.   The clerk's website.

21        Q.   So you got these three case numbers. More

22   recently, you asked someone to pull the St. Tammany

23   Parish file on them, and then for each one of them,

24   you looked them up on the clerk's website; is that

25   correct?

1        A.    I did not personally.  The same person

2   who provided me the written report, the arrest

3   reports, did.

4        Q.    So some time ago, Lunsford gave you the

5   three case numbers for criminal defamation arrests,

6   and then more recently you asked someone in the

7   records department to pull the case files and get

8   the disposition for those three; is that correct?

9        A.    Actually, he made me aware that there

10   were at least three occasions.  I knew of one and

11   possibly others.  I didn't know for sure, but

12   through his research he found that there were at

13   least three instances, four counting Rogers, that

14   criminal defamation arrests were made.

15        Q.    I'm just trying to pin down the timeline.

16   So before Jerry Rogers' arrest, you were aware of

17   one and possibly other arrests?

18        A.    Definitely one.  Definitely the one that

19   I was the supervisor of that was changed to

20   cyberstalking, yes.

21        Q.    So before Jerry Rogers' arrest, you were

22   aware -- you were definitely aware of one arrest

23   for criminal defamation by the St. Tammany Parish

24   Sheriff's Office and the disposition of it, and you

25   might have been aware of others, and then

1    subsequent to his arrest, someone told you that

2    there were three and the disposition of them,

3    correct?

4         A.   They told me there were at least three

5    total prior to. After, four counting Rogers,

6    correct.

7         Q.   But other than that, my statement was

8    correct?

9         A.   Correct.  Prior to obtaining the arrest

10   warrant, I was personally aware that at least one

11   other occasion an arrest was made for criminal

12   defamation and tendered to the district attorney's

13   office, yes.

14        Q.   And then the district attorney's office

15   did not charge that person for criminal defamation.

16   They charged them under a different statute,

17   correct?

18        A.   Correct.  They elevated the charge to

19   cyberstalking.  I believe it was cyberstalking.  It

20   was some electronic charge.

21        Q.   Did you tell me earlier that you also

22   looked for arrests by other jurisdictions?

23        A.   No.

24        Q.   Did you say something about charges of

25   criminal defamation by other DA offices?

1        A.    No.

2        Q.    Perhaps I misheard you.  Going back, you

3    have participated in approximately three

4    depositions, to your recollection; is that right?

5        A.    Yes. As far as I can recall.

6        Q.    And were you participating in those

7    depositions as a witness or as a plaintiff or a

8    defendant?

9        A.    One was an automobile accident when I was

10   in Jefferson Parish.  I was a plaintiff in that.

11   Another -- I believe it was two prior here.  One

12   was -- I was an investigating officer or assisting

13   in the investigation of a police shooting, and then

14   one that I was listed as a defendant in a police

15   shooting. I wasn't -- I didn't -- as the

16   investigator.  I was listed as a defendant for a

17   police shooting that I investigated.

18       Q.    That was a civil suit about the police

19   shooting?

20       A.    Correct.

21       Q.    Approximately when was that, that you

22   were a defendant in that case?

23       A.    I want to say the incident occurred prior

24   to this administration.

25             MR. COLLINGS:

```
 1              Is that the Greenwood case?
 2         THE WITNESS:
 3              Yes, sir.
 4         MR. COLLINGS:
 5              I was the lawyer on that, William.
 6           I think that was --
 7         THE WITNESS:
 8              Five years ago.
 9         MR. COLLINGS:
10              Yeah.  About four or five years ago.
11    BY MR. MOST:
12      Q.   Greenwood was the plaintiff?
13      A.   Yes.
14      Q.   Was that in federal court or state court?
15         MR. COLLINGS:
16              Yes.  Federal.
17    BY MR. MOST:
18      Q.   Captain, could you give us the sort of
19    nutshell version of your education and career
20    history?
21      A.   I graduated from Brother Martin High
22    School in New Orleans.  I worked for the Orleans
23    Parish Sheriff's Office.  Then in I think it was
24    '92 and a half went to the Jefferson Parish
25    Sheriff's Office and worked there until the end of
```

1  2006 when I started with the St. Tammany Sheriff's
2  Office.
3      Q.   When did you begin as a law enforcement
4  officer?  What year?
5      A.   1988.
6      Q.   So you've been a law enforcement officer
7  for approximately 33 years or so; is that correct?
8      A.   33 and counting, yes, sir.
9      Q.   Thank you.  So you've been a public
10  servant and a public official since 1988, correct?
11      A.   I wouldn't say public official.  I
12  wouldn't say public servant.  Just been a law
13  enforcement officer.
14      Q.   You don't think --
15      A.   I don't think of myself that way, no.
16      Q.   Okay.  You don't believe that law
17  enforcement officers are public servants?
18      A.   Well, public servants.  We do serve the
19  public.  Our job is to -- I've never thought of
20  serving the public, but I'm assuming that's what we
21  do in law enforcement, try to help people, enforce
22  the laws.  That's how I've always thought of it.
23  Help the victim, solve a crime.
24      Q.   So you are currently a captain.  At the
25  time of Jerry Rogers' arrest, you were a sergeant,

1  correct?

2       A.   Yes, sir.

3       Q.   At the time of Jerry Rogers' arrest, what

4  part of the sheriff's office were you part of?

5       A.   I was the sergeant in the Major Crimes

6  Unit.

7       Q.   What does the Major Crimes Unit do?

8       A.   We handle all death investigations, any

9  investigation on a criminal -- any criminal

10 investigation of an employee of the sheriff's

11 office.  It varies.  Serious offenses, stranger

12 kidnappings, stranger rapes.  It kind of fluctuates

13 in those -- that area, serious violent crimes.

14      Q.   So the Major Crimes Unit handles death

15 investigations, internal criminal investigations,

16 and serious other crimes, correct?

17      A.   Yeah.  And, basically, whatever -- they

18 can designate major crimes to investigate anything

19 they want, but, mainly, we -- those are the areas

20 that are day-to-day operations in Major Crimes.

21      Q.   Does the Major Crimes Unit investigate

22 misdemeanors?

23      A.   No.  Not specifically, no.

24      Q.   Can you recall any time the Major Crimes

25 Unit investigated misdemeanors while you were part

1   of the Major Crimes Unit?

2        A.   If it was an employee involved issue,

3   yes.  Domestic battery with an employee who was the

4   suspect, things like that.  Theft.  Namely

5   involving employees.  Mainly involving employees.

6        Q.   This is skipping ahead a little bit, but

7   Jerry Rogers was arrested for misdemeanor criminal

8   defamation, correct?

9        A.   Yes, he was.

10       Q.   Can you recall -- he was not a current

11   employee of the St. Tammany Parish Sheriff's Office

12   at the time, correct?

13       A.   Correct.

14       Q.   Can you recall any other time in your

15   work at the Major Crimes Unit that you participated

16   in investigation of a misdemeanor for a non-

17   sheriff's office employee other than Jerry Rogers?

18       A.   Not that I can remember.  No, sir.

19       Q.   How long were you with the Major Crimes

20   Unit?

21       A.   Initially, since its inception in 2009,

22   and briefly moved back to Persons Crimes, because

23   we had a lot of young people in Persons Crimes,

24   younger detectives, and they wanted to move some

25   experience in there.  I came back to the Major

```
 1   Crimes Unit, and then I was promoted to a sergeant
 2   over Persons Crimes Unit.  And then --
 3              {INTERRUPTION IN PROCEEDINGS DUE TO
 4                 TECHNICAL DIFFICULTIES}
 5   BY MR. MOST:
 6        Q.   So, Captain, if I understand you
 7   correctly, to the best of your recollection, you
 8   spent approximately 11 or 12 years in the Major
 9   Crimes Unit; is that correct?
10        A.   Correct.  In Persons Crimes and Major
11   Crimes, yes.
12        Q.   So for those 11 to 12 years total, you
13   were in the Major Crimes Unit and sometimes also
14   assigned to another unit; is that right?
15        A.   From 2009, from the inception of Major
16   Crimes until I think 20 -- I don't remember exactly
17   when I went to Persons for that year and some, and
18   then I went back into Major Crimes. So from 2009
19   until last March, with the exception of about a
20   year in Burglary as a sergeant, I've been here 15
21   years.  I would say at least ten of my 15 years
22   have been in Major Crimes.  That would probably be
23   the best guesstimate.
24        Q.   Got it.  Thank you.  At the time of the
25   Jerry Rogers' arrest, who did you report to?
```

1        A.    Lieutenant Alvin Hotard.

2        Q.    Who did Lieutenant Hotard report to?

3        A.    Captain Steve Gaudet.

4        Q.    Who did Steve Gaudet report to?

5        A.    Major Doug Sharp at that time.

6        Q.    At that time, who did Shaw report to?

7        A.    Major Sharp would have reported to Chief

8   Danny Culpeper.

9        Q.    Who did Chief Culpeper report to at that

10  time?

11       A.    I don't recall who was our chief deputy

12  at that time, but it would be whoever our chief

13  deputy was and then the sheriff. I don't recall if

14  we had a chief deputy at that time, because there

15  was a period where we didn't.

16       Q.    So at the time of the Rogers' arrest, you

17  reported to Hotard, who reported to Gaudet, who

18  reported to Shaw, who reported to Culpeper, who

19  reported either directly to the sheriff or to a

20  chief deputy, correct?

21       A.    It would be Sharp, S-H-A-R-P.  I thought

22  you said Shaw.  I'm sorry.

23       Q.    Okay.  But other than that, my

24  description is correct?

25       A.    Yes.  That was my chain of command.

1    Q.    Thank you.  All right.  Do you know who
2  Nanette Krentel is?
3    A.    I'm familiar with the investigation.  I
4  didn't know her previously, but, yeah.
5    Q.    She was a St. Tammany Parish resident who
6  died in 2017, correct?
7    A.    Correct.
8    Q.    Her death was initially classified by the
9  sheriff's office as a suicide, correct?
10    A.    No.  I don't think there was ever an
11  official classification at all.  I had limited
12  involvement in that case.  At the time, I was a
13  sergeant over the Persons Crime Unit.
14    Q.    Were you part of the investigation into
15  the Krentel death at any point?
16    A.    At any point, yes.  Initially, I think
17  the first week I was loosely involved, because
18  their sergeant, Alvin Hotard, was away on military.
19  I didn't have any detailed knowledge.  I wasn't
20  involved in the actual hands-on investigation in
21  that case initially.  Then later, towards the end
22  -- when I say the end, as the case grew, went on
23  for years, I was tasked with accompanying Genny May
24  on a couple of interviews that they did. One was in
25  Washington, D.C., just because she had revered

1    status with our agency, and they wanted somebody to

2    go with her, and at that time, I was the sergeant

3    in Major Crimes, so that's about it.

4         Q.   At one point, Daniel Buckner was the lead

5    investigator on the Krentel death investigation; is

6    that correct?

7         A.   From what I understand, he was the lead

8    the entire length of the investigation while the

9    sheriff's office had it.

10        Q.   Buckner is a law enforcement officer with

11   the St. Tammany Parish Sheriff's Office?

12        A.   Yes, he is.

13        Q.   I take it you know who Jerry Rogers is?

14        A.   I do.

15        Q.   Jerry Rogers is a former St. Tammany

16   Parish sheriff's officer, correct?

17        A.   Correct.  I don't know exactly when he

18   left.  I don't know if I was there when he left.  I

19   kind of remember him being in the property world.

20   At that time, we were really split as far as

21   investigations on the east side of the parish and

22   the west side of the parish.  So, yeah, I knew

23   Jerry from just law enforcement.

24        Q.   You understand that at some point after

25   he was a sheriff's office deputy and after the

1   death of Nanette Krentel, he sent e-mails to a

2   family member of Nanette Krentel, correct?

3           A.    Yes.

4           Q.    Those e-mails were critical of the St.

5   Tammany Parish Sheriff's Office investigation into

6   that death, correct?

7           A.    Among other things, yeah.

8           Q.    Among other things, they were

9   specifically critical of Daniel Buckner, correct?

10          A.    Correct.

11          Q.    And you authored an affidavit in support

12  of an arrest warrant for the arrest of Jerry Rogers

13  for criminal defamation, correct?

14          A.    Yes.

15          Q.    I'm going to pull up Exhibit L, as in

16  Larry.  Can you see this, Captain?

17          A.    Yes.

18          Q.    What is this document we're looking at

19  here?

20          A.    It's an entry for the arrest warrant in

21  the RMS system for Jerry Rogers.

22          Q.    What is the RMS system?

23          A.    It's our report management system for the

24  sheriff's office.  Just the name that's assigned to

25  it.

1      Q.   So this is a printout from your

2 electronic records management system?

3      A.   Yes.

4      Q.   It says here the defendant is Jerry

5 Rogers, and the offense is Misdemeanor Defamation

6 14:47; is that correct?

7      A.   Correct.

8      Q.   And it says here you are the reporting

9 officer on this, at the bottom?

10      A.   Yes.

11      Q.   I'm going to turn to Page 4 of this

12 document.

13      A.   This is the offense report.

14      Q.   Is this something that you wrote?

15      A.   Yeah.   It would be the report I typed,

16 yes.

17      Q.   I'm looking at the bottom of Page 4.   It

18 says, "One offense, one victim, one offender."   Is

19 that correct?

20      A.   Correct.

21      Q.   I'm looking at Page 5 of this Exhibit L.

22 This lists the victim as Daniel Buckner, correct?

23      A.   Correct.

24      Q.   So Daniel Buckner was the one victim of

25 the criminal defamation charge that you drafted

1    this report for, correct?

2         A.    Correct.

3         Q.    And it says here, "Victim Type LE

4    Officer."  Does that stand for law enforcement

5    officer?

6         A.    Yes, sir.

7         Q.    And the address, 300 Brownswitch Road, is

8    that Mr. Buckner's home address or is that the St.

9    Tammany Parish Sheriff's Office address?

10        A.    It's the sheriff's office address.

11        Q.    So Daniel Buckner is listed here as the

12   victim in his capacity as a law enforcement

13   officer, correct?

14        A.    Correct.

15        Q.    So if Daniel Buckner was the victim of

16   the criminal defamation, then Jerry Rogers -- you

17   filed an affidavit in support of the arrest for him

18   for what he said or wrote about Daniel Buckner,

19   correct?

20        A.    Correct. Can I expound on my answer

21   briefly?

22        Q.    Of course.

23        A.    His actions in whole of what he wrote and

24   how it affected -- and what the, I guess, reactions

25   of a family member to those actions, and, yes,

1    that's why, but it's for what he wrote in e-mails,

2    correct.

3            Q.   So Jerry Rogers -- you sought the arrest

4    of Jerry Rogers for what he wrote about Daniel

5    Buckner in e-mails and the effect you anticipated

6    it would have, correct?

7            A.   The effect that was over that, yes.

8            Q.   I'm sorry?

9            A.   That I could see of that, yes.

10           Q.   So to restate, you sought the arrest of

11   Jerry Rogers for criminal defamation for what he

12   wrote about Detective Daniel Buckner and the

13   effects you saw that it was having; is that

14   correct?

15           A.   Not saw.  The effect it had and the

16   application to the law itself and what the law

17   said.

18           Q.   Okay.  I'll rephrase.  So you sought the

19   arrest of Jerry Rogers for criminal defamation for

20   what he wrote about Detective Daniel Buckner and

21   the effects it did have; is that correct?

22           A.   I can tell you that I -- the reason I

23   sought the arrest of Jerry Rogers is because he

24   violated the statute of criminal defamation and the

25   elements that are listed therein.

1        Q.    Okay.

2        A.    That's the correct answer to -- my

3    correct and true answer to your question.

4        Q.    Okay.  And he violated those elements in

5    what he wrote in e-mails about Detective Daniel

6    Buckner and the effects that those e-mails did

7    have; is that correct?

8        A.    From what I see, yes.  That was a tool he

9    used to violate the elements of that crime.

10        Q.    So you investigated these e-mails from

11    Jerry Rogers to Kim Watson, correct?

12        A.    It was part of the investigation.

13    Initially, I was charged to investigate possible

14    violations of the law by one of our employees, and

15    after conducting the investigation as to

16    obstruction of justice, there were no facts found

17    that elements of obstruction of justice were

18    committed by either Mr. Rogers or Mr. Montgomery,

19    but that Mr. Rogers had, in fact, violated the law

20    of criminal defamation, of the elements in criminal

21    defamation.  That's how the investigation started.

22    You had asked earlier if Major Crimes investigates

23    misdemeanors.  Well, it's part and parcel to a

24    criminal investigation of one of our employees, so

25    yes.

1      Q.   Can you recall any other time while you

2  were in the Major Crimes Unit that you wound up

3  arresting someone for a misdemeanor even if you had

4  been investigating something other prior?

5      A.   I can't remember any specifics, but

6  during several homicides through the course of

7  doing search warrants and things of that nature, we

8  come across things that violate misdemeanor

9  statutes.  We don't call somebody else in to do

10  that.  It's just we cut a separate item number on

11  the misdemeanor and handle it.  So there are

12  instances when a Major Crimes detective will make

13  misdemeanor arrests during the course of the

14  investigation of a more serious felony.

15      Q.   So if I've got this right, you were

16  conducting an Internal Affairs investigation into

17  potential obstruction of justice, correct?

18      A.   No, sir.  An Internal Affairs

19  investigation was done by Internal Affairs.  I was

20  handling a criminal investigation of the potential

21  violation by one of our members of obstruction of

22  justice.

23      Q.   Maybe I don't understand.  How is that

24  not an Internal Affairs investigation?

25      A.   Because Internal Affairs affords the

 1    rights and privileges to officers under Garrity,

 2    and it is separate and distinct from a criminal

 3    investigation.  An Internal Affairs investigation

 4    is a violation of policy by the employee, not by

 5    criminal law.

 6         Q.   I got you.  Okay.  So Internal Affairs is

 7    administrative or disciplinary investigations which

 8    are separate from criminal investigations.  I got

 9    you. Is that correct?

10         A.   Yes.

11         Q.   So you were conducting an internal

12    criminal investigation into potential obstruction

13    of justice, correct?

14         A.   Correct.

15         Q.   And you concluded that neither Jerry

16    Rogers nor Stefan Montgomery had committed acts

17    that met the elements of obstruction of justice,

18    correct?

19         A.   Correct.

20         Q.   But you did conclude that Jerry Rogers

21    had committed actions that met the elements of

22    criminal defamation, correct?

23         A.   Correct.

24         Q.   So you filed an affidavit in support of

25    an arrest warrant for Jerry Rogers, correct?

1      A.    Correct.

2      Q.    And then that caused him to be arrested

3  once the judge had signed the warrant, correct?

4      A.    Correct.

5      Q.    You mentioned the elements of criminal

6  defamation.  Is that something you knew off the top

7  of your head when you were investigating Mr. Rogers

8  or did you look it up?

9      A.    I didn't know the specific -- all of the

10  specific elements, but I knew, I guess what you

11  would call the spirit of the law, and I looked up

12  the letter of the law.

13      Q.    You looked it up.  Where did you look it

14  up?

15      A.    In a Westlaw book.

16      Q.    Do you still have that Westlaw book?

17      A.    I have no idea.  It was in my prior

18  office many moons ago.  It would have been the most

19  current we had, so we were using the year or

20  previous year.  I don't know exactly what year it

21  was we looked it up, but.

22      Q.    Do you think Major Crimes might still

23  have that book?

24      A.    That I don't know.

25      Q.    When you say the Westlaw book, do you

1   know the title of that Westlaw book?

2       A.   It's the book that we've been getting

3   definitely since I've been here and even prior, in

4   JP, we used it for years and years and years.

5       Q.   It's a Westlaw book of Louisiana

6   statutes?

7       A.   Louisiana statutes, yes.

8       Q.   Was it just criminal statutes or was it

9   all statutes?

10      A.   I don't remember, honestly.  It was

11  thick.  I don't remember exactly, but I believe it

12  was all under criminal, yeah.  It would have been

13  criminal.  We don't have civil law books, that I

14  can remember.

15      Q.   Did you look up the statute anywhere

16  else?

17      A.   No.

18      Q.   Did you look it up online, like on the

19  Louisiana State Legislature's website?

20      A.   I don't believe I did.  I'm not very

21  savvy when it comes to online and things like that.

22      Q.   Okay.  If someone warned you that

23  arresting Jerry Rogers for criminal defamation

24  about what he said or wrote about Daniel Buckner

25  might be unconstitutional under that statute, is

```
1    that something that you should have put in your

2    affidavit in support of the arrest warrant?

3              MR. COLLINGS:

4                   Object to the form.  You can answer.

5              THE WITNESS:

6                   Not -- I've never run across this

7                issue in all my years in law

8                enforcement.  Usually, we tender facts

9                and accurate information in an

10               affidavit to a judge.  The judge knows

11               the law.  I would hope far better than

12               anyone else and has the resources to

13               research any statute that -- any

14               affidavit we send to him.

15                   I say send now, because we used to

16               have to hand walk it to them, but we

17               send it now.  If there were any

18               questions that the judge had about a

19               case or anything, we have communication

20               with him, but if you're asking that I

21               hid anything from the judge, because I

22               see what you're asking, is no.  If the

23               statute is still in the book and has

24               not been repealed, the elements of the

25               crime were met, therefore, we put them
```

```
 1              in written form in an affidavit, sent
 2              it to the judge, and he signed it.
 3   BY MR. MOST:
 4       Q.   Yeah.  I'm actually not asking if you hid
 5   anything, Captain.  What I'm asking is, if someone
 6   actually warns you that arresting someone for a
 7   particular crime might be unconstitutional, is that
 8   the kind of thing you should put in an arrest
 9   affidavit?
10              MR. COLLINGS:
11                  Objection.  Answer the question, if
12                you can.
13              THE WITNESS:
14                  I don't know the feelings on that.
15                Personally, no.  I think the judge --
16                it should stand on the affidavit, and
17                as long as it's factual information in
18                the affidavit, and you are not lying or
19                hiding anything from the judge, to the
20                judge, from the judge, for him to
21                review that document, then, no.  I
22                would assume it would be who is doing
23                the warning and why.  That may come
24                into play.  It may not.  Who knows.
25   BY MR. MOST:
```

```
 1        Q.    Okay.
 2        A.    The view just changed on my screen.
 3        Q.    Yes.  I pulled down Exhibit L.
 4        A.    Oh, okay.  Thank you.
 5        Q.    I'm now going to share my screen with
 6   Exhibit A.  Do you see this, Captain?
 7        A.    I do.
 8        Q.    This is the affidavit in support of an
 9   arrest warrant for Jerry Rogers, correct?
10        A.    Yes, sir.
11        Q.    This is the affidavit that you wrote?
12        A.    Yes.  It appears to be.
13        Q.    We can look at the bottom of Page 2 here.
14   Is that your electronic signature there?
15        A.    It is. When we changed systems, it
16   changed, but, yes, it is.
17        Q.    So this is a printout of the arrest
18   affidavit that you drafted and submitted to the
19   judge for the arrest of Jerry Rogers, correct?
20        A.    Correct.
21        Q.    So at the top of Page 2, it says, "The
22   unknown author referred to the lead investigator as
23   clueless and anything is better than the lead
24   investigator."  Do you see this here?
25        A.    Yes.
```

1      Q.    The lead investigator being Daniel

2  Buckner, correct?

3      A.    Correct.

4      Q.    The unknown author is later described as

5  Jerry Rogers, correct?

6      A.    Yes.

7      Q.    Clueless and anything is better than.

8  Are these the defamatory statements that you sought

9  the arrest of Jerry Rogers for?

10      A.    There was another that was not included

11  in there.  I believe it was he portrayed him as a

12  stone-cold rookie.  Something to that effect in the

13  e-mails, but, yes.

14      Q.    So the defamatory statements for which

15  you sought the arrest of Jerry Rogers were that

16  Daniel Buckner was clueless, that anything is

17  better than Daniel Buckner, and something to the

18  effect of Daniel Buckner being a stone-cold rookie;

19  is that correct?

20      A.    And having no experience investigating

21  homicides, yes.

22      Q.    So the defamatory statements for which

23  you sought the arrest of Jerry Rogers were that

24  Daniel Buckner was clueless, that anything is

25  better than Daniel Buckner, something to the effect

1    of Daniel Buckner being a stone-cold rookie, and

2    something to -- about Daniel Buckner not having any

3    experience; is that correct?

4         A.   Yes.  In the midst of a homicide

5    investigation, yes.

6         Q.   I'll take down Exhibit A.  So what is

7    your understanding of what defamation is?

8         A.   What I understand is derogatory comments

9    that are purposely made to erode public trust and

10   confidence, and that was the part of the law that I

11   recall that specifically was an element in this

12   case.

13        Q.   Do those statements have to be false?

14        A.   From what I understand, they have to be

15   false, not truthful as why we didn't look to other

16   things or anything else that he wrote about anybody

17   else in there, in his e-mail.

18        Q.   And they have to be false statements of

19   fact, correct?

20        A.   Correct.

21        Q.   So you understood at the time of the

22   arrest of Jerry Rogers that a false opinion is not

23   defamation, correct?

24        A.   Correct.

25        Q.   So Jerry Rogers describing Daniel Buckner

```
 1   as clueless, did you understand that to be a false
 2   statement of fact or an opinion by Jerry Rogers?
 3        A.   Well, the way he stated it, and the
 4   context in which he stated it in the e-mails is
 5   that he was stating fact.  He had already
 6   established himself through the pseudonym or
 7   whatever from the name he was using for the account
 8   as a law enforcement officer who was concerned
 9   gravely about the handling of this case by the
10   sheriff's office.  There were several derogatory
11   things said about numerous people attached to the
12   sheriff's office in that case and others, and he
13   was speaking, I guess, as a law enforcement
14   authority.  Not guess.  I'm not going to guess.
15            The way he came across was he was stating
16   fact to these people that Daniel Buckner was
17   clueless, he didn't have any experience, that he
18   was a stone-cold rookie, and that elicited a wow
19   from the other end of that e-mail, from Ms. Watson.
20        Q.   I'm sorry.  It elicited a what?
21        A.   A comment that was, wow.  Like he doesn't
22   have any experience either.  So, obviously, she is
23   believing what he is telling her.  She stated that
24   right after one of those comments was, wow, he
25   doesn't have any experience either?  So, to me, her
```

1   own writing showed that it caused alarm in the

2   family and that she was taking what Mr. Rogers said

3   as fact, not as an opinion.

4        Q.   Okay.  The statement that anything is

5   better than Daniel Buckner, is that an --

6        A.   I think, as a whole, all of the

7   statements that he was speaking from an

8   authoritative place, or at least he had gained the

9   trust or at least led the family that he was

10  speaking, the family member that he was

11  communicating with -- when I say speaking, I mean

12  communicating with electronically, that he was

13  stating fact, that he knew that -- he was from this

14  area, and he was familiar with these people and

15  that he was -- that he understood -- he knows that

16  anything better than Danny Buckner working that

17  case, and that he was a stone-cold rookie, and that

18  he was clueless.  He was stating that like it was

19  fact to this day, and she was taking it as that by

20  her responses.  So, no, I don't believe it was a

21  matter -- it may be his opinion, but he was

22  presenting it as fact.

23       Q.   So the statement, "Anything is better

24  than Daniel Buckner," you think that was presented

25  not as an opinion but as a statement of fact?

1      A.   I don't believe -- it was his belief --
2   it was his belief that he was stating it as fact.
3   I guess that's the best way I can describe what I
4   saw.
5      Q.   By clueless, it was clueless in the
6   context of the Nanette Krentel investigation,
7   correct?
8      A.   In the context of the e-mail, that's what
9   it appeared to be, yes, sir.
10      Q.   And anything is better than Daniel
11   Buckner, that is in the context of the Nanette
12   Krentel investigation, correct?
13      A.   That's what it appeared to be, yes.
14      Q.   The same is true about Daniel Buckner's
15   lack of experience and being a rookie, that is in
16   the context of his role as a detective with the St.
17   Tammany Parish Sheriff's Office, correct?
18      A.   I believe so, yes.
19      Q.   Going back to Exhibit A, it says in here
20   that a family member requested that they find the
21   identity of the unknown author.
22      A.   Correct.
23      Q.   What family member was that?
24      A.   I believe that was Gina Watson.
25      Q.   How did you know that Gina Watson had

1   requested that the St. Tammany Parish Sheriff's
2   Office find the identity of the unknown author?
3        A.   Prior to my beginning this investigation,
4   I was briefed in about the internal investigation
5   that was taking place by Lieutenant Hotard and
6   Buckner himself about the e-mails and about those
7   things.  I don't know if it was -- I don't remember
8   who exactly.  It was either Danny Buckner or Alvin
9   Hotard, or both, that told me that it was Gina
10  Watson that had reached out to Danny Buckner and
11  requested we find out who is sending -- I think it
12  was in the context -- I remember being told, who is
13  sending this, because it's causing problems in the
14  family.
15       Q.   So we talked a little bit about other
16  arrests by the St. Tammany Parish Sheriff's Office
17  for criminal defamation.  So, to your knowledge, as
18  long as there has been electronic records, at
19  least, the St. Tammany Parish Sheriff's Office has
20  arrested three people for criminal defamation; is
21  that correct?
22       A.   Four counting Mr. Rogers, yes.
23       Q.   Thank you.  Four counting Mr. Rogers.
24  Other than Mr. Rogers, have you ever personally
25  sought the arrest of anyone for criminal defamation

1    other than Mr. Rogers?

2        A.    No, sir.

3        Q.    Are you aware in your two prior law

4    enforcement agencies any arrests for criminal

5    defamation by those agencies?

6        A.    I don't know.

7        Q.    But you can't recall any, correct?

8        A.    I don't believe I've -- I don't recall

9    any specifically, no.  That doesn't mean they exist

10   or not.  I don't know.

11       Q.    So whose idea -- who first came up with

12   the idea of using the criminal defamation statute

13   with regard to Jerry Rogers?

14       A.    I think it was when we were briefing in a

15   group about where we were and where I was in the

16   obstruction investigation.  I don't recall exactly

17   who said, well, criminal defamation fits, and then

18   when we looked in the book, the elements were

19   there.

20       Q.    Who else was in that briefing?

21       A.    I believe that would have been myself,

22   Lieutenant Hotard.  I'm unsure if Captain Gaudet

23   was there, and at the time Chief Culpeper.

24       Q.    So there was a briefing about the

25   investigation with you, Hotard, and perhaps Gaudet

1    and Culpeper.  Any others?

2         A.   Not that I remember.  When I said

3    briefing, it was informal.  Hey, where we're at,

4    you know, in the case.  I just brought everybody up

5    to speed about where we were.

6         Q.   You can't recall who first proposed the

7    idea of using the criminal defamation statute, but

8    was it you or was it one of the other people there?

9         A.   It was -- I didn't say, hey, criminal

10   defamation fits.  Somebody said, "What about

11   criminal defamation?"  I don't remember who.  I

12   think we even grabbed the book and looked at it

13   collectively and just looked at it and said okay.

14   I don't know who brought it directly to my

15   attention or to the group's attention or anything

16   like that.

17        Q.   Was anyone consulted outside of that

18   group about whether the elements of criminal

19   defamation applied?

20        A.   Consulted.  What do you mean by

21   consulted?

22        Q.   Well, I mean, did you talk to anyone else

23   about criminal defamation other than that group?

24        A.   Yeah.  After -- we did.  We spoke with

25   the -- we had a meeting with the district

1    attorney's office.

2         Q.   We'll come back to that one.   Anyone

3    else?

4         A.   I don't remember specifically.   I doubt

5    it.   I think maybe Tim Crabtree, because he was my

6    corporal at the time, but I don't remember exactly

7    who.

8         Q.   So then at some point you drafted the

9    affidavit in support of the arrest warrant,

10   correct?

11        A.   Yeah.   At some point, yes.

12        Q.   Did anyone else review that affidavit

13   before you submitted it to the judge?

14        A.   I don't recall.   I don't believe so.   It

15   was done on a computer.   Maybe if Lieutenant Hotard

16   was in my office and read it over once.   I don't

17   really recall.   It wasn't printed out and brought

18   anywhere or anything like that, that I remember.

19        Q.   Did anyone approve the decision to arrest

20   Jerry Rogers for criminal defamation?

21        A.   At one point in time, when we were called

22   to brief the sheriff on where we were with the

23   investigation, we were in a meeting upstairs in the

24   conference room, and all the sheriff said was,

25   "Well, if he violated the law, then put it before a

1    judge," and I went back downstairs, and Chief
2    Culpeper called me and said, "Yeah, go ahead and
3    put it before the judge," and that's when I typed
4    the arrest form.
5         Q.   So the meeting upstairs, was that in the
6    sheriff's office?
7         A.   No.  It was in a conference room adjacent
8    to his office.
9         Q.   Who else was present for that meeting?
10        A.   I believe my rank structure all the way
11   up, I believe.  Myself, Lieutenant Hotard.  I
12   believe Captain Gaudet was there.  I believe, if my
13   memory serves me, Major Sharp was there, Chief
14   Culpeper.  I believe that was everybody in the
15   room, and then the sheriff came into the room.
16        Q.   So before you filed the arrest affidavit,
17   was it the same day that you filed the arrest
18   affidavit?
19        A.   Yeah.  I believe that meeting was.
20        Q.   I'm looking at Exhibit A here.  The
21   arrest affidavit is dated September 16, 2019 at
22   11:25 AM.  Is that correct?
23        A.   That's correct.
24        Q.   So prior to 11:25 AM on September 16,
25   2019, you met with the sheriff, Culpeper, Hotard,

1    and possibly Gaudet and Sharp, correct?

2         A.   Yeah.  I know the captain was in the

3    meeting, Captain Gaudet was in the meeting.  The

4    only person I'm unsure of that was in the meeting

5    was Major Sharp, but I would assume -- I hate to

6    assume anything, but it would make sense that he

7    was there, because we were actually discussing the

8    potential arrest of a federal agent, which doesn't

9    happen every day in our parish, but it has happened

10   before.  That's why everybody kind of weighs in on

11   the case as far as -- and everybody has to be

12   informed up the rank structure, because we're

13   possibly going to arrest a federal agent.  Even

14   though it's for a misdemeanor, it's still an

15   arrest.

16        Q.   Okay.  So before 11:25 AM on September

17   16th, 2019, you met with Sheriff Smith, Captain

18   Gaudet, Hotard, Culpeper, and possibly Sharp in a

19   conference room adjacent to the sheriff's office,

20   correct?

21        A.   Correct.  We were there prior to the

22   sheriff coming in the room, yes.

23        Q.   At that meeting, it was discussed the

24   possibility of arresting Jerry Rogers for criminal

25   defamation, correct?

54

1      A.   Correct.  Moving forward to present it to

2  a judge, an affidavit to the judge, yep.

3      Q.   For what Jerry Rogers had written in

4  e-mails about Daniel Buckner in e-mails to the

5  member of the Krentel family, correct?

6      A.   Which we felt violated -- I felt which

7  violated the elements or at least some of the

8  elements, and I believe the required elements, in

9  the criminal defamation statute, yes, sir.

10     Q.   Okay.  The sheriff said if he had

11  violated -- if the elements of the criminal statute

12  had been met to go ahead and make the arrest; is

13  that correct?

14     A.   To draft a warrant and put it before a

15  judge, yes, sir. I think that's the only thing --

16  the only -- not I think.  I know that's the only

17  time that I recall meeting with the sheriff or

18  being in a meeting where the sheriff was there and

19  this case was discussed, that briefing.

20     Q.   So at that briefing, the sheriff approved

21  that if Jerry Rogers had met the elements of the

22  criminal statute, to put the arrest affidavit in

23  front of the judge and then arrest Jerry Rogers,

24  correct?

25     A.   Correct.

1      Q.   Did anyone at that meeting express a

2  different point of view or object to the arrest?

3      A.   I don't think anybody objected to any

4  arrest.  I think we discussed information we had

5  learned about a previous case that was ruled

6  unconstitutional by the state and that it -- apples

7  aren't apples.  I mean, it was not the same as the

8  case that we had.  It involved council members and

9  Facebook posts, that it was not in the context of

10  being in the middle of a homicide investigation,

11  and it wasn't the same kind of case.

12         From my understanding or from all our

13  understanding is that the law was not ruled

14  unconstitutional.  The application of that law was

15  ruled unconstitutional in that particular case, so,

16  yeah, that was discussed.  I don't know if the

17  sheriff was in the room when it was discussed.  It

18  might have been prior to him walking in, but we had

19  that discussion amongst ourselves.

20      Q.   So either before or after the sheriff

21  walked in, the group discussed the fact that the

22  criminal defamation statute had been declared

23  unconstitutional in some context; is that correct?

24      A.   In the application to that particular

25  case.  I believe it was from Livingston Parish,

```
 1    yes.  I don't know the specifics of that case.  I
 2    remember reviewing it to the fact that it wasn't
 3    the same as our case, and we wanted to put our case
 4    before a judge at that time.
 5         Q.   Okay.  I'm going to pull up Exhibit W at
 6    Page 3.  Do you see this case, McLin v. Ard here?
 7         A.   Yes, sir.
 8         Q.   You see that this is against Jason Ard in
 9    his official capacity as sheriff of Livingston
10    Parish?
11         A.   Yes.
12         Q.   Is this the case you are talking about?
13         A.   I believe that is the case I was
14    referring to out of Livingston Parish, yes, sir.
15         Q.   So at the meeting on September 16, 2019,
16    it was discussed that in this case, McLin v. Ard,
17    criminal defamation had been decided to be, at
18    least in that context, unconstitutional as applied
19    there, correct?
20         A.   Correct.
21         Q.   Was it discussed any other cases, any
22    Supreme Court or Louisiana Supreme Court cases?
23         A.   I believe that was the case that we were
24    referred to, that we were aware of, because of
25    prior -- a detective had some discussion with the
```

```
 1   district attorney's office about a potential -- one
 2   of his cases prior to all of this, and that
 3   district attorney -- that ADA had provided that
 4   case to that detective at the time, so we were
 5   aware of that case.
 6        Q.   At the September 16th meeting, in the
 7   conference room adjacent to the sheriff's office,
 8   did you discuss your meeting with the district
 9   attorney's office?
10        A.   Well, I don't know.  I don't recall.  I
11   know we had talked about that case, and I believe
12   that is the same case that was referenced by the
13   district attorney, so it may have been, yeah, we
14   already know about that, and we don't feel that our
15   case mirrors that case, and the elements in our
16   case are different, vastly different from that
17   case.  So I don't think a lot of time was spent
18   like in-depth discussion.
19             At that point in time, we were there to
20   brief the sheriff on where we were at this point,
21   and we had come to an end of the investigation, and
22   this is where we were, and, basically, to brief him
23   on that, because, like I said, it involved a
24   federal agent.  Just like we would whenever we had
25   to investigate an FBI agent for domestic things or
```

1    -- which we have in the past, and any time we're

2    investigating another officer, whether it be

3    federal or local, the sheriff gets briefed on it.

4         Q.   You said the district attorney's office

5    pointed you to this case, McLin v. Ard, in the

6    context of Jerry Rogers, correct?

7         A.   When we had that meeting with the DA's

8    office, I believe his name is Matt Caplan.  He is

9    with the district attorney's office, and he does

10   research.  From what it appears, he does a lot of

11   their research.  I know -- I don't know if he tries

12   anything.  I think he is a research attorney, and

13   he brought up that case in that meeting.  We never

14   got a definitive answer from the district

15   attorney's office either way at that point in time.

16        Q.   So the district attorney's office at

17   least pointed you to that the arrest might be

18   unconstitutional because of this McLin v. Ard case.

19   Are saying they didn't give you a definitive

20   answer?

21        A.   They did not give us a definitive answer.

22   We gave them copies of what we had, some of the

23   e-mails and such.  It was Mr. Sims.  I don't know

24   if Mr. Dearing was there or not, but it was

25   Mr. Sims.  Definitely Matt Caplan came in the room.

```
 1    I don't know if he stayed the whole time.  We was
 2    in Mr. Sims' office.  It was a bunch of us, but we
 3    left that meeting with he'll let us know.
 4         Q.   Okay.  But just to answer the first part
 5    of my question --
 6         A.   I'm sorry.
 7         Q.   It's okay.  The district attorney's
 8    office pointed you to McLin v. Ard to suggest that
 9    the arrest of Jerry Rogers under these facts might
10    be unconstitutional, correct?
11         A.   When you say pointed -- he pointed to it,
12    their contention was -- I won't say contention,
13    because they didn't come to a decision, but their
14    initial response to us was, well, you know, several
15    times Mr. Sims said that the statute was
16    unconstitutional, and I had -- I actually stopped
17    him and said -- and asked for clarification, and
18    said, "Well, Mr. Sims, you are referring" -- I
19    said, "Collin, are you referring the application as
20    to that case, correct?" And he corrected himself.
21    He says, "Yes.  As to this case, it was ruled
22    unconstitutional," because it had not been repealed
23    at that time.  It was still in the law book. That's
24    -- I think that is what I wanted to get.  If any
25    clarification came in that meeting, it was to me
```

```
 1    between me and Mr. Sims when he clarified that it
 2    was unconstitutional.  It was ruled
 3    unconstitutional as to that particular case.  I'm
 4    sorry.  I'm Italian.  I'm talking with my hands.
 5    But as to that particular case, yes, but not in
 6    general.  That's what I took from that initial
 7    meeting, and then he said -- all he told us as a
 8    group was that he would get back with us.
 9        Q.   We'll come back to that.  So then in the
10    September 16th meeting, in the conference room
11    adjacent to the sheriff's office, McLin v. Ard was
12    discussed, and it was discussed that the DA had
13    brought this up, correct?
14        A.   Yeah, in general, and then we had already
15    known about it previous to that, because, like I
16    said, I think it was one of our detectives had
17    spoken about another issue prior to this in another
18    case that Mr. Bartholomew knew about it.
19    Initially, he was in the Major Crimes Unit, the
20    deputy I'm speaking of.  The detective I'm speaking
21    of.  And I think he brought it to Tim.  He and Tim
22    Crabtree were talking or something.  He goes, yeah,
23    I -- it may have come into context how it was
24    presented to me.  Oh, that came up between me and
25    Harold awhile back, and then I think Lieutenant
```

1    Hotard said, "Hey, can you get us a copy of
2    whatever Harold sent you?"  I think he e-mailed me,
3    and I don't know if he e-mailed Tim.  I know he
4    e-mailed myself and Alvin the actual documentation
5    of the Ard case or whatever it was.
6         Q.   And this is going up to the top of Page 1
7    of Exhibit W.  Is this that e-mail you are talking
8    about?
9         A.   I haven't gotten it yet.
10        Q.   I'm sorry.
11        A.   Yeah.  That would be Grey Thurman had
12   forwarded it to us or something, yeah.
13        Q.   So then at that September 16th, 2019
14   conference, this case, McLin v. Ard, was discussed,
15   and it was decided--
16        A.   I'm sorry.  I didn't mean to cut you off.
17   Sorry about that.  That's the first time I did it.
18   I'm proud of myself.
19        Q.   Yeah.  I appreciate it.
20        A.   Go ahead and finish.  I'm sorry.
21        Q.   Let's just stop there.  At the September
22   16th, 2019 meeting, McLin v. Ard was discussed,
23   correct?
24        A.   When I say discussed, it was, like I
25   said, we didn't spend a lot of time on it, because

1   when we said, "Yeah, that's the same case that

2   Mr. Sims was talking about in his office," we had

3   already talked to him about that in the office, and

4   had that, I guess, that clarity as far as the law

5   is not unconstitutional.  It was unconstitutional

6   through this application in this case.

7          Mr. Sims did clear that up for us.  I

8   thought that's what it was, but he was able to

9   clear that up at least personally for me to know

10  that I'm not chasing an unconstitutional law that

11  -- just act and don't have the repeal under it, you

12  know.  So when we say discussed, it wasn't like a

13  long, drawn-out discussion about every sentence of

14  this case.

15     Q.   But you understood that the case McLin v.

16  Ard held that it was unconstitutional for the

17  Livingston Parish Sheriff's Office to arrest McLin

18  in that context under the criminal defamation

19  statute, correct?

20     A.    Correct.

21     Q.   What made the arrest, the potential

22  arrest, of Jerry Rogers different than the arrest

23  of Mr. McLin?

24     A.    If I remember correctly, the case in

25  Livingston Parish was more Facebook, Facebook posts

1    about several councilmen, not one particular

2    person.  I would believe a councilman is an elected

3    official.  It's a public official.  Not one

4    particular in the case in the context of a homicide

5    investigation.  It just, to me, it was clearly not

6    the same type of case.  The elements of the case,

7    I'm sorry, were not the same.

8         Q.   So the two things that you thought made

9    it different and not unconstitutional to arrest

10   Jerry Rogers was that it was statements about a

11   detective rather than about multiple council

12   members and because it was in the context of a

13   homicide investigation; is that correct?

14        A.    Well, when you look at it in total,

15   Mr. Rogers targeted the family members of the

16   homicide victim, I believe, and I'm not a lawyer,

17   so I don't know this other case, Livingston Parish

18   inside and out, but it did not have the same

19   elements in it that Jerry Rogers had.

20        Q.   I'm trying to nail down what did you

21   think were the differences that made it

22   unconstitutional to arrest Mr. McLin but

23   constitutional to arrest Mr. Rogers?  I've heard

24   two things.  One, there is a homicide

25   investigation; is that correct?

1      A.    There is a homicide investigation, yes.

2      Q.    Was that the thing that made it different

3    and made it constitutional to arrest Jerry Rogers?

4      A.    No.   One was in a social media setting.

5    The other one was electronically targeting the

6    victims of the homicide.   To me, that is not the

7    same context.

8      Q.    So the thing that you made --

9      A.    When I said homicide, that's what I

10   meant.   That it was -- go ahead.

11     Q.    So the thing that you think was different

12   that made it unconstitutional to arrest Mr. McLin

13   but constitutional to arrest Jerry Rogers is that

14   Jerry Rogers, rather than doing a Facebook post,

15   was doing e-mails that targeted the family of a

16   victim of a homicide; is that correct?

17     A.    Part and parcel.   I'm not a

18   constitutional lawyer.   I don't know why the court

19   came to its decision in the other case.   That's not

20   my case, but I knew -- the bit I knew about that

21   case was different than our case.   I think that it

22   was apples and oranges not apples and apples.

23     Q.    Okay, but the difference that I described

24   there, that is what led you to believe that it was

25   constitutional to arrest --

1      A.    Yeah, one of them.

2      Q.    What were the others?

3      A.    I don't recall exactly.  You are going to

4  have to -- like I said, I don't know this decision

5  that was ruled unconstitutional backwards and

6  forwards, so, no, I don't recall if that was the

7  only thing.

8      Q.    Okay.  Other than what I just described,

9  can you recall any other differences that led you

10 to believe that it was constitutional to arrest

11 Jerry Rogers?

12     A.    I don't remember exactly.  I don't

13 remember exactly.  No, sir.

14     Q.    So you can't recall any other differences

15 besides --

16     A.    I can't recall if I did at the time or

17 didn't, but those are the ones that stick in my

18 mind.  That one in particular, that in the crux, in

19 the midst of a homicide investigation, Mr. Rogers

20 sought out family members of our victim and made

21 false statements about the lead investigator which

22 eroded their public trust and confidence in our

23 detective.  That's the best way I can answer that

24 one.

25     Q.    Okay.  Without telling me the contents of

 1    any discussions you had with a lawyer, can you --
 2    did you consult with a lawyer, other than lawyers
 3    at the DA's office, about arresting Jerry Rogers?
 4         A.   No.  I don't believe.  Me personally, no.
 5         Q.   Without telling me the contents of any
 6    conversations, do you know if anyone else consulted
 7    a lawyer about the possibility of arresting Jerry
 8    Rogers other than the DA's office?
 9         A.   I don't know.
10         Q.   So the DA's office, to your knowledge,
11    was the only lawyers consulted about the
12    possibility of arresting Jerry Rogers before it
13    happened, correct?
14         A.   Correct.  At the time of that meeting, we
15    were aware that his wife was employed by the
16    district attorney's office, also.
17         Q.   So speaking of Jerry Rogers' wife, you
18    contacted her during this investigation, correct?
19         A.   Correct. I did.
20         Q.   Why did you do that?
21         A.   Initially, if I remember correctly, one
22    of the phone numbers was -- it was her phone number
23    attached to one of the e-mail accounts.  It was a
24    very brief meeting in which I just understood that
25    she didn't want to have an interview with us, and

```
 1    that was it.  It was in a witness room in the
 2    courthouse.
 3         Q.   So you went to the courthouse and asked
 4    her to join you in a witness room to interview her?
 5         A.   Yeah.  I actually spoke initially with --
 6    I don't know if it was with Collin or Bruce Dearing
 7    just to see if, you know, they could speak to her
 8    first to let her know that we wanted to talk with
 9    her, and because she was working at the time.  We
10    definitely didn't want to do it in their office, if
11    we were going to have any kind of conversation.
12              So I think she met me in a witness room
13    in the hallway of the courthouse.  I very briefly
14    introduced myself.  I explained to her I understood
15    why she wouldn't want to talk to us, and at that
16    time, Brian Trainor was representing her husband.
17    I said, "You might want to speak to Brian about it.
18    Just let us know if you want to talk to us," and
19    that was it.
20         Q.   Okay.  So September 2019.  This was
21    shortly before the sheriff's re-election, correct?
22         A.   Yes.  I'm sorry.  Yeah.  I was trying to
23    run dates in my head, yes.
24         Q.   There was an election in October and then
25    a run-off in November of 2019?
```

1      A.    Yes, sir.

2      Q.    Did you understand Jerry Rogers to be
3  affiliated with any of the candidates or supporting
4  any of the candidates in that race?

5      A.    Initially, no, until I saw some of the
6  e-mails he had corresponded with Mr. Lentz and with
7  Mr. Tranchina.

8      Q.    So when you say you saw the e-mails,
9  there was a search warrant for the e-mail account
10 that Mr. Rogers was using, and you saw the e-mails
11 that were obtained from that search warrant,
12 correct?

13     A.    Right.  It was under a false name.
14 Justicenanette, I believe, yes.

15     Q.    Included in those e-mails were
16 correspondence to and from the sheriff's opponents
17 in that race, correct?

18     A.    Yeah.  I don't remember exactly what was
19 in them, but he communicated with Mr. Lentz, and he
20 communicated with Mr. Tranchina.  He didn't
21 communicate with our sheriff.  It just looked like
22 he was involving himself in communicating with all
23 parties involved in addition to extending the
24 family information.

25     Q.    So what did you do when you saw that

1    there were -- the fruits of a search warrant had

2    turned up e-mail communications with the sheriff's

3    opponents in the political race?

4         A.   What do you mean what did I do?

5         Q.   Well, frankly, that seem pretty sensitive

6    to me.  Like the sheriff is running for

7    re-election.  A search warrant has turned up

8    e-mails with his opponents.  Were those e-mails

9    separated, kept confidential somehow, or in any

10   other way treated differently?

11        A.   Well, the only thing I did, by the time I

12   got the e-mails, they had already been with the

13   sheriff's office prior.  They were in the

14   possession of the sheriff's office prior to me

15   getting the copies of those e-mails.  That was all

16   done during the internal investigation.  Did I

17   separate out junk from what pertained to the

18   criminal defamation?  Yeah.  I just -- the fact

19   that he didn't like our sheriff or liked our

20   sheriff had no bearing on what he said about the

21   lead investigator to violate the elements of the

22   crime.  So that is what I was concerned with.  Did

23   my superiors have the e-mails in bulk?  I don't

24   know who -- I don't remember ever providing them,

25   but I would not have the only copy anyway, because

1    they were given to me months after they were -- I

2    say months.  I don't know, but they were prior

3    already in our office, and then they were given to

4    me when I started the criminal investigation.

5        Q.   So you don't know of any way in which the

6    e-mails obtained from a criminal search warrant

7    which involved e-mails of the sheriff's opponents

8    in the race were treated any differently or

9    segregated, correct?

10       A.   I know I was concerned with the e-mails

11   to the Krentel family.  I don't know if they had

12   any politicalness in them or not.  I don't recall,

13   but those are the e-mails that I was concerned

14   with.  Anything to do with the Krentel homicide,

15   like the fact -- and him speaking to the family

16   through justicenanette.

17       Q.   I appreciate that, Captain, but

18   respectfully, my question was a little different.

19   My question was, do you know of any way in which

20   the e-mails to and from the sheriff's opponents

21   were segregated or handled differently because of

22   their sensitive political nature by any person at

23   the sheriff's office, yes or no?

24       A.   Not to my knowledge.  I can only tell you

25   what I did with the e-mail.

1      Q.    On the morning of September 16th, 2019,

2    there was this meeting about the possibility of

3    arresting Jerry Rogers for criminal defamation,

4    correct?

5      A.    Correct.

6      Q.    And then, thereafter, you said it was

7    approved by Crabtree?

8      A.    No.

9      Q.    Maybe I misheard that.  After that

10   meeting at 11:25, you submitted the affidavit in

11   support of an arrest warrant, correct?

12     A.    Yes.

13     Q.    And Jerry Rogers was arrested later that

14   day?

15     A.    He was.

16     Q.    And then he was booked into the St.

17   Tammany Parish jail?

18     A.    Yes.  As far as I know.

19     Q.    And that booking process, does that

20   involve a strip search?

21     A.    I don't know if his did or didn't.  I

22   know generally, yes.  Honestly, I don't want to --

23   I don't know.  I don't know what the booking

24   procedures are at the jail.  I don't know.  I'm not

25   familiar with them.

1      Q.   But when you were familiar with them, it
2   typically involved a strip search?
3      A.   At some point in time I believe.  Again,
4   the jail end of the business, at this agency, I've
5   never -- I've been on the enforcement side.
6      Q.   Mr. Rogers was being accused of a
7   misdemeanor, correct?
8      A.   Correct.
9      Q.   And so a misdemeanor can be handled
10   either by issuing someone a summons, which doesn't
11   require actually physically bringing them to the
12   jail and booking them, or you can physically arrest
13   them, bring them to the jail and book them,
14   correct?
15      A.   Correct.
16      Q.   Mr. Rogers was not issued a summons.  He
17   was physically arrested and brought to the jail,
18   correct?
19      A.   Correct.
20      Q.   And do you know why that was?
21      A.   We -- I don't want to say we. I came to
22   the decision that just two weeks prior, he had a
23   confrontation with -- had an incident in Monroe
24   Parish where he attempted suicide by police, and I
25   was concerned that any advance notice to his

1    attorney at the time, Mr. Trainor, or any advance

2    notice to Mr. Rogers may not be in Mr. Rogers' best

3    interest, as far as his state, or for our officers

4    when they went to issue him a summons.  So it

5    allows us to decide whether someone is arrested on

6    a misdemeanor or summons on a misdemeanor due to

7    the circumstances.

8          Q.   So you knew he had an attorney at the

9    time.  Could the summons have been issued to his

10   attorney, provided to his attorney?

11         A.   No.  He would have to sign the summons.

12   He was going to sign the summons.  So we were

13   worried that any advance notice to Mr. Rogers --

14   when I say we, it was me.  I was worried that any

15   advance notice to Mr. Rogers may cause Mr. Rogers

16   to act erratically as he did two weeks prior, place

17   himself in harm, a harmful situation, as he did two

18   weeks prior.  So a surprise arrest I felt was

19   actually the safest of--

20         Q.   The safest alternative?

21         A.   Safest for all involved.  For our

22   officers, for himself, for Mr. Rogers.  That's how

23   I felt, and I still feel that way.

24         Q.   So a surprise arrest by three officers

25   was the safest alternative to what?

1      A.    To advance notice of Mr. Rogers.  Based

2  off two weeks prior he had an informal interview

3  speaking with two of our detectives, and not so

4  many days later, he was hold up in a hotel room

5  armed and then attempted suicide by police in West

6  Monroe Parish.

7      Q.    I got you, Captain.

8      A.    That's what I based my decision off of.

9      Q.    So when you are talking about advanced

10  notice in the context of a summons, what do you

11  mean?

12      A.    Well, at some point we have to contact

13  his attorney.  His attorney would contact him, and

14  we meet him and issue him a summons.  That is my

15  understanding of how we have always done things

16  when somebody was represented.  If somebody wasn't

17  represented, we would just call them and say, "Hey,

18  we are going to issue you a summons.  Come to our

19  office," or we go meet them somewhere.  And as long

20  as they fit the criteria to get a misdemeanor

21  summons, they would.

22      Q.    So the key thing here is you didn't want

23  to give Mr. Rogers advanced notice that you were

24  going to be serving him with something, right?

25      A.    That he was going to be arrested either

1   via a misdemeanor summons or arrest, correct.

2        Q.   So could you have done -- sent three

3   officers to do a surprise service of a summons?

4        A.   You are asking me what I could have done

5   or what I couldn't have done.  I'm not dealing in

6   hypotheticals.  I did what I did.

7        Q.   Respectfully, Captain, you are answering

8   the questions, right.  I can ask even these

9   hypotheticals.  I'm just trying to understand your

10  decision-making process, right.  You were deciding

11  between sending people to arrest him or sending

12  people to serve him a summons, right?

13       A.   Correct.

14       Q.   And you decided to send people to arrest

15  him, correct?

16       A.   I decided to send people to arrest him,

17  correct.

18       Q.   I guess what I'm confused about is why

19  couldn't you have just sent three officers to

20  surprise him, serve him with a summons?  I don't

21  understand why he needed to be arrested and booked

22  as part of that as well.

23       A.   He violated the misdemeanor offense.

24  What we did was not a policy.  It was not -- he

25  violated a misdemeanor offense, and he was arrested

1   for it.  They could have done a lot of things in

2   this case.  They could have -- I don't deal with

3   any could have done, would have done, that kind of

4   thing.  A decision was made by myself that a

5   surprise arrest would be the safest for all

6   involved.  That's why I sent three of our Major

7   Crimes detectives to arrest him.

8       Q.   You do have to answer hypotheticals.

9   Could you have sent three officers to surprise

10  serve him with a summons?

11      A.   I could have, as your client could have

12  not sent e-mails.  I mean, anything could have

13  happened is what I'm trying to explain to you, but

14  it's not what happened.

15      Q.   Right.

16      A.   Okay.

17      Q.   Sending three officers to do a surprise

18  service of a summons would have accomplished the

19  not giving him notice and would have accomplished

20  the beginning of the criminal process, correct?

21          MR. COLLINGS:

22              I am going to enter a continuing

23              objection.  I mean, I think you have

24              belabored the point a lot at this

25              point.  He's answered the question the

```
 1                  best he can.  I understand where you
 2                  are going, but it's -- you are asking
 3                  him to speculate on what could have
 4                  happened.  He answered the best he can.
 5              MR. MOST:
 6                  Okay.  Objection noted.  Thank you,
 7              Chad.
 8      BY MR. MOST:
 9          Q.   Captain, so serving him with a surprise
10      summons would have accomplished the goal of not
11      giving him advanced notice, correct?
12          A.   I can't say that for certain.  I don't
13      know.
14          Q.   In what way would a surprise service of a
15      summons not have accomplished the goal of not
16      giving him advanced notice?
17          A.   At the time, anything could have
18      happened.  I don't know.  You are asking me to say
19      what could have happened.  I don't know what could
20      have happened.  If we would have issued him a
21      summons right then and there, I don't know what his
22      reaction would have been.  I only know what his
23      reaction was when he was taken into custody.  So I
24      understand what you're asking me.  I'm answering
25      you the only way I know how, honestly.  I don't
```

1    know what would have happened.  You say it would

2    have served the same purpose.  I don't know that it

3    would have.  I don't know what his reaction would

4    have been to being summonsed as opposed to being

5    arrested.

6            Q.    Okay.  But you thought it was the best

7    thing for him to be arrested rather than served

8    with a summons; is that correct?

9            A.    Correct.  That was my decision based on

10   his prior actions.

11           Q.    I want to get the timeline of that day

12   down.

13           A.    Can we take a break?

14           Q.    Absolutely.

15               {BRIEF RECESS, 11:30-11:35}

16   BY MR. MOST:

17           Q.    As I mentioned before, I just want to pin

18   down the timeline of September 16, 2019, which was

19   the date of Jerry Rogers' arrest, correct?

20           A.    Yes, sir.

21           Q.    Do you know whether a press release went

22   out that day about Jerry Rogers' arrest?

23           A.    I assume it did.  I don't know if it did

24   or not.  I think there was one issued.  That's not

25   my area.

1     Q.    Were you consulted by anyone in the
2  preparation of that press release?  I mean, they
3  had to get the information from somewhere, right?
4     A.    Yeah.  I don't know if Captain Lee --
5  sometimes he -- at the time, Captain Lee was a PIO,
6  if I'm not mistaken.  Sometimes they ask us for a
7  copy of our affidavit so they can surmise or a
8  brief on the case.  Whatever he would have
9  requested I would have gave to him.  I don't recall
10  in this particular matter what he requested.
11     Q.    Had you ever seen a press release about
12  an arrest that went out before the person was even
13  booked?
14     A.    No.  None that I can remember.  Not that
15  I know of. You mean post-arrest, prior to the
16  booking process? I don't know.
17     Q.    That seems really fast to me that a press
18  release would be out before someone was even
19  booked.  Would that surprise you as well?
20     A.    I wouldn't say surprised.  Sometimes that
21  happens.  We have people who go to the hospital.
22  We have people that aren't booked immediately in
23  the booking process.  I really don't have a, I
24  guess, a knowledgeable opinion on that.
25     Q.    I'm going to pull up Exhibit L.  Do you

```
 1   see that this is -- looking at Page 3.  Do you see
 2   that this is the narrative of the arrest of Jerry
 3   Rogers?
 4        A.   Yes.
 5        Q.   You see it says at approximately 1433
 6   hours, they arrested Jerry Rogers?  Is that
 7   correct?
 8        A.   It looks that way from the report, yes,
 9   sir.
10        Q.   So that would be 2:33 in the afternoon is
11   the approximate time of Jerry Rogers' arrest?
12        A.   Yes, sir.
13        Q.   Now, pulling up Exhibit T, do you see
14   this is the press release regarding the arrest of
15   Jerry Rogers?
16        A.   I do.
17        Q.   You see this came out at 2:48 PM, so
18   approximately 15 minutes after the arrest of Jerry
19   Rogers?
20        A.   Yes, sir.
21        Q.   That seems incredibly fast to me.  Have
22   you ever seen a press release issued so quickly
23   upon someone's arrest?
24        A.   As I said before, I don't really notice
25   those types of things in investigations.  I'm on
```

1   the other side of it.

2        Q.   Does it surprise you that there was a

3   press release ready and published approximately 15

4   minutes after the arrest of Jerry Rogers?

5        A.   No.  I wouldn't say surprised in any

6   case, not just this one.

7        Q.   How many times in your career, after you

8   have sought the arrest of someone, how often have

9   you then reported them to their employer?

10       A.   Only in cases involving law enforcement.

11       Q.   And you did that with Jerry Rogers,

12   correct?

13       A.   We did.  I did.

14       Q.   Do you do that every time you have an

15   arrest involving a member of law enforcement?

16       A.   Yes, sir.  Or me personally, yeah.  I've

17   only arrested one other police officer.  I've

18   investigated a couple and have at the request of

19   their agencies, so they already knew about it, but,

20   yeah, if we arrest a LEO of any variety, federal,

21   state, local, we have to inform the agency.

22       Q.   Is there a difference between informing

23   the agency of their arrest and filing a formal

24   complaint about that person's conduct?

25       A.   Yeah.  I would believe there is a

1   difference.

2        Q.   So it is policy that every time you

3   arrest a law enforcement officer you have to inform

4   their agency; is that right?

5        A.   I'm unsure if it's policy.  I know it's

6   been practice ever since I've been involved in

7   these types of investigations.

8        Q.   So it's at least your practice to inform

9   the agency if you arrest a law enforcement officer,

10  correct?

11       A.   Correct.

12       Q.   Is it your practice to also file a formal

13  complaint about that officer each time if you

14  arrest a law enforcement officer?

15       A.   No, no.  It's not policy or practice.

16  It's a case-by-case issue, and if you're asking --

17  if we're going to go to the point where you are

18  asking me why did we do that, because Mr. Rogers

19  injected himself as a federal agent anonymously

20  into a homicide investigation.  So we did think his

21  actions, by doing that, warranted a formal

22  complaint to his department.

23       Q.   Have you ever filed a formal complaint

24  about any other law enforcement officer?

25       A.   Not that I know of.  No, sir.  Not that I

1   can recall.

2       Q.   Do you know if the St. Tammany Parish

3   Sheriff's Office ever filed a formal complaint

4   about a law enforcement officer to their employer,

5   other than Jerry Rogers?

6       A.   I don't know.

7       Q.   We went over it kind of quickly, but I

8   just want to pull it up again.  This is Exhibit W,

9   which this is the e-mail from Grey Thurman to you

10  and Mr. Hotard, correct?

11      A.   Yes, it is. It's the forward e-mail, yes.

12      Q.   This contained the McLin v. Ard case,

13  correct?

14      A.   Correct.

15      Q.   You read the McLin v. Ard case, correct?

16      A.   I skimmed it.  I wouldn't say I under-

17  stood every word, no, but, yes, I was aware of it.

18      Q.   You skimmed the McLin v. Ard case and

19  were aware of its existence but didn't carefully

20  read the entire case, correct?

21      A.   Correct.  As I said, I'm not an attorney.

22  Some of the information in it I did not understand,

23  but I read the crux of what the case was about and

24  found it different from ours.

25      Q.   Did you look at any other cases besides

1  McLin v. Ard?
2       A.   No, sir.
3       Q.   Did you look at the U.S. Supreme Court
4  case in which the U.S. Supreme Court said that
5  Louisiana's criminal defamation statute was
6  unconstitutional in some circumstances?
7       A.   No, I did not.
8       Q.   What about the Louisiana Supreme Court
9  case that said that Louisiana's criminal defamation
10  statute was unconstitutional in some circumstances?
11       A.   No, sir.
12       Q.   And Grey Thurman forwarded you this
13  because this had been discussed, and you asked him
14  to forward this to you?  I forget exactly what you
15  said.
16       A.   No.  I didn't ask him.  I don't know who
17  asked him to forward it to us, but it was in the
18  context of we were looking -- someone, and I don't
19  know who.  I believe it was Tim Crabtree, but I'm
20  not sure, was familiar that Grey had some
21  discussions with the DA's office on a prior case
22  that -- and that Harold Bartholomew had -- some
23  kind of a way it was communicated that Harold had
24  talked to Grey or sent him this information.  I
25  don't know who, but it was forwarded to us.

1    Q.   It was forwarded to you, and you under-
2  stood it to be an indication that it could be
3  unconstitutional to arrest someone for criminal
4  defamation, and so you needed to look and see if
5  the circumstances here are constitutional or
6  unconstitutional; is that correct?
7    A.   I wanted to see if the circumstances of
8  that case were the same as the circumstances of our
9  case.
10   Q.   Right, because you understood that in
11 some circumstances it's unconstitutional to arrest
12 someone for criminal defamation in Louisiana,
13 correct?
14   A.   At least in that one, particular one,
15 yeah, as to that case.
16   Q.   Now I am pulling up Exhibit Z-A, which is
17 what you've got in front of you.  These are the
18 three cases that you had someone pull prior?
19   A.   Yeah.  I'm familiar with what you are
20 showing me.
21   Q.   These are pulled from St. Tammany Parish
22 Sheriff's Office RMS system and the Clerk of Court
23 system, correct?
24   A.   Correct.
25   Q.   Did you have access to these systems in

1    2019?

2         A.   I did.

3         Q.   So if you wanted --

4         A.   I'm sorry.  I didn't want to cut you off.

5    I'm not sure about the clerk system for a

6    particular operating system.  I didn't know if it

7    was the same exact system, but the information,

8    yeah.

9         Q.   So you had the access to the information

10   here in Exhibit Z-A, if you had wanted to look it

11   up in 2019, correct?

12        A.   Correct.

13        Q.   But you did not take steps to look up the

14   disposition of prior --

15        A.   No.  No.  I'm sorry.

16        Q.   Just to finish my question.  So you did

17   not, in 2019, do any investigation to look up prior

18   criminal defamation arrests by the St. Tammany

19   Parish Sheriff's Office or their dispositions at

20   that time, correct?

21        A.   At that time, no, other than the personal

22   knowledge about that one that I referred to earlier

23   that was accepted and changed to a, I believe,

24   cyber crime.  That one in particular case in which

25   I was the sergeant in Persons Crimes when that case

1    was handled by one of our detectives.

2         Q.   When you say accepted and changed, what

3    you mean is the DA -- the St. Tammany Parish

4    Sheriff's Office arrested someone for criminal

5    defamation.  The DA's office accepted the case but

6    charged the person with a different crime other

7    than criminal defamation, correct?

8         A.   Correct.

9         Q.   So in 2019, you did not know of any

10   criminal defamation arrests that had been accepted

11   by the DA, correct?

12        A.   Correct.

13        Q.   So in talking about McLin v. Ard, that is

14   a 2017 Fifth Circuit Court of Appeal case, correct?

15        A.   I believe so.

16        Q.   And so that case, it's the Fifth Circuit,

17   Federal Fifth Circuit.  You understand that the St.

18   Tammany Parish Sheriff's Office is within the

19   Federal Fifth Circuit?

20        A.   I do.

21        Q.   So the decisions of the Federal Fifth

22   Circuit, you understood, governed your actions as a

23   law enforcement officer; is that correct?

24        A.   Eventually, yes.  I don't understand.

25   Their decisions based on the law governs what we

1    can enforce and what we can't enforce, yes, if that

2    answers your question.

3        Q.   That was my question so thank you.

4        A.   And it's a case-by-case basis, to my

5    understanding.

6        Q.   I am pulling up -- you said you looked at

7    the crux of McLin v. Ard.  Looking at Page 16 here,

8    do you see this first sentence on Page 16 of this

9    Exhibit W? Do you see this first sentence here?

10       A.   I do.

11       Q.   It says, "In Garrison v. Louisiana, the

12   Supreme Court held that the Louisiana criminal

13   defamation statute, LA Stat 14:47, is

14   unconstitutional in the context of criticism of the

15   official conduct of public officials."  Do you see

16   that part?

17       A.   Yes, I do.

18       Q.   Is that part of the crux that you

19   reviewed when you read McLin v. Ard?

20       A.   I was aware of that, yes, sir. That was

21   discussed, also, at the district attorney's office.

22       Q.   This part of McLin v. Ard was discussed

23   at the district attorney's office?

24       A.   The feeling that a police officer is a

25   public official.  At the time, they, meaning the

1  DA's office, could not cite any rule or order by

2  any court deeming a police officer as a public

3  official.  In this case, they -- I take it as a

4  public official they're speaking of were the three

5  councilmen, not the police officer who made the

6  arrest, or not the police officer.  That's what I

7  understood by this statute then and up until now.

8      Q.   You think it is unconstitutional to

9  arrest someone for criticizing the official conduct

10  of council members?

11      A.   No.  The official -- if they're an

12  elected public official.  I mean, in this day and

13  age of social media and things like that, correct.

14  That's what I felt, that that is what this ruling

15  was regarding.

16      Q.   You think it is constitutional to arrest

17  someone for criminal defamation for their criticism

18  of the official conduct of police officers?

19      A.   The official conduct?  What do you mean?

20  If they proved to have done wrong? Now, in this

21  state, it's not constitutional to arrest anybody

22  for defamation, because it's been repealed, so I

23  can only enforce the laws on the books when they're

24  on the books, and they're not on the books anymore.

25      Q.   Yeah.  I understand.

1    A.   That's my feeling.  My feeling is

2  whatever the law tells me to do is what I'll do,

3  because that's what I've done my whole career is

4  follow the law.

5    Q.   Right.  You understand that the law in

6  2019 was that it was unconstitutional to arrest a

7  person in the context of criticism of the official

8  conduct of public officials like council members,

9  right?  That was your understanding in 2019?

10    A.   That was my understanding of this

11  particular case.  That's why I had the -- that's

12  why we felt that it was comparing apples to oranges

13  and not apples to apples.  The cases were

14  different.

15    Q.   Because it was comparing council members

16  to police officers?

17    A.   Elected officials to police officers,

18  yes, sir.

19    Q.   I'm pulling up Exhibit Y at Page 24.

20  These are discovery responses that were provided in

21  this case.  Do you see that this refers here, sort

22  of the middle of the page, a meeting involving --

23  the first meeting says that meeting included not

24  only the sheriff but Detective Canizaro, Lieutenant

25  Hotard, Major Sharp, Steven Gaudet, Culpeper.  Is

1   that the meeting upstairs in the conference room

2   adjacent to the sheriff's office that you were

3   describing earlier?

4         A.   I believe so.  That was the same people

5   that were there.

6         Q.   Then the next sentence talks about one or

7   more sheriff's office employees, including

8   Detective Canizaro, discussed the Rogers

9   investigation with members of the DA's office.

10  That is the DA's office you were talking about?

11        A.   Yes, sir.

12        Q.   I want to talk a little bit more about

13  that meeting.  So you physically went to the DA's

14  office for that meeting; is that correct?

15        A.   Yes, sir.

16        Q.   And that was September -- let's see.

17  September 13th, 2019?

18        A.   That sounds correct.

19        Q.   So about three days before the arrest of

20  Jerry Rogers, you went physically to the DA's

21  office?

22        A.   Yes, sir.

23        Q.   And who was present at that meeting?

24        A.   To the best of my recollection, it was

25  myself, Lieutenant Hotard, Captain Gaudet.  I do

1    not know if Major Sharp was there or not.  He may

2    or may not have been.  I don't remember

3    specifically, and Chief Culpeper.  Then some of the

4    district attorneys.  Again, I'm not sure if

5    Mr. Sims was there.  I know Mr. Caplan was there.

6    I don't know if he was there the entire time, and I

7    believe Mr. Dearing was there, also, but I'm not

8    totally sure.

9        Q.    At that meeting, it was discussed the

10   possibility of arresting Jerry Rogers for criminal

11   defamation, right?

12       A.    Yes.  We brought them the documents, the

13   e-mails.  We provided them with copies of e-mails

14   and things of that nature, and, basically, briefed

15   them on where we were in the investigation.

16       Q.    I assume you don't do that for every

17   investigation.  Was there something special about

18   the Jerry Rogers investigation that made you want

19   to brief the DA's office in advance of an arrest?

20       A.    We don't do it with every investigation.

21   We do, however, consult with the DA's office on a

22   number of investigations.  They usually never

23   provide us with a definite answer, but we ask for

24   their input sometimes.  Sometimes we agree with

25   them and sometimes we don't.  That is not uncommon.

1    However, this case being a misdemeanor, albeit a

2    misdemeanor, involved the arrest of -- or a

3    potential arrest for violation by a federal

4    officer.  I believe that's why -- I don't know who

5    made the decision that we go meet with them.  I was

6    just told that we were meeting with them.

7        Q.   You had already received McLin v. Ard and

8    reviewed it prior to this meeting, correct?

9        A.   Correct.  We were familiar with it.  I

10   didn't know it chapter and verse, but we were

11   familiar with the issues that that case had, and we

12   had already felt that it differed from our case,

13   correct.

14       Q.   Was the fact that this statute had been

15   declared unconstitutional in some context part of

16   the reason to go to the DA's office to consult?

17       A.   I don't know.  I was just told to go to

18   the meeting.

19       Q.   At that meeting, if I heard you

20   correctly, an attorney from the DA's office pointed

21   out that this law was unconstitutional, and you

22   remind them unconstitutional in some context,

23   correct?

24       A.   Mr. Sims referred to the law as being

25   unconstitutional several times, and then I asked

1    him, as a bit of clarification, "You keep saying

2    it's unconstitutional.  Do you mean it's

3    unconstitutional as to the application in that

4    case?"  And he said, "Yes, the application for that

5    case."

6         Q.   Did he say anything about the application

7    to Jerry Rogers?

8         A.   Mr. Caplan was unsure or felt that a

9    public official was a police officer.  That's what

10   he felt.  He was unsure of it.  That's why we never

11   left there with an answer.  They said -- I don't

12   remember the exact words, but we'll get back to

13   y'all.

14        Q.   So an attorney from the DA's office

15   expressed that they felt that a public official

16   included a police officer but didn't give you a

17   definitive answer and said they would get back to

18   you; is that correct?

19        A.   Basically, yes.

20        Q.   Do you know if the DA's office ever got

21   back to anyone at the sheriff's office?

22        A.   I didn't know at the time, but I know now

23   that a phone call was placed at a much later date

24   or at a later date.  I don't know whether it was

25   with an answer or whether it was anything.

1      Q.   I'm going to share with you Exhibit U,

2  which is -- you see this is the FBI investigatory

3  file?  I think you said you had already seen a copy

4  of this?

5      A.   Yes.  Yes, sir.

6      Q.   Have you reviewed it?

7      A.    In its redacted form, yes, sir.

8      Q.   Have you reviewed an unredacted version

9  of it?

10     A.   No, sir.

11     Q.   Have you signed any sort of document, a

12  privacy act form, that would allow you to see the

13  unredacted version?

14     A.   No, sir.

15     Q.   I'm looking at Page 6 here.  You see that

16  Page 6 describes at approximately 10:30 AM there

17  was a meeting to discuss the Rogers case.  Does

18  this appear to be -- it says the DA's office at the

19  top.  Does this appear to be the meeting with

20  Collin Sims and other members of the DA's office?

21     A.    It appears that that is the first mention

22  of the case in this report.  I would assume that

23  that is the meeting that we're speaking of.

24     Q.   You see further in the third paragraph on

25  the page it says someone contacted someone between

```
1    10:30 AM and 11:30 AM, and somebody told somebody
2    that the DA's office did not support the use of
3    defamation, as it had been found unconstitutional
4    on multiple occasions in previous applications.  Do
5    you see that?
6         A.   I see the sentence you are referring to.
7         Q.   Are you aware of any such phone call
8    saying the DA's office did not support the use of
9    this statute?
10        A.   No, I'm not.
11        Q.   Pulling up what is labeled Exhibit N, do
12   you see that this appears to me to be a search of
13   Jerry Rogers' criminal history?  Is that right?
14        A.   Yes.  That's what it appears to me.
15        Q.   It is also called a rap sheet sometimes?
16        A.   Yes, sir.
17        Q.   Do you see that the only thing on this
18   rap sheet is Jerry Rogers' arrest for defamation?
19        A.   Yes, sir.
20        Q.   So before Jerry Rogers' arrest for
21   defamation, he had no criminal history, nothing on
22   his rap sheet, correct?
23        A.   Nothing on his rap sheet.  Not that I
24   know of.
25        Q.   Now, because of you seeking his arrest
```

1  for criminal defamation, he now has a criminal

2  history and arrest for defamation, and he has

3  something on his rap sheet now, correct?

4       A.   I wouldn't say because of me seeking his

5  arrest.  I would say because of his own actions,

6  yes, he has an arrest.

7       Q.   But if you had not sought his arrest,

8  then he would not have anything on his rap sheet,

9  right?

10      A.   Correct.  And if he wouldn't have done

11 what he done, then there would be no reason for the

12 investigation to begin with, correct.  If he had

13 not violated the law.

14      Q.   Are St. Tammany Parish Sheriff's officers

15 allowed to use search warrants for Internal Affairs

16 investigations?

17      A.   I don't know the answer that.  I don't

18 handle Internal Affairs.

19      Q.   Have you ever given a recorded or hand-

20 written statement in reference to Jerry Rogers'

21 arrest or anything to do with Jerry Rogers, other

22 than --

23      A.   Me personally?

24      Q.   You personally, yeah.

25      A.   Other than this deposition?

```
 1        Q.    Correct.
 2        A.    No, sir.
 3        Q.    I just heard a beep.  Did you get a
 4   message of some sort?
 5             MR. COLLINGS:
 6                   He is using my laptop.  That's him
 7              just getting e-mail on my laptop.
 8             THE WITNESS:
 9                   It was just a notification black box
10              that came up and then disappeared.
11                   It's happened a couple of times.
12   BY MR. MOST:
13        Q.    No problem.  I don't think there is a
14   problem.  I'm just being extra cautious.
15        A.    No.  It just pops up under the law firm,
16   to Mr. Collings, and it slides right back over.
17        Q.    Not a problem.  Did you know there was a
18   preliminary examination in Jerry Rogers' criminal
19   case?
20        A.    I did not until after it happened.
21        Q.    And then after it happened, you found out
22   that Judge Gardner found there was no probable
23   cause for Rogers' arrest?
24        A.    I believe it -- how it was explained to
25   me by the attorney general's office was that it was
```

1    for the bail, for his posting bail, release bail.

2    That's how it was explained to me by the AG's

3    office, release of bail.

4         Q.   So we can look at -- this is Exhibit D.

5    You see that this is the minutes of a preliminary

6    hearing?

7         A.   I do.

8         Q.   Do you see it says the Court finding no

9    probable cause?

10        A.   It says, "Defendant relieved of his bond

11   obligation."  That's what was explained to me, that

12   it was his bond obligation.

13        Q.   Because the Court found there was no

14   probable cause for his arrest, correct?

15        A.   Correct.  No. Strike that last correct,

16   because I don't know if that's, in fact, what

17   happened here at this hearing.  That's not how it

18   was presented to me by the AG's office.  The AG's

19   office did not say that the case was in any way,

20   shape, or form dismissed at that time, that they

21   would not carry forward.

22        Q.   So you're talking about a conversation

23   with the DA's office?

24        A.   No.  The attorney general's office.

25        Q.   I'm sorry.

1       A.    The AG's office.  I'm sorry.  State AG.

2       Q.    Who did you talk to at the state AG's

3    office?

4       A.    Pat Magee, and I cannot remember his

5    first name.  It's LeBeau.  I think something to

6    that was the person who was going to review

7    everything we gave him.

8       Q.    Did he talk to you on the phone?

9       A.    I initially spoke with Mr. Magee's

10   secretary on the phone and set an appointment to

11   deliver the reports and the information to him.  I

12   drove to Baton Rouge and brought it to their

13   office, briefed them both about the case.  They

14   took the information, and then several months later

15   called us back to have another meeting with them,

16   with my lieutenant at the time.  I don't want to

17   get ahead of myself, but I've had two meetings with

18   them about this case.

19      Q.    Let's talk about those two meetings.  The

20   first one was after the arrest of Jerry Rogers,

21   right?

22      A.    Correct.

23      Q.    Was the constitutionality of his arrest

24   discussed at that first meeting?

25      A.    Not really.  They just wanted the

1  documents and documentation and the reports and

2  things like that.  Neither of them were real long.

3  I briefed them verbally on the case and provided

4  the documents, too.

5       Q.   Then at the second --

6       A.   I was by myself when I went to deliver

7  the documents.

8       Q.   Then at the second meeting, was the

9  constitutionality of his arrest or prosecution

10 discussed at that second meeting?

11      A.   Very briefly.  Mr. Magee did most of the

12 talking at the time.  I believe he was the head of

13 criminal prosecution at that time under the AG.

14 What Mr. Magee told myself and at that time was my

15 lieutenant.  Goodness.  Kenny Latour.  I'm sorry.

16 Kenneth Latour was my lieutenant.  That they

17 reviewed the case.  They felt that it would be

18 appealed.  They didn't want to waste time trying to

19 prosecute and deal with it as a misdemeanor.

20           Mr. Magee said that he knows -- he felt

21 that it would be a constitutional issue whether a

22 police officer was deemed a public official or not.

23 He said that the attorney general asked him if he

24 felt there was any foul play involved in the

25 arrest.  He told them that it was not.  It was a

1    good faith arrest, but that they weren't going to

2    waste the time and energy on a misdemeanor.  That

3    is exact.  Not exact words, but that's what he

4    relayed to myself and Lieutenant Latour, and we

5    thanked him and left.  I did ask him one question.

6    I asked him in criminal law is there any place

7    where a police officer in criminal law is defined

8    as a public official, and both him and Mr. LeBeau

9    -- I might be mispronouncing his name -- stated

10   that they were not aware of any.

11        Q.   I understand you can't remember his

12   precise words.  Look at Exhibit E.  Do you see that

13   this is the declination of charges by the attorney

14   general's office?

15        A.   I do.

16        Q.   Generally, the attorney general's office,

17   are they a reliable source of what the law is?

18        A.   I would --

19             MR. COLLINGS:

20                  Object to the form.  It is way

21               beyond the scope of this fact witness'

22               deposition.  To the extent you can

23               answer it.

24             THE WITNESS:

25                  I would -- I don't know.  I don't

 1              know who is the authority.  Obviously,

 2              the U.S. Supreme Court is, but, yes,

 3              they would be a credible source. I

 4              guess.  Short answer, yes.

 5   BY MR. MOST:

 6        Q.   Do you see here at the last sentence of

 7   this declination of charges, Exhibit E, "Because

 8   the alleged conduct under these specific facts

 9   involved statements aimed at a public official

10   performing public duties, this office is precluded

11   by law from moving forward with any criminal

12   action?"

13        A.   Correct.  I see it.

14        Q.   So they're saying they can't move forward

15   because it wouldn't be constitutional to prosecute

16   Jerry Rogers for criminal defamation, right?

17        A.   It differs from what Mr. Magee told me

18   personally, myself, and the lieutenant.

19        Q.   But that is what this is saying, right?

20        A.   That is what that -- Yes, sir.

21        Q.   So before you arrested Mr. Rogers, you

22   met with the DA's office.  They raised the

23   potential unconstitutionality of the arrest; is

24   that fair to say?

25        A.   Yes.

1    Q.   And then after the arrest, the AG's

2  office said they would be precluded from moving

3  forward with any prosecution of Mr. Rogers,

4  correct?

5    A.   That is what it says in the declination

6  of charges, yes.

7    Q.   You still feel like you were right to

8  arrest Mr. Rogers for criminal defamation?

9    A.   I don't judge right and wrong.  I know

10  that I acted under the cover of law.  I know that I

11  carried out my duties as a law enforcement officer,

12  and I applied the elements -- applied the facts to

13  the elements of the crime and made a lawful arrest

14  or authored a lawful warrant, reviewed by a judge,

15  and signed by a judge, and there were no inaccurate

16  statements in the application for the warrant, and

17  the judge signed it.  That's what I know.

18    Q.   Knowing what you know now, would you

19  still have arrested Jerry Rogers for criminal

20  defamation?

21    A.   Knowing the law is no longer valid. I

22  mean, the law has been repealed, so, no, I wouldn't

23  because of that.

24    Q.   Setting aside the repeal of the law,

25  knowing what you know now, would you still have

```
 1   arrested Jerry Rogers for criminal defamation?
 2              MR. COLLINGS:
 3                   Object to the form of the question.
 4   BY MR. MOST:
 5        Q.   You can answer.
 6        A.   Yes, sir.
 7        Q.   Setting aside the repeal of the law,
 8   would you do anything differently knowing what you
 9   know now with regard to Jerry Rogers?
10              MR. COLLINGS:
11                   Object to the form.  Answer, if you
12             can.
13              THE WITNESS:
14                   I don't know.
15   BY MR. MOST:
16        Q.   You don't know if you would do anything
17   differently?
18        A.    I don't know if I would have done
19   anything differently, correct, because I can't see
20   into the future to know what is going to happen in
21   the future, yes.  So, no, I don't know if I would
22   have done anything differently.
23        Q.   I'm going to pull back up Exhibit U
24   again.  You see this is the FBI file?
25        A.   Yes.
```

1        Q.    Turn to Page 53.

2        A.    Can I interrupt you for one second?  I am

3    sorry.  I have a message in the top left that I

4    don't want to move or fool with.

5            MR. COLLINGS:

6                That's just a calendar.

7            THE WITNESS:

8                Oh, a calendar.  I'm sorry.  Thank

9            you, sir.  Go on.  It was blocking part

10            of the page.

11    BY MR. MOST:

12        Q.    Not a problem.  So I am looking at Page

13    52 of Exhibit U. Do You see that here?

14        A.    I do.

15        Q.    Do you see that this is discussing the

16    judge who received the affidavit for the arrest of

17    Jerry Rogers?

18        A.    I do.

19        Q.    Going down to Page 53.  You see where it

20    says in the middle of the page, "Additionally, if

21    the law enforcement officer had information that a

22    law was possibly unconstitutional, the law

23    enforcement officer should make those questions or

24    concerns known to the judge prior to the review of

25    the affidavit and warrant?"

1          A.    I lost you.  I'm sorry.

2          Q.    I'm looking at -- can you see this

3     highlighting here?

4          A.    Yeah, I see it.

5          Q.    Do you see this section on Page 53 where

6     the judge explains, "If the law enforcement officer

7     had information that a law was possibly

8     unconstitutional, the law enforcement officer

9     should make those questions or concerns known to

10    the judge prior to the review of an affidavit and

11    warrant."  Do you see that?

12         A.    Correct.  Who said that?

13         Q.    This is -- do you see where it says it's

14    been asked of the person who signed the arrest

15    warrant?

16         A.    Okay.  The judge that signed the arrest

17    warrant.

18         Q.    Yeah.  Do you agree with that sentence

19    where if the law enforcement officer had

20    information that a law was possibly

21    unconstitutional, the law enforcement officer

22    should make those questions or concerns known to

23    the judge?

24         A.    I think that that is that judge's opinion

25    on the back end of this issue.  Judges can

1   communicate with judges all the time during the

2   course of a warrant.  They can ask us questions.

3   They can stop.  They have law clerks.  In fact, I

4   think they even referenced the law clerk that they

5   spoke with, a law clerk about this case.  They

6   reviewed it. It fit the elements of the crime, and

7   he signed it.  I can't say or not say how much he

8   reviewed it to know that that other case was still

9   out there.

10          I know in the past I'm sure there have

11   been opinions on cases that we've sent to judges

12   that we never -- I have never referenced that

13   before in a warrant in all of my years of this.  In

14   all my years in law enforcement, I have not

15   referenced previously or any kind of pending court

16   case or a judgment or appellate court judgment.  We

17   are not judges.  We are now lawyers.  We are law

18   enforcement officers.  That's why we send it to the

19   judge, for a judge to review it.  And from what I'm

20   seeing here, that is this judge's opinion of what I

21   should or shouldn't have done or somebody in my

22   situation should or shouldn't have done.

23      Q.   I hear you.  My question was, do you

24   agree that if the law enforcement officer had

25   information that a law was possibly

```
 1   unconstitutional, the law enforcement officer
 2   should make those questions or concerns known to
 3   the judge prior to the review of an affidavit and
 4   warrant?  Do you agree with that statement, yes or
 5   no?
 6        A.   No.  I don't agree with the way the judge
 7   -- and it is hard for me to say no or yes.  I don't
 8   know.  I don't know if I agree with it or I don't
 9   agree with it.
10        Q.   You just said you no, you don't agree
11   with it.  So is it --
12        A.   Well, in the context of what this judge
13   is talking to the FBI about after the fact, I feel
14   that that's that judge's opinion, given the
15   circumstances of an FBI agent talking to him after
16   this incident.
17        Q.   So do you agree with that opinion, yes,
18   no, or I don't know?
19        A.   I don't know.
20        Q.   Okay.  Your answer a moment ago was no.
21   Are you changing your answer?
22        A.   Well, I don't agree, no.  Leave my no.  I
23   don't think it's responsible -- I don't think the
24   officer is responsible to make the judge aware of
25   the law or decisions or things like that.
```

1     Q.   Did you make the judge aware that you had

2  consulted with the DA's office, and they raised

3  concerns about the constitutionality of the arrest?

4     A.   No, I did not.

5     Q.   Do you think you should have made the

6  judge aware of that?

7     A.   I can't answer that.

8          MR. MOST:

9              We are, I think, getting close to

10             the end here.  I'm going to take five

11             and review my notes and see if there is

12             anything I've missed.  I may have some

13             questions, and then if Mr. Collings

14             would like to ask follow-up questions,

15             he is welcome to.  Let's take five and

16             reconvene at 12:25.  All right.

17         THE WITNESS:

18             Thank you.

19             {BRIF RECESS, 12:20-12:25}

20  BY MR. MOST:

21     Q.   I have just a couple more questions.

22  It's not going to take long I don't think.  So the

23  document that we received here, which is labeled as

24  Z-A, this is -- what is in front of you here is the

25  State v. Baudot case.

 1        A.    Yes.

 2        Q.    I only see one -- details of one arrest,

 3    Ms. Baudot.  The document in front of you, does it

 4    have more than one?  I think you talked about

 5    having three arrests for --

 6        A.    No.  This is only pertaining to that one

 7    case that was accepted as is and was pled to.

 8        Q.    So you didn't --

 9        A.    I didn't print out the other two clerk's

10    entries.  I knew that one was up, and the other was

11    not accepted at all.  It was in with a bunch of

12    drug charges and other things, and the DA's office

13    accepted some of the charges, not all of them, and

14    the criminal defamation was one of the ones that

15    was accepted, or I've forgotten.  It would not be

16    this one.  It would not be the one I was aware of.

17    The one that got changed to cyberstalking.

18        Q.    Got it.  I'm going to pull up Exhibit U,

19    the FBI file again, Page 28.  Do you see that this

20    is talking about the September 13th meeting between

21    the sheriff's office and the DA's office?

22        A.    Yes.

23        Q.    Do you see where it says, "According to

24    St. Tammany Parish Sheriff's Office detectives,

25    Rogers' e-mails undermined STPSO's ability to

```
1    communicate with the family?"  Do you see that
2    part?
3         A.    Yes, sir.
4         Q.    You see the next sentence, "Somebody told
5    somebody 'This is very important to the sheriff.
6    He wants to move on this?'"
7         A.    Yeah.
8         Q.    Do you recall anyone saying something
9    like that?
10        A.    Not to me.  Not those types of words
11   other than the sheriff wants to open the
12   investigation.  I mean, we opened the
13   investigation.  The sheriff wants to move forward
14   with the arrest warrant.  Other than that, no.
15   Nobody told me that.
16        Q.    So someone at the September 13th, 2019
17   meeting said something about the sheriff wanting to
18   move forward with this arrest warrant?
19        A.    I don't recall that being said at that
20   meeting.  I'm not saying it wasn't.  There was a
21   lot of things said, but I don't remember.  I don't
22   remember what was said to the DA's office other
23   than I was more wrapped up in my conversation with
24   Collin as far as the law and that part.  So I don't
25   know who would have said that.  I'm not saying it
```

1    wasn't said.  I just don't recall it.

2         Q.   You don't recall the sheriff wanting to

3    move on this being brought up at that meeting?  You

4    don't recall if it was said or not said?

5         A.   Correct.  I'm not saying it was or it

6    wasn't.  I just don't recall being involved in that

7    conversation, that part of our conversation.

8         Q.   Do you know if by this point the sheriff

9    had been consulted and wanted to -- had any desires

10   about this case?

11        A.   I don't know about desires.  He wanted us

12   to continue to investigate it.  I guess with the

13   criminal investigation as to our employee was part

14   and parceled out, because it was deemed that there

15   was no violation of law there, that was -- that's

16   when we ran parallel investigations.  Everything

17   else was turned over to Internal Affairs as far as

18   that person was concerned, and the criminal end

19   with Jerry Rogers stayed with me, so I'm sure the

20   sheriff was aware of how the investigation was

21   going, but I was only in one briefing with him.

22             Now, I briefed my supervisors throughout

23   the whole thing, Lieutenant Hotard, Captain Gaudet.

24   And during several of those conversations, Chief

25   Culpeper would come downstairs and talk to us, but

```
 1    it wasn't a constant thing, but I briefed them on
 2    every step of the investigation, as I would any
 3    time we're investigating a federal agent or another
 4    law enforcement officer.
 5         Q.   When you say you handed it over to
 6    Internal Affairs, you handed over your criminal
 7    investigatory file to Internal Affairs to see if
 8    there were any --
 9         A.   No.  When I say handed it over, they took
10    it -- meaning handed that person's involvement in
11    our -- like he was --
12         Q.   Oh, okay.
13         A.   -- part of my -- he wasn't part of my
14    track anymore.  He was IA's investigation.  If
15    there were any policy violations, things like that.
16    They did their own independent investigation.  At
17    least that's usually how it works.  When I say
18    parallel, there was still a criminal investigation
19    but just not him at that time.
20         Q.   I got you.  I thought that sounded like a
21    big Garrity problem, but I misunderstood you.
22         A.   No.  I meant handed him off, like he is
23    off my plate.  I'm dealing with just this part of
24    the investigation.  That's what I meant.
25         Q.   I got you.  On Page 29 of Exhibit U, it
```

1    talks about a -- you see it says, "During the phone
2    conversation, somebody told somebody the criminal
3    defamation statute was likely unconstitutional.
4    Somebody told somebody this is unconstitutional,
5    and you can't do this."  Do you see that part?
6         A.    Yes.
7         Q.    Did you ever hear anything like that
8    being communicated by anybody?
9         A.    It was never said to me.  No, sir.
10        Q.    Going to the next page, do you see on
11   Page 30, at an unrelated meeting several days
12   later, blank commented on Rogers arrest to blank.
13   Blank responded by saying it wasn't my decision on
14   the timing?
15        A.    Uh-huh.
16        Q.    Do you know if -- it wasn't my decision
17   on the timing.  Is that something you said?
18        A.    Yeah.  I believe when I was speaking to
19   Mr. Sims -- I don't remember it being those exact
20   words, but I remember meaning it wasn't my
21   decision. Again, I don't know how I said it to him.
22   I don't think it -- it doesn't sound like something
23   I would say normally, like timing.  I meant that as
24   far as making -- moving forward with the arrest was
25   my decision when I said -- when we decided we were

1    going to move forward and put it before a judge.  I

2    think that's what I was trying to relay to Mr. Sims

3    at the time, because he asked me.  I saw him in the

4    DA's office on an unrelated issue in Major Crimes.

5    He said, "Man, y'all" -- something to the effect of

6    "Man, y'all made the arrest anyway," and I think I

7    was trying to explain to him it wasn't like

8    everybody said at one time, let's go arrest Jerry

9    Rogers.  That's not what I was trying to convey to

10   him as far as the timing.  I don't remember saying

11   timing.  I did have that conversation with him,

12   yes.  It was just a one sentence, and Collin just

13   dropped it.  That was kind of at the end.

14        Q.   I don't totally understand. You said

15   something -- it wasn't my decision to something.

16   Maybe not the timing?

17        A.   It wasn't -- meaning it wasn't my

18   decision on when we were going to move forward with

19   putting it in front of the judge, meaning my mind

20   only.  We had a meeting with everyone, briefed the

21   sheriff.  The sheriff said move forward.  I think

22   that's what I was referring to when I said that.

23        Q.   You are saying it wasn't me alone making

24   the --

25        A.   It wasn't totally my decision to do this.

We presented the facts.  We had a meeting with
everybody in my investigation, supervisors, and all
of my investigation supervisors all the way up to
the sheriff, and the decision was made to move
forward and put it in front of a judge.  I think
that's what I was trying to get across for you.  It
wasn't one person's decision to do that.

     Q.   Your supervisors, including the sheriff,
said move forward with this?

     A.   Yes.

          MR. MOST:

               Those are the questions I've got for

            you, reserving the right for redirect

            if Mr. Collings asks any question.

               Chad, do you have any questions for

            Captain Canizaro?

          MR. COLLINGS:

               I've got a couple of follow-up

            questions.

EXAMINATION BY MR. COLLINGS:

     Q.   Captain Canizaro, when an individual is
booked into the St. Tammany Parish jail, do you
know if there is a suicide evaluation of that
person when they're booked?

     A.    There is a health and medical screening

118

1   form done on everybody who is arrested. There is a

2   medical health and psychiatric screening that's

3   done on everybody.  Anybody that gets booked.

4       Q.   Did that factor into your decision making

5   as to your arrest or as opposed to issuing a

6   summons of Mr. Rogers?

7       A.   I think, as I said earlier, I think for

8   the safety of Jerry, anyone coming into contact

9   with Jerry, that he was evaluated approximately two

10  weeks prior after his incident in West Monroe, and

11  that I did not know how he would react to even a

12  summons.  I felt that if we summonsed him and would

13  say, "Here is your ticket.  See you later," walking

14  away, I didn't know how he would react.  So, yes,

15  that factored into my decision.  At least he would

16  be evaluated again.

17      Q.   And in your 30 years of being in law --

18  30 -- how many years?

19      A.   33.

20      Q.   33.  Good for you.  In your 33 years of

21  law enforcement experience, do you ever recall a

22  judge asking your legal opinion as part of a

23  warrant-seeking process?

24      A.   Never our opinion.  They may be asking

25  more input as to the facts of the case but never a

1    legal opinion, no, sir.

2         Q.   Never happened?

3         A.   No, sir.

4         Q.   And did the Court have the ability to ask

5    you for legal opinions if he so chose to ask?

6         A.   The judge can ask me anything he wanted.

7    Even if we -- even now, electronically, they could

8    have typed their questions or called me or -- they

9    do that sometimes now, because everything is

10   electronic.  They'll put, please contact me about

11   this.  I don't know how many times it happens, but

12   it does happen.

13        Q.   Question.  Maybe my notes are -- it's my

14   fault.  You were asked in the beginning of the

15   deposition about prior criminal defamation cases,

16   and then you were asked later on in the deposition

17   again about them.  So let me make sure my note is

18   clear here.  Correct me if I'm wrong.

19             At the time of Jerry Rogers' arrest in

20   September of 2019, were you aware of other criminal

21   defamation cases that had involved the St. Tammany

22   Parish Sheriff's Office that had been forwarded to

23   the district attorney's office?

24        A.   Yes.

25        Q.   Had you been -- did you know of any

```
 1   instance of any of those cases where the district
 2   attorney's office had previously said this statute
 3   is unconstitutional?
 4        A.   None that I know of, no.
 5             MR. COLLINGS:
 6                  That's all I have.
 7             MR. MOST:
 8                  Okay.  Captain, thank you very much
 9                for your time here today.  I appreciate
10                it.
11                  [End of deposition, 12:40]
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1                     WITNESS CERTIFICATE

2

3

4

5               I, SERGEANT KEITH CANIZARO, have

6    read or have had the foregoing testimony read to me

7    pursuant to Rule 30(e) of the Federal Rules of

8    Civil Procedure and do hereby certify that to the

9    best of my ability and understanding, it is a true

10   and correct transcription of my testimony.

11

12

13   Please check one:

14

     _____Without corrections

15

16

     _____With corrections (see errata sheet)

17

18

19

20   _____     _____

     SERGEANT KEITH CANIZARO             Date

21

22

23

24

25

C E R T I F I C A T E

This certification is valid only for a transcript accompanied by my original signature and original required seal on this page.

I, SANDRA P. DIFEBBO, Certified Court Reporter, in and for the State of Louisiana, as the officer before whom this testimony was taken, do hereby certify that CAPTAIN KEITH A. CANIZARO, after having been duly sworn by me upon authority of R.S. 37:2554, did testify as hereinbefore set forth in the foregoing 121 pages;

That the testimony was reported by me in stenotype, was prepared and transcribed by me or under my personal direction and supervision, and is a true and correct transcript to the best of my ability and understanding;

That the transcript has been prepared in compliance with transcript format guidelines required by statute or by rules of the board, that I have acted in compliance with the prohibition on contractual relationships as defined by Louisiana Code of Civil Procedure Article 1434 and in rules and advisory opinions of the board;

That I am not related to Counsel or to the parties herein, nor am I otherwise interested in the outcome of this matter.

_____
Sandra P. DiFebbo,
Certified Shorthand Reporter

Date:  _____